**ROME & ASSOCIATES, A.P.C.**
Eugene Rome (admitted pro hac vice)
Sridavi Ganesan (admitted pro hac vice)
Brianna Dahlberg (admitted pro hac vice)
2029 Century Park East, Suite 450
Los Angeles, CA  90067
Telephone:    310-282-0690
Facsimile:    310-282-0691
Email: erome@romeandassociates.com
Email: sganesan@romeandassociates.com
Email: bdahlberg@romeandassociates.com


FENNEMORE CRAIG, P.C.
Ray K. Harris (No. 007408)
Mario Vasta (No. 033254)
2394 E. Camelback Road
Suite 600
Phoenix, AZ 85016
Telephone: (602) 916-5000
Email: rharris@fclaw.com
Email: mvasta@fclaw.com


Attorneys for Defendants
Namecheap, Inc. and WhoisGuard, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Facebook, Inc., a Delaware corporation; Instagram, LLC, a Delaware limited liability company; and WhatsApp Inc., a Delaware corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>Namecheap, Inc., a Delaware corporation, and WhoisGuard, Inc., a Republic of Panama corporation,<br><br>Defendants. | CASE NO. 2:20-cv-00470-GMS<br><br>**DEFENDANT NAMECHEAP, INC.'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6) AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>(Oral Argument Requested) |

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant Namecheap, Inc. ("Namecheap") moves to dismiss the Complaint filed by Plaintiffs Facebook Inc., Instagram LLC, and WhatsApp Inc. (collectively, "Plaintiffs) for failure to state a claim upon which relief can be granted. This motion is supported by the following memorandum of points and authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

In this cybersquatting and trademark action, rather than properly name as defendants the parties who have registered certain domain names incorporating Plaintiffs' trademarks and allegedly exploited the same in derogation of Plaintiffs' rights, Plaintiffs have named as defendants a domain name registrar, Namecheap, and a privacy service provider, WhoisGuard, Inc. ("WhoisGuard") (collectively, "Defendants"). Plaintiffs' claims are hinged precariously on the premise that Defendants can be held directly liable for their customers' acts of cybersquatting and trademark infringement, despite prior rejection of these theories by other courts.

First, Plaintiffs cannot establish the "bad faith" element of their cybersquatting claim. A prior court has held that the WhoisGuard privacy service is "indisputably legal" and that Namecheap's refusal to reveal the identity of its customers does not constitute bad faith intent to profit under the Anticybersquatting Consumer Protection Act ("ACPA"). Further, Defendants are now legally mandated by the European Union's General Data Protection Regulation 2016/679 ("GDPR") to protect the privacy of their customers' personal information. As shall be detailed more fully below, if Namecheap failed to provide a privacy service, it would be subject to draconian penalties and enforcement actions under the GDPR.

Second, each of Plaintiffs' remaining Lanham Act claims fail because they have not alleged a "use in commerce" of their marks by Defendants, a required element of Plaintiffs' claims for trademark infringement, false designation of origin, and dilution. The Complaint is devoid of any allegations that Defendants themselves (as opposed to their customers) used the marks in connection with the sale or advertisement of any goods or services. Defendants' mere act of providing registration and privacy services is, as a matter of law, inadequate to

establish a use of Plaintiffs' marks in commerce within the meaning of the Lanham Act. This defect is fatal to Plaintiffs' second, third, and forth causes of action.

Third, Plaintiffs cannot remedy these fatal defects through their allegations that Defendants, in contracts with third parties, "agreed that they are liable" for their customers' use of the infringing domain names. The Ninth Circuit has held that the contract on which Plaintiffs rely, the Registrar Accreditation Agreement ("RAA") between the Internet Corporation for Assigned Names and Numbers ("ICANN") and domain name registrars like Namecheap, does not create any right or duty owed to nonparties, such as Plaintiffs. Thus, to the extent Plaintiffs claim that they are third party beneficiaries to this agreement, their claims still fail as a matter of law.

As a practical matter, this misguided legal effort by Plaintiffs seeks to turn the domain name registration system on its head by imposing liability for misuse of certain of the total 350,000,000+ domain names presently registered not on the parties actually misusing the domains but, rather, upon the service providers who, pursuant to the ICANN charter, provide *automated* registration services. Such legal theories have been rejected time and time again and for good reason: to impose the subject liability upon the registrars would crush the entire domain name registration system. This Court, too, should reject such theories and dismiss Plaintiffs' Complaint in its entirety.

## II.    FACTS ALLEGED IN THE COMPLAINT

### A.    Namecheap and the RAA

Namecheap is an ICANN-accredited domain name registrar. Complaint, ¶ 51. Customers who elect Namecheap to be their domain name registrar are subject to Namecheap's Domain Registration Agreement. *Id*. at Exh. 1. As an ICANN-accredited registrar, Namecheap is subject to ICANN's Registrar Accreditation Agreement ("RAA"), which requires that certain terms must be included in the Domain Registration Agreement. *Id*. at ¶ 51, Exh. 7. One of the RAA's provisions—paragraph 3.7.7.3—requires Namecheap's domain registration agreement to include a provision that the registered name holder shall accept liability for harm caused by wrongful use of a registered domain name, unless it

discloses within seven days the name and contact information of the licensee to the third party providing reasonable evidence of harm. *Id*. at Exh. 7, ¶ 3.7.7.3.

The RAA also requires that Namecheap's Domain Name Registration Agreement include the Uniform Domain Name Dispute Resolution Policy ("UDRP")[1] as a method for resolving disputes with respect to registered domain names. *See id*. at Exh. 1, ¶ 9

The RAA includes a "No Third Party Beneficiaries" clause which expressly states that the RAA does not create any obligation to any third party by ICANN or the domain registrar (*i.e*., Namecheap). *Id*. at Exh. 7, ¶ 7.5.

## B.     The WhoisGuard Privacy Service

WhoisGuard provides a privacy service to Namecheap's customers which protects the customers' names and contact information from being made available in the public WHOIS database.[2] WhoisGuard, acting as a "proxy" for the customer, registers and administers the domain names selected and purchased by the customers, and licenses the use of the domain names to the customers who purchased them. *Id*. at ¶ 53, Exh. 2, ¶ 2. As a result, the public WHOIS database lists WhoisGuard's name and contact information instead of the customer's name. *Id*. at ¶ 55, Exh. 2, ¶ 2. The is the full extent of the services provided by WhoisGuard to its customers.  Id. at Exh. 2 , ¶ 2.  The domains are otherwise in the customers' full control. *See id*.

Namecheap's customers' use of WhoisGuard's services is governed by the Namecheap WHOIS Proxy Agreement ("WHOIS Proxy Agreement"). *Id*. at Exh. 2. The WHOIS Proxy Agreement is expressly between Namecheap and Namecheap's customers

---

[1] The UDRP "establishes an expedited and inexpensive arbitration process for resolving cybersquatting claims. It also provides that registrars need only intervene in a cybersquatting dispute upon order of a court or an arbitration decision. The purpose of the UDRP procedure is to remove registrars from participation in domain name disputes." *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 737 F.3d 546, 548, n.1 (9th Cir. 2013).

[2] The WHOIS database is a centralized, publicly accessible database of information concerning all domain names in a top-level domain (*e.g*., ".com," ".net," ".org," or ".edu"). *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1095 (C.D. Cal. 2009). ICANN requires its accredited registrars, like Namecheap, to collect and publish data regarding its registrants in the WHOIS databases.

electing the WhoisGuard privacy service; WhoisGuard is not a party to the WHOIS Proxy Agreement. *Id*. The WHOIS Proxy Agreement is a supplement to the Namecheap's Domain Registration Agreement. *Id*.

### C.    Plaintiffs' Cybersquatting and Trademark Allegations

Plaintiffs allege that they own the exclusive rights to certain trademarks and service marks used in connection with their services since at least 2004, and that they own numerous trademark registrations issued by the United States Patent and Trademark Office which they have used in interstate commerce. *Id*. at ¶¶ 31-50. Plaintiffs allege that certain domains registered with Namecheap are identical or confusingly similar to their marks ("Infringing Domains"). *See id*. at ¶¶ 70-73. Notwithstanding the fact that Defendants are merely service providers and did not select or control the Infringing Domains, the Complaint asserts causes of action against Defendants for (1) Cybersquatting, (2) Trademark Infringement, (3) False Designation of Origin, and (4) Dilution.

On their first cause of action for cybersquatting, Plaintiffs allege that Defendants "registered (as the registrant), trafficked in, or used" the Infringing Domains with a "bad faith intent to profit from Plaintiffs' Trademarks." *Id*. at ¶ 109. Specifically, they allege that WhoisGuard is listed as the WHOIS registrant of each of the Infringing Domains and registered the Infringing Domains for the customers. *Id*. at ¶¶ 74-75. They further allege that WhoisGuard "trafficked in" the Infringing Domains by licensing them to the customers. *Id*. at ¶ 76. Plaintiffs allege that the customers "used" the Infringing Domains, but do not allege any facts as to how Defendants used them. *See id*. at ¶¶ 79, 85-88. They further allege that Namecheap is liable for the actions of WhoisGuard as its alter ego, and that Namecheap profits from offering the WhoisGuard service for free because it induces customers to use Namecheap's registrar services. *Id*. at ¶¶ 57-68, 88. Plaintiffs allege that Defendants are aware that the WhoisGuard service is being used by some to infringe on the intellectual property rights of third parties based on the number of UDRP complaints filed against WhoisGuard for cybersquatting, many of which WhoisGuard has lost. *Id*. at ¶¶ 93-94.

On their second and third causes of action for trademark infringement and false

designation, Plaintiffs allege that the customers have used their marks, "or variations thereof," in interstate commerce, and that such use is "likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval by Plaintiffs' of [the customers'] websites" or to "deceive the relevant public that [the customers'] goods and services are authorized, sponsored, or approved by, or are affiliated with, Plaintiffs." *Id*. at ¶¶ 127, 137. On their fourth cause of action, Facebook and Instagram allege that the customers' use of their famous marks constitute dilution by blurring and tarnishment. *Id*. at ¶¶ 146-148.

Plaintiffs do not allege anywhere in the Complaint that Defendants themselves used Plaintiffs' marks, or any variations thereof, in connection with the sale or advertising of any goods or services. Nor do they attempt to allege any cause of action for contributory or vicarious trademark liability.

On all causes of action, Plaintiffs allege that "Defendants agreed that they are liable for the harm to Plaintiffs" caused by their customers' actions. *Id*. at ¶¶ 121, 131, 141, 151. Specifically, they allege that under the RAA, Defendants agreed that WhoisGuard would accept liability for harm caused by their customers' use of the protected domains, unless they provide the customers' name and contact information within seven days to a third party who provides reasonable evidence of harm. *Id*. at ¶ 80. Plaintiffs allege that between October 2, 2018 and February 7, 2020, they provided WhoisGuard with reasonable evidence that each of the Infringing Domains caused them harm and requested that WhoisGuard disclose the identities of the registrants, but that WhoisGuard failed to do so. *Id*. at ¶¶ 83-84.

## III.   LEGAL STANDARD

A Fed. R. Civ. P. 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint. *Ileto v. Glock Inc*., 349 F. 3d 1191, 1199-1200 (9th Cir. 2003). A court should dismiss a claim if "there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Conservation Force v. Salazar*, 646 F. 3d 1240, 1242 (9th Cir. 2011). A complaint must allege enough facts to state a claim that is plausible, not merely conceivable. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Although the court should grant the plaintiff leave to amend if the claim can possibly

1  be cured by additional factual allegations, the district court need not grant leave to amend if

2  amendment would be futile. *Doe v. United States,* 58 F. 3d 494, 497 (9th Cir. 1995);

3  *see Kendall v. Visa U.S.A., Inc.,* 518 F. 3d 1042, 1051–52 (9th Cir. 2008).

4  **IV.    LEGAL ARGUMENT**

5      **A.    Plaintiffs' First Claim for Cybersquatting Fails as a Matter of Law**

6      To allege a cause of action for cybersquatting under the ACPA, a trademark owner

7  must establish that: "(1) it has a valid trademark entitled to protection; (2) its mark is

8  distinctive or famous; (3) the defendant's domain name is identical or confusingly similar

9  to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used,

10 registered, or trafficked in the domain name (5) with a bad faith intent to profit." *Bosley*

11 *Med. Inst., Inc. v. Kremer,* 403 F. 3d 672, 680 (9th Cir. 2005) (quoting *DaimlerChrysler v.*

12 *The Net Inc.,* 388 F. 3d 201, 204 (6th Cir. 2004).

13     Plaintiffs have not stated a viable claim against Namecheap for cybersquatting

14 because they have not sufficiently pled a bad faith intent to profit, or that Defendants used,

15 registered, or trafficked in the Infringing Domains within the meaning of the ACPA.

16     *1.    Plaintiffs Have Failed to Allege Facts Sufficient to Demonstrate a Bad*

17        *Faith Intent to Profit by Defendants*

18     "Bad faith intent to profit" within the meaning of the ACPA is not simply general bad

19 faith, but instead  "bad faith intent to profit ***from the mark***," 15 U.S.C. § 1125(d)(1)(A)(i)

20 (emphasis added); *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.,* 202 F. 3d 489, 499, n. 13

21 (2d Cir. 2000) ("We expressly note that 'bad faith [and] intent to profit' are terms of art in

22 the ACPA and hence should not necessarily be equated with 'bad faith' in other contexts.").

23 Thus, the defendant must intend to profit ***specifically*** from the goodwill associated with

24 another's trademark.  *See Lucas Nursery and Landscaping, Inc. v. Grosse,* 359 F. 3d 806,

25 810 (6th Cir. 2004) ("In its report on the ACPA, the Senate Judiciary Committee distilled

26 the crucial elements of bad faith to mean an 'intent to trade on the goodwill of another's

27 mark[.]'") (quoting S. Rep. No. 106–140, at 9).

28     In enacting the ACPA, Congress made clear that the statute does not extend to domain

name registrations by those who are "aware of the trademark status of the name but registers a domain name containing the mark for any reason *other than with bad faith intent to profit from the goodwill associated with that mark,*" *See Harrods Ltd. v. Sixty Internet Domain Names*, 110 F. Supp. 2d 420, 426 (E.D. Va. 2000) (*quoting* H.R. Conf. Rep. No. 106–464 (1999)) (emphasis added). Instead, the ACPA was meant to be limited to "bad-faith registrations and uses of others' marks by *persons who seek to profit unfairly from the goodwill associated therewith.*" *Id.* (quoting S. Rep. No. 106–140) (emphasis in original). In other words, Plaintiffs must demonstrate that Defendants **subjectively** intended to profit from Plaintiffs' **specific marks** in **bad faith**. *See Petroliam Nasional Berhad*, 737 F. 3d at 553-55.

Here, Plaintiffs allege that Namecheap profits from providing WhoisGuard's privacy services to its customers at no additional cost such that the free service induces customers to register their domains with Namecheap. Complaint, ¶ 88. Plaintiffs also allege that Defendants resist attempts to reveal their customers' identities, even when presented with "reasonable evidence" of cybersquatting and continued to provide the privacy service. *Id.* at ¶¶ 91-92. These allegations are insufficient to plead bad faith for the reasons below.

(a)     WhoisGuard's "Indisputably Legal" Privacy Service Does Not Constitute Evidence of Bad Faith

Courts have unequivocally validated privacy services, such as those offered by WhoisGuard, as legal and necessary. In fact, the court in *Solid Host, NL v. Namecheap, Inc.* 652 F. Supp. 2d 1092 (C.D. Cal. 2009) addressed this very issue with respect to the WhoisGuard privacy service.[3]   In that case, the plaintiff asserted a claim for cybersquatting under the ACPA against Namecheap. Much like with Plaintiffs, the plaintiff in *Solid Host* alleged that Namecheap acted in bad faith by refusing to reveal the identity of the Doe

---

[3] While the *Solid Host* court found that the plaintiff in that case had alleged sufficient facts to plead a claim for contributory cybersquatting, the Ninth Circuit subsequently held that such a claim may not be asserted under the ACPA. *Petroliam Nasional Berhad*, 737 F. 3d at 553.

defendant who stole the plaintiff's domain name. *Id.* at 1109. The plaintiff further alleged that Namecheap profited by charging a fee for the WhoisGuard privacy service (it was not free at that time) and by maintaining anonymous registration despite being provided with reasonable evidence that the plaintiff's domain was stolen by the Doe Defendant, and that "Namecheap has an economic incentive to resist any attempts to expose [its customers'] identities[.]" *Id.*

The court found that these allegations were insufficient to demonstrate bad faith intent to profit from the plaintiff's marks, holding that Namecheap's provision of an "indisputably legal" anonymous registration service and its refusal to reveal the identity of its customers did not constitute a bad faith intent to profit under the ACPA. *Id.* at 1110. The court also noted that, "[t]he only intent to profit alleged is linked to Namecheap's operation and promotion of its anonymity service[.]" *Id.* What was missing were the crucial factual allegations showing that Namecheap intended to profit from the goodwill associated with plaintiff's trademarks specifically. *See id.*

Other courts' opinions following *Solid Host* have confirmed that privacy services like WhoisGuard serve a ***legitimate purpose*** in protecting the identities of individuals engaging in free speech both in the United States and around the world, even though they may also be used by some for improper purposes. *See Rosen v. Imagevenue.com,* No. CV 13-01742 SJO (MANx), 2013 WL 12132052, *5 (C.D. Cal. Nov. 26, 2013). Indeed, privacy protection has become a paramount issue for consumers and lawmakers alike in the last few years, recognizing that without these protections, consumer information may be used for nefarious purposes by ***any*** third party that has access to it.[4]

_____

[4] Facebook certainly understands this all too well, having been held accountable by customers and various governmental entities alike for famously allowing Cambridge Analytica to harvest data from millions of Facebook users without their consent, which came to light in early 2018. The fiasco culminated with Mark Zuckerberg, CEO of Facebook, testifying before Congress on April 10, 2018 and apologizing for Facebook's failings with respect to protecting its customer's data. In mid-2019, Facebook ultimately agreed to pay $5 billion to settle the FTC's investigation into the scandal. *See* Federal Trade Commission, *FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook,* (2019), https://www.ftc.gov/news-events/press-releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions, (last visited April 16, 2020). Remarkably,

Similar to *Solid Host*, the only facts to support bad faith intent alleged by Plaintiffs are (1) Namecheap's offering of the WhoisGuard privacy service for free to any customer who wants it and (2) WhoisGuard's (and by extension, Namecheap's) decision to not reveal their customers' identity when presented with claimed "reasonable" evidence of harm to trademark holders such as Plaintiffs.  As in *Solid Host*, the alleged intent to profit is linked to Namecheap's promotion of the legal WhoisGuard service for free to ***all*** customers, not just to cybersquatters of Plaintiffs' marks. Therefore, just as in *Solid Host*, these facts do not demonstrate that Defendants intended to profit from the goodwill associated with Plaintiffs' trademarks ***specifically***, nor could such an allegation ever be credibly made since the service is entirely automated.  *See Acad. of Motion Picture Arts & Sciences v. GoDaddy.com, Inc.*, Case No. CV 10-03738 AB (CWx), 2015 WL 5311085, *2 (C.D. Cal. Sept. 10, 2015) (finding that GoDaddy's domain registration services and selection of privacy services are automated); *see also Panavision Int'l., L.P. v. Toeppen*, 141 F.3d 1316, 1318–1319 (9th Cir. 1998).

Defendants' refusal to reveal their customers' identity upon Plaintiffs' request does not demonstrate bad faith, either. Courts have held that registrars and privacy services should ***not*** have to decide whether their customers are infringing on third parties' intellectual property rights based on information provided by third parties in determining whether to provide the requested customer information. Instead, "[t]his is the province of the courts." *Rosen,* 2013 WL 12132052 at *5; *Lockheed Martin Corp. v. Network Solutions, Inc.*, 141 F. Supp. 2d 648, 655 (N.D. Tex. 2001) ("*Lockheed Martin II*") (Registrars could not function "if they had to become entangled in, and bear the expense of, disputes regarding the right of a registrant to use a particular domain name.").

**(b)**    <u>**Plaintiffs Fail to Show Bad Faith Intent to Profit from the Specific Marks at the Time of the Domains' Registration**</u>

---

Facebook is now challenging Defendants' practices aimed at affording netizens much needed privacy protection.

Additionally, Plaintiffs' ACPA claim fails as a matter of law because they do not sufficiently plead a bad faith intent to profit from the specific marks at issue at the time of the domains' registration, as required under the ACPA. The Ninth Circuit has stated that in order to establish a claim under the ACPA, the defendant's bad faith intent to profit must exist *at the time of registration*. *See GoPets Ltd. v. Hise,* 657 F. 3d 1024, 1030 (9th Cir. 2011); *see also AECOM Energy & Constr., Inc. v. Ripley*,  348 F. Supp. 3d 1038, 1058 (C.D. Cal. 2018) ("Plaintiff must prove that Defendants had a 'bad faith intent to profit' from the MORRISON KNUDSEN mark *when they registered* their domain name." (emphasis added) (citing to 15 USC § 1125(d)(1)(A)(i)). The allegations do not show that Defendants intended to profit from Plaintiffs' specific marks at the time the Infringing Domains were registered. Indeed, Defendants could not conceivably have any such awareness as domains are registered on a first-come, first-served basis through an ***automated*** process: if a domain is available, it is registered.  *See Sporty's Farm L.L.C.*, 202 F. 3d at 493; *see also Acad. of Motion Picture Arts & Sciences*, 2015 WL 5311085 at *2; *Panavision Int'l, L.P.*, 141 F.3d at 1318–1319.

Here, the only facts Defendants allege to show some connection between Defendants intent and Plaintiffs' specific trademarks concern Defendants' responses to Plaintiffs' email notices of cybersquatting. Complaint, ¶¶ 96-103. These alleged communications indisputably took place sometime ***after*** the registration of the domains, and therefore cannot be used to demonstrate bad faith intent to profit as a matter of law.

Finally, Plaintiffs argue that Defendants are aware that the WhoisGuard service is being used to infringe others' trademarks based on the number of UDRP complaints filed against WhoisGuard, and that WhoisGuard knew or should have known that the domains were similar to famous marks at the time of registration. However, when consenting to WhoisGuard's privacy services at the time of registration of their respective domain names, each customer represented and warranted in their respective WHOIS Proxy Agreements that "[he/she has] no knowledge or reason to believe that [his/her] Protected Domain or content found at any associated IP address infringes upon or conflicts with the legal rights of any

third party or any third party's trademark or tradename." *See* Complaint, Exh. 2, ¶ 7.  In *Academy of Motion Picture Arts & Sciences v. GoDaddy.com, Inc.*, the court found it was reasonable for domain name registrar GoDaddy to believe that similar representations made by its registrants in their respective domain registration agreements were true at the time of registration. 2015 WL 5311085 at *26-28.  As such, it was also reasonable for Defendants to believe their customers' representations that their domains did not infringe any marks. Further, the allegations that WhoisGuard (and by extension, Namecheap) had actual or constructive knowledge of trademark infringement or dilution of third party marks, is simply insufficient to demonstrate bad faith intent to profit, as they do not show WhoisGuard's bad faith intent to profit from Plaintiffs' marks specifically.

> (c)   Under the GDPR, the Privacy Services Provided by Namecheap Through WhoisGuard Are Now Mandatory

In addition to the privacy services offered by Namecheap through WhoisGuard being unquestionably legal, they are now ***mandatory*** under new privacy legislation—further undercutting Plaintiffs' contentions that Defendants acted with a bad faith intent to profit.

Specifically, following the implementation of the GDPR[5] on May 25, 2018 by the European Union, Internet service providers like Defendants cannot disclose or publish the personal data of customers/registrants without the risk of draconian penalties. For domains registered by natural persons, publishing the customer/registrants' personal data in the WHOIS database is a violation of the GDPR, absent explicit, opt-in consent from the registrant. *See* Exh. A attached hereto at Art. 6(1) & Art. 7. To comply with the GDPR, ICANN now requires registrars like Namecheap to redact certain WHOIS fields so that they

---

[5] Pursuant to Federal Rule of Evidence 201(c)(2), Namecheap requests that the Court take judicial notice of relevant excerpts of the GDPR, true and correct copies of which are attached hereto and incorporated herein by reference as Exhibit "A".  Given that the GDPR is a regulation in European Union law, it  "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" and therefore is appropriate for judicial notice.  *See* Fed. R. Evid. 201(b)(2); *In re Ex Parte Application of Caterpillar, Inc.*, No. 3:19-mc-0031, 2020 WL 1923227, n.5 (M.D. Tenn. Apr. 21, 2020) (granting judicial notice of provisions of European law).

are not publicly displayed unless the registrant has consented to the publication of their information.[6] *See* Exh. B attached hereto, Appx. A, § 2.3. The registrant's consent must be freely given and not "bundled" with the domain registration agreement. *See* Exh. A attached hereto at Art 7(4). The GDPR applies to ***all*** companies processing and holding the personal data of subjects residing in the European Union, regardless of the company's location. *Id*. at Art. 3(2); *see In re Facebook, Inc. Sec. Lit.*, 405 F. Supp. 3d at 821, n.2 . Given that Namecheap and WhoisGuard's customers include those in the European Union, the GDPR applies to Defendants.[7]

The penalties for non-compliance with the GDPR are severe. National authorities can impose fines up to €20 million, or 4% of the company's total worldwide revenue from the preceding financial year, whichever is higher.[8] *See* Exh. A, attached hereto, Art. 83-84; Exh. C attached hereto. Accordingly, following the enactment of the GDPR, Namecheap began enabling WhoisGuard's privacy service to the accounts of all customers by default, free of charge. *See* Complaint, ¶ 61. Consistent with the GDPR's conditions for informed consent, (*see* Exh. A attached hereto at Art. 7(4)), a customer's personal information will not be disclosed or made public unless he or she affirmatively disables the privacy service.

As evident from the new requirements imposed upon Namecheap by the GDPR,

---

[6] Pursuant to Federal Rule of Evidence 201(c)(2), Namecheap requests that the Court take judicial notice of the ICANN Temporary Specification for gTLD Registration, true and correct copies of which are attached hereto and incorporated herein by reference as Exhibit "B"  This document was created by ICANN and is publicly available on ICANN's website at    <https://www.icann.org/resources/pages/gtld-registration-data-specs-en/#temp-spec>. As such, it is appropriate for judicial notice.  *See* Fed. R. Evid. 201(b)(2); *In re Facebook, Inc. Sec. Lit.*, 405 F. Supp. 3d 809, 827 (N.D. Cal. 2019)  ("A court may take judicial notice of…(3) publicly accessible websites whose accuracy and authenticity is not subject to dispute.")

[7] Because it is not commercially or technically feasible for registrars like Namecheap to identify and limit GDPR protections to European Union residents, ICANN permits them to apply the protections across the board to all registrants. Exh. B, attached hereto, Appx. A, § 3.

[8] Pursuant to Federal Rule of Evidence 201(c)(2), Namecheap requests that the Court take judicial notice of the webpage found at <https://gdpr.eu/fines>, a true and correct copy of which is attached hereto and incorporated herein by reference as Exhibit "C".  This publicly accessible webpage is from a website co-sponsored by the European Union, outlining the fines set forth in the GDPR. It is appropriate for judicial notice under Federal Rule of Evidence 201(b)(3).  *See In re Facebook, Inc. Sec. Lit.*, 405 F. Supp. 3d at 827.

protecting customers' privacy is not merely an option but, rather, a legal requirement carrying with it extraordinary penalties for non-compliance. To balance the interests of rightsholders, such as Plaintiffs, Defendants will disclose the underlying data in compliance with Court orders.  This procedure has been recognized by U.S. courts as the appropriate mechanism for procuring the registrant's identity. *See Rosen,* 2013 WL 12132052 at *5. It can do no more legally without facing crushing fines under the GDPR. In sum, Namecheap's compliance with the law cannot be deemed to constitute "bad faith".

For all of these reasons, Plaintiffs have failed to sufficiently allege the element of a "bad faith intent to profit" under the ACPA as a matter of law.

2.    *Namecheap Did Not "Use, Register, or Traffic in" the Domains Within the Meaning of the ACPA*

Plaintiffs' ACPA claim also fails for the separate reason that Plaintiffs fail to allege any facts to support their bare allegation that Namecheap "used, registered, or trafficked in" the Infringing Domains. First, the ACPA imposes liability on persons who "use" an infringing domain name "only if that person is the domain name registrant or that registrant's authorized licensee." 15 U.S.C. § 1125(d)(1)(D). Because Plaintiffs do not allege Namecheap to be either the "registrant" or the "registrant's authorized licensee," Namecheap did not "use" the Infringing Domains within the meaning of the ACPA.

Nor have Plaintiffs alleged that Namecheap "registered" or "trafficked in" domains within the meaning of the ACPA. The ACPA does not create a cause of action against a domain name registrar acting in its capacity as a registrar, *i.e.* accepting registrations for domain names.  *See Lockheed Martin II*, 141 F. Supp. 2d at 655 ("Having studied the language of § 1125(d) in the light of the summary judgment record, the court cannot conclude that it creates a cause of action against defendant as a domain name registrar or registry."). To the extent Plaintiffs are alleging that Namecheap is liable for providing registration services for the Infringing Domain Names, the ACPA provides safe-harbor protection for domain name registrars against liability for damages absent a showing of bad faith intent to profit. *See* 15 USC 1114(2)(D)(iii). As discussed above, Plaintiffs have not

alleged facts to show a bad faith intent to profit on the part of Namecheap.

3. *Plaintiffs Have Failed to Allege that Namecheap's Alleged Alter Ego WhoisGuard "Used, Registered, or Trafficked in" the Domains*

Namecheap cannot be held liable for violation of the ACPA on an alter ego theory either, because Plaintiffs fail to allege a viable underlying ACPA claim against WhoisGuard.

First, Plaintiffs do not allege any facts to establish that WhoisGuard "used" the Infringing Domains. There are no allegations that WhoisGuard controlled the Infringing Domains or the websites to which they were directed, that it offered or advertised any goods or services, or that it used the Infringing Domains in connection with email services. The Complaint alleges that the customers engaged in all of these "uses," not WhoisGuard. *See* Complaint, ¶¶ 85-87. Further, the Namecheap WHOIS Proxy Agreement explicitly provides that the customers control the Infringing Domains, not WhoisGuard. *Id.* at Exh. 2, ¶ 2.

Second, Plaintiffs fail to allege that WhoisGuard "trafficked in" the Infringing Domains. The ACPA defines "trafficking in" to mean "transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer *for consideration* or receipt in exchange for consideration." 15 U.S.C. § 1125(d)(1)(E) (emphasis added). Plaintiffs do not allege that WhoisGuard receives any consideration from the customers for licensing the Infringing Domains. To the contrary, they allege that the WhoisGuard privacy service is offered to customers for free. Complaint, ¶ 61. As such, WhoisGuard's licensing of the Infringing Domains is not "trafficking" under the ACPA.

Finally, the customer, not WhoisGuard, is the person who "registered" the Infringing Domains within the meaning of the ACPA. WhoisGuard, acting as an automatic agnostic service, simply provides a randomized address as a technical function for the benefit of the customer who submits a domain for registration with Namecheap and enrolls in the privacy service. *See* Complaint, Exh. 2. Indeed, the Namecheap WHOIS Proxy Agreement provides that it is a *supplement* to the customer's Domain Registration Agreement with Namecheap. *See id.* "The word 'registers,' when considered in context, obviously refers to a person who

14

presents a domain name for registration, not to the registrar" or similar service provider like WhoisGuard. *See Solid Host*, 652 F. Supp.2d at 1104 (quoting *Lockheed Martin II*, 141 F. Supp. 2d at 650-51).

Further, even *assuming arguendo* that WhoisGuard could be seen as registering its customers domains—it does not—the mere act of "registering" an infringing domain, on its own, is not sufficient to establish liability under the ACPA. *See Ford Motor Co. v. Catalanotte,* 342 F. 3d 543, 549 (6th Cir. 2003) ("Registering a famous trademark as a domain name ***and then*** offering it for sale to the trademark owner is exactly the wrong Congress intended to remedy when it passed the ACPA.") (emphasis added). Indeed, among those Congress intend to target in passing the ACPA were those who: (1) "register well-known domain names ***in order to*** extract payment from the rightful owners of the marks"; (2) "register well-known marks as domain names and warehouse those marks ***with the hope*** of selling them to the highest bidder"; or (3) "register well-known marks to prey on customer confusion by misusing the domain name ***to divert*** customers from the mark owner's site to the cybersquatter's own site." *See Lucas Nursery and Landscaping, Inc.* 359 F. 3d 806 at 809 (*quoting* S. Rep. No. 106–140) (emphasis added).

Thus, the persons who "registered" the infringing domains within the meaning of the ACPA are Namecheap's customers who selected and presented the domain names for registration with the intent of using the domains for some purpose; it is not WhoisGuard, who only acted in the role of a service provider.

As argued above, Plaintiffs have not plead that WhoisGuard acted with a bad faith intent to profit. As such, Plaintiffs have not pled a viable ACPA claim against WhoisGuard. Namecheap therefore cannot be held liable as WhoisGuard's alter ego.

**B.     Plaintiffs' Trademark Infringement and Dilution Claims Fail as a Matter of Law**

   *1.     Plaintiffs Fail to Allege that Defendants Used the Marks in Commerce*

Plaintiffs' second cause of action for trademark infringement, third case of action for false designation of origin, and fourth cause of action for dilution all fail for the same reason:

Plaintiffs have not, and cannot, allege that Namecheap has made a "use in commerce" of any of Plaintiffs' marks.

To allege a claim for trademark infringement, false designation of origin, or dilution, a plaintiff must allege that the alleged infringer used the plaintiff's marks "in commerce" in connection with the sale or advertising of goods or services. 15 U.S.C. §§ 1114(1), 1125(a)(1); *see Gibson Brands, Inc. v. Viacom Int'l, Inc*., 640 Fed. Appx. 677, 678 (9th Cir. 2016) ("use in commerce" is an element of the claim and not jurisdictional). Trademark claims are "subject to a commercial use requirement." *Bosley*, 403 F. 3d 672, 676 (9th Cir. 2005). "A party's commercial use is properly determined by assessing whether the use was 'in connection with a sale of goods or services.'" *Id*. at 677.

The mere registration of a domain name does not constitute a "use in commerce" for purposes of the Lanham Act. *GoPets Ltd.*, 657 F. 3d at 1035; *Dent v. Lotto Sport Italia SpA*, No. CV-17-00651-PHX-DMF, 2020 WL 1170840, *12 (D. Ariz. March 11, 2020) (registrant who did not market or sell goods or services in connection with allegedly infringing domains did not use the domain name in commerce or violate Lanham Act); *Acad. of Mot. Picture Arts & Sciences*, 989 F. Supp. at 1279-80 ("There has been no allegation that Network Solutions markets its registration service or the quality of its service by displaying or otherwise exploiting the Academy's marks"); *Lockheed Martin Corp. v. Network Solutions, Inc.* 985 F. Supp. 949, 959 (C.D. Cal. 1997) ("*Lockheed Martin I*") ("Where domain names are used to infringe, the infringement does not result from [the registrar's] publication of the domain name list, *but from the registrant's use of the name on a Web site* or other Internet form of communication in connection with goods or services.") (emphasis added); *Lockheed Martin II*, 141 F. Supp. 2d at 654-55.

Plaintiffs cannot allege this requisite element with respect to Defendants. They do not allege that Defendants themselves used the Infringing Domains in connection with marketing or selling any goods or services; rather, they allege that the customers did so. Again, Namecheap is a domain name registrar. The activities of a registrar are limited to the processing of end users' applications to register domain names, which are done blindly

against a WHOIS database that contains the entirety of the records reflecting registered as well as available names.  Namecheap's limited activities do not amount to a use of Plaintiffs' claimed marks as embodied in the Infringing Domains in connection with the sale of goods or services. Thus, Plaintiffs' second, third, and fourth causes of action fail as a matter of law.

2.    *Plaintiffs Fail to Allege Any Theory of Secondary Trademark Liability*

Plaintiffs do not allege any cognizable cause of action for secondary trademark liability, either. Under the Lanham Act, two forms of secondary liability exist under which a defendant may be held liable for another's infringement: contributory and vicarious liability. *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F. 3d 788, 807 (9th Cir. 2007). Plaintiffs fail to allege facts that would support any cognizable claim under either theory.

Contributory liability requires that the defendant "intentionally induced" third party's infringement or "directly controlled and monitored" the instrumentality used. *Id.* at 807. Domain name registrars do not typically have the required level of "direct control and monitoring" over their customers to support a claim for contributory infringement. *E.g.*, *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F. 3d 980, 985 (9th Cir. 1999) ("NSI cannot reasonably be expected to monitor the Internet") (quoting *Lockheed Martin I*, 985 F. Supp. at 962). Plaintiffs do not, and cannot, allege that Defendants had the ability to directly control and monitor their customers' use of the Infringing Domains.

Vicarious trademark liability requires a defendant and infringer to have an apparent or actual partnership, authority to bind one another, or joint ownership or control over the infringing product. *Perfect 10*, 494 F. 3d at 807. Plaintiffs plead no such allegations here. Thus, neither form of secondary liability applies to Defendants as a matter of law.

**C.    Namecheap's Contracts with Third Parties Do Not Make Defendants Liable to Plaintiffs for Customers' Cybersquatting or Trademark Infringement**

Despite Plaintiffs' contentions, Defendants cannot be liable for Plaintiffs' injuries based on bilateral agreements between Namecheap and ICANN or the Domain Registration Agreement between Namecheap and its own customers.

1.    *Plaintiffs Are Not Third Party Beneficiaries Under the RAA*

Plaintiffs base **all** of their causes of action on allegations that "Defendants agreed that they are liable for their harm to Plaintiffs" due to the customers' infringing acts; and that "since Defendants did not disclose the names of the customers in response to Plaintiffs' Notices, Defendants are liable for the harm to Plaintiffs" caused by the customers' infringing acts. *See* Complaint, ¶¶ 121-122; 131-132; 141-142; 151-152. These allegations have no legal basis and therefore are unable to support a claim of liability against Defendants.

Plaintiffs' allegations arise from paragraph 3.7.7.3 of the RAA between ICANN and all its accredited registrars, including Namecheap. The RAA states that:

> A Registered Name Holder licensing use of a Registered Name according to this provision shall accept liability for harm caused by wrongful use of the Registered Name, unless it discloses the current contact information provided by the licensee and the identity of the licensee within seven (7) days to a party providing the Registered Name Holder reasonable evidence of actionable harm.

*Id.*, Exh. 7, ¶ 3.7.7.3.  Plaintiffs allege that because WhoisGuard is the "Registered Name Holder" who licensed the infringing domain names to the customers, Defendants therefore "agreed" that WhoisGuard would accept liability for harm caused by the customers, due to its failure to reveal the customers names and contact information within seven days after Plaintiffs provided reasonable evidence of harm.  *Id.* at ¶¶ 80, 83, 84.  This provision is insufficient to establish liability against Defendants.

First, paragraph 3.7.7 of the RAA (which incorporates 3.7.7.1 through 3.7.7.12) sets forth terms registrars are required to include in their respective domain registration agreements with their customers, which are separate agreements from the RAA itself.  *See Balsam v. Tucums, Inc*., 627 F. 3d 1158, 1162 (9th Cir. 2010). As the court in *Solid Host* noted, "[P]aragraph 3.7.7.3 is not itself a term of the [RAA]; the agreement merely required that NameCheap include such a provision in future contracts between it and parties to whom it registered domain names." 652 F. Supp. 2d at 1119. Paragraph 3.7.7.3 is therefore not a "binding obligation" to ICANN or anyone else. *See Balsam*, 627 F. 3d at 1162 ("[B]ecause ¶ 3.7.7.3 does not create an independent binding obligation for the parties to the RAA, this

provision cannot reasonably be construed to confer a right or benefit to any party, let alone a third party.")

Second, to the extent that Plaintiffs are alleging that they are third party beneficiaries to the RAA, the RAA has a "No Third Party Beneficiaries" clause which states: "This Agreement shall not be construed to create any obligation by either ICANN or Registrar to any non-party to this Agreement, including any Registered Name Holder." *See* Complaint, Exh. 7, ¶ 5.10. This provision therefore explicitly precludes any third-party rights or obligations under the RAA.

The Ninth Circuit's opinion in *Balsam v. Tucows* is directly on point. In *Balsam*, the plaintiff sued Tucows, a domain name registrar, because it failed to provide the name and contact information of Tucows' customer who registered a domain with Tucows. The plaintiff alleged that Tucows had accepted liability for the harm caused by its customer's bad acts pursuant to paragraph 3.7.7.3 of the RAA. The customer used Tucows' privacy service which, similar to WhoisGuard here, replaced the customer's name and contact information in the public record with that of Contactprivacy.com, which plaintiff alleged to be a dba of Tucows. The *Balsam* plaintiff alleged that due to the proxy arrangement with its customer, Tucows/Contactprivacy.com became the registered name holder and the registrar of the domain at issue under the RAA. The plaintiff sued Tucows for breach of contract, as well as negligence, civil conspiracy, and declaratory relief. 627 F. 3d at 1160, fn. 1.

In affirming the district court's ruling dismissing all of plaintiff's claims against Tucows, the Ninth Circuit held that the "'No Third Party Beneficiaries' clause unambiguously manifests an intent *not* to create any obligation to third parties through the RAA."[9] *Id.* at 1163. Independent from the "No Parties Beneficiaries" clause, the *Balsam*

_____

[9] Although *Balsam* applied California law as to whether a third party is an intended beneficiary to a contract, Arizona law employs the same principles of intent by the contracting parties. *Compare Karo v. San Diego Symphony Orchestra Ass'n,* 762 F.2d 819, 821–22 (9th Cir.1985) (under California law, "[A] third party qualifies as a beneficiary under a contract if the parties intended to benefit the third party and the terms of the contract make that intent evident."), *with Norton v. First Fed. Savings,* 128 Ariz. 176, 178, 624 P.2d 854, 856 (1981) (Arizona requires "an intention to benefit that person[ ] indicated in the contract itself . . .").

court also determined that because paragraph 3.7.7.3 did not create a binding obligation on the parties to the RAA, it could not be construed to confer a right or benefit to a third party. *Id*. at 1162.

The facts here are identical to that in *Balsam*. Like in *Balsam*, Plaintiffs allege that Namecheap and WhoisGuard (as Namecheap's alter ego) agreed under paragraph 3.7.7.3, that WhoisGuard would accept liability as the registered name holder of the acts of its customers causing harm to third parties, if it failed to provide customer contact information within seven days of receiving reasonable evidence of harm from a third party.  Complaint, ¶¶ 57, 80.  Similar to the *Balsam* plaintiff, Plaintiffs allege that due to the proxy arrangement, WhoisGuard is the registered name holder for the domain at issue under the RAA.  *Id*. at ¶¶ 52-55, 80.  Like the *Balsam* plaintiff, Plaintiffs are implying that as the third parties that provided reasonable evidence of harm to Defendants, that they are the intended beneficiaries of paragraph 3.7.7.3.  *See id*. ¶¶ 80, 83, 84, 121-122. 131-132, 141-142, 151-152. The Ninth Circuit in *Balsam* rejected Plaintiffs' exact theory and held that the RAA does not confer any right or benefit to third parties like Plaintiffs.

Plaintiffs' role as third party beneficiaries of paragraph 3.7.7.3 is a basis of Defendants' liability for all of Plaintiffs' claims, it is the ***only*** basis of liability for Plaintiffs' trademark infringement and trademark dilution claims.  *See* Complaint, ¶¶ 126-154.  Indeed, Plaintiffs do not allege that Defendants otherwise engaged in trademark infringement or dilution.  *Id*. As such, Plaintiffs' second, third, and fourth causes of action are ***entirely dependent*** on their status as third-party beneficiaries to the RAA.  This dependency, without any other basis for liability, proved fatal to all of the *Balsam* plaintiff's claims, whether in tort or contract.  *See Balsam*, 627 F.3d at 1160.

Moreover, as the *Balsam* court noted, the RAA is only between ICANN and domain registrars, and so the registered name holder, who is not a party to the RAA, cannot be bound by it.  *See id*. at 1162-1163 (agreeing with district court that Tucows was only bound to the

RAA in its capacity as a registrar, *not* as a registered name holder).  As such, WhoisGuard (and Namecheap as its alleged alter ego) can not bound by the terms of the RAA in its role as a registered name holder.

For these reasons, all of Plaintiffs claims against Namecheap should be dismissed.

2.   *Plaintiffs Are Not Intended Beneficiaries to the Domain Registration Agreement*

Plaintiffs also allege that WhoisGuard as the domain name "registrant" agreed to accept liability under Namecheap's Domain Registration Agreement with its customers. Plaintiffs base this allegation on the following provision of that agreement, which is provided in whole herein:

> You agree that if you license the use of the domain name registered to you to a third party, you nonetheless remain the domain name holder of record, and remain responsible for all obligations under this Agreement, including but not limited to payment obligations, and providing (and updating, as necessary) both your own full and accurate contact information, and accurate technical, administrative, billing and zone contact information adequate to facilitate timely resolution of any problems that arise in connection with the domain name and domain name registration and for ensuring non-infringement of any third party intellectual property rights or other rights.

Complaint, Exh. 1, ¶ 20. As with the RAA, Plaintiffs allege that under the Domain Registration Agreement, Defendants "agreed to be liable" for Plaintiffs' claims. *See id*. at ¶¶ 56, 80-82, 84, 121-122, 131-132, 141-142, 151-152. As with the RAA, Plaintiffs' reliance on the Domain Registration Agreement is misplaced.

First, it is abundantly apparent that nothing in paragraph 20 provides that WhoisGuard accepts liability for the customers' acts. Second, per paragraph 20, when licensing a domain, the registrant's obligations to Namecheap under the Domain Registration Agreement relate to keeping their contact information updated and accurate with Namecheap for purposes related to the domain name and its registration. The specific reference to "ensuring non-infringement of any third parties" pertains to paragraph 7 of the Domain Registration Agreement titled "Our Obligations to Ensure Entitlement to Use Domain Name", which states in part:

> It is your responsibility to know whether or not the domain name(s) you select or use infringes legal rights of others. We might be ordered by a court to cancel, modify, or transfer your domain name; *it is your responsibility to list accurate contact information in association with your account* and to communicate with litigants, potential litigants, and governmental authorities. It is not our responsibility to forward court orders or other communications to you. We will comply with court orders unless you contact us to contest the order.

*Id*. at Ex. 1, ¶ 7 (emphasis added). As can be seen, the registrant's obligation concerning "ensuring non-infringement of any third-party intellectual property rights" also relates to maintaining current and accurate contact information associated with the domain account.

Further, the obligations owed under the Domain Registration Agreement are between the parties to that Agreement—Namecheap and its customer—not to any third parties such as Plaintiffs. Under Arizona law, an agreement can be deemed to confer a benefit for a third party only if (1) an intention to benefit the third party is indicated in the contract itself; (2) the benefit must be both intentional and direct; (3) it clearly appears that the parties intend to recognize the third party as the primary party in interest. *Norton,* 128 Ariz. at 178.

Here, there is no indication in the Domain Registration Agreement that Namecheap or WhoisGuard intended to confer a right or benefit to any third party, including Plaintiffs. The provisions in the Domain Registration Agreement in which Namecheap requires the customer to indemnify it if it is sued in relation to the domain registration services and informs the customer that it may terminate the customer's Namecheap account upon proper notice of infringement, do not establish a clear intent to benefit any third party; to the contrary, they establish exclusively an intent to benefit Namecheap only. *See* Complaint, ¶¶ 81-82; Exh.1 , ¶¶ 8, 21, 25. Further, the provisions only describe what Namecheap may do *in its discretion*, not what it "will" do.[10] *See id.*

---

[10] It should be noted that nothing in the Domain Registration Agreement discusses canceling the WHOIS Proxy Agreement, despite Plaintiffs reference to the same. *See* Complaint, ¶ 82, Exh. 1. The WHOIS Proxy Agreement discusses Namecheap's discretion to cancel the proxy service but does not do so in the context of receiving "reasonable evidence" of trademark infringement. *See id*., Exh. 2, ¶¶ 8-9. Thus, allegations in paragraphs 81-82 are contradicted by the exhibits attached to the Complaint. In such circumstances, the Court may disregard these allegations. *See Snyder v. HSBC Bank, USA, N.A.*, 913 F. Supp. 2d 755, 767 (D. Ariz. 2012) ("Factual allegations can be disregarded, however, if the

As such, Plaintiffs are unable to allege any viable claim for liability against Namecheap premised upon Domain Registration Agreement or the RAA.

**D.    If Plaintiffs' Theories of Liability Were Accepted, It Would Upend the Domain Name Registration System**

As demonstrated in the preceding sections, Plaintiffs' attempt to hold Defendants liable for the cybersquatting and trademark violations by their customers runs contrary to established legal precedent and the existing framework for secondary liability under the Lanham Act. As a practical matter, if Plaintiffs' legal theories were accepted, they would also nullify the legality of privacy services and upend the entire domain name registration system, due to the acts of a few bad actors.

The opinion in *Lockheed Martin II*, affirms the practical logic and reasoning behind limiting domain registrars' liability for acts of infringement by their customers:

> Although plaintiff now tries to backtrack somewhat from the position that defendant as registrar should perform gatekeeper functions for mark owners, even the modified gatekeeper role it now proposes is untenable. Sheer volume alone would prohibit defendant performing the role plaintiff would assign. Defendant simply could not function as a registrar, or as keeper of the registry, if it had to become entangled in, and bear the expense of, disputes regarding the right of a registrant to use a particular domain name. The fact that defendant could theoretically do what plaintiff asks does not mean that defendant is obligated to do so at the risk of financial ruin.

141 F. Supp. 2d at 654-55. If Plaintiffs' attempt to hold Defendants liable merely for acting as service providers were accepted, by the same token, telephone services should be rendered illegal as scammers use the phones to trick victims, mail should be outlawed as scams are often consummated by mail, and all Internet services should be deemed illegal due to scams being operated online. Clearly, this is not the law, nor can it be.

Moreover, third party rights holders, like Plaintiffs, are not without options for redress.  As the Court stated in *Rosen*:

---

allegations are contradicted by the facts established by reference to documents attached as exhibits to the complaint.").

> Aggrieved copyright holders are still able to initiate actions against infringers as "John Doe" defendants and to uncover their identities through other means, such as subpoena or injunction…. Plaintiff concedes that Contact would have provided the identity of the Imagevenue Defendants had Plaintiff presented Contact with a subpoena… Plaintiff chose not to avail himself of these remedies and instead sued Defendants for damages.

2013 WL 12132052 at *5 (holding that plaintiff failed to allege a cognizable theory of contributory copyright liability based upon Contact's provision of domain privacy services).

Similar to the plaintiff in *Rosen*, Plaintiffs acknowledge that they could obtain the customers' information by subpoena or even by filing a UDRP action, and that Defendants do provide the unmasked WHOIS records in these situations, *i.e.* when required by a court order or administrative action.  *See* Complaint, ¶¶ 63, 64.  Indeed, Plaintiffs' own exhibit to the Complaint underscores the ready availability of existing and established extra-judicial methods such as initiating a UDRP proceeding as a tool for ascertaining the true identity of the registrant.  Specifically, Exhibit 13 shows that each WIPO action filed against WhoisGuard identified the registrant as the true party in interest:



Snapshot from Exh. 13 to Complaint (true party in interests' names highlighted pink).  Thus, as Plaintiffs' own exhibit makes clear, next to each action initiated against WhoisGuard appears the name of the actual registrant who registered the offending domain name and employed WhoisGuard's services. As such, the privacy services are not an impediment for Plaintiffs' ability to redress their injuries. Plaintiffs know this all too well, having

commenced numerous UDRP proceedings in the past to a successful resolution. *See* Complaint, ¶ 95.

As the court in *Lockheed Martin II* observed, the UDRP was developed for the very purpose of resolving domain name disputes, and if rightsholders like Plaintiffs were permitted to hold registrars liable under the ACPA, it would not only ***"render the UDRP nugatory, it would cause the domain name registration system in its entirety not to be feasible."*** 141 F. Supp. 2d at 655. The same reasoning applies now more than ever in light of the enactment of the GDPR, which subjects service providers like Defendants to extraordinary penalties if they fail to protect the privacy of their customers who become involved in intellectual property disputes with third parties—thus substantially raising the "risk of financial ruin" if they were required to become entangled in such disputes.

## V.    CONCLUSION

For all the foregoing reasons, the Court should grant Namecheap's Rule 12(b)(6) Motion and dismiss all claims asserted against Namecheap with prejudice.

Dated:  April 24, 2020

**FENNEMORE CRAIG, P.C.**

By: *s/ Mario C. Vasta*
    Ray K. Harris
    Mario C. Vasta
    Attorneys for Defendants NAMECHEAP,
    INC.; and WHOISGUARD, INC.

15743707