David G. Barker (#024657)
dbarker@swlaw.com
Jacob C. Jones (#029971)
jcjones@swlaw.com
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070

TUCKER ELLIS LLP
David J. Steele (*pro hac vice*)
david.steele@tuckerellis.com
Howard A. Kroll (*pro hac vice*)
howard.kroll@tuckerellis.com
Steven E. Lauridsen (*pro hac vice*)
steven.lauridsen@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223
Telephone: (213) 430-3400
Facsimile: (213) 430-3409

Attorneys for Plaintiffs,
Facebook, Inc., Instagram, LLC and
WhatsApp Inc.

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Facebook, Inc., a Delaware corporation; Instagram, LLC, a Delaware limited liability company; and WhatsApp Inc., a Delaware corporation,<br><br>                    Plaintiffs,<br><br>          v.<br><br>Namecheap, Inc., a Delaware corporation, and Whoisguard, Inc., a Republic of Panama corporation,<br><br>                    Defendants. | Case No. CV-20-470-PHX-GMS<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT NAMECHEAP, INC.'S REFILED MOTION TO DISMISS AND WHOISGUARD, INC.'S AMENDED MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**<br><br>[Concurrently filed with Declaration of Kelsey A. Ewing]<br><br>(Oral Argument Requested) |

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

## I.  INTRODUCTION

Plaintiffs Facebook, Inc., Instagram, LLC and WhatsApp Inc. (collectively, "Plaintiffs") own numerous famous and distinctive trademarks, including FACEBOOK, INSTAGRAM, and WHATSAPP (collectively, "Plaintiffs' Marks"). Plaintiffs seek to enforce their rights and protect the public from malicious domain names that are identical or confusingly similar to Plaintiffs' Marks, like the 45 in this case (the "Infringing Domain Names"). The Infringing Domain Names include facebo0k-login.com, facebok-security.com, 1nstagrambusinesshelp.com, instagramlogin.org, whatapp.services, whatsappsex.club, and others that were used for unlawful activities including phishing, malware, spam, fraud, and trademark infringement.

Defendants Namecheap, Inc. ("Namecheap") and Whoisguard, Inc. ("Whoisguard") (collectively, "Defendants")[1] registered (as the registrant), trafficked in, and used the Infringing Domain Names with a bad faith intent to profit, in violation of the Anticybersquatting Consumer Protection Act ("ACPA"). In addition, under the ICANN-mandated language in the Namecheap Registration Agreement, Defendants have accepted liability for the harm caused by the wrongful use of the Infringing Domain Names because they failed to disclose the contact information of their customers in response to Plaintiffs' notices of infringement.[2]

Defendants' Motion to Dismiss ("Motion") should be denied because the Complaint has properly pleaded claims for cybersquatting, trademark infringement, false designation of origin, and dilution. Defendants' Motion is based on misstatements of the law,

---

[1] Namecheap is an Internet Corporation for Assigned Names and Numbers ("ICANN") accredited registrar. Whoisguard is a proxy service established by Namecheap and used exclusively by Namecheap's customers to hide their identity.

[2] Namecheap is liable for Whoisguard's unlawful activities because it is the direct participant in Whoisguard's activities and its alter ego. Indeed, Defendants' Motion to Dismiss does not address (and thus concedes) that Namecheap is the direct participant in the actions of Whoisguard.

misconstruction of the facts alleged, a misreading of Defendants' own contracts, and a misrepresentation of the roles each of them play in the registration, trafficking in and use of the Infringing Domain Names. For example, Defendants claim without any support, that the proxy service customer, not Whoisguard, is the actual registrant. Yet, Whoisguard listed itself as the Registered Name Holder for each of the Infringing Domain Names, and Defendants made clear to their customers in their contracts and on their website that Whoisguard, not the customer, owned the Infringing Domain Names.[3]

Defendants also claim that the Complaint fails to allege facts demonstrating a bad faith intent to profit by Defendants. Yet, Defendants ignore (and thus concede) the Complaint's numerous allegations of Defendants' bad faith under the nine factors set forth in the ACPA. Defendants also do not dispute that the Infringing Domain Names are confusingly similar or identical to Plaintiffs' Marks. Indeed, as Plaintiffs allege, Defendants continued to infringe Plaintiffs' Marks after receiving notice of infringement, further demonstrating their bad faith intent to profit from Plaintiffs' Marks.

In addition, Defendants improperly seek protection under the ACPA's safe harbor for domain name registrars even though that provision only protects registrars acting as registrars. The safe harbor provision does not protect a registrar when it uses a domain name.[4] Moreover, the safe harbor provision of the ACPA does not protect proxy services like Whoisguard at all.

Furthermore, even though the Namecheap Registration Agreement requires Whoisguard to identify its customers or accept liability, Defendants seek to avoid liability

---

[3] Defendants claim "the mere act of 'registering' an infringing domain on its own, is not sufficient to establish liability under the ACPA." (Mot. 15:11–16.) But Plaintiffs do not assert the act of registering *alone* gives rise to liability. Rather, Defendants are liable because Whoisguard registered and trafficked in, and because Namecheap used, the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' marks.

[4] The allegations and exhibits to the Complaint show that Namecheap used the Infringing Domain Names by hosting commercial parking pages that diverted customers away from Plaintiffs' legitimate websites. Contrary to Defendants' claims, this "use" is sufficient to support Plaintiffs' allegations of trademark infringement and dilution.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

by claiming that ICANN's Registrar Accreditation Agreement ("RAA") does not permit third party claims. Since Plaintiffs seek relief under the Namecheap Registration Agreement—which does permit third party claims—this argument is unavailing.

Finally, Defendants misrepresent their obligations and duties under European Union's General Data Protection Regulation 2016/679 ("GDPR") as an ICANN registrar and proxy service. In order to serve legitimate interests, such as intellectual property protection, Defendants were **required** under the ICANN rules to disclose the contact information of its customers to Plaintiffs upon request.

Defendants' Motion to Dismiss should be denied.

## II. FACTUAL ALLEGATIONS

Plaintiffs own the exclusive rights to Plaintiffs' Marks, which they use in connection with their respective services. (Compl. ¶¶ 31–50.) Defendants registered, trafficked in, or used the Infringing Domain Names that infringe Plaintiffs' Marks. (*Id*. ¶¶ 69–78.)[5]

Namecheap and Whoisguard have continuously engaged in a scheme to attract cybersquatters to use their services to infringe others' trademarks through the fraudulent registrations of domain names used for malicious activity, including phishing, malware, spam, fraud and trademark infringement. (*Id*. ¶¶ 7–14, 88–95.) Namecheap is a direct participant in the actions of Whoisguard. (*Id*. ¶ 25.) Whoisguard is also Namecheap's alter ego and provides a proxy service known as "WhoisGuard" to Namecheap's customers. (*Id*. ¶ 4.) To provide this service, Whoisguard registers domain names in its own name and licenses them to Namecheap's customers (the "Licensees"). (*Id*. ¶¶ 5, 52–53.) Namecheap sometimes uses domain names registered by Whoisguard under a license provided by its registration agreement, and therefore is also one of the Licensees. (*Id*. Exs. 1 & 12)

Namecheap, as an ICANN-accredited domain name registrar, is subject to ICANN's RAA. (*Id*. ¶¶ 3, 51.) The RAA is a standard agreement required by ICANN describing the

---

[5] Some examples include facebo0k-login.com, facebok-security.com, xn--faceboo-jhb.net (which appears as "facebоⱪ.net"), and xn--nstaram-yya574a.com (which appears as "ïnstagram.com"). (*Id*. ¶¶ 71–73.)

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

rules and policies governing all generic domain name registrations and the obligations applicable to registrants in order to create accountability for the registration and use of domain names. The RAA requires "Registered Name Holders to enter into an electronic or paper registration agreement with Registrar." (*Id*. ¶ 51 & Ex. 7.) The RAA also requires that the agreement between Registrars and Registered Name Holders include language requiring registrants to accept liability for harm caused by a domain name licensee's wrongful use of the registrant's domain name unless the registrant promptly discloses the licensee's identity and contact information upon the registrant being provided with reasonable evidence of actionable harm. (*Id*. ¶¶ 51, 80 & Ex. 7.) Namecheap's registration agreement with its Registered Name Holders ("Namecheap Registration Agreement") includes these required terms. (*Id*. ¶ 29 & Ex. 1.) The Namecheap Registration Agreement does not include any limitation on third party beneficiaries. (*Id*. Ex. 1.) Namecheap and Whoisguard entered into the Namecheap Registration Agreement for domain name registration services. (*Id*. ¶ 29.)

As the domain name registrant, Whoisguard is listed in the WHOIS record for domain names utilizing the WhoisGuard service. (*Id*. ¶¶ 6, 55.) Upon registering each domain name that utilizes the WhoisGuard service, including all of the Infringing Domain Names, Whoisguard agreed under the Namecheap Registration Agreement to

> accept liability for harm caused by wrongful use of the Registered Name, unless it discloses the current contact information provided by the licensee and the identity of the licensee within seven (7) days to a party providing [Whoisguard] reasonable evidence of actionable harm.

(*Id*. ¶ 80 & Ex. 1.)

Between October 2018 and February 2020, Plaintiffs' authorized representatives sent Whoisguard notices with reasonable evidence that the Infringing Domain Names caused Plaintiffs actionable harm and requested that Whoisguard disclose the Licensees' identities and contact information. (*Id*. ¶¶ 83–84.) After receiving these notices, Whoisguard failed to disclose the identity or contact information of any of the Licensee(s). (*Id*. ¶ 84.) In addition to this failure to disclose, Namecheap, Whoisguard, and their

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

4

Licensees engaged in numerous acts that demonstrate bad faith intent to profit from using, registering, and trafficking in the Infringing Domain Names. (*Id*. ¶¶ 85–104.) Indeed, they continued to license and directly use the Infringing Domain Names even after receiving Plaintiffs' notices of infringement. Because Defendants refuse to take steps to respond to domain name abuse or disclose the identities of Licensees when presented with reasonable evidence that Licensees are using Whoisguard's domain names to cause harm, Namecheap has become the world's most popular domain name registrar for malicious actors. (*Id.* ¶¶ 8–11.)

## III.   ARGUMENT

### A.   Fed. R. Civ. P. 12(b)(6) Motion to Dismiss Standard

Courts view with "disfavor" Rule 12(b)(6) motions to dismiss because of the lesser role of pleadings in federal practice and the liberal amendment policy. *See Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003) (Rule 12(b)(6) dismissal with prejudice proper only in "extraordinary" cases). On a motion to dismiss, the court accepts the complaint's factual allegations as true. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 5 (2010). All reasonable inferences from the alleged facts are drawn in the plaintiff's favor. *Barker v. Riverside County Office of Ed.*, 584 F.3d 821, 824 (9th Cir. 2009).

When allegations are capable of more than one inference, the court must adopt any plausible inference that supports a valid claim. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). At the motion to dismiss stage, courts do not evaluate whether the allegations will be proven true; it merely asks whether the pleadings, if proven, would support a plausible claim for relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

### B. Plaintiffs have stated a claim under the ACPA.

To state an ACPA cybersquatting claim, a plaintiff must allege (1) ownership of a valid mark; (2) that the mark is distinctive or famous; (3) the existence of a domain name that is identical or confusingly similar to, or in the case of a famous mark, dilutive of, the owner's mark; and (4) that a defendant registered, trafficked in, or used the domain name; (5) with the bad faith intent to profit from the mark. *See* 15 U.S.C. § 1125(d)(1); *Bosley*

5

*Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2005).

## C. Defendants do not dispute that Plaintiffs adequately pleaded the first three elements under the ACPA.

Defendants have not disputed that Plaintiffs adequately alleged ownership of valid marks, that those marks are distinctive or famous, and that the Infringing Domain Names are identical, confusingly similar to, and/or dilutive of Plaintiffs' Marks. (*See generally* Mot. 1:21–22, 4:15–20, 6:19–28.)

### 1. Plaintiffs pleaded that Defendants registered, trafficked in, and used the Infringing Domain Names with bad faith intent to profit.

#### a. Whoisguard registered each Infringing Domain Name.

There is no dispute that Whoisguard provides a proxy service to its customers to register domain names. (Compl. ¶ 4; Mot. 4:1–3.) This admission, as well as the allegations in the Complaint, the Exhibits to the Complaint, Namecheap's contracts, and Namecheap's representations to its customers make clear that Whoisguard registered each Infringing Domain Name as the registrant.

First, and most significantly, Whoisguard is, and was, listed as the domain name registrant[6] in the WHOIS contact information for each Infringing Domain Name (Compl. ¶ 55 & Ex. 11.)[7] Second, the Namecheap WHOIS Proxy Agreement with customers acknowledges this: "By subscribing to the Namecheap WHOIS Privacy Protection Services [], you are engaging Whoisguard to administer ***and register*** each domain name controlled by you [] ***in the name of WhoisGuard***." (Compl. Ex. 2, § 2 (Doc. 1-3 at 3) (emphasis added).) Third, the Namecheap Registration Agreement states that when a customer uses a proxy service, "***the proxy service is the Registered Name Holder***, and the

---

[6] The ACPA uses the term "registrant" to refer to a person who registers and owns a domain name; ICANN (and Namecheap) uses the term "registered name holder" to refer to a person who registers and owns a domain name.

[7] Defendants admit that "ICANN requires its accredited registrars, like Namecheap, to collect and publish data regarding its registrants in the WHOIS databases." (Mot. 4 n.2.)

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

proxy service licenses the use of the domain name to the customer." (*Id.* Ex. 1 (Doc. 1-2 at 54) (emphasis added).)[8] Fourth, Namecheap admits on its website that a "potential drawback" of the WhoisGuard service "***comes down to ownership***. Technically ***the domain name registrant owns the website*** (in the eyes of ICANN), ***not you***." (*Id.* Ex. 8 (Doc. 1-6 at 2) (emphasis added).) Finally, Defendants' Motion even admits that Whoisguard is the Registered Name Holder for the Infringing Domain Names. (Mot. 21:6–8 (claiming that WhoisGuard "can not [be] bound by the terms of the RAA in its role ***as a registered name holder***") (emphasis added).)

Despite these admissions, Defendants assert "the customer, not Whoisguard, is the person who 'registered' the Infringing Domains within the meaning of the ACPA." (Mot. 5:1–10.) Defendants are mistaken. The ACPA specifically anticipates the licensing arrangement present in this case and acknowledges the existence of registrants who license their domain names to others. For example, under the ACPA, "the domain name registrant ***or that registrant's authorized licensee***" is liable for the use of the domain name. 15 U.S.C. § 1125(d)(1)(D) (emphasis added).

The facts and law make clear that Whoisguard is the registrant of the Infringing Domain Names and the customer is the authorized licensee under the ACPA. Moreover, the Court must adopt all inferences that Whoisguard registered, as the registrant, the Infringing Domain Names based on the WHOIS contact information found in the Complaint's Exhibit 11, Namecheap's WHOIS Proxy Agreement, Namecheap's Registration Agreement, and Namecheap's admissions. *Starr*, 652 F.3d at 1216.

### b. Whoisguard trafficked in the Infringing Domain Names.

"Trafficking in" is a separate and distinct act that creates liability under the ACPA. *See Acad. of Motion Pictures Arts & Scis. v. GoDaddy.com, Inc.*, No. CV 10-3738 ABC

---

[8] ICANN defines a proxy service like Whoisguard as one where the "Registered Name Holder's contact information is displayed in the Registration Data Service (Whois) or equivalent services rather than the P/P Customer's contact information." (*See* RAA Specification on Privacy and Proxy Registrations, ¶ 1.3 (*Id.* Ex. 1 (Doc. 1-5 at 59).)

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

(CWX), 2013 WL 12122689, at *6 (C.D. Cal. June 21, 2013) ("*AMPAS I*") ("The ACPA imposes liability for 'register[ing], traffic[king] in, or us[ing]' a domain name that is identical to or confusingly similar to a distinctive mark. 15 U.S.C. § 1125(d)(1)(A). The disjunctive 'or' shows that only one type of conduct is sufficient to establish liability."). Section 1125(d)(1)(E) defines "traffics in" as engaging in "transactions that include but are not limited to, sales, purchases, loans, pledges, *licenses*, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration." (emphasis added). Plaintiffs allege and provide factual support that Whoisguard registered each Infringing Domain Name and licensed it to Licensees. (Compl. ¶ 5 & Ex. 1 (Doc. 1-2 at 54) (explaining "the proxy service is the Registered Name Holder, and the proxy service licenses the use of the domain name to the customer").)[2]

       Defendants' only argument that Whoisguard did not traffic in the Infringing Domain Names is that Whoisguard did not receive any consideration for its services. (Mot. 14:19–27.) Yet, Defendants assert that "Whoisguard provides its WHOIS privacy protection services to customers of Namecheap pursuant to a Service Agreement between WhoisGuard and Namecheap." (Declaration of Vernon Emmanuel Salazar Zurita ("Zurita Decl.") ¶ 7 (Doc. 31-1 at 3).)[10] Because consideration is necessary in order for the "Service Agreement" to be valid, Whoisguard must have received consideration for its services. *See Malcoff v. Coyier*, 14 Ariz. App. 524, 526, 484 P.2d 1053, 1055 (1971) ("it is essential to an enforceable contract that there be a consideration"). But even if Whoisguard does not receive monetary consideration under the "Service Agreement," this would only further show that Whoisguard is Namecheap's alter ego because it is an undercapitalized shell

---

[2] This is consistent with the RAA Specification on Privacy and Proxy Registrations, with which Namecheap must comply. (*Id*. Ex. 7, § 1.3 (Doc 1-5 at 59) (defining a Proxy Service as "a service through which a Registered Name Holder licenses use of a Registered Name to" a customer).)

[10] Defendants did not provide the Court or Plaintiffs a copy of this alleged Service Agreement. As such, the Court should disregard any argument based on this document, which is not before this Court. Fed. R. Evid. 802 and 1002.

company that commingles its money with Namecheap. Because they are alter egos, payments from Licensees to Namecheap qualify as consideration paid to Whoisguard in exchange for providing the proxy service to Licensees. And non-monetary benefits to Whoisguard are "consideration" that further support Whoisguard's direct trafficking.

### c.  Namecheap used the Infringing Domain Names as parking pages for advertisements that exploited Plaintiffs' Marks.

Namecheap directly used some of the Infringing Domain Names to set up revenue-generating advertising "parking pages" that diverted consumers away from Plaintiffs' legitimate websites. (Compl. ¶¶ 85–86 & Ex. 12).[11] When a domain name is registered using Namecheap, the Namecheap Registration Agreement permits Namecheap's use of the domain name to host advertising parking pages if a webpage is not set up at the domain name. (*Id*. Ex. 1 § 22 (Doc. 1-2 at 13) (explaining that in exchange for "Free Services," including a "free parking page," Namecheap "may display advertising in conjunction therewith through the use of" various advertising mechanisms).)

This use of a domain name to host advertising parking pages by a registrar is outside of the registrar's safe harbor for registrar activities. *See AMPAS I*, 2013 WL 12122689, at *6–7. Namecheap used at least eleven of the Infringing Domain Names to set up parking pages that diverted consumers to websites for Namecheap's commercial gain. (Compl. ¶ 115 and Ex. 12 (Doc. 1-8 at 5–6, 9, 12, 14, 16, 19, 21–24).) This use was coupled with a bad faith intent to profit from Plaintiffs' Marks because, even after Namecheap and Whoisguard were notified of the infringement, Namecheap continued to use the domain names to host advertising parking pages to exploit Plaintiffs' Marks.

Indeed, the Complaint contains numerous allegations that Defendants directly used

---

[11] For example, Namecheap hosted advertising parking pages at the Infringing Domain Names facebo0k-login.com, facebok-securty.com and hackanyinstagram.com, among others. (Compl. ¶ 86 & Ex. 12.) Namecheap's hosted advertising parking page at facebo0k-login.com diverted consumers to other unknown sites using links labeled "access my account," "login," "portal login," "student portal login," and "banking account" exposing these consumers to potential identity theft, online scams and financial fraud.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

the Infringing Domain Names. (*Id*. ¶ 109 ("Defendants . . . used one or more of the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Trademarks."); *Id*. ¶ 115. In addition, the Complaint alleges that Licensees, with bad faith intent to profit from Plaintiffs' trademarks, used the Infringing Domain Names to divert consumers for malicious activity, including misdirecting visitors to commercial sites. (*Id*. ¶¶ 85–86 (citing screenshots of infringing use in Ex. 12).)[12]

### 2. Plaintiffs pleaded Defendants acted with bad faith intent to profit from Plaintiffs' Marks.

#### a. The Complaint contains extensive allegations that Defendants acted with bad faith intent to profit from Plaintiffs' Marks.

The Complaint contains extensive allegations of Defendants' bad faith under the statutory factors Congress included in the ACPA. 15 U.S.C § 1125(d)(1)(b)(i); (Compl. ¶¶ 35, 44, 93, 94, 98, 111–118). "An analysis of whether a defendant's actions constitute bad faith within the meaning of the ACPA usually begins with consideration of several factors, nine of which are listed in the ACPA." *Lucas Nursery and Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004).

Whoisguard and Namecheap do not dispute,[13] nor can they, that (a) Whoisguard has no trademark or intellectual property rights in the Infringing Domain Names, (b) the Infringing Domain Names do not consist of Whoisguard's legal name or a name commonly used to identify them, (c) Whoisguard has not made any prior use of any Infringing Domain Name in connection with the *bona fide* offering of any goods or services, (d) Whoisguard has not made any *bona fide* noncommercial or fair use of Plaintiffs' Marks on a website

---

[12] When Namecheap exercised its right under the Namecheap Registration Agreement to use the Infringing Domain Names to host advertising parking pages, Namecheap became an authorized Licensee and is liable for "using" them. (*Id*. Ex. 1 § 22 (Doc.1-2 at 13); *see also* ¶ 79.)

[13] Because Defendants do not dispute any of these allegations in their opening memorandum, they have waived any argument to the contrary in their reply. *FT Travel--New York, LLC v. Your Travel Ctr., Inc.*, 112 F. Supp. 3d 1063, 1079 (C.D. Cal. 2015) ("Courts decline to consider arguments that are raised for the first time in reply.")

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

accessible at any of the Infringing Domain Names, (e) Namecheap intended to divert consumers from Plaintiffs' websites to Namecheap's parking pages when, after notice of the Infringing Domain Names, Namecheap continued to use these parking pages on the Infringing Domain Names, (f) Whoisguard provided material and misleading false contact information,[14] (g) Whoisguard registered multiple domain names that it knew were identical or confusingly similar to the marks of others (Compl. ¶¶ 93, 94 & Ex. 13), and (h) Plaintiffs' Marks are distinctive and famous. 15 U.S.C § 1125(d)(1)(b)(i)(I)–(IX).

In addition to alleging facts to support the nine bad faith factors in the ACPA, Plaintiffs allege additional case-specific facts to further show Defendants' bad faith intent to profit from the Infringing Domain Names. For example, Plaintiffs allege that Defendants have continuously engaged in a scheme to attract cybersquatters to use their services to infringe trademarks through the fraudulent registrations of domain names used for malicious activity, including phishing, malware, spam, fraud and trademark infringement. (Compl. ¶¶ 7–14, 88–95.) Allegations of operating such a deliberate scheme are sufficient to survive a motion to dismiss on the bad faith element. *See Transamerica Corp. v. Moniker Online Svcs. LLC*, 672 F. Supp. 2d 1353, 1367 (S.D. Fla. 2009); *see also Dell Inc. v. BelgiumDomains, LLC*, No. 07-22674-CIV, 2007 WL 6862342, at *10 (S.D. Fla. Nov. 21, 2007) ("Here, Defendant registrars are in a position of trust as ICANN-accredited registrars. By concealing their unlawful activities, however, they have grossly abused their position of trust to the detriment of Plaintiffs' customers and the general public, as well as Plaintiffs and countless other trademark owners. This abuse of trust further supports, and

---

[14] The Namecheap WHOIS Proxy Agreement states that Whoisguard administers and registers the Infringing Domain Names. Contrary to that agreement, when Whoisguard was contacted by Plaintiffs regarding the Infringing Domain Names, Whoisguard falsely replied that it did not own, administer, host or provide registration services to the domain and could not provide the registrant contact information. (Compl. ¶¶ 98–99.) Further, to the extent Whoisguard maintains it is not the registrant of Infringing Domain Names, listing Whoisguard instead of the customer in the WHOIS data is material and misleading false contact information.

indeed amplifies, Defendants' bad-faith intent.")).

Defendants assert, however, that "the **only** facts to support bad faith intent" concern Defendants' offering of the WhoisGuard service for free[15] and Whoisguard's refusal to reveal the Licensees' identities upon being presented with evidence of infringement. (Mot. 9:5–9 (emphasis added).) Once again, Defendants are mistaken. Plaintiffs have properly alleged, and supported, (a) the ACPA factors of bad faith intent, (b) Defendants' fraudulent domain registration scheme used to hide the identity of the Licensees, and (c) that Defendants continued to license and continued to use the Infringing Domain Names after receiving notice. (Compl. ¶¶ 8–9, 17–18, 83–84, 96, 98.).[16] "Because defendants easily can conjure up a 'legitimate' use for a domain name that incorporates a trademark, plaintiffs frequently will find it difficult, if not impossible, to obtain evidence probative of 'bad faith intent' without court sanctioned discovery. Indeed, obtaining information relevant to almost all of the bad faith factors set forth in the statute requires direct testimony from the defendant." *Ford Motor Co. v. Greatdomains.com, Inc.*, 177 F. Supp. 2d 635, 643 (E.D. Mich. 2001). Therefore, once a plaintiff alleges facts that would establish a prima facie case of bad faith intent to profit, as Plaintiffs do here, their pleading is sufficient to survive a motion to dismiss on the bad faith element. *Id.*

**b. Defendants acted with bad faith intent to profit by continuing to infringe Plaintiffs' Marks after receiving notice of infringement.**

Defendants also acted with bad faith intent to profit from Plaintiffs' Marks when,

---

[15] The fact that Namecheap offers WhoisGuard for free to all customers does not absolve Namecheap's bad faith intent to profit from its scheme to attract bad actor customers in order to increase Namecheap's business. *See Transamerica*, 672 F. Supp. 2d at 1367 (holding allegations of a scheme by a registrar to shield bad actors, involving history of adverse UDRP proceedings, were "sufficient at the pleading stage to satisfy the bad faith prong by creating an inference that Defendants intended to profit from the misuse of [Plaintiff's] marks as well as the marks of others").

[16] Defendants' bad faith intent to profit by continuing to infringe Plaintiffs' Marks after receiving notice of infringement is discussed in section III.C.2.b, *infra*.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

after receiving notices as to each Infringing Domain Name, (a) Whoisguard continued to traffic in the domain names by continuing to license the domain names, (b) Whoisguard chose not to reveal the Licensees' contact information, and (c) Namecheap continued to use many of the Infringing Domain Names to host advertising parking pages.[17]

In an attempt to avoid the consequences of their disregard for Plaintiffs' rights, Defendants argue a registrar can never have bad faith intent to profit when it (1) utilizes an automated process for its proxy service or (2) relies on customer representations of non-infringement. (Mot. 9:11–18, 11:4–14 (citing *Acad. of Motion Pictures Arts & Scis. v. GoDaddy.com, Inc.* ("*AMPAS II*"), No. CV 10-3738 AB (CWX), 2015 WL 5311085 (C.D. Cal. Sept. 10, 2015).) This contention is without merit. *AMPAS II* does not support Defendants' motion because that opinion was issued after a bench trial where the court made specific factual findings refuting allegations that GoDaddy acted with a bad faith intent to profit from the plaintiff's marks. The court found GoDaddy did not act with bad faith because, in part, GoDaddy "developed policies and procedures to assist intellectual property right owners in the protection of their brands" (*id.* at *7, Finding of Fact 72); manually overrode its automated system[18] and disabled webpage advertisements after notice of infringement by a trademark owner (*id.* at *9, Finding of Fact 89); and, "responded to each cease and desist letter" from AMPAS (*id.* at *10, Finding of Fact 97).

Unlike in *AMPAS II*, and contrary to GoDaddy's actions in that case, Defendants have not developed a program to assist intellectual property owners in resolving their claims against infringers, but instead hamper attempts to resolve disputes. For example, Defendants routinely fail to respond to intellectual property owners' notices of

---

[17] There can be no doubt regarding the infringement of these domain names, which include, for example, facebook-securty.com and hackanyinstagram.com. (Compl. ¶ 86 & Ex. 12.)

[18] In the ACPA's legislative history, "Congress described the use of automated computer programs to register thousands of domain names at a time as one of the 'abuses of the domain name registrations systems' the new law was targeting. S. Rep No. 106-140, 6–7 (1999)." *Verizon California Inc. v. Lead Networks Domains Private Limited,* CV09-613-ABC (CWx), 2009 WL 10700112, at *7 n.3 (C.D. Cal. Feb. 17, 2009).

infringement, and when Defendants did respond to one of Plaintiffs' notices they actually misrepresented their involvement in the ownership and use of the domain name at issue. (Compl. ¶¶ 8–9, 96, 98.) As significantly, Defendants continued to traffic in and use the Infringing Domain Names after receiving notice from Plaintiffs. (*Id.* ¶ 86 & Ex. 12.)

Furthermore, after Plaintiffs notified Defendants of the Infringing Domain Names, they could no longer rely on their customers' representations of non-infringement. *AMPAS II*, 2015 WL 5311085, at *26 ("GoDaddy reasonably relied in good faith on the representations made by the registrants of the Accused Domains . . . ***until such time as GoDaddy received notice by a third party of a potential issue***." (emphasis added)). Defendants cannot rely on an automated process or their customers' representations of non-infringement ***after receiving notice*** of a specific Infringing Domain Name. *Id.* Yet, after notice, by refusing to disclose and continuing to traffic in and use the Infringing Domain Names, Defendants engaged in a conscious, deliberate act with bad faith intent to profit from Plaintiffs' Marks.

### c. Bad faith intent to profit can arise after registration of a domain name.

Defendants also argue that even if they acted with bad faith intent after the registration of domain names, they cannot be liable under the ACPA because they did not have bad faith intent at the time each Infringing Domain Name was registered.[19] (Mot. 10:9–13.) It is indisputable, however, that bad faith intent giving rise to ACPA liability can arise after registration. Several of the bad faith statutory factors necessarily look to post-registration conduct. *See* §§ 1125(d)(1)(B)(i)(III), (IV), (VI), (VII). And case law expressly holds that a party can be liable under the ACPA when bad faith intent arises after registration. *E.g.*, *DSPT Intern., Inc. v. Nahum*, 624 F.3d 1213, 1219 (9th Cir. 2010) ("Though there was no evidence of anything wrong with Nahum's registration of the domain name to himself, the evidence supported a verdict that Nahum subsequently, years

---

[19] Since Plaintiffs have properly alleged that Whoisguard had the bad faith intent to profit at the time of registration (*see* Section III.B.3.a., *supra*), Plaintiffs will address only Defendants' claim of bad faith arising **after** the time of registration.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

later, used the domain name to get leverage for his claim for commissions."); *Storey v. Cello Holdings, LLC,* 347 F.3d 370, 385 (2d Cir. 2003) ("Congress intended the cybersquatting statute to make rights to a domain name registration contingent on ongoing conduct rather than to make them fixed at the time of registration."); *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2002) ("Evidence of bad faith may arise well after registration of the domain name."); *Virtual Works v. Volkswagen,* 238 F.3d 264, 270 (4th Cir. 2001) (holding ACPA violation existed when defendant offered to sell domain name years after registration; "the evidence establishes that at the time Virtual Works proposed to sell *vw.net* to Volkswagen, it was motivated by a bad faith intent to profit from the famousness of the VW mark").

Defendants rely on *GoPets Ltd. v. Hise*, 657 F.3d 1024 (9th Cir. 2011) for the proposition that bad faith must exist at the time of registration or else liability under the ACPA can never arise—even for violations based on use and trafficking. (Mot. 10:11–14.) But the court in *GoPets* was not confronted with and did not consider ACPA liability arising out of use or trafficking. Rather, the court addressed whether a mark was "distinctive at the time of registration of the domain name," which it was not because the mark did not exist until several years after the initial domain name registration. *Id.* at 1030. The language of *GoPets* makes clear that the Ninth Circuit was not stating that an ACPA claim could only arise for use or trafficking if bad faith existed at the time of registration. In particular, the Ninth Circuit explained what "GoPets Ltd. must show . . . [t]o prevail on its ACPA claim," *id.* at 1030; not a standard for all ACPA claims. *GoPets* spoke only to "(1) registration of a domain name" and did not consider liability based on use or trafficking. *Id.* The limited nature of this holding is further evidenced by the fact that the Ninth Circuit did not purport to overrule its prior decisions in *DSPT Intern.*, decided the previous year, or *Lahoti*, which *GoPets* cites, 657 F.3d at 1033.[20]

---

[20] Moreover, the ACPA only refers to "at the time of registration" in relation to when a plaintiff's mark must be distinctive.

1    For these reasons, and as Plaintiffs allege, Defendants can be responsible for a bad

2    faith intent to profit that arises after registration.

3    **d. Defendants are not entitled to the ACPA's safe harbor.**

4    Defendants argue that because the act of providing a proxy service itself is

5    "indisputably legal," Whoisguard's provision of the service falls under the ACPA's safe

6    harbor for registrars—even when Whoisguard refuses to disclose Licensee contact

7    information upon receiving evidence of trademark infringement. (Mot. 8:1–9:4.) But

8    Plaintiffs never suggest proxy services are *per se* illegal. Regardless, value-added services

9    that some registrars choose to provide, including proxy services, are not registrar services

10   and do not fall under the ACPA's safe harbor. Moreover, Whoisguard is not even a registrar

11   and therefore does not qualify for the ACPA's safe harbor. And to the extent Namecheap

12   directly uses the Infringing Domain Names, the ACPA's safe harbor does not apply.

13   The limited safe harbor for domain name registrars applies only to their activities ***as***

14   ***registrars***. When a registrar provides a proxy service, or directly uses a domain name, the

15   safe harbor does not apply. *See Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092,

16   1103–05 (C.D. Cal. 2009) (specifically rejecting Namecheap's argument that the

17   WhoisGuard service falls under ACPA safe harbor). *Solid Host* also explains that the

18   ACPA's safe harbor shields registrars from liability only when the registrar "*acts [as] a*

19   *registrar*, i.e., when it accepts registrations for domain names from customers." *Solid Host*,

20   652 F. Supp. 2d at 1104 (emphasis in original); *see also id.* at 1105 ("Indeed, to the extent

21   that Name-Cheap was the registrant of the domain name and 'used' the name, this section

22   would support the imposition of liability on it, not a grant of immunity to it.");

23   *Transamerica,* 672 F. Supp. 2d at 1365 (holding ACPA safe harbor does not apply when

24   registrar is also registrant).

25   The WhoisGuard service is not covered by the ACPA's safe harbor—the legislative

26   history of the ACPA, language of the ACPA, and relevant case law neither permit nor even

27   contemplate a proxy service safe harbor.

28

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

**e.  Defendants misrepresent their obligations and duties under GDPR as an ICANN registrar and proxy service.**

Defendants also misrepresent the nature of GDPR's restrictions on registrars and proxy services disclosing customer data. (Mot. 11:21–13:15.) First, Defendants claim, without any support, "that proxy services such as WhoisGuard are now ***mandatory*** under GDPR." (*See* Mot. 11:21–23 (emphasis in original).) Defendants are mistaken. Nothing in GDPR requires listing a proxy company's information instead of an actual customer's information in the WHOIS directory, which is what a proxy service like Whoisguard does. Indeed, in response to GDPR, ICANN only requires **redaction** of certain contact information that would otherwise be listed publicly in the WHOIS directory. (*See* ICANN's Temporary Specification ("Temp. Spec.") Appx. A §§ 2.2–2.3 (Doc. 30-2 at 23–24).) The Temp. Spec. was adopted by ICANN to address registrar responsibilities under GDPR.

Second, Defendants ignore their obligation under the Temp. Spec. to disclose information in order to serve legitimate interests such as intellectual property protection.[21] Under the portion of the Temp. Spec. controlling here, registrars are **required** to disclose contact information to third parties such as Plaintiffs in response to a legitimate interest. (*Id*. Appx. A § 4.1 (Doc. 30-2 at 26) ("Registrar and Registry Operator MUST provide reasonable access to Personal Data in Registration Data to third parties on the basis of a legitimate interests pursued by the third party . . . ." (emphasis in original)).) The Temp. Spec. specifically recognizes intellectual property protection as a **legitimate interest**. (*Id*. §§ 4.4 & 4.4.8 (Doc. 30-2 at 11–12)).

It was Defendants' choice to offer the WhoisGuard proxy service, which they have done for over a decade, rather than simply redact personal contact information as specified under the Temp. Spec. *See Solid Host*, 652 F. Supp. 2d at 1096. Defendants now point to GDPR as a post-hoc rationalization for their refusal to comply with ICANN's rules, their

---

[21] Defendants also ignore that GDPR permits disclosure "for the purposes of the ***legitimate interests*** pursued by . . . a third party." GDPR Article 6(1)(f) (emphasis added).

own contracts, and the ACPA. Defendants assert GDPR absolves them of bad faith; yet, they refuse to comply with the Temp. Spec. that is consistent with GDPR's permissive sharing of data for legitimate interests. Defendants' failures to promptly disclose Licensee identities and contact information upon notice of infringement from Plaintiffs, as required by ICANN, is further evidence of bad faith intent to profit in violation of the ACPA.

**D.   Defendants are liable for trademark and service mark infringement, false designation of origin, and dilution.**

**1.   Namecheap's use of parking pages is evidence that Namecheap used the marks in commerce.**

Defendants contend that Plaintiffs have failed to allege use in commerce. (Mot. 2:7–9.) They further argue the Complaint is devoid of any allegations that Defendants, as opposed to their customers, used Plaintiffs' Marks in commerce. (*Id*. 2:9–11.) As explained above (*see* Section III.B.2.c., *supra*.), however, Namecheap used some of the Infringing Domain Names to set up revenue-generating advertising "parking pages" that diverted consumers away from Plaintiffs' legitimate websites. (Compl. ¶¶ 85–86 & Ex. 12). The Namecheap Registration Agreement permits Namecheap's use of the domain name to host advertising parking pages. (*Id*. Ex. 1 § 22 (Doc. 1-2 at 13).) Namecheap must agree that use of a domain name to host advertising parking pages is a use in commerce under the Lanham Act because it has registered its own NAMECHEAP mark for these very services. *See, e.g.*, U.S. Reg. No. 4,213,990 for the mark NAMECHEAP (reciting, among other services, "Parking domain names for others, namely, providing computer servers for facilitation of the storage of domain name addresses" and claiming first use in commerce in 2000).[22]

---

[22] Namecheap's counsel of record, Eugene Rome, signed the Combined Declaration of Use and Incontestability under Sections 8 & 15 (Nov. 14, 2018), declaring in part, "the mark is in use in commerce on or in connection with all of the goods/all of the services," attached to this Opposition as Exhibit A. Plaintiffs request that the Court take judicial notice of this document under Fed. R. Evid. 201(b)(2).

### 2.   Whoisguard contractually agreed to accept liability on behalf of its Licensees under the Namecheap Registration Agreement.

Namecheap is an ICANN-accredited domain name registrar subject to ICANN's RAA. (Compl. ¶¶ 3, 51.) ICANN requires every registrant of a domain name to enter into a Registration Agreement with an ICANN-accredited domain name registrar. (*Id*. ¶ 51 & Ex. 7.) As the registrant of the Infringing Domain Names, Whoisguard was thus required to enter into the Namecheap Registration Agreement and be bound by its terms.

Whoisguard is a party to this agreement because the agreement defines "you" and "your" to include "***the registrant listed in the WHOIS contact information for the domain name,***" which, as shown above, is Whoisguard. (*Id*. Ex. 1 (Doc. 1-2 at 3) (emphasis added).) The language of the agreement confirms that Whoisguard is a party to the agreement because it "sets forth the terms and conditions of ***your*** use of domain name registration and related services." (*Id*. Ex. 1 (Doc. 1-2 at 3) (emphasis added).) Furthermore, "[t]his Agreement explains our obligations to ***you***, and explains ***your*** obligations to us for various services offered by Namecheap." (*Id.* (emphasis added).)

Namecheap is also required to include certain material terms in its Registration Agreement, including the language from RAA ¶ 3.7.7.3. (*Id*. ¶ 51 & Ex. 1.) Defendants do not dispute, nor could they, that the Namecheap Registration Agreement contains all the terms required by ICANN, including RAA ¶ 3.7.7.3. (Mot. 3:10–14; *see* Declaration of Kelsey A. Ewing ¶¶ 2–9 & Exs. A–D). Therefore, anyone who registers a domain name with Namecheap, including Whoisguard, agrees:

> A Registered Name Holder licensing use of a Registered Name according to this provision ***shall accept liability for harm caused by wrongful use of the Registered Name, unless it discloses the current contact information provided by the licensee*** and the identity of the licensee within seven (7) days to a party providing the Registered Name Holder reasonable evidence of actionable harm.

(Compl. Ex 7, RAA ¶ 3.7.7.3 (Doc. No. 1-5 at 16–17) (emphasis added).) Whoisguard contractually agreed under the Namecheap Registration Agreement to accept liability if it failed to disclose the Licensee's contact information within seven days of being provided

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

reasonable evidence of trademark infringement. Whoisguard is thus liable for the cybersquatting, infringement, false designation of origin, and dilution of its customers because Whoisguard refused to disclose the Licensees' contact information after Plaintiffs sent notice of the Infringing Domain Names. (*Id*. ¶¶ 83–84.)[23]

### a. Defendants mistakenly argue Plaintiffs are attempting to enforce the RAA, rather than Namecheap's own contract.

Defendants ignore that the Namecheap Registration Agreement must incorporate language required under the Registrar Accreditation Agreement and that the Namecheap Registration Agreement **does** in fact incorporate the required language. Defendants further ignore case law supporting that the language in Namecheap's Registration Agreement confers a third party benefit on parties in Plaintiffs' position. *See Solid Host*, 652 F. Supp. 2d at 1119 (denying Namecheap's motion to dismiss because language from RAA ¶ 3.7.7.3 incorporated into separate domain name registration agreement is inferred to confer a third party benefit at motion to dismiss stage; "Because they involve factual questions of intent, third party beneficiary claims are often not appropriate for resolution via motion to dismiss.").

Rather than directly confront these truths, Defendants create a straw man not advanced in the Complaint. (Mot. 18:8–21:9.) To do that, Defendants rely on *Balsam v. Tucows Inc.*, 627 F.3d 1158 (9th Cir. 2010), to argue Plaintiffs' claims fail because the RAA (not the Namecheap Registration Agreement) does not create any third party rights. But here, unlike the plaintiff in *Tucows*, Plaintiffs seek to enforce the provision **in Namecheap's Registration Agreement** that the RAA required Namecheap to include in its own contract. *See Tucows*, 627 F.3d at 1162 n.2 (noting that Balsam did "not allege that Tucows failed to enter into a separate agreement with the registered name holder, in violation of ¶ 3.7.7 of the RAA" and implying plaintiff's proper recourse was to enforce

---

[23] Defendants do not dispute that these notices constituted "reasonable evidence of actionable harm."

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

the mandated language in the registration agreement, not the RAA itself). *See Solid Host,* 652 F. Supp. 2d at 1119 (holding that the plaintiff had stated a claim for breach of the separate registration agreement between the registrar and registrant based on the language that agreement incorporated from RAA ¶ 3.7.7.3 and denying motion to dismiss.) Construing all allegations in plaintiff's favor, the court also held an intent to benefit a third party was inferred from the registration agreement's incorporation of RAA ¶ 3.7.7.3. *Id.* Here, Plaintiffs have alleged they are the category of third parties contemplated by the language incorporated into Namecheap's Registration Agreement.

### E. Namecheap is liable for Whoisguard's actions as a direct participant.

Namecheap is liable for all of Whoisguard's actions[24] because Namecheap is a direct participant in Whoisguard's unlawful activities. (Compl. ¶¶ 25, 68.) Under the direct participant theory,[25] even if all of the acts alleged in the Complaint were committed solely by Whoisguard, Namecheap would still be liable as a direct participant. (*Id.* ¶ 68.)

Plaintiffs allege that Namecheap performs virtually all services necessary for Whoisguard's operation and describes the service as "Whoisguard by Namecheap." (*Id.* ¶ 59.) Indeed, Whoisguard admitted in responding to Plaintiffs' infringement notices that

---

[24] Plaintiffs allege that Whoisguard is liable for violating the ACPA because Whoisguard registered and licensed the Infringing Domain Names with a bad faith intent to profit from the Plaintiffs' marks. Plaintiffs also allege that Whoisguard is liable under the Namecheap Registration Agreement for the harm caused by the Licensees' use of the Infringing Domain Names because Whoisguard failed to disclose the contact information of the Licensees after receiving notice from Plaintiffs.

[25] The direct participation theory is distinct from Plaintiffs' alter ego theory, as described more fully below. "[A] significant body of case law supports the direct participant theory of liability." *Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227, 233–34 (Ill. 2007) (collecting state and federal cases); *see also Allen v. Amer. Cap. Ltd.*, 287 F. Supp. 3d 763, 806 (D. Ariz. 2017) ("A parent company can be liable for a subsidiary's acts where the parent directly participates [in] and directs the subsidiary's harmful activities."). Under this theory, a "parent corporation may be held liable for the wrongdoing of a subsidiary where the parent directly participated in the subsidiary's unlawful actions." *Esmark, Inc. v. Nat'l Labor Relations Bd.*, 887 F.2d 739, 756 (7th Cir. 1989); *Cher v. Forum Int'l, Ltd.*, 692 F.2d 634, 640 (9th Cir. 1982) (finding parent liable for actions of subsidiary where parent owned 80% of subsidiary's stock and participated in tortious conduct).

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

it has no control over its own service. (*Id.* ¶ 98.) This service is integrated within Namecheap's website. (*Id.* ¶¶ 27, 60.) Namecheap's customers obtain the service directly from their Namecheap user account. (*Id.* ¶ 60 & Ex. 10.) Namecheap, not Whoisguard, responded to trademark infringement notices sent to Whoisguard. (*Id.* ¶ 62.) Namecheap, not Whoisguard, responded to subpoenas in other litigations sent to Whoisguard. (*Id.* ¶ 63.) When administrative domain name complaints are filed against Whoisguard, Namecheap, not Whoisguard, discloses the names of Whoisguard's customers. (*Id.* ¶ 64.) Namecheap, not Whoisguard, operates the whoisguard.com website. (*Id.* ¶ 66.)

In their motion, Defendants fail to address Plaintiffs' direct participant allegations. As such, Defendants concede for purposes of their motion to dismiss that Namecheap is a direct participant in Whoisguard's activities and liable for Whoisguard's actions. *See FT Travel--New York, LLC*, 112 F. Supp. 3d at 1079.

**F.      Whoisguard is an alter ego of Namecheap.**

Despite Defendants' claim, the Complaint contains numerous allegations that if proven true would establish that Whoisguard is the alter ego of Namecheap (Compl. ¶¶ 59–64)—facts that are not disputed by Defendants. As alter egos of each other Namecheap is liable for Whoisguard's tortious conduct.

In federal question cases, courts apply federal common law on alter ego, which borrows from state law. *See McGeachy v. Pinto Valley Mining Corp.*, No. 2:16-CV-03348 JWS, 2017 WL 3130639, at *4 (D. Ariz. July 24, 2017) (citing *Johnson v. Serenity Transportation, Inc.*, 141 F. Supp. 3d 974, 984 n.1 (N.D. Cal. 2015)). To state a claim under an alter ego theory, a plaintiff "must make out a prima facie case '(1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice.'" *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015) (alteration marks

1  in original omitted).[26]

2  **1.  Unity of interest and ownership exist between Defendants.**

4       Courts find that unity of interest and ownership exist when the parent controls the

5  subsidiary "to such a degree as to render the latter the mere instrumentality of the former."

6  *Ranza*, 793 F.3d at 1073. This can be shown through "pervasive control," when the parent

6  "dictates every facet of the subsidiary's business." *Id.*

8       The same facts which support the direct participation theory also support that

9  Defendants are alter egos of each other. Plaintiffs also allege—and Defendants do not

10 dispute—that Whoisguard provides its service for free. (Compl. ¶ 61.) Since Whoisguard

10 provides its proxy services solely through Namecheap,[27] there is no evidence that

11 Whoisguard earns any income from anyone. As such, offering this proxy service for free

12 supports that Namecheap has failed to adequately capitalize or finance Whoisguard.

13 Furthermore, apparently Namecheap does not pay Whoisguard for the proxy service. *Id.*

14 Thus, when Namecheap receives money from customers for registration and proxy

15 services, and fails to pay Whoisguard, the two companies improperly commingle funds.

17      Further demonstrating the companies' disregard of their supposedly separate

17 existences, Namecheap confuses the role of registrar and proxy service provider in

18 representations made to customers on Namecheap's own website: "The only potential

---

[26] Arizona applies a similar alter ego standard. *See e.g.*, *McGeachy*, 2017 WL 3130639, at
*4 n.41; *Gatecliff v. Great Republic Life Ins. Co.*, 821 P.2d 725, 728 (Ariz. 1991)
("plaintiffs must prove both (1) unity of control and (2) that observance of the corporate
form would sanction a fraud or injustice").

[27] Namecheap's website explains that WhoisGuard subscriptions can be used only with
domains registered with Namecheap. "Can I use my WhoisGuard subscription for a domain
not registered through Namecheap? Unfortunately, it is not possible. WhoisGuard
subscriptions can be used only with domains registered with Namecheap." Namecheap,
*Can I use my WhoisGuard subscription for a domain not registered through Namecheap*,
https://www.namecheap.com/support/knowledgebase/article.aspx/279/37/can-i-use-my-
whoisguard-subscription-for-a-domain-not-registered-through-namecheap (last accessed
May 21, 2020)), attached to this Opposition as Exhibit B. Pursuant to Fed. R. Evid.
201(b)(2) & (c)(2), the court may take judicial notice of Namecheap's website.

drawback of domain name privacy comes down to ownership. Technically, the ***domain name registrant*** owns the website (in the eyes of ICANN) not you. In most cases, this will never be an issue because it's unlikely that ***your registrar*** is going to steal your domain." (Compl. Ex. 8 (Doc. 1-6 at 2) (emphasis added).) Because the proxy service, Whoisguard, owns the domain and website, and is not the registrar, stating that "your registrar" can steal the domain name admits that Namecheap, the registrar, is the same entity as Whoisguard, the proxy service provider.

Similarly, the two purported contracts Whoisguard puts forth in support of its Motion frequently confuse or interchange Namecheap and Whoisguard for each other or reference themselves in ways that disregard their separate existence. For example, Exhibit 1 to the Zurita Declaration describes Whoisguard as both a party and a third party to the agreement. (¶ 1.2 (Doc 31-1 at 5) ("This Proxy Agreement explains Whoisguard's obligations to you in connection with your WHOIS privacy protection services, and explains your obligations to Whoisguard for privacy protection services offered by third Whoisguard [sic].").) It also states that Whoisguard reserves the right to "instruct Whoisguard." (*Id.* at ¶ 8.1 (Doc 31-1 at 7).)

Plaintiffs alleged facts showing that there exists a unity of interest and ownership between Namecheap and Whoisguard because of the pervasive control that Namecheap has over Whoisguard. To the extent Defendants challenge these facts, such conflicts must be resolved in Plaintiffs' favor. *Barker,* 584 F.3d at 824.

**2.   Failure to disregard Namecheap's and Whoisguard's separate identities would result in fraud or injustice.**

At the pleading stage, a plaintiff need only "plausibly allege" an inequitable result. *See In re Packaged Seafood Prods. Antitrust Lit.*, 277 F. Supp. 3d 1167, 1188 (S.D. Cal. 2017). Observance of separate identities may result in fraud or injustice when doing so would deny recovery to a plaintiff. *See Gatecliff v. Great Republic Life Ins. Co.*, 821 P. 2d 725, 729 (Ariz. 1991) ("[O]bservance of the corporate form could permit the two corporations to confuse plaintiffs and frustrate their efforts to protect their rights before

24

suit, while allowing the party responsible . . . to avoid liability after suit."). Numerous courts have held ACPA claims can be based on an alter ego theory. *See Flentye v. Kathrein*, 485 F. Supp. 2d 903, 914–15 (N.D. Ill. 2007) (denying defendants' motion to dismiss based on ACPA safe harbor because plaintiffs alleged defendant engaged in violation as alter ego of other defendant); *Bally Schuhfabriken AG v. Bally Manufacturing Corp.*, No. 92 C 0312, 1992 WL 80554, at *2 (N.D. Ill. Apr. 8, 1992) (collecting authorities); *see also Hamptons Locations, Inc. v. Rubens*, No. 01CV5477DRHWDW, 2005 WL 2436209, at *8 (E.D.N.Y. Sept. 30, 2005) (denying summary judgment motion because issue of fact existed regarding whether one defendant was de facto registrant of infringing domain name as "authorized licensee").

Similarly, here, an inequitable result should be avoided. Defendants have a history of domain name abuse, consistently fail to cooperate with trademark owners investigating infringement and refuse to respond appropriately to reports of abuse, as required by ICANN. (*Id.* ¶¶ 7–14, 92, 96–104.) These bad acts are an integral part of Defendants' scheme to profit by attracting cybersquatters and other bad actors to their services. (*Id.* ¶¶ 7–14, 88–95.) Defendants have abused their position of trust as a registrar to the detriment of Plaintiffs, the public, and other trademark owners. (*Dell Inc., supra.*)

To ensure that they are protected from liability for its bad acts, Namecheap set up Whoisguard as a hollow shell and alter ego of Namecheap, situated in Panama to evade U.S. jurisdiction and avoid liability for Namecheap's unlawful conduct and the conduct of Namecheap's cybersquatting customers.[28] Treating Namecheap and Whoisguard as separate entities would result in fraud and injustice.

### G. Holding Defendants liable is consistent with ICANN's Domain Name Registration System and the ACPA.

Defendants argue that if they are held liable for shielding trademark infringers and

---

[28] Counsel for Whoisguard suggested during the Parties' April 15, 2020, meet and confer conference that Whoisguard is not subject to jurisdiction anywhere outside of Panama.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

operators of malicious websites, the entire domain name registration system will be disrupted. (Mot. 23:10–12.) To the contrary, Plaintiffs merely seek to exercise their rights under the ACPA and enforce the very liability-shifting mechanism ICANN envisioned in designing the domain name registration system's framework and related policies. Imposing liability here is also consistent with Congress's intent in enacting the ACPA, which provides limited safe harbor for registrars who act in good faith and work with trademark owners to prevent cybersquatting. *See Solid Host*, 652 F. Supp. 2d at 1105.

Defendants' argument that they should not be liable for their and their licensees' bad acts because Plaintiffs could file Doe lawsuits to obtain discovery is not consistent with the law or Defendants' obligations. (Mot. 24:13–16) First, this argument does not address Defendants' liability for their own conduct, such as registering, trafficking in, and using the Infringing Domain Names themselves, including Namecheap's use of the domain names to set up parking pages. Second, requiring that a lawsuit or UDRP complaint be filed every time a trademark holder discovers a domain name is infringing on its marks would create tremendous burden and expense for trademark holders and courts. Third, as discussed above, it is contrary to the Temp. Spec.'s requirement to disclose information in response to infringement notices, as required by ICANN. (Temp. Spec. Appx. A § 4.1 (Doc. 30-2 at 26) Indeed, ICANN and Congress both envisioned a cooperative relationship between trademark owners and registrars, which Defendants refuse to honor.

This case does not challenge the legality of proxy services or challenge the privacy protections of GDPR. It does not seek to hold Namecheap liable for its actions as a registrar. Indeed, many registrars, such as GoDaddy, lawfully provide proxy services and comply with GDPR while honoring their obligations to disclose infringers' contact information to trademark holders. If hundreds of other ICANN-accredited domain name registrars can comply with the rules of the domain name registration system, Namecheap can too.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss.

26

DATED: May 26, 2020                    TUCKER ELLIS LLP


By: /s/ David J. Steele
David J. Steele
Howard A. Kroll
Steven E. Lauridsen
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223

SNELL & WILMER L.L.P.
David G. Barker
Jacob C. Jones
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

Attorneys for Plaintiffs,
FACEBOOK, INC., INSTAGRAM, LLC,
and WHATSAPP INC.

## CERTIFICATE OF SERVICE

I hereby certify that, on May 26, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants of record.


By: /s/ David J. Steele___

TUCKER ELLIS LLP
Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

28