EXHIBIT H

CURIA - Dokumente                                              http://curia.europa.eu/juris/document/document_print.jsf?docid=152065...

JUDGMENT OF THE COURT (Grand Chamber)

13 May 2014 (*)

(Personal data — Protection of individuals with regard to the processing of such data — Directive 95/46/EC — Articles 2, 4, 12 and 14 — Material and territorial scope — Internet search engines — Processing of data contained on websites — Searching for, indexing and storage of such data — Responsibility of the operator of the search engine — Establishment on the territory of a Member State — Extent of that operator's obligations and of the data subject's rights — Charter of Fundamental Rights of the European Union — Articles 7 and 8)

In Case C‑131/12,

REQUEST for a preliminary ruling under Article 267 TFEU from the Audiencia Nacional (Spain), made by decision of 27 February 2012, received at the Court on 9 March 2012, in the proceedings

**Google Spain SL,**

**Google Inc.**

v

**Agencia Española de Protección de Datos (AEPD),**

**Mario Costeja González,**

THE COURT (Grand Chamber),

composed of V. Skouris, President, K. Lenaerts, Vice-President, M. Ilešič (Rapporteur), L. Bay Larsen, T. von Danwitz, M. Safjan, Presidents of Chambers, J. Malenovský, E. Levits, A. Ó Caoimh, A. Arabadjiev, M. Berger, A. Prechal and E. Jarašiūnas Judges,

Advocate General: N. Jääskinen,

Registrar: M. Ferreira, Principal Administrator,

having regard to the written procedure and further to the hearing on 26 February 2013,

after considering the observations submitted on behalf of:

—    Google Spain SL and Google Inc., by F. González Díaz, J. Baño Fos and B. Holles, abogados,

—    Mr Costeja González, by J. Muñoz Rodríguez, abogado,

—    the Spanish Government, by A. Rubio González, acting as Agent,

—    the Greek Government, by E.-M. Mamouna and K. Boskovits, acting as Agents,

—    the Italian Government, by G. Palmieri, acting as Agent, and P. Gentili, avvocato dello Stato,

—    the Austrian Government, by G. Kunnert and C. Pesendorfer, acting as Agents,

—   the Polish Government, by B. Majczyna and M. Szpunar, acting as Agents,

—   the European Commission, by I. Martínez del Peral and B. Martenczuk, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 25 June 2013,

gives the following

## Judgment

1    This request for a preliminary ruling concerns the interpretation of Article 2(b) and (d), Article 4(1)(a) and (c), Article 12(b) and subparagraph (a) of the first paragraph of Article 14 of Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data (OJ 1995 L 281, p. 31) and of Article 8 of the Charter of Fundamental Rights of the European Union ('the Charter').

2    The request has been made in proceedings between, on the one hand, Google Spain SL ('Google Spain') and Google Inc. and, on the other, the Agencia Española de Protección de Datos (Spanish Data Protection Agency; 'the AEPD') and Mr Costeja González concerning a decision by the AEPD upholding the complaint lodged by Mr Costeja González against those two companies and ordering Google Inc. to adopt the measures necessary to withdraw personal data relating to Mr Costeja González from its index and to prevent access to the data in the future.

## Legal context

### European Union law

3    Directive 95/46 which, according to Article 1, has the object of protecting the fundamental rights and freedoms of natural persons, and in particular their right to privacy with respect to the processing of personal data, and of removing obstacles to the free flow of such data, states in recitals 2, 10, 18 to 20 and 25 in its preamble:

'(2)    ... data-processing systems are designed to serve man; ... they must, whatever the nationality or residence of natural persons, respect their fundamental rights and freedoms, notably the right to privacy, and contribute to ... the well-being of individuals;

...

(10)    ... the object of the national laws on the processing of personal data is to protect fundamental rights and freedoms, notably the right to privacy, which is recognised both in Article 8 of the European Convention for the Protection of Human Rights and Fundamental Freedoms [, signed in Rome on 4 November 1950,] and in the general principles of Community law; ... for that reason, the approximation of those laws must not result in any lessening of the protection they afford but must, on the contrary, seek to ensure a high level of protection in the Community;

...

(18)    ... in order to ensure that individuals are not deprived of the protection to which they are entitled under this Directive, any processing of personal data in the Community must be carried out in accordance with the law of one of the Member States; ... in this connection, processing carried out under the responsibility of a controller who is established in a Member State should be

governed by the law of that State;

(19)    ... establishment on the territory of a Member State implies the effective and real exercise of activity through stable arrangements; ... the legal form of such an establishment, whether simply [a] branch or a subsidiary with a legal personality, is not the determining factor in this respect; ... when a single controller is established on the territory of several Member States, particularly by means of subsidiaries, he must ensure, in order to avoid any circumvention of national rules, that each of the establishments fulfils the obligations imposed by the national law applicable to its activities;

(20)    ... the fact that the processing of data is carried out by a person established in a third country must not stand in the way of the protection of individuals provided for in this Directive; ... in these cases, the processing should be governed by the law of the Member State in which the means used are located, and there should be guarantees to ensure that the rights and obligations provided for in this Directive are respected in practice;

...

(25)    ... the principles of protection must be reflected, on the one hand, in the obligations imposed on persons ... responsible for processing, in particular regarding data quality, technical security, notification to the supervisory authority, and the circumstances under which processing can be carried out, and, on the other hand, in the right conferred on individuals, the data on whom are the subject of processing, to be informed that processing is taking place, to consult the data, to request corrections and even to object to processing in certain circumstances'.

4    Article 2 of Directive 95/46 states that '[f]or the purposes of this Directive:

(a)    "personal data" shall mean any information relating to an identified or identifiable natural person ("data subject"); an identifiable person is one who can be identified, directly or indirectly, in particular by reference to an identification number or to one or more factors specific to his physical, physiological, mental, economic, cultural or social identity;

(b)    "processing of personal data" ("processing") shall mean any operation or set of operations which is performed upon personal data, whether or not by automatic means, such as collection, recording, organisation, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, blocking, erasure or destruction;

...

(d)    "controller" shall mean the natural or legal person, public authority, agency or any other body which alone or jointly with others determines the purposes and means of the processing of personal data; where the purposes and means of processing are determined by national or Community laws or regulations, the controller or the specific criteria for his nomination may be designated by national or Community law;

...'

5    Article 3 of Directive 95/46, entitled 'Scope', states in paragraph 1:

'This Directive shall apply to the processing of personal data wholly or partly by automatic means, and to the processing otherwise than by automatic means of personal data which form part of a filing system or are intended to form part of a filing system.'

6      Article 4 of Directive 95/46, entitled 'National law applicable', provides:

'1.      Each Member State shall apply the national provisions it adopts pursuant to this Directive to the processing of personal data where:

(a)     the processing is carried out in the context of the activities of an establishment of the controller on the territory of the Member State; when the same controller is established on the territory of several Member States, he must take the necessary measures to ensure that each of these establishments complies with the obligations laid down by the national law applicable;

(b)     the controller is not established on the Member State's territory, but in a place where its national law applies by virtue of international public law;

(c)     the controller is not established on Community territory and, for purposes of processing personal data makes use of equipment, automated or otherwise, situated on the territory of the said Member State, unless such equipment is used only for purposes of transit through the territory of the Community.

2.      In the circumstances referred to in paragraph 1(c), the controller must designate a representative established in the territory of that Member State, without prejudice to legal actions which could be initiated against the controller himself.'

7      In Section I (entitled 'Principles relating to data quality') of Chapter II of Directive 95/46, Article 6 is worded as follows:

'1.      Member States shall provide that personal data must be:

(a)     processed fairly and lawfully;

(b)     collected for specified, explicit and legitimate purposes and not further processed in a way incompatible with those purposes. Further processing of data for historical, statistical or scientific purposes shall not be considered as incompatible provided that Member States provide appropriate safeguards;

(c)     adequate, relevant and not excessive in relation to the purposes for which they are collected and/or further processed;

(d)     accurate and, where necessary, kept up to date; every reasonable step must be taken to ensure that data which are inaccurate or incomplete, having regard to the purposes for which they were collected or for which they are further processed, are erased or rectified;

(e)     kept in a form which permits identification of data subjects for no longer than is necessary for the purposes for which the data were collected or for which they are further processed. Member States shall lay down appropriate safeguards for personal data stored for longer periods for historical, statistical or scientific use.

2.      It shall be for the controller to ensure that paragraph 1 is complied with.'

8      In Section II (entitled 'Criteria for making data processing legitimate') of Chapter II of Directive 95/46, Article 7 provides:

'Member States shall provide that personal data may be processed only if:

...

(f)     processing is necessary for the purposes of the legitimate interests pursued by the controller or by the third party or parties to whom the data are disclosed, except where such interests are overridden by the interests [or] fundamental rights and freedoms of the data subject which require protection under Article 1(1).'

9     Article 9 of Directive 95/46, entitled 'Processing of personal data and freedom of expression', provides:

'Member States shall provide for exemptions or derogations from the provisions of this Chapter, Chapter IV and Chapter VI for the processing of personal data carried out solely for journalistic purposes or the purpose of artistic or literary expression only if they are necessary to reconcile the right to privacy with the rules governing freedom of expression.'

10    Article 12 of Directive 95/46, entitled 'Rights of access', provides:

'Member States shall guarantee every data subject the right to obtain from the controller:

...

(b)     as appropriate the rectification, erasure or blocking of data the processing of which does not comply with the provisions of this Directive, in particular because of the incomplete or inaccurate nature of the data;

...'

11    Article 14 of Directive 95/46, entitled 'The data subject's right to object', provides:

'Member States shall grant the data subject the right:

(a)     at least in the cases referred to in Article 7(e) and (f), to object at any time on compelling legitimate grounds relating to his particular situation to the processing of data relating to him, save where otherwise provided by national legislation. Where there is a justified objection, the processing instigated by the controller may no longer involve those data;

...'

12    Article 28 of Directive 95/46, entitled 'Supervisory authority', is worded as follows:

'1.     Each Member State shall provide that one or more public authorities are responsible for monitoring the application within its territory of the provisions adopted by the Member States pursuant to this Directive.

...

3.     Each authority shall in particular be endowed with:

–     investigative powers, such as powers of access to data forming the subject-matter of processing operations and powers to collect all the information necessary for the performance of its supervisory duties,

–     effective powers of intervention, such as, for example, that ... of ordering the blocking, erasure or destruction of data, of imposing a temporary or definitive ban on processing ...

—      ...

Decisions by the supervisory authority which give rise to complaints may be appealed against through the courts.

4.      Each supervisory authority shall hear claims lodged by any person, or by an association representing that person, concerning the protection of his rights and freedoms in regard to the processing of personal data. The person concerned shall be informed of the outcome of the claim.

...

6.      Each supervisory authority is competent, whatever the national law applicable to the processing in question, to exercise, on the territory of its own Member State, the powers conferred on it in accordance with paragraph 3. Each authority may be requested to exercise its powers by an authority of another Member State.

The supervisory authorities shall cooperate with one another to the extent necessary for the performance of their duties, in particular by exchanging all useful information.

...'

*Spanish law*

13    Directive 95/46 was transposed into Spanish Law by Organic Law No 15/1999 of 13 December 1999 on the protection of personal data (BOE No 298 of 14 December 1999, p. 43088).

**The dispute in the main proceedings and the questions referred for a preliminary ruling**

14    On 5 March 2010, Mr Costeja González, a Spanish national resident in Spain, lodged with the AEPD a complaint against La Vanguardia Ediciones SL, which publishes a daily newspaper with a large circulation, in particular in Catalonia (Spain) ('La Vanguardia'), and against Google Spain and Google Inc. The complaint was based on the fact that, when an internet user entered Mr Costeja González's name in the search engine of the Google group ('Google Search'), he would obtain links to two pages of La Vanguardia's newspaper, of 19 January and 9 March 1998 respectively, on which an announcement mentioning Mr Costeja González's name appeared for a real-estate auction connected with attachment proceedings for the recovery of social security debts.

15    By that complaint, Mr Costeja González requested, first, that La Vanguardia be required either to remove or alter those pages so that the personal data relating to him no longer appeared or to use certain tools made available by search engines in order to protect the data. Second, he requested that Google Spain or Google Inc. be required to remove or conceal the personal data relating to him so that they ceased to be included in the search results and no longer appeared in the links to La Vanguardia. Mr Costeja González stated in this context that the attachment proceedings concerning him had been fully resolved for a number of years and that reference to them was now entirely irrelevant.

16    By decision of 30 July 2010, the AEPD rejected the complaint in so far as it related to La Vanguardia, taking the view that the publication by it of the information in question was legally justified as it took place upon order of the Ministry of Labour and Social Affairs and was intended to give maximum publicity to the auction in order to secure as many bidders as possible.

17    On the other hand, the complaint was upheld in so far as it was directed against Google Spain and Google Inc. The AEPD considered in this regard that operators of search engines are subject to data

protection legislation given that they carry out data processing for which they are responsible and act as intermediaries in the information society. The AEPD took the view that it has the power to require the withdrawal of data and the prohibition of access to certain data by the operators of search engines when it considers that the locating and dissemination of the data are liable to compromise the fundamental right to data protection and the dignity of persons in the broad sense, and this would also encompass the mere wish of the person concerned that such data not be known to third parties. The AEPD considered that that obligation may be owed directly by operators of search engines, without it being necessary to erase the data or information from the website where they appear, including when retention of the information on that site is justified by a statutory provision.

18    Google Spain and Google Inc. brought separate actions against that decision before the Audiencia Nacional (National High Court). The Audiencia Nacional joined the actions.

19    That court states in the order for reference that the actions raise the question of what obligations are owed by operators of search engines to protect personal data of persons concerned who do not wish that certain information, which is published on third parties' websites and contains personal data relating to them that enable that information to be linked to them, be located, indexed and made available to internet users indefinitely. The answer to that question depends on the way in which Directive 95/46 must be interpreted in the context of these technologies, which appeared after the directive's publication.

20    In those circumstances, the Audiencia Nacional decided to stay the proceedings and to refer the following questions to the Court for a preliminary ruling:

'1.    With regard to the territorial application of Directive [95/46] and, consequently, of the Spanish data protection legislation:

(a)    must it be considered that an "establishment", within the meaning of Article 4(1)(a) of Directive 95/46, exists when any one or more of the following circumstances arise:

–    when the undertaking providing the search engine sets up in a Member State an office or subsidiary for the purpose of promoting and selling advertising space on the search engine, which orientates its activity towards the inhabitants of that State,

or

–    when the parent company designates a subsidiary located in that Member State as its representative and controller for two specific filing systems which relate to the data of customers who have contracted for advertising with that undertaking,

or

–    when the office or subsidiary established in a Member State forwards to the parent company, located outside the European Union, requests and requirements addressed to it both by data subjects and by the authorities with responsibility for ensuring observation of the right to data protection, even where such collaboration is engaged in voluntarily?

(b)    Must Article 4(1)(c) of Directive 95/46 be interpreted as meaning that there is "use of equipment ... situated on the territory of the said Member State":

–    when a search engine uses crawlers or robots to locate and index information contained in web pages located on servers in that Member State,

or

&ndash; when it uses a domain name pertaining to a Member State and arranges for searches and the results thereof to be based on the language of that Member State?

(c) Is it possible to regard as a use of equipment, in the terms of Article 4(1)(c) of Directive 95/46, the temporary storage of the information indexed by internet search engines? If the answer to that question is affirmative, can it be considered that that connecting factor is present when the undertaking refuses to disclose the place where it stores those indexes, invoking reasons of competition?

(d) Regardless of the answers to the foregoing questions and particularly in the event that the Court … considers that the connecting factors referred to in Article 4 of [Directive 95/46] are not present:

must Directive 95/46 … be applied, in the light of Article 8 of the [Charter], in the Member State where the centre of gravity of the conflict is located and more effective protection of the rights of … Union citizens is possible?

2. As regards the activity of search engines as providers of content in relation to Directive 95/46 …:

(a) in relation to the activity of [Google Search], as a provider of content, consisting in locating information published or included on the net by third parties, indexing it automatically, storing it temporarily and finally making it available to internet users according to a particular order of preference, when that information contains personal data of third parties: must an activity like the one described be interpreted as falling within the concept of "processing of … data" used in Article 2(b) of Directive 95/46?

(b) If the answer to the foregoing question is affirmative, and once again in relation to an activity like the one described:

must Article 2(d) of Directive 95/46 be interpreted as meaning that the undertaking managing [Google Search] is to be regarded as the "controller" of the personal data contained in the web pages that it indexes?

(c) In the event that the answer to the foregoing question is affirmative:

may the [AEPD], protecting the rights embodied in [Article] 12(b) and [subparagraph (a) of the first paragraph of Article 14] of Directive 95/46, directly impose on [Google Search] a requirement that it withdraw from its indexes an item of information published by third parties, without addressing itself in advance or simultaneously to the owner of the web page on which that information is located?

(d) In the event that the answer to the foregoing question is affirmative:

would the obligation of search engines to protect those rights be excluded when the information that contains the personal data has been lawfully published by third parties and is kept on the web page from which it originates?

3. Regarding the scope of the right of erasure and/or the right to object, in relation to the "derecho al olvido" (the "right to be forgotten"), the following question is asked:

must it be considered that the rights to erasure and blocking of data, provided for in Article 12(b),

and the right to object, provided for by [subparagraph (a) of the first paragraph of Article 14] of Directive 95/46, extend to enabling the data subject to address himself to search engines in order to prevent indexing of the information relating to him personally, published on third parties' web pages, invoking his wish that such information should not be known to internet users when he considers that it might be prejudicial to him or he wishes it to be consigned to oblivion, even though the information in question has been lawfully published by third parties?'

**Consideration of the questions referred**

*Question 2(a) and (b), concerning the material scope of Directive 95/46*

21    By Question 2(a) and (b), which it is appropriate to examine first, the referring court asks, in essence, whether Article 2(b) of Directive 95/46 is to be interpreted as meaning that the activity of a search engine as a provider of content which consists in finding information published or placed on the internet by third parties, indexing it automatically, storing it temporarily and, finally, making it available to internet users according to a particular order of preference must be classified as 'processing of personal data' within the meaning of that provision when that information contains personal data. If the answer is in the affirmative, the referring court seeks to ascertain furthermore whether Article 2(d) of Directive 95/46 is to be interpreted as meaning that the operator of a search engine must be regarded as the 'controller' in respect of that processing of the personal data, within the meaning of that provision.

22    According to Google Spain and Google Inc., the activity of search engines cannot be regarded as processing of the data which appear on third parties' web pages displayed in the list of search results, given that search engines process all the information available on the internet without effecting a selection between personal data and other information. Furthermore, even if that activity must be classified as 'data processing', the operator of a search engine cannot be regarded as a 'controller' in respect of that processing since it has no knowledge of those data and does not exercise control over the data.

23    On the other hand, Mr Costeja González, the Spanish, Italian, Austrian and Polish Governments and the European Commission consider that that activity quite clearly involves 'data processing' within the meaning of Directive 95/46, which is distinct from the data processing by the publishers of websites and pursues different objectives from such processing. The operator of a search engine is the 'controller' in respect of the data processing carried out by it since it is the operator that determines the purposes and means of that processing.

24    In the Greek Government's submission, the activity in question constitutes such 'processing', but inasmuch as search engines serve merely as intermediaries, the undertakings which operate them cannot be regarded as 'controllers', except where they store data in an 'intermediate memory' or 'cache memory' for a period which exceeds that which is technically necessary.

25    Article 2(b) of Directive 95/46 defines 'processing of personal data' as 'any operation or set of operations which is performed upon personal data, whether or not by automatic means, such as collection, recording, organisation, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, blocking, erasure or destruction'.

26    As regards in particular the internet, the Court has already had occasion to state that the operation of loading personal data on an internet page must be considered to be such 'processing' within the meaning of Article 2(b) of Directive 95/46 (see Case C-101/01 *Lindqvist* EU:C:2003:596, paragraph 25).

27     So far as concerns the activity at issue in the main proceedings, it is not contested that the data found, indexed and stored by search engines and made available to their users include information relating to identified or identifiable natural persons and thus 'personal data' within the meaning of Article 2(a) of that directive.

28     Therefore, it must be found that, in exploring the internet automatically, constantly and systematically in search of the information which is published there, the operator of a search engine 'collects' such data which it subsequently 'retrieves', 'records' and 'organises' within the framework of its indexing programmes, 'stores' on its servers and, as the case may be, 'discloses' and 'makes available' to its users in the form of lists of search results. As those operations are referred to expressly and unconditionally in Article 2(b) of Directive 95/46, they must be classified as 'processing' within the meaning of that provision, regardless of the fact that the operator of the search engine also carries out the same operations in respect of other types of information and does not distinguish between the latter and the personal data.

29     Nor is the foregoing finding affected by the fact that those data have already been published on the internet and are not altered by the search engine.

30     The Court has already held that the operations referred to in Article 2(b) of Directive 95/46 must also be classified as such processing where they exclusively concern material that has already been published in unaltered form in the media. It has indeed observed in that regard that a general derogation from the application of Directive 95/46 in such a case would largely deprive the directive of its effect (see, to this effect, Case C-73/07 *Satakunnan Markkinapörssi and Satamedia* EU:C:2008:727, paragraphs 48 and 49).

31     Furthermore, it follows from the definition contained in Article 2(b) of Directive 95/46 that, whilst the alteration of personal data indeed constitutes processing within the meaning of the directive, the other operations which are mentioned there do not, on the other hand, in any way require that the personal data be altered.

32     As to the question whether the operator of a search engine must be regarded as the 'controller' in respect of the processing of personal data that is carried out by that engine in the context of an activity such as that at issue in the main proceedings, it should be recalled that Article 2(d) of Directive 95/46 defines 'controller' as 'the natural or legal person, public authority, agency or any other body which alone or jointly with others determines the purposes and means of the processing of personal data'.

33     It is the search engine operator which determines the purposes and means of that activity and thus of the processing of personal data that it itself carries out within the framework of that activity and which must, consequently, be regarded as the 'controller' in respect of that processing pursuant to Article 2(d).

34     Furthermore, it would be contrary not only to the clear wording of that provision but also to its objective — which is to ensure, through a broad definition of the concept of 'controller', effective and complete protection of data subjects — to exclude the operator of a search engine from that definition on the ground that it does not exercise control over the personal data published on the web pages of third parties.

35     In this connection, it should be pointed out that the processing of personal data carried out in the context of the activity of a search engine can be distinguished from and is additional to that carried out by publishers of websites, consisting in loading those data on an internet page.

36     Moreover, it is undisputed that that activity of search engines plays a decisive role in the overall dissemination of those data in that it renders the latter accessible to any internet user making a search on

the basis of the data subject's name, including to internet users who otherwise would not have found the web page on which those data are published.

37     Also, the organisation and aggregation of information published on the internet that are effected by search engines with the aim of facilitating their users' access to that information may, when users carry out their search on the basis of an individual's name, result in them obtaining through the list of results a structured overview of the information relating to that individual that can be found on the internet enabling them to establish a more or less detailed profile of the data subject.

38     Inasmuch as the activity of a search engine is therefore liable to affect significantly, and additionally compared with that of the publishers of websites, the fundamental rights to privacy and to the protection of personal data, the operator of the search engine as the person determining the purposes and means of that activity must ensure, within the framework of its responsibilities, powers and capabilities, that the activity meets the requirements of Directive 95/46 in order that the guarantees laid down by the directive may have full effect and that effective and complete protection of data subjects, in particular of their right to privacy, may actually be achieved.

39     Finally, the fact that publishers of websites have the option of indicating to operators of search engines, by means in particular of exclusion protocols such as 'robot.txt' or codes such as 'noindex' or 'noarchive', that they wish specific information published on their site to be wholly or partially excluded from the search engines' automatic indexes does not mean that, if publishers of websites do not so indicate, the operator of a search engine is released from its responsibility for the processing of personal data that it carries out in the context of the engine's activity.

40     That fact does not alter the position that the purposes and means of that processing are determined by the operator of the search engine. Furthermore, even if that option for publishers of websites were to mean that they determine the means of that processing jointly with that operator, this finding would not remove any of the latter's responsibility as Article 2(d) of Directive 95/46 expressly provides that that determination may be made 'alone or jointly with others'.

41     It follows from all the foregoing considerations that the answer to Question 2(a) and (b) is that Article 2(b) and (d) of Directive 95/46 are to be interpreted as meaning that, first, the activity of a search engine consisting in finding information published or placed on the internet by third parties, indexing it automatically, storing it temporarily and, finally, making it available to internet users according to a particular order of preference must be classified as 'processing of personal data' within the meaning of Article 2(b) when that information contains personal data and, second, the operator of the search engine must be regarded as the 'controller' in respect of that processing, within the meaning of Article 2(d).

*Question 1(a) to (d), concerning the territorial scope of Directive 95/46*

42     By Question 1(a) to (d), the referring court seeks to establish whether it is possible to apply the national legislation transposing Directive 95/46 in circumstances such as those at issue in the main proceedings.

43     In this respect, the referring court has established the following facts:

–     Google Search is offered worldwide through the website 'www.google.com'. In numerous States, a local version adapted to the national language exists. The version of Google Search in Spanish is offered through the website 'www.google.es', which has been registered since 16 September 2003. Google Search is one of the most used search engines in Spain.

–     Google Search is operated by Google Inc., which is the parent company of the Google Group and has its seat in the United States.

— Google Search indexes websites throughout the world, including websites located in Spain. The information indexed by its 'web crawlers' or robots, that is to say, computer programmes used to locate and sweep up the content of web pages methodically and automatically, is stored temporarily on servers whose State of location is unknown, that being kept secret for reasons of competition.

— Google Search does not merely give access to content hosted on the indexed websites, but takes advantage of that activity and includes, in return for payment, advertising associated with the internet users' search terms, for undertakings which wish to use that tool in order to offer their goods or services to the internet users.

— The Google group has recourse to its subsidiary Google Spain for promoting the sale of advertising space generated on the website 'www.google.com'. Google Spain, which was established on 3 September 2003 and possesses separate legal personality, has its seat in Madrid (Spain). Its activities are targeted essentially at undertakings based in Spain, acting as a commercial agent for the Google group in that Member State. Its objects are to promote, facilitate and effect the sale of on-line advertising products and services to third parties and the marketing of that advertising.

— Google Inc. designated Google Spain as the controller, in Spain, in respect of two filing systems registered by Google Inc. with the AEPD; those filing systems were intended to contain the personal data of the customers who had concluded contracts for advertising services with Google Inc.

44    Specifically, the main issues raised by the referring court concern the notion of 'establishment', within the meaning of Article 4(1)(a) of Directive 95/46, and of 'use of equipment situated on the territory of the said Member State', within the meaning of Article 4(1)(c).

Question 1(a)

45    By Question 1(a), the referring court asks, in essence, whether Article 4(1)(a) of Directive 95/46 is to be interpreted as meaning that processing of personal data is carried out in the context of the activities of an establishment of the controller on the territory of a Member State, within the meaning of that provision, when one or more of the following three conditions are met:

— the operator of a search engine sets up in a Member State a branch or subsidiary which is intended to promote and sell advertising space offered by that engine and which orientates its activity towards the inhabitants of that Member State, or

— the parent company designates a subsidiary located in that Member State as its representative and controller for two specific filing systems which relate to the data of customers who have contracted for advertising with that undertaking, or

— the branch or subsidiary established in a Member State forwards to the parent company, located outside the European Union, requests and requirements addressed to it both by data subjects and by the authorities with responsibility for ensuring observation of the right to protection of personal data, even where such collaboration is engaged in voluntarily.

46    So far as concerns the first of those three conditions, the referring court states that Google Search is operated and managed by Google Inc. and that it has not been established that Google Spain carries out in Spain an activity directly linked to the indexing or storage of information or data contained on third parties' websites. Nevertheless, according to the referring court, the promotion and sale of advertising space, which Google Spain attends to in respect of Spain, constitutes the bulk of the Google group's

commercial activity and may be regarded as closely linked to Google Search.

47    Mr Costeja González, the Spanish, Italian, Austrian and Polish Governments and the Commission submit that, in the light of the inextricable link between the activity of the search engine operated by Google Inc. and the activity of Google Spain, the latter must be regarded as an establishment of the former and the processing of personal data is carried out in context of the activities of that establishment. On the other hand, according to Google Spain, Google Inc. and the Greek Government, Article 4(1)(a) of Directive 95/46 is not applicable in the case of the first of the three conditions listed by the referring court.

48    In this regard, it is to be noted first of all that recital 19 in the preamble to Directive 95/46 states that 'establishment on the territory of a Member State implies the effective and real exercise of activity through stable arrangements' and that 'the legal form of such an establishment, whether simply [a] branch or a subsidiary with a legal personality, is not the determining factor'.

49    It is not disputed that Google Spain engages in the effective and real exercise of activity through stable arrangements in Spain. As it moreover has separate legal personality, it constitutes a subsidiary of Google Inc. on Spanish territory and, therefore, an 'establishment' within the meaning of Article 4(1)(a) of Directive 95/46.

50    In order to satisfy the criterion laid down in that provision, it is also necessary that the processing of personal data by the controller be 'carried out in the context of the activities' of an establishment of the controller on the territory of a Member State.

51    Google Spain and Google Inc. dispute that this is the case since the processing of personal data at issue in the main proceedings is carried out exclusively by Google Inc., which operates Google Search without any intervention on the part of Google Spain; the latter's activity is limited to providing support to the Google group's advertising activity which is separate from its search engine service.

52    Nevertheless, as the Spanish Government and the Commission in particular have pointed out, Article 4(1)(a) of Directive 95/46 does not require the processing of personal data in question to be carried out 'by' the establishment concerned itself, but only that it be carried out 'in the context of the activities' of the establishment.

53    Furthermore, in the light of the objective of Directive 95/46 of ensuring effective and complete protection of the fundamental rights and freedoms of natural persons, and in particular their right to privacy, with respect to the processing of personal data, those words cannot be interpreted restrictively (see, by analogy, Case C-324/09 *L'Oréal and Others* EU:C:2011:474, paragraphs 62 and 63).

54    It is to be noted in this context that it is clear in particular from recitals 18 to 20 in the preamble to Directive 95/46 and Article 4 thereof that the European Union legislature sought to prevent individuals from being deprived of the protection guaranteed by the directive and that protection from being circumvented, by prescribing a particularly broad territorial scope.

55    In the light of that objective of Directive 95/46 and of the wording of Article 4(1)(a), it must be held that the processing of personal data for the purposes of the service of a search engine such as Google Search, which is operated by an undertaking that has its seat in a third State but has an establishment in a Member State, is carried out 'in the context of the activities' of that establishment if the latter is intended to promote and sell, in that Member State, advertising space offered by the search engine which serves to make the service offered by that engine profitable.

56    In such circumstances, the activities of the operator of the search engine and those of its establishment situated in the Member State concerned are inextricably linked since the activities relating to the

advertising space constitute the means of rendering the search engine at issue economically profitable and that engine is, at the same time, the means enabling those activities to be performed.

57     As has been stated in paragraphs 26 to 28 of the present judgment, the very display of personal data on a search results page constitutes processing of such data. Since that display of results is accompanied, on the same page, by the display of advertising linked to the search terms, it is clear that the processing of personal data in question is carried out in the context of the commercial and advertising activity of the controller's establishment on the territory of a Member State, in this instance Spanish territory.

58     That being so, it cannot be accepted that the processing of personal data carried out for the purposes of the operation of the search engine should escape the obligations and guarantees laid down by Directive 95/46, which would compromise the directive's effectiveness and the effective and complete protection of the fundamental rights and freedoms of natural persons which the directive seeks to ensure (see, by analogy, *L'Oréal and Others* EU:C:2011:474, paragraphs 62 and 63), in particular their right to privacy, with respect to the processing of personal data, a right to which the directive accords special importance as is confirmed in particular by Article 1(1) thereof and recitals 2 and 10 in its preamble (see, to this effect, Joined Cases C-465/00, C-138/01 and C-139/01 *Österreichischer Rundfunk and Others* EU:C:2003:294, paragraph 70; Case C-553/07 *Rijkeboer* EU:C:2009:293, paragraph 47; and Case C-473/12 *IPI* EU:C:2013:715, paragraph 28 and the case-law cited).

59     Since the first of the three conditions listed by the referring court suffices by itself for it to be concluded that an establishment such as Google Spain satisfies the criterion laid down in Article 4(1)(a) of Directive 95/46, it is unnecessary to examine the other two conditions.

60     It follows from the foregoing that the answer to Question 1(a) is that Article 4(1)(a) of Directive 95/46 is to be interpreted as meaning that processing of personal data is carried out in the context of the activities of an establishment of the controller on the territory of a Member State, within the meaning of that provision, when the operator of a search engine sets up in a Member State a branch or subsidiary which is intended to promote and sell advertising space offered by that engine and which orientates its activity towards the inhabitants of that Member State.

Question 1(b) to (d)

61     In view of the answer given to Question 1(a), there is no need to answer Question 1(b) to (d).

*Question 2(c) and (d), concerning the extent of the responsibility of the operator of a search engine under Directive 95/46*

62     By Question 2(c) and (d), the referring court asks, in essence, whether Article 12(b) and subparagraph (a) of the first paragraph of Article 14 of Directive 95/46 are to be interpreted as meaning that, in order to comply with the rights laid down in those provisions, the operator of a search engine is obliged to remove from the list of results displayed following a search made on the basis of a person's name links to web pages, published by third parties and containing information relating to that person, also in a case where that name or information is not erased beforehand or simultaneously from those web pages, and even, as the case may be, when its publication in itself on those pages is lawful.

63     Google Spain and Google Inc. submit that, by virtue of the principle of proportionality, any request seeking the removal of information must be addressed to the publisher of the website concerned because it is he who takes the responsibility for making the information public, who is in a position to appraise the lawfulness of that publication and who has available to him the most effective and least restrictive means of making the information inaccessible. Furthermore, to require the operator of a search engine to withdraw information published on the internet from its indexes would take insufficient account of the

CURIA - Dokumente                              http://curia.europa.eu/juris/document/document_print.jsf?docid=152065...

fundamental rights of publishers of websites, of other internet users and of that operator itself.

64    According to the Austrian Government, a national supervisory authority may order such an operator to erase information published by third parties from its filing systems only if the data in question have been found previously to be unlawful or incorrect or if the data subject has made a successful objection to the publisher of the website on which that information was published.

65    Mr Costeja González, the Spanish, Italian and Polish Governments and the Commission submit that the national authority may directly order the operator of a search engine to withdraw from its indexes and intermediate memory information containing personal data that has been published by third parties, without having to approach beforehand or simultaneously the publisher of the web page on which that information appears. Furthermore, according to Mr Costeja González, the Spanish and Italian Governments and the Commission, the fact that the information has been published lawfully and that it still appears on the original web page has no effect on the obligations of that operator under Directive 95/46. On the other hand, according to the Polish Government that fact is such as to release the operator from its obligations.

66    First of all, it should be remembered that, as is apparent from Article 1 and recital 10 in the preamble, Directive 95/46 seeks to ensure a high level of protection of the fundamental rights and freedoms of natural persons, in particular their right to privacy, with respect to the processing of personal data (see, to this effect, *IPI* EU:C:2013:715, paragraph 28).

67    According to recital 25 in the preamble to Directive 95/46, the principles of protection laid down by the directive are reflected, on the one hand, in the obligations imposed on persons responsible for processing, in particular regarding data quality, technical security, notification to the supervisory authority and the circumstances under which processing can be carried out, and, on the other hand, in the rights conferred on individuals whose data are the subject of processing to be informed that processing is taking place, to consult the data, to request corrections and even to object to processing in certain circumstances.

68    The Court has already held that the provisions of Directive 95/46, in so far as they govern the processing of personal data liable to infringe fundamental freedoms, in particular the right to privacy, must necessarily be interpreted in the light of fundamental rights, which, according to settled case-law, form an integral part of the general principles of law whose observance the Court ensures and which are now set out in the Charter (see, in particular, Case C-274/99 P *Connolly v Commission* EU:C:2001:127, paragraph 37, and *Österreichischer Rundfunk and Others* EU:C:2003:294, paragraph 68).

69    Article 7 of the Charter guarantees the right to respect for private life, whilst Article 8 of the Charter expressly proclaims the right to the protection of personal data. Article 8(2) and (3) specify that such data must be processed fairly for specified purposes and on the basis of the consent of the person concerned or some other legitimate basis laid down by law, that everyone has the right of access to data which have been collected concerning him or her and the right to have the data rectified, and that compliance with these rules is to be subject to control by an independent authority. Those requirements are implemented inter alia by Articles 6, 7, 12, 14 and 28 of Directive 95/46.

70    Article 12(b) of Directive 95/46 provides that Member States are to guarantee every data subject the right to obtain from the controller, as appropriate, the rectification, erasure or blocking of data the processing of which does not comply with the provisions of Directive 95/46, in particular because of the incomplete or inaccurate nature of the data. As this final point relating to the case where certain requirements referred to in Article 6(1)(d) of Directive 95/46 are not observed is stated by way of example and is not exhaustive, it follows that non-compliant nature of the processing, which is capable of conferring upon the data subject the right guaranteed in Article 12(b) of the directive, may also arise

from non-observance of the other conditions of lawfulness that are imposed by the directive upon the processing of personal data.

71      In this connection, it should be noted that, subject to the exceptions permitted under Article 13 of Directive 95/46, all processing of personal data must comply, first, with the principles relating to data quality set out in Article 6 of the directive and, secondly, with one of the criteria for making data processing legitimate listed in Article 7 of the directive (see *Österreichischer Rundfunk and Others* EU:C:2003:294, paragraph 65; Joined Cases C-468/10 and C-469/10 *ASNEF and FECEMD* EU:C:2011:777, paragraph 26; and Case C-342/12 *Worten* EU:C:2013:355, paragraph 33).

72      Under Article 6 of Directive 95/46 and without prejudice to specific provisions that the Member States may lay down in respect of processing for historical, statistical or scientific purposes, the controller has the task of ensuring that personal data are processed 'fairly and lawfully', that they are 'collected for specified, explicit and legitimate purposes and not further processed in a way incompatible with those purposes', that they are 'adequate, relevant and not excessive in relation to the purposes for which they are collected and/or further processed', that they are 'accurate and, where necessary, kept up to date' and, finally, that they are 'kept in a form which permits identification of data subjects for no longer than is necessary for the purposes for which the data were collected or for which they are further processed'. In this context, the controller must take every reasonable step to ensure that data which do not meet the requirements of that provision are erased or rectified.

73      As regards legitimation, under Article 7 of Directive 95/46, of processing such as that at issue in the main proceedings carried out by the operator of a search engine, that processing is capable of being covered by the ground in Article 7(f).

74      This provision permits the processing of personal data where it is necessary for the purposes of the legitimate interests pursued by the controller or by the third party or parties to whom the data are disclosed, except where such interests are overridden by the interests or fundamental rights and freedoms of the data subject — in particular his right to privacy with respect to the processing of personal data — which require protection under Article 1(1) of the directive. Application of Article 7(f) thus necessitates a balancing of the opposing rights and interests concerned, in the context of which account must be taken of the significance of the data subject's rights arising from Articles 7 and 8 of the Charter (see *ASNEF and FECEMD*, EU:C:2011:777, paragraphs 38 and 40).

75      Whilst the question whether the processing complies with Articles 6 and 7(f) of Directive 95/46 may be determined in the context of a request as provided for in Article 12(b) of the directive, the data subject may, in addition, rely in certain conditions on the right to object laid down in subparagraph (a) of the first paragraph of Article 14 of the directive.

76      Under subparagraph (a) of the first paragraph of Article 14 of Directive 95/46, Member States are to grant the data subject the right, at least in the cases referred to in Article 7(e) and (f) of the directive, to object at any time on compelling legitimate grounds relating to his particular situation to the processing of data relating to him, save where otherwise provided by national legislation. The balancing to be carried out under subparagraph (a) of the first paragraph of Article 14 thus enables account to be taken in a more specific manner of all the circumstances surrounding the data subject's particular situation. Where there is a justified objection, the processing instigated by the controller may no longer involve those data.

77      Requests under Article 12(b) and subparagraph (a) of the first paragraph of Article 14 of Directive 95/46 may be addressed by the data subject directly to the controller who must then duly examine their merits and, as the case may be, end processing of the data in question. Where the controller does not grant the request, the data subject may bring the matter before the supervisory authority or the judicial

authority so that it carries out the necessary checks and orders the controller to take specific measures accordingly.

78    In this connection, it is to be noted that it is clear from Article 28(3) and (4) of Directive 95/46 that each supervisory authority is to hear claims lodged by any person concerning the protection of his rights and freedoms in regard to the processing of personal data and that it has investigative powers and effective powers of intervention enabling it to order in particular the blocking, erasure or destruction of data or to impose a temporary or definitive ban on such processing.

79    It is in the light of those considerations that it is necessary to interpret and apply the provisions of Directive 95/46 governing the data subject's rights when he lodges with the supervisory authority or judicial authority a request such as that at issue in the main proceedings.

80    It must be pointed out at the outset that, as has been found in paragraphs 36 to 38 of the present judgment, processing of personal data, such as that at issue in the main proceedings, carried out by the operator of a search engine is liable to affect significantly the fundamental rights to privacy and to the protection of personal data when the search by means of that engine is carried out on the basis of an individual's name, since that processing enables any internet user to obtain through the list of results a structured overview of the information relating to that individual that can be found on the internet — information which potentially concerns a vast number of aspects of his private life and which, without the search engine, could not have been interconnected or could have been only with great difficulty — and thereby to establish a more or less detailed profile of him. Furthermore, the effect of the interference with those rights of the data subject is heightened on account of the important role played by the internet and search engines in modern society, which render the information contained in such a list of results ubiquitous (see, to this effect, Joined Cases C-509/09 and C-161/10 *eDate Advertising and Others* EU:C:2011:685, paragraph 45).

81    In the light of the potential seriousness of that interference, it is clear that it cannot be justified by merely the economic interest which the operator of such an engine has in that processing. However, inasmuch as the removal of links from the list of results could, depending on the information at issue, have effects upon the legitimate interest of internet users potentially interested in having access to that information, in situations such as that at issue in the main proceedings a fair balance should be sought in particular between that interest and the data subject's fundamental rights under Articles 7 and 8 of the Charter. Whilst it is true that the data subject's rights protected by those articles also override, as a general rule, that interest of internet users, that balance may however depend, in specific cases, on the nature of the information in question and its sensitivity for the data subject's private life and on the interest of the public in having that information, an interest which may vary, in particular, according to the role played by the data subject in public life.

82    Following the appraisal of the conditions for the application of Article 12(b) and subparagraph (a) of the first paragraph of Article 14 of Directive 95/46 which is to be carried out when a request such as that at issue in the main proceedings is lodged with it, the supervisory authority or judicial authority may order the operator of the search engine to remove from the list of results displayed following a search made on the basis of a person's name links to web pages published by third parties containing information relating to that person, without an order to that effect presupposing the previous or simultaneous removal of that name and information — of the publisher's own accord or following an order of one of those authorities — from the web page on which they were published.

83    As has been established in paragraphs 35 to 38 of the present judgment, inasmuch as the data processing carried out in the context of the activity of a search engine can be distinguished from and is additional to that carried out by publishers of websites and affects the data subject's fundamental rights additionally, the operator of the search engine as the controller in respect of that processing must ensure,

within the framework of its responsibilities, powers and capabilities, that that processing meets the requirements of Directive 95/46, in order that the guarantees laid down by the directive may have full effect.

84    Given the ease with which information published on a website can be replicated on other sites and the fact that the persons responsible for its publication are not always subject to European Union legislation, effective and complete protection of data users could not be achieved if the latter had to obtain first or in parallel the erasure of the information relating to them from the publishers of websites.

85    Furthermore, the processing by the publisher of a web page consisting in the publication of information relating to an individual may, in some circumstances, be carried out 'solely for journalistic purposes' and thus benefit, by virtue of Article 9 of Directive 95/46, from derogations from the requirements laid down by the directive, whereas that does not appear to be so in the case of the processing carried out by the operator of a search engine. It cannot therefore be ruled out that in certain circumstances the data subject is capable of exercising the rights referred to in Article 12(b) and subparagraph (a) of the first paragraph of Article 14 of Directive 95/46 against that operator but not against the publisher of the web page.

86    Finally, it must be stated that not only does the ground, under Article 7 of Directive 95/46, justifying the publication of a piece of personal data on a website not necessarily coincide with that which is applicable to the activity of search engines, but also, even where that is the case, the outcome of the weighing of the interests at issue to be carried out under Article 7(f) and subparagraph (a) of the first paragraph of Article 14 of the directive may differ according to whether the processing carried out by the operator of a search engine or that carried out by the publisher of the web page is at issue, given that, first, the legitimate interests justifying the processing may be different and, second, the consequences of the processing for the data subject, and in particular for his private life, are not necessarily the same.

87    Indeed, since the inclusion in the list of results, displayed following a search made on the basis of a person's name, of a web page and of the information contained on it relating to that person makes access to that information appreciably easier for any internet user making a search in respect of the person concerned and may play a decisive role in the dissemination of that information, it is liable to constitute a more significant interference with the data subject's fundamental right to privacy than the publication on the web page.

88    In the light of all the foregoing considerations, the answer to Question 2(c) and (d) is that Article 12(b) and subparagraph (a) of the first paragraph of Article 14 of Directive 95/46 are to be interpreted as meaning that, in order to comply with the rights laid down in those provisions and in so far as the conditions laid down by those provisions are in fact satisfied, the operator of a search engine is obliged to remove from the list of results displayed following a search made on the basis of a person's name links to web pages, published by third parties and containing information relating to that person, also in a case where that name or information is not erased beforehand or simultaneously from those web pages, and even, as the case may be, when its publication in itself on those pages is lawful.

*Question 3, concerning the scope of the data subject's rights guaranteed by Directive 95/46*

89    By Question 3, the referring court asks, in essence, whether Article 12(b) and subparagraph (a) of the first paragraph of Article 14 of Directive 95/46 are to be interpreted as enabling the data subject to require the operator of a search engine to remove from the list of results displayed following a search made on the basis of his name links to web pages published lawfully by third parties and containing true information relating to him, on the ground that that information may be prejudicial to him or that he wishes it to be 'forgotten' after a certain time.

90    Google Spain, Google Inc., the Greek, Austrian and Polish Governments and the Commission consider that this question should be answered in the negative. Google Spain, Google Inc., the Polish Government and the Commission submit in this regard that Article 12(b) and subparagraph (a) of the first paragraph of Article 14 of Directive 95/46 confer rights upon data subjects only if the processing in question is incompatible with the directive or on compelling legitimate grounds relating to their particular situation, and not merely because they consider that that processing may be prejudicial to them or they wish that the data being processed sink into oblivion. The Greek and Austrian Governments submit that the data subject must approach the publisher of the website concerned.

91    According to Mr Costeja González and the Spanish and Italian Governments, the data subject may oppose the indexing by a search engine of personal data relating to him where their dissemination through the search engine is prejudicial to him and his fundamental rights to the protection of those data and to privacy — which encompass the 'right to be forgotten' — override the legitimate interests of the operator of the search engine and the general interest in freedom of information.

92    As regards Article 12(b) of Directive 95/46, the application of which is subject to the condition that the processing of personal data be incompatible with the directive, it should be recalled that, as has been noted in paragraph 72 of the present judgment, such incompatibility may result not only from the fact that such data are inaccurate but, in particular, also from the fact that they are inadequate, irrelevant or excessive in relation to the purposes of the processing, that they are not kept up to date, or that they are kept for longer than is necessary unless they are required to be kept for historical, statistical or scientific purposes.

93    It follows from those requirements, laid down in Article 6(1)(c) to (e) of Directive 95/46, that even initially lawful processing of accurate data may, in the course of time, become incompatible with the directive where those data are no longer necessary in the light of the purposes for which they were collected or processed. That is so in particular where they appear to be inadequate, irrelevant or no longer relevant, or excessive in relation to those purposes and in the light of the time that has elapsed.

94    Therefore, if it is found, following a request by the data subject pursuant to Article 12(b) of Directive 95/46, that the inclusion in the list of results displayed following a search made on the basis of his name of the links to web pages published lawfully by third parties and containing true information relating to him personally is, at this point in time, incompatible with Article 6(1)(c) to (e) of the directive because that information appears, having regard to all the circumstances of the case, to be inadequate, irrelevant or no longer relevant, or excessive in relation to the purposes of the processing at issue carried out by the operator of the search engine, the information and links concerned in the list of results must be erased.

95    So far as concerns requests as provided for by Article 12(b) of Directive 95/46 founded on alleged non-compliance with the conditions laid down in Article 7(f) of the directive and requests under subparagraph (a) of the first paragraph of Article 14 of the directive, it must be pointed out that in each case the processing of personal data must be authorised under Article 7 for the entire period during which it is carried out.

96    In the light of the foregoing, when appraising such requests made in order to oppose processing such as that at issue in the main proceedings, it should in particular be examined whether the data subject has a right that the information relating to him personally should, at this point in time, no longer be linked to his name by a list of results displayed following a search made on the basis of his name. In this connection, it must be pointed out that it is not necessary in order to find such a right that the inclusion of the information in question in the list of results causes prejudice to the data subject.

97    As the data subject may, in the light of his fundamental rights under Articles 7 and 8 of the Charter,

request that the information in question no longer be made available to the general public by its inclusion in such a list of results, it should be held, as follows in particular from paragraph 81 of the present judgment, that those rights override, as a rule, not only the economic interest of the operator of the search engine but also the interest of the general public in finding that information upon a search relating to the data subject's name. However, that would not be the case if it appeared, for particular reasons, such as the role played by the data subject in public life, that the interference with his fundamental rights is justified by the preponderant interest of the general public in having, on account of inclusion in the list of results, access to the information in question.

98    As regards a situation such as that at issue in the main proceedings, which concerns the display, in the list of results that the internet user obtains by making a search by means of Google Search on the basis of the data subject's name, of links to pages of the on-line archives of a daily newspaper that contain announcements mentioning the data subject's name and relating to a real-estate auction connected with attachment proceedings for the recovery of social security debts, it should be held that, having regard to the sensitivity for the data subject's private life of the information contained in those announcements and to the fact that its initial publication had taken place 16 years earlier, the data subject establishes a right that that information should no longer be linked to his name by means of such a list. Accordingly, since in the case in point there do not appear to be particular reasons substantiating a preponderant interest of the public in having, in the context of such a search, access to that information, a matter which is, however, for the referring court to establish, the data subject may, by virtue of Article 12(b) and subparagraph (a) of the first paragraph of Article 14 of Directive 95/46, require those links to be removed from the list of results.

99    It follows from the foregoing considerations that the answer to Question 3 is that Article 12(b) and subparagraph (a) of the first paragraph of Article 14 of Directive 95/46 are to be interpreted as meaning that, when appraising the conditions for the application of those provisions, it should inter alia be examined whether the data subject has a right that the information in question relating to him personally should, at this point in time, no longer be linked to his name by a list of results displayed following a search made on the basis of his name, without it being necessary in order to find such a right that the inclusion of the information in question in that list causes prejudice to the data subject. As the data subject may, in the light of his fundamental rights under Articles 7 and 8 of the Charter, request that the information in question no longer be made available to the general public on account of its inclusion in such a list of results, those rights override, as a rule, not only the economic interest of the operator of the search engine but also the interest of the general public in having access to that information upon a search relating to the data subject's name. However, that would not be the case if it appeared, for particular reasons, such as the role played by the data subject in public life, that the interference with his fundamental rights is justified by the preponderant interest of the general public in having, on account of its inclusion in the list of results, access to the information in question.

### Costs

100   Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the referring court, the decision on costs is a matter for that court. Costs incurred in submitting observations to the Court, other than the costs of those parties, are not recoverable.

On those grounds, the Court (Grand Chamber) hereby rules:

1.    **Article 2(b) and (d) of Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data are to be interpreted as meaning that, first, the**

activity of a search engine consisting in finding information published or placed on the internet by third parties, indexing it automatically, storing it temporarily and, finally, making it available to internet users according to a particular order of preference must be classified as 'processing of personal data' within the meaning of Article 2(b) when that information contains personal data and, second, the operator of the search engine must be regarded as the 'controller' in respect of that processing, within the meaning of Article 2(d).

2.    Article 4(1)(a) of Directive 95/46 is to be interpreted as meaning that processing of personal data is carried out in the context of the activities of an establishment of the controller on the territory of a Member State, within the meaning of that provision, when the operator of a search engine sets up in a Member State a branch or subsidiary which is intended to promote and sell advertising space offered by that engine and which orientates its activity towards the inhabitants of that Member State.

3.    Article 12(b) and subparagraph (a) of the first paragraph of Article 14 of Directive 95/46 are to be interpreted as meaning that, in order to comply with the rights laid down in those provisions and in so far as the conditions laid down by those provisions are in fact satisfied, the operator of a search engine is obliged to remove from the list of results displayed following a search made on the basis of a person's name links to web pages, published by third parties and containing information relating to that person, also in a case where that name or information is not erased beforehand or simultaneously from those web pages, and even, as the case may be, when its publication in itself on those pages is lawful.

4.    Article 12(b) and subparagraph (a) of the first paragraph of Article 14 of Directive 95/46 are to be interpreted as meaning that, when appraising the conditions for the application of those provisions, it should inter alia be examined whether the data subject has a right that the information in question relating to him personally should, at this point in time, no longer be linked to his name by a list of results displayed following a search made on the basis of his name, without it being necessary in order to find such a right that the inclusion of the information in question in that list causes prejudice to the data subject. As the data subject may, in the light of his fundamental rights under Articles 7 and 8 of the Charter, request that the information in question no longer be made available to the general public on account of its inclusion in such a list of results, those rights override, as a rule, not only the economic interest of the operator of the search engine but also the interest of the general public in having access to that information upon a search relating to the data subject's name. However, that would not be the case if it appeared, for particular reasons, such as the role played by the data subject in public life, that the interference with his fundamental rights is justified by the preponderant interest of the general public in having, on account of its inclusion in the list of results, access to the information in question.

[Signatures]

* Language of the case: Spanish.