# Exhibit A

David G. Barker (#024657)
dbarker@swlaw.com
Jacob C. Jones (#029971)
jcjones@swlaw.com
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070

TUCKER ELLIS LLP
David J. Steele, CA Bar No. 209797
david.steele@tuckerellis.com
Howard A. Kroll, CA Bar No. 100981
howard.kroll@tuckerellis.com
Steven E. Lauridsen, CA Bar No. 246364
steven.lauridsen@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223
Telephone: (213) 430-3400
Facsimile: (213) 430-3409

Attorneys for Plaintiffs,
Facebook, Inc., Instagram, LLC and
WhatsApp Inc.

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Facebook, Inc., a Delaware corporation; Instagram, LLC, a Delaware limited liability company; and WhatsApp Inc., a Delaware corporation, | Case No. 2:20-cv-00470-GMS |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR CYBERSQUATTING; TRADEMARK INFRINGEMENT; FALSE DESIGNATION OF ORIGIN; AND DILUTION** |
| v. | |
| Namecheap, Inc., a Delaware corporation, and Whoisguard, Inc., a Republic of Panama corporation | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

TUCKER ELLIS LLP
Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

1

Plaintiffs Facebook, Inc. ("Facebook"), Instagram, LLC ("Instagram"), and WhatsApp Inc. ("WhatsApp") (collectively "Plaintiffs") by and through their attorneys, Tucker Ellis LLP and Snell & Wilmer LLP, file their ~~complaint~~First Amended Complaint against Defendants Namecheap, Inc. ("Namecheap), and Whoisguard, Inc. ("Whoisguard") (collectively "Defendants") for injunctive relief and damages.

# I.    INTRODUCTION

1.    Cybercrime is highly dependent on Internet domain names, which are registered and used to send spear-phishing emails, operate malware, and engage in other types of online abuse. According to the Internet Corporation of Assigned Names and Numbers ("ICANN"), as of July 31, 2019, there were over 800,000 resolving domain names used for phishing, malware, spam, and botnets. These types of domain names often target the personal and financial information of people all over the globe.

2.    Cybercriminals often rely on proxy services to hide their ~~ownership~~use and control of malicious domains from the public. Proxy services conceal the ~~domain name registrant's~~ identity of the cybercriminals that are normally listed ~~on~~in publicly available domain name registration records. These proxy services, like the ~~services~~service offered by Defendants, are increasingly used by cybercriminals and spammers as they cycle through domain names in order to conceal their identities and evade detection.

3.    Namecheap is an ICANN-accredited domain name registrar.

4.    ~~Whoisguard, which is~~ Namecheap's business strategy involves presenting itself to the public as unwilling to reveal the identity and contact information of its customers even when confronted with evidence that those customers are using Namecheap's registrar services to engage in cybercrime.

5.    Even when Namecheap has received reasonable evidence of actionable harm caused by a domain name registered through Namecheap, it frequently does not disable the domain name.

6.    Through promoting itself in this light, Namecheap aims to attract business from cybercriminals and therefore enhance Namecheap's revenue.

7.      Namecheap facilitates the shielding of cybercrime through the provision of a proxy service that it calls "WhoisGuard."

8.      After Namecheap recognized that the operation of its "WhoisGuard" proxy service exposed it to legal liability for the cybercrime Namecheap was facilitating, Namecheap spun the WhoisGuard proxy service off through a Panamanian shell company that Namecheap created and named "Whoisguard."

4.9.    Whoisguard, a wholly-controlled alter ego of Namecheap, provides a proxy service to Namecheap's customers(, which Whoisguard and Namecheap continue to refer to this service as "WhoisGuard" with a capital "G").".

10.     Upon information and belief, Whoisguard is a subsidiary of Namecheap.

11.     When a Namecheap customer selects a domain name for registration, Namecheap by default opts the customer into using the WhoisGuard proxy service. In order for a Namecheap customer not to use the WhoisGuard proxy service, the customer must affirmatively opt out.

12.     The WhoisGuard proxy service is an optional, value-added service, outside of the core services that a registrar provides when it registers domain names.

5.13.   When the WhoisGuard proxy service is utilized, Whoisguard, instead of the Namecheap customer, registers the domain name (as the registrant) and licenses the domain name to the individual or entitycustomer who uses the domain name (the Namecheap customer or "Licensee").

14.     In some cases, Namecheap is a Licensee of these domain names.

15.     Namecheap also registers, as the registrant, domain names that it uses in connection with revenue-generating advertising "parking pages."

16.     Namecheap assumes the registration of domain names that its customers have allowed to expire, but have not been removed by the registry operator, becoming the registrant for these domain names. Namecheap uses these domain names in connection with revenue-generating advertising "parking pages."

17.     For domain names utilizing the WhoisGuard proxy service, Whoisguard is

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

3

FIRST AMENDED COMPLAINT

the registrant of the domain name.

6.18.   For domain names utilizing the WhoisGuard proxy service, Whoisguard is listed as the registrant ~~for domain names which use the WhoisGuard service on~~in the publicly available domain name registration records.

7.19.   Countless domain names registered by Whoisguard and licensed to ~~Licensee(s)~~Licensees, including to Namecheap as one of Whoisguard's Licensees, are used in connection with online abuse, including phishing, malware, spam, and trademark infringement.

20.   Namecheap and Whoisguard have registered (as the registrant), trafficked in, or used at least 996 domain names that are identical or confusingly similar to the Facebook Trademarks, FB Trademarks, Instagram Trademarks, and WhatsApp Trademarks (the "Infringing Domain Names").

21.   Facebook, Instagram and WhatsApp operate enforcement programs to identify and mitigate threats from abusive domain names that target the personal or financial information of its users or infringe on their famous brands. As part of these programs, notices of abuse are sent regarding infringing domain names.

8.22.   Despite notice, Namecheap has repeatedly failed to take "… steps to investigate and respond appropriately to any reports of abuse" as required by the ICANN Registrar Accreditation Agreement ("RAA").

9.23.   Even when Whoisguard has received reasonable evidence of actionable harm caused by one of the domain names Whoisguard registered, Whoisguard has failed to provide the identity or contact information of its Licensee(s) to the ~~victim~~victims of that harm.

24.   Even when Whoisguard has received reasonable evidence of actionable harm caused by one of the domain names Whoisguard registered, Whoisguard continues to provide its proxy service to its Licensee(s).

25.   Namecheap is the registrar of choice for cybercriminals because Namecheap uses its WhoisGuard proxy service to shield customers' identifying data,

Tucker Ellis LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

FIRST AMENDED COMPLAINT,

even after being presented with evidence that domain names registered through Namecheap are being used for illegal purposes.

10.26. According to the Internet anti-spam organization, Spamhaus.org, Namecheap was responsible for more fraudulent domain registrations than the next three registrars on the "Top 20" list combined. In Spamhaus' third-quarter 2019 report, it explained: "The US-based domain registrar 'Namecheap' continued to be the favorite place for malware authors to register their botnet C&C domains." In Spamhaus' 2019 overall report, it stated: "Namecheap was (again) the most abused registrar: Around 25% of all botnet C&C domain names were registered through this US-based registrar. It's the third consecutive year that Namecheap has held the pole position in our annual ranking of most abused domain registrars." In Spamhaus' second-quarter 2020 report, it found "The US-based domain registrar Namecheap has been in the #1 spot [of most abused registrars] for a significant length of time."

11.27. In 2018, Internet security expert Brian Krebs, who writes extensively on cybersecurity matters, reported on a so-called sextortion email scam that was making its way around the Internet. Krebs reviewed the domain names used in the scams and noted: "most were registered at the end of May 2018 through domain registrar Namecheap."

12.28. One such example Krebs discussed in his 2018 report involved uscourtsgov.com and numerous other domain names that were used in connection with a ransomware scam that was perpetrated by sending out spam emails. These domain names were registered through Namecheap.

29. More recently, on March 3, 2020, Namecheap and Whoisguard and facilitated a predatory wire fraud scheme exploiting the COVID-19 pandemic. Whoisguard registered, as the registrant, and licensed use of the domain name "coronavirusmedicalkit.com," which promoted purported "free World Health Organization 'vaccine kits'" for a $4.95 shipping charge.

30. The coronavirusmedicalkit.com domain name was engaged in making false claims in order to induce victims to pay $4.95 for non-existent "vaccine kits" and provide

credit card and other personal information to cybercriminals engaging in fraudulent activity and identity theft.

31.    The website hosted at coronavirusmedicalkit.com used a photograph of Dr. Anthony Fauci, head of the National Institute of Allergy and Infectious Diseases at the National Institutes of Health, in order to add the imprimatur of the United States government to its ~~alter ego,~~fraudulent claims.

32.    According to the U.S. Department of Justice ("DOJ"), Namecheap ~~has and continues to register,~~ played a "critical role" in this scheme by serving as the ~~registrant,~~domain name registrar for coronavirusmedicalkit.com.

33.    After the DOJ informed Namecheap of the fraudulent statements being promoted on coronavirusmedicalkit.com, Namecheap failed to take any corrective action to protect victims of this fraudulent scheme.

34.    On March 22, 2020, the U.S. District Court for the Western District of Texas found that the domain name coronavirusmedicalkit.com was being used as an instrumentality to commit crimes and granted the United States' Motion for Temporary Restraining Order and restrained the maintenance and use of the domain. coronavirusmedicalkit.com. The Court also ordered that Namecheap take steps to prevent the public from accessing the website available at coronavirusmedicalkit.com.

~~13.~~35. Namecheap and Whoisguard have acted to further an intentional and continuous scheme to attract cybersquatters to use their services to infringe trademarks through the fraudulent registration of domain names used for malicious activity, including phishing ~~and online fraud. Many of these domain names infringed and continue to infringe on Plaintiffs' trademarks,~~ malware, spam, fraud, and trademark infringement.

36.    This scheme to attract cybersquatters is intended to increase Namecheap's profits, which demonstrates Defendants' bad faith intent to profit from Plaintiffs' trademarks, as well as the marks of others.

37.    Whoisguard and Namecheap, as its alter ego, have registered and continue to register, as the registrant, domain names that are identical or confusingly similar to

FIRST AMENDED COMPLAINT

Plaintiffs' trademarks with a bad faith intent to profit.

14.38. Whoisguard and Namecheap, as its alter ego, with a bad faith intent to profit from Plaintiffs' trademarks, registered (as the registrant),have trafficked in (, as the licensor),, and/or used continue to traffic in domain names that are identical or confusingly similar to Plaintiffs' trademarks in violation of 15 U.S.C. § 1125with a bad faith intent to profit.

39.    Namecheap has trafficked in, as the licensee, and continues to traffic in domain names that are identical or confusingly similar to Plaintiffs' trademarks with a bad faith intent to profit.

40.    Namecheap has used and continues to use domain names that are identical or confusingly similar to Plaintiffs' trademarks with a bad faith intent to profit.

15.   Namecheap and Whoisguard agreed in theNamecheap's Domain Name Registration Agreement that, "if [Whoisguard] license[s] the use of the domain name registered to [Whoisguard] to a third party, [Whoisguard] nonetheless remain[s] the domain name holder of record, and remain[s] responsible for all obligations under this Agreement, including but not limited to … ensuring non-infringement of any third party intellectual property rights or other rights."

16.41. Namecheap and Whoisguard also agreed that Whoisguard, as the Registered Name Holder, shall accept liability for harm caused by wrongful use of the Registered Namea domain name, unless itWhoisguard discloses the current contact information provided by the licensee and the identity of the licensee within seven days of notice to Whoisguard of reasonable evidence of actionable harm caused by that domain name.

17.42. Plaintiffs have sent multiple notices to Whoisguard providing reasonable evidence of actionable harm and requesting that Whoisguard disclose the identity and current contact information for the relevant Whoisguard's Licensees.

18.43. Whoisguard failed to timely disclose the identity and current contact information for the Licensees and, therefore, Whoisguard and Namecheap, as its alter

FIRST AMENDED COMPLAINT

ego, have agreed to accept liability for the harm caused by the use of ~~the~~those domain names.

44.   At other times, Whoisguard disclosed fake or false identification and contact information for the Licensees and, therefore, Whoisguard and Namecheap, as its alter ego, have agreed to accept liability for the harm caused by the use of those domain names.

45.   Plaintiffs have also sent notices to Namecheap providing reasonable evidence of actionable harm and requesting that Namecheap disable abusive domain names registered at Namecheap.

46.   Namecheap at first ignored these notices. When Namecheap finally did respond, it disregarded the evidence of domain name abuse and refused to disable the domain names registered at Namecheap.

~~19.~~47. Plaintiffs seek damages and injunctive relief against Defendants to stop their ongoing unlawful and harmful conduct~~,~~ pursuant to the Lanham Act and the Anti-Cybersquatting Consumer Protection Act~~,~~ ("ACPA"), 15 U.S.C. § 1125.

**II.   THE PARTIES**

~~20.~~48. Plaintiff Facebook, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California.

~~21.~~49. Plaintiff Instagram, LLC is a Delaware limited liability company with its principal place of business in Menlo Park, California.

~~22.~~50. Plaintiff WhatsApp Inc. is a Delaware corporation with its principal place of business in Menlo Park, California.

~~23.~~51. Defendant Namecheap, Inc. is a Delaware corporation with its principal place of business in Phoenix, Arizona.

~~24.~~52. Defendant Whoisguard, Inc. is a Republic of Panama corporation with its principal place of business in Phoenix, Arizona.

~~25.~~53. At all times material to this action, Namecheap and Whoisguard have been and continue to be instrumentalities and alter egos of each other. Namecheap is also ~~the~~a

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

FIRST AMENDED COMPLAINT

direct participant in the actions of Whoisguard as alleged in this First Amended Complaint.

**III.   JURISDICTION AND VENUE**

26.54. The Court has federal question jurisdiction over the federal causes of action alleged in this complaintFirst Amended Complaint pursuant to 28 U.S.C. § 1331.

27.55. The Court has general jurisdiction over Namecheap because its principal place of business is in Phoenix, Arizona. Namecheap further operates its datacenters in Arizona, both its headquarters and employees are in Arizona, and Namecheap specifies Arizona in the forum selection clauses in its contracts.

28.56. The Court has personal jurisdiction over Whoisguard because the business of Whoisguard is to provide services to Namecheap in Arizona. Further, Whoisguard's Whoisguard, as the alter ego of Namecheap, has its principal place of business is in Phoenix, Arizona. and its headquarters, employees and/or contractors are in Arizona. Whoisguard further operates its datacenters in Arizona, both its headquarters and employees are in Arizona, and Whoisguard specifies Arizona in the forum selection clauses in its contracts.

29.57. Namecheap and Whoisguard have entered into one or more contracts for domain name registration services and proxy services used in connection with Defendants' unlawful scheme; abusiness. A material term of these contracts wasis Defendants' agreement to submit to the Court's jurisdiction. A copy of Namecheap's Domain Name Registration Agreement (including the referenced agreements which form part of the agreement) is attached to this First Amended Complaint as Exhibit 1. A copy of Whoisguard's proxy service agreement, titled Namecheap WHOIS Proxy Agreement ("Whoisguard's Proxy Agreement") is attached to this First Amended Complaint as Exhibit 2.

30.58. Venue is proper with respect to each of the Defendants pursuant to 28 U.S.C. § 1391(b)(1) because Defendants reside in this judicial district. Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial

9

part of the events and omissions giving rise to the claims alleged occurred in this district. In the alternative, venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(3) because Defendants are subject to the Court's personal jurisdiction.

## IV.   FACTUAL ALLEGATIONS

### A.   Background on Plaintiffs and their Trademarks

31.59. Amongst other products and services, Facebook offers a social networking website and mobile application that enablesenable its users to create their own personal profiles and connect with each other on their personal computers and mobile devices.

32.60. Facebook owns the exclusive rights to numerous trademarks and service marks to provide its online services, including the distinctive FACEBOOK wordmark and stylized mark, having used the marks in connection with its services since at least as early as 2004.

33.61. In addition to its extensive common law rights, Facebook owns numerous United States registrations for its FACEBOOK marks including, but not limited to:

a.   United States Registration Number 3,122,052; and

b.   United States Registration Number 3,881,770.

34.62. Copies of these registration certificates are attached to this First Amended Complaint as Exhibit 3. Facebook's common law and registered trademarks are collectively referred to as the "Facebook Trademarks."

35.63. Facebook's use of the Facebook Trademarks in interstate commerce has been extensive, continuous, and substantially exclusive. Facebook has made, and continues to make, a substantial investment of time, effort, and expense in the promotion of Facebook and the Facebook Trademarks. As a result of Facebook's efforts and use, the Facebook Trademarks are famous (and have been famous since at least as early as 2011) as they are recognized within the US and around the world as signifying high quality, authentic goods and services provided by Facebook.

36.64. Facebook owns the exclusive rights to the distinctive FB wordmark, having

1   used the marks in connection with its services since at least as early as 2014.

2   37.65. In addition to its extensive common law rights, Facebook owns numerous

3   United States registrations for its FB marks including, but not limited to:

4       a.  United States Registration Number 4,659,777;

5       b.  United States Registration Number 4,764,764;

6       c.  United States Registration Number 4,782,234; and

7       d.  United States Registration Number 4,782,235.

8   38.66. Copies of these registration certificates are attached to this First Amended

9   Complaint as Exhibit 4. Facebook's common law and registered trademarks are

10  collectively referred to as the "FB Trademarks."

11  39.67. Facebook's use of the FB Trademarks in interstate commerce has been

12  extensive, continuous, and substantially exclusive. Facebook has made, and continues to

13  make, a substantial investment of time, effort, and expense in the promotion of Facebook

14  and the FB Trademarks.

15  40.68. Instagram offers a photo and video sharing and editing service, mobile

16  application, and social network. Instagram users can choose to share their photos and

17  videos with their followers online.

18  41.69. Instagram owns the exclusive rights to the distinctive INSTAGRAM

19  wordmark and stylized mark, having used the marks in connection with its goods and

20  services since at least as early as 2010.

21  42.70. In addition to its extensive common law rights, Instagram owns numerous

22  United States registrations for the INSTAGRAM marks including, but not limited to:

23      a.  United States Registration Number 4,795,634;

24      b.  United States Registration Number 4,146,057;

25      c.  United States Registration Number 4,756,754;

26      d.  United States Registration Number 5,566,030;

27      e.  United States Registration Number 4,170,675;

28      f.  United States Registration Number 4,856,047;

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

g.  United States Registration Number 4,822,600;

h.  United States Registration Number 4,827,509;

i.  United States Registration Number 4,863,595; and

j.  United States Registration Number 5,019,151.

43.71. Copies of these registration certificates are attached to this First Amended Complaint as Exhibit 5. Instagram's common law and registered trademarks are collectively referred to as the "Instagram Trademarks."

44.72. Instagram's use of the Instagram Trademarks in interstate commerce has been extensive, continuous, and substantially exclusive. Instagram has made, and continues to make, a substantial investment of time, effort, and expense in the promotion of Instagram and the Instagram Trademarks. As a result of Instagram's efforts and use, the Instagram Trademarks are famous (and have been famous since at least as early as 2014) as they are recognized within the US and around the world as signifying high quality, authentic goods and services provided by Instagram.

45.73. WhatsApp offers a private messaging service provided both for mobile devices and desktop computers.

46.74. WhatsApp owns the exclusive rights to several trademark trademarks and service marks including the distinctive WHATSAPP trademark, having used the mark in connection with its goods and services since at least as early as 2009.

47.75. In addition to its extensive common law rights, WhatsApp owns numerous United States registrations for the WHATSAPP mark including, but not limited to:

a.  United States Registration Number 3,939,463;

b.  United States Registration Number 4,083,272;

c.  United States Registration Number 5,492,738; and

d.  United States Registration Number 5,520,108.

48.76. Copies of these registration certificates are attached to this First Amended Complaint as Exhibit 6. WhatsApp's common law and registered trademarks are collectively referred to as the "WhatsApp Trademarks."

Tucker Ellis LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

49.77. WhatsApp's use of the WhatsApp Trademarks in interstate commerce has been extensive, continuous, and substantially exclusive. WhatsApp has made, and continues to make, a substantial investment of time, effort, and expense in the promotion of WhatsApp and the WhatsApp Trademarks. As a result of WhatsApp's efforts and use, the WhatsApp Trademarks are inextricably linked with the products and services offered by WhatsApp.

50.   The Facebook Trademarks, FB Trademarks, Instagram Trademarks and WhatsApp Trademarks are collectively referred to as "Plaintiffs' Trademarks."

**B.   Whoisguard is Registered, as the Registrant, Many of the Infringing Domain Names.**

51.78. Namecheap is accredited by ICANN and subject to ICANN's RAA. A copy of the RAA is attached to this First Amended Complaint as Exhibit 7.

79.   Every domain name, including the Infringing Domain Names, registered using Namecheap as the registrar, is subject to Namecheap's Domain Name Registration Agreement.

80.   Namecheap's Domain Name Registration Agreement includes certain RAA provisions that ICANN requires all registrars include in registration agreements.

81.   One RAA provision included, either directly or by reference, in Namecheap's Domain Name Registration Agreement, includes the language from 3.7.7.3 of the RAA.

52.82. Whoisguard provides a domain registration proxy service: Whoisguard registers a domain name in its own name and, as the registrant and owner of the domain name, and licenses the domain name to one of its Licensees for that Licensee's use.

53.83. Whoisguard's Proxy Agreement provides, "[b]y subscribing to the Namecheap WHOIS Privacy Protection Services . . . you [the Licensee] are engaging Whoisguard to administer and register each domain name controlled by you . . . in the name of WhoisGuard." *See* Exhibit 2, § 2.

54.84. Namecheap explains on its website that, "[t]he only potential drawback of

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

13

domain privacy comes down to ownership. Technically the domain name registrant owns the website (in the eyes of ICANN), not you." A copy of Namecheap's webpage with this text highlighted is attached to this First Amended Complaint as Exhibit 8.

55.85. As the registrant of the registered domain names, Whoisguard is listed as the registrant in the registrant name or registrant organization field, and Whoisguard's contact information is listed as that of the registrant in the WHOIS directory. The WHOIS directory contains important information about domain names, including the identity and contact information for the registrant of the domain name.

56.86. Whoisguard agreed, when it registered the domain names pursuant to the domain name registration agreement, that "if [Whoisguard] license[s] the use of the domain name registered to [Whoisguard] to a third party, [Whoisguard] nonetheless remain[s] the domain name holder of record, and remain[s] responsible for all obligations under this Agreement … ." *See* Exhibit 1, including but not limited to … ensuring non-infringement of any third party intellectual property rights or other rights." *See* Exhibit 1, § 20.

**C.   Namecheap is Responsible for the Actions of Whoisguard, its Alter Ego**

57.   At all times material to this action, Whoisguard was the alter ego of Namecheap. The acts of Whoisguard were in the scope of such relationship. In doing the acts and failing to act as alleged in this Complaint, each Defendant acted with the knowledge, permission, and the consent of each of the other Defendant, and each Defendant aided and abetted the other Defendant in the acts or omissions alleged in this Complaint.

58.   Whoisguard is not a separate autonomous entity from Namecheap.

59.   Namecheap controls certain business operations of Whoisguard. For example, Namecheap describes the service as "WhoisGuard by Namecheap." An annotated screen capture of Namecheap's webpage is attached as Exhibit 9. Whoisguard provides a domain name registration proxy service on behalf of Namecheap.

60.   The WhoisGuard service is integrated within Namecheap's own website,

T U C K E R   E L L I S   L L P

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

and Namecheap's customers obtain the WhoisGuard service directly from their Namecheap user account. A copy of Namecheap's support page for the question: "How do I enable WhoisGuard for my domain?" is attached to this Complaint as Exhibit 10.

61.   There is no charge for the WhoisGuard service. Namecheap simply provides Namecheap's WhoisGuard service to its customers as a part of Namecheap's regular service. *See* Exhibit 9.

62.1.   In the past when Whoisguard was served with reasonable evidence of actionable harm and a request for Whoisguard's Licensees' information, Namecheap, instead of Whoisguard, provided the responsive information concerning the Whoisguard Licensee to the noticing party. As discussed further in this Complaint, Namecheap and Whoisguard now fail to disclose the responsive information to the noticing party.

63.1.   On information and belief, when Whoisguard is served with a subpoena seeking Whoisguard's Licensees' information, Namecheap, instead of Whoisguard, responds to and provides the responsive information concerning Whoisguard's Licensees.

64.1.   When administrative domain name complaints are filed against Whoisguard's Licensees using the WhoisGuard service, Namecheap, instead of Whoisguard, discloses the name of Whoisguard's Licensees to the dispute provider's administrator.

65.1.   According to historic WHOIS information for whoisguard.com (Whoisguard's domain name), Namecheap owned the domain name in the past, and Namecheap was also listed as the technical contact. Today the WHOIS information for whoisguard.com is hidden by the WhoisGuard proxy service.

66.1.   On information and belief, Namecheap still operates the whoisguard.com domain name and controls the content available on the website available at whoisguard.com.

67.1.   Namecheap and Whoisguard are instrumentalities and alter egos of each other. In view of the facts above, observing the separate corporate form of Whoisguard from Namecheap would sanction a fraud and promote injustice.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

FIRST AMENDED COMPLAINT

68.   In addition, Namecheap is liable for the actions of Whoisguard, as alleged in this Complaint, under the theory of direct participant liability.

D.  87.  Defendants Registered, Trafficked In, and/or Used the registered at least 914 Infringing Domain Names.

69. 88. Whoisguard registered, trafficked in, or used at least forty-five domain names 258 Infringing Domain Names that are identical or confusingly similar to the Facebook Trademarks, FB Trademarks, Instagram Trademarks. Several examples include: facebo0k-login.com, faceb0ok-security-dept.com, facebookloginpage.site, faceooklogin.com, and WhatsApp Trademarks (m-facebook.com. Whoisguard is or was the "Infringing Domain Names"). For example:registrant for each of these Infringing Domain Names. A list of these domain names is attached to this First Amended Complaint as Exhibit 9. A copy of the WHOIS data for each of the Infringing Domain Names is attached to this First Amended Complaint as Exhibit 10.

70.   Whoisguard registered, trafficked in, or used at least the following63 Infringing Domain Names that are identical or confusingly similar to the FacebookFB Trademarks:

xn—faceboo-jhb.net (facebook.net)

facebo0k-login. Several examples include: fb-mailsupport.com

facebok-securty.com

facebookloginpage.site

facebooksupport.email

howtohackfacebook-account.com

facebookvideodownload., fb-marketplace-online

89.   facebookvideodownloaderonline..shop, fbcopyrights.com, fbsecurity-review.com, and review-fb-account.com. Whoisguard is or was the registrant for each of these Infringing Domain Names. A list of these domain names is attached to this First Amended Complaint as Exhibit 11. A copy of the WHOIS data for each of the Infringing Domain Names is attached to this First Amended Complaint as Exhibit 12.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

FIRST AMENDED COMPLAINT

1  faceboookmail.online

2  facebokloginpage.space

3  facebokproblemsolution.com

4  facebokprofile.com

5  71.   Whoisguard registered, trafficked in, or used at least the following 412

6  Infringing Domain Names that are identical or confusingly similar to the FB Trademarks:

7  fbpokerforte.com

8  fbhelp.me

9  72.   Whoisguard registered, trafficked in, or used at least the following

10  Infringing Domain Names that are identical or confusingly similar to the Instagram

11  Trademarks:

12  xn--nstaram-yya574a.com (instagram.com)

13  lnstagrambusinesshelp.com

14  weblogin-instagram.com

15  instagramlogin.org

16  instagramlogin.site

17  instagramverify.services

18  securedlogin Instagram Trademarks. Several examples include: 1nstagram.com, email-

19  lnstagram.com

20  , hackanyinstagram.com, instagram-login.site, instagram-support.net, and security-

21  instagram.email

22  verified-lnstagram.com

23  inst4gram.com

24  instagram-download.pictures

25  instagram-spy.online

26  instagramspy.info

27  hackanyinstagram.com

28  hackinganinstagram.com

FIRST AMENDED COMPLAINT

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1    cdninstagram.download

2    cryptoinstagram.com

3        73.   Whoisguard registered, trafficked in, or used at least the following

4    Infringing Domain Names that are identical or confusingly similar to the WhatsApp

5    Trademarks:

6    whatapp.services

7    joinwhatsappgroup.online

8    backupmywhatsapp.online

9    download-whatsapp.online

10   whatsappdownload.site

11   whatsappsex.club

12   whatsapptricks.club

13   whatzapphacks.xyz

14   freewhatsappspy.com

15   freewhatsapptracker.com

16   ggirlsnumberwhatsapp.online

17   whatsapp-sohbet.xyz

18   whatsapponline.bid

19   whatsapp-sohbet.club

20       74.90. .  Whoisguard is or was the registrant for each of the~~the~~these Infringing Domain

21   Names.  A list of these domain names is attached to this First Amended Complaint as

22   Exhibit 13. A copy of the WHOIS ~~entries~~data for each of the Infringing Domain Names

23   is attached to this First Amended Complaint as Exhibit 1114.

24       75.   Whoisguard registered ~~each of the~~at least 181 Infringing Domain Names

25   ~~for one~~that are identical or ~~more of Whoisguard's Licensees.~~

26       76.91. confusingly similar to the WhatsApp Trademarks. Several examples

27   include:  download-whatsapp.online,  hackwhatsapp.xyz,  whatsapp-chat.me,  whatsapp-

28   security.mobi, whatsappp.net, and wwwwhatsapp.net. Whoisguard ~~trafficked in~~is or was

the registrant for each of these Infringing Domain Names by licensing. A list of these domain names is attached to this First Amended Complaint as Exhibit 15. A copy of the WHOIS data for each of the Infringing Domain Names to its Licenseesis attached to this First Amended Complaint as Exhibit 16.

77.92. Plaintiffs' Facebook Trademarks and Instagram Trademarks were distinctive and famous when Whoisguard registered, trafficked in, or used the Infringing Domain Names.

78.93. Plaintiffs' FB Trademarks, and WhatsApp Trademarks were distinctive when Whoisguard registered, trafficked in, or used the Infringing Domain Names.

**79.C.   The Licensees used Whoisguard Trafficked in the Infringing Domain Names.**

94.     Defendants'Whoisguard trafficked in many of the Infringing Domain Names by licensing the Infringing Domain Names to its Licensees, including to Namecheap who is one of the Licensees.

95.     Plaintiffs' Facebook Trademarks and Instagram Trademarks were distinctive and famous when Whoisguard trafficked in the Infringing Domain Names.

96.     Plaintiffs' FB Trademarks, and WhatsApp were distinctive when Whoisguard trafficked in the Infringing Domain Names.

**D.       Namecheap Trafficked In and Used Many of the Infringing Domain Names.**

97.     Namecheap trafficked in and used at least 229 of the Infringing Domain Names by licensing the Infringing Domain Names for its use.

98.     Namecheap used and continues to use many of the Infringing Domain Names to operate revenue-generating advertising "parking pages" that diverted consumers away from Plaintiffs' legitimate websites.

99.     Namecheap used and uses Whoisguard's proxy service to hide Namecheap's identity when it licenses domain names, including licensing the Infringing Domain Names. For example, despite that Whoisguard disclosed that Namecheap was the

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1  Licensee for grouplinkswhatsapp.com, Namecheap uses the WhoisGuard proxy services

2  to hide that Namecheap is responsible for using the Infringing Domain Name.

3       100.   Namecheap's Registration Agreement grants Namecheap the right to use

4  domain names registered through Namecheap if a customer does not set up a webpage for

5  the domain name. Exhibit 1, § 22 at 13 (explaining that in exchange for "Free Services,"



18  including a "free parking page," Namecheap "may display advertising in conjunction

19  therewith through the use of" various advertising mechanisms). An example of a

20  Namecheap parking page (for the Infringing Domain Name facbooklogin.online) is

21  below.

22       101.   Namecheap's parking page service is an optional, value-added service,

23  outside of the core services that a registrar provides when it registers domain names.

24       102.   Namecheap has exploited its right to host revenue-generating advertising

25  parking pages for numerous domain names that infringe Plaintiffs' Trademarks.

26       103.   When Namecheap used or uses an Infringing Domain Name, Namecheap

27  is a Licensee of that Infringing Domain Name.

28       104.   One example of Namecheap's licensing and using the Infringing Domain

FIRST AMENDED COMPLAINT

Names is grouplinkswhatsapp.com. On November 20, 2020, Whoisguard disclosed to Plaintiffs that Namecheap was the Licensee for this domain name. A screen capture of the WHOIS data for this domain name (showing Whoisguard as the registrant), and the parking page used by Namecheap are attached to this First Amended Complaint as Exhibit 17.

105.   Other examples of Namecheap's use of the Infringing Domain Names include: facebook-signin.com, faceebook-support.com, face-book-messenger.com, fb-mailsupport.com, instaagram.website, 1nstagram.com, freewhatsappspy.com, and whatsapp-security.mobi. Screen captures showing Namecheap's use of the Infringing Domain Names to host revenue-generating advertising parking pages attached to this First Amended Complaint as Exhibit 18.

106.   Each of these revenue-generating parking pages contains and prominently depicts one of Plaintiffs' Trademarks or a substantially similar designation thereto.

107.   Namecheap used these revenue-generating parking pages hosted at the Infringing Domain Names to divert Plaintiffs' customers from Plaintiffs' websites, services, and products and to earn revenue for Namecheap.

108.   Plaintiffs' Facebook Trademarks, and Instagram Trademarks were distinctive and famous when Namecheap trafficked in and used the Infringing Domain Names.

109.   Plaintiffs' FB Trademarks, and WhatsApp Trademarks were distinctive when Namecheap trafficked in and used the Infringing Domain Names.

**E.     Namecheap Registered, as the Registrant, and Used Many of the Infringing Domain Names.**

110.   Namecheap registered, as the registrant, and used at least 82 of the Infringing Domain Names.

111.   Namecheap is listed as the registrant in the registrant name or registrant organization field, and Namecheap's contact information is listed in the registrant contact fields in the WHOIS directory.

FIRST AMENDED COMPLAINT

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

112.   For some of the Infringing Domain Names that Namecheap registered, it assumed the registration (became the registrant) after its customers did not renew the registration but before the domain name was removed by the registry operator.

113.   Namecheap used and continues to use many of the Infringing Domain Names that it registered, as the registrant, to operate revenue-generating advertising "parking pages" that diverted consumers away from Plaintiffs' legitimate websites. *See* Exhibit 18.

114.   Namecheap registered at least 29 Infringing Domain Names that are identical or confusingly similar to the Facebook Trademarks. Several examples include: fa4cebook.com, faceb0ok-security.com, and facebok.website. Namecheap is or was the registrant for each of these Infringing Domain Names. A list of these domain names is attached to this First Amended Complaint as Exhibit 19. A copy of the WHOIS data for each of the Infringing Domain Names is attached to this First Amended Complaint as Exhibit 20.

115.   Namecheap registered at least 8 Infringing Domain Names that are identical or confusingly similar to the FB Trademarks. Several examples include: fb-login-error61311.host, fb-marketplace-trade.club, fb-marketplace.store, fb-profil.site, and fb-profil.website. Namecheap is or was the registrant for each of these Infringing Domain Names. A list of these domain names is attached to this First Amended Complaint as Exhibit 21. A copy of the WHOIS data for each of the Infringing Domain Names is attached to this First Amended Complaint as Exhibit 22.

116.   Namecheap registered at least 45 Infringing Domain Names that are identical or confusingly similar to the Instagram Trademarks. Several examples include: en-lnstagram.com, instagramemail.com, instagramhelpservices.com, instagramuser.net, my-instagram.net, and verification-instagram.com. Namecheap is or was the registrant for each of these Infringing Domain Names. A list of these domain names is attached to this First Amended Complaint as Exhibit 23. A copy of the WHOIS data for each of the Infringing Domain Names is attached to this First Amended Complaint as Exhibit 24.

FIRST AMENDED COMPLAINT

117. Plaintiffs' Facebook Trademarks and Instagram Trademarks were distinctive and famous when Namecheap registered the Infringing Domain Names.

118. Plaintiffs' FB Trademarks, and WhatsApp were distinctive when Namecheap registered the Infringing Domain Names.

**E.F.   Whoisguard's Failure to Disclose Contact Information.**

80.119.    Under the RAA, which governs Namecheap's permission ~~under~~by ICANN to act as a registrar, and by mandatory incorporation of certain RAA provisions into Namecheap's Domain Name Registration Agreement, Namecheap and Whoisguard agreed that Whoisguard, as the Registered Name Holder, "shall accept liability for harm caused by wrongful use of the Registered Name, unless it discloses the current contact information provided by the licensee and the identity of the licensee within seven (7) days to a party providing [Whoisguard] reasonable evidence of actionable harm." Exhibit 1 and Exhibit 7.

81.120.    Namecheap's Domain Name Registration Agreement and Whoisguard's Proxy Agreement anticipate that ~~they~~Namecheap and Whoisguard will be sued for misuse of domain names, including for trademark infringement and cybersquatting, and ~~they~~ require parties to ~~their~~the respective agreements to indemnify ~~them~~Namecheap and Whoisguard against such claims. *See* Exhibits 1-2.

82.121.    Namecheap's Domain Name Registration Agreement states that it will cancel its proxy service if a domain name is alleged to infringe on a third party's trademark or if it receives valid evidence of trademark infringement. *See* Exhibit 1.

83.122.    Between October 2, 2018, and February 7, 2020, Plaintiffs' authorized representatives sent at least the following notices to Whoisguard with evidence that ~~each~~46 of the Infringing Domain Names caused Plaintiffs actionable harm and with a request that Whoisguard disclose the ~~identities~~current contact information provided by the Licensee(s) and the identity of the ~~registrant~~Licensee(s) (~~"~~(collectively, "Plaintiffs' Notices"):

a.    On October 2, 2018, Plaintiffs' authorized representatives sent

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

notice regarding fbhelp.me.

   b.     On November 1, 2018, Plaintiffs' authorized representatives sent notice regarding whatsapp-sohbet.xyz; whatsapponline.bid; and whatsapp-sohbet.club

   c.     On January 23, 2019, Plaintiffs' authorized representatives sent notice regarding: xn--faceboo-jhb.net (facebоok.net).

   d.     On May 5, 2019, Plaintiffs' authorized representatives sent notice regarding: facebo0k-login.com.

   e.     On May 30, 2019, Plaintiffs' authorized representatives sent notice regarding instagram-download.pictures and facebokprofile.com.

   f.     On June 7, 2019, Plaintiffs' authorized representatives sent notice regarding whatapp.services; whatsappsex.club; whatsapptricks.club; and cryptoinstagram.com.

   g.     On June 13, 2019, Plaintiffs' authorized representatives sent notice regarding inst4gram.com.

   h.     On June 14, 2019, Plaintiffs' authorized representatives sent notice regarding facebok-securty.com.

   i.     On June 29, 2019, Plaintiffs' authorized representatives sent notice regarding facebooksupport.email.

   j.     On July 15, 2019, Plaintiffs' authorized representatives sent notice regarding facebokproblemsolution.com; facebookvideodownloaderonline.com; freewhatsappspy.com.

   k.     On July 15, 2019, Plaintiffs' authorized representatives sent notice regarding freewhatsapptracker.com; hackanyinstagram.com; and hackinganinstagram.com.

   l.     On July 18, 2019, Plaintiffs' authorized representatives sent notice regarding howtohackfacebook-account.com; securedlogin-lnstagram.com; verified-lnstagram.com; and weblogin-instagram.com.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

FIRST AMENDED COMPLAINT

m. On July 22, 2019, Plaintiffs' authorized representatives sent notice regarding cdninstagram.download; security-instagram.email; instagramspy.info; backupmywhatsapp.online; and download-whatsapp.online.

n. On July 25, 2019, Plaintiffs' authorized representatives sent notice regarding facebookvideodownload.online; faceboookmail.online; ggirlsnumberwhatsapp.online; instagram-spy.online; and joinwhatsappgroup.online.

o. On July 29, 2019, Plaintiffs' authorized representatives sent notice including instagramlogin.org; instagramverify.services; facebokloginpage.site; instagramlogin.site; whatsappdownload.site; facebokloginpage.space; and whatzapphacks.xyz.

p. On September 14, 2019, Plaintiffs' authorized representatives sent notice regarding xn--nstaram-yya574a.com (ìnstagram.com).

q. On February 7, 2020, Plaintiffs' authorized representatives sent notice regarding fbpokerforte.com and lnstagrambusinesshelp.com.

123.   After ~~receipt of~~Whoisguard received Plaintiffs' Notices, ~~which presented Whoisguard with reasonable evidence of actionable harm by Plaintiffs or their authorized representatives that one or more domain names infringed or cybersquatted on Plaintiffs' Trademarks,~~ Whoisguard failed to disclose the ~~identity or any~~current contact information provided by the Licensee(s) and the identity of the Licensee(s) of these domain names within seven days.

124.   After the Court denied Whoisguard's motions to Dismiss, Whoisguard began responding to additional notices sent by Plaintiffs. For example, on November 14, 2020, Plaintiffs' authorized representatives sent notices to Whoisguard with evidence that an additional 285 Infringing Domain Names were causing Plaintiffs actionable harm and requested that Whoisguard disclose the current contact information provided by the Licensee(s) and the identity of the Licensee(s).

125.   However, the information that Whoisguard disclosed to Plaintiffs, in

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

response to its November 14, 2020 notice, contained fake identities and/or false contact information for the Licensee(s) of many these domain names, including:

- aaswedcsfg (listed as both the first and last name) at 4059 Hidden Valley Road, Buffalo, New York 14216, for the domain names fb-514547-marketplace.com and fb-marketplace-851458.com;

- dwqhb buywgqyuq at limas st 66, Dallas, TX 75011 for the domain name facebook-marketplace.us; and

- 84. profilename profilelast at 101 Lane, New York, New York 10001 for the domain name whatsappgroup.org.

**F.G.   Defendants' Bad Faith Intent to Profit From Plaintiffs' Trademarks.**

85.   The Licensees of the Infringing Domain Names intended to divert consumers to websites using domain names that were identical or confusingly similar to the Facebook Trademarks, the FB Trademarks, the Instagram Trademarks, and the WhatsApp Trademarks.

86.   In some instances, the Infringing Domain Names have been used for malicious activity, including misdirecting visitors to commercial sites or to websites involved in scams, phishing, and selling purported tools for hacking. Screenshots of several of these websites hosted at the Infringing Domain Names are attached to this Complaint as Exhibit 12.

87.   One or more of the Licensees also used some of the Infringing Domain Names in connection with email services (sending and/or receiving emails from the Infringing Domain Names that are confusingly similar to the Facebook Trademarks, the FB Trademarks, the Instagram Trademarks, or the WhatsApp Trademarks). Specifically, at least the following domain names had domain name servers configured with email exchange records so as to facilitate email:

cdninstagram.download

fbpokerforte.com

facebookvideodownload.online

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1   ~~freewhatsappspy.com~~

2   ~~freewhatsapptracker.com~~

3   ~~hackanyinstagram.com~~

4   ~~instagramlogin.org~~

5   ~~instagramspy.info~~

6   ~~Instagrambusinesshelp.com~~

7   ~~security-instagram.email~~

8   ~~verified-Instagram.com~~

9   ~~weblogin-instagram.com~~

10  ~~whatsappsex.club~~

11  **1.    Defendants' History of Facilitating Cybersquatting**

12  126.    Defendants have a history of facilitating the actions of cybercriminals

13  through provision of the WhoisGuard proxy service.

14  ~~88.~~127.    Upon information and belief, Namecheap profits from ~~the~~its

15  provision of the WhoisGuard proxy service to Namecheap's customers ~~without charge~~for

16  free because ~~use of that~~ the WhoisGuard proxy service induces ~~the~~Namecheap's

17  customers to use Namecheap's registrar services and other related services.

18  128.    ~~Whoisguard's actions are~~ Namecheap also profits when domain names are

19  registered and not used because Namecheap can host revenue-generating parking pages

20  on those domain names and earn money.

21  ~~89.~~129.    The WhoisGuard proxy service is part of a deliberate scheme by

22  ~~Whoisguard and~~ Namecheap to shield the identity of the Licensees ~~to aid them~~ (including,

23  Namecheap as a Licensee) and thus aid the Licensees in cybersquatting, including

24  cybersquatting on Plaintiffs' Trademarks~~, to further Namecheap's business interests~~.

25  ~~90.~~130.    Whoisguard and Namecheap knowingly and intentionally shield the

26  identities of the Licensees, who are ~~trademark infringers and~~

27  ~~cybersquatters~~cybercriminals, including those who infringe and cybersquat on Plaintiffs'

28  Trademarks.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

131.   Whoisguard and Namecheap use the WhoisGuard proxy service to hide Namecheap's registration, as the registrant, and use of domain names that infringe the trademark rights of others. For example, in response to Plaintiffs' November 14, 2020, notice, Whoisguard confirmed that Namecheap is the Licensee of Infringing Domain Name grouplinkswhatsapp.com. According to the WHOIS data this domain name uses WhoisGuard's proxy service and lists Whoisguard as the registrant.

91.132.   Whoisguard and Namecheap have an economic incentive to resist any attempts to expose the identities of its Licensees, especially when Namecheap itself is the Licensee, even when presented with reasonable evidence of actionable harm by Plaintiffs and othersother trademark owners.

92.   Whoisguard continued to provide the WhoisGuard service even after it received Plaintiffs' Notices which provided reasonable evidence of actionable harm to Plaintiffs caused by Whoisguard's Licensees.

133.   Defendants are aware that the WhoisGuard service is being used to infringe the trademark rights of trademark owners. A search of domain name This history of conduct by Defendants evidences a deliberate scheme to attract business from cybercriminals.

134.   This history of conduct also demonstrates Defendants' bad faith intent to profit from Plaintiffs' Trademarks, as well as the marks of others, by earning revenue from cybercriminals who exploit those marks for unlawful purposes.

135.   In numerous cases, Whoisguard, as the provider of Namecheap's proxy service, has been a named respondent in complaints filed under ICANN's Uniform Domain Name Dispute Resolution Policy ("UDRP")."), with the result that Whoisguard was forced to transfer domain names to the owner of the mark being infringed.

93.136.   A search of UDRP complaints found over one thousand UDRP complaints filed against Whoisguard for cybersquatting, andwith the vast majority of these UDRP complaints were decided against Whoisguard, resulting in the transfer of the domain name(s) to the trademark owner bringing the complaint. An annotated printout of

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

FIRST AMENDED COMPLAINT

the first page of this search is attached to this First Amended Complaint as Exhibit ~~13~~25.

137.   Whoisguard has also been subject to default judgments in numerous ACPA complaints in which the WhoisGuard proxy service was used to shield the identities of individuals or entities infringing the trademark rights of trademark owners. A list of some of these actions is attached to this First Amended Complaint as Exhibit 26.

~~94.~~138.   In addition, Whoisguard has registered ~~multiple~~, as the registrant, numerous domain names that it knew or should have known were identical or confusingly similar to marks of others that were distinctive at the time of registration of the domain names, or dilutive of famous marks of others that were famous at the time of registration of the domain names. A table showing examples of some of Defendants' registered domains that were the subject of UDRP complaints is attached to this First Amended Complaint as Exhibit ~~14~~27.

139.   Defendants are aware that the WhoisGuard proxy service that they provide is used to infringe the trademark rights of trademark owners because both Whoisguard, as the registrant, and Namecheap, as the registrar, receive notice of every UDRP complaint and decision against a domain name using the WhoisGuard proxy service.

**2.     Defendants' History of Concealing Identity of the Licensees**

140.   Despite these scores of successful UDRP complaints against Whoisguard, it continues to refuse to disclose identifying information for Licensees when presented with evidence of actionable harm caused by domain names.

141.   By refusing to identify the Licensees when presented with evidence of actionable harm, even after being subject to over one thousand adverse UDRP complaints, Defendants have demonstrated that they are knowingly disregarding their legal and contractual obligations, the rights of those being harmed by cybercriminals who use their services to register domain names to infringe the marks of others, and the harm caused to third parties who fall victim to cybercrime such as phishing and malware attacks that are facilitated through domain names registered with Namecheap by Whoisguard on behalf of their cybercriminal customers. These cybercrimes rely on the deceptive domain names

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

FIRST AMENDED COMPLAINT

registered with Namecheap by Whoisguard to harvest users' personal and financial information. Numerous examples are shown in Exhibit 30.

142.   Namecheap's history of shielding cybercriminals also runs contrary to commitments it has made to ICANN and the public to address domain name abuse.

143.   In 2012, when applying to operate the .Online TLD as a domain name registry, Namecheap acknowledged that the domain name registrar is in the best position to act to curb domain name abuse, because "the registrar has a direct relationship and contract with the registrant," and the registrar holds "vital information," including "the identity of a proxy-protected registrant."

144.   In that application, Namecheap promised to adopt a policy to "limit how proxy/privacy services are offered. The goal of this policy is to make proxy/privacy services unattractive to abusers, namely the spammers and e-criminals who use such services to hide their identities."

145.   Namecheap affirmatively promised ICANN that it would "institute a contractual obligation that proxy protection be stripped away if a domain is proven to be used for malicious purposes."

146.   Namecheap also pledged when joining the DNS Abuse Framework, a voluntary domain name industry initiative, that it would investigate and promptly act on good faith allegations of domain name abuse.

147.   In 2014, ICANN found that Namecheap breached the RAA because it failed to maintain records relating to Namecheap's dealings with Registry Operator(s) and Registered Name Holders and to make such records available to ICANN for inspection, pursuant to Sections 3.4.2 and 3.4.3 of the RAA.

### 3.     Defendants' Continued Facilitation of Cybersquatting After Notice

148.   Whoisguard routinely continues to provide the WhoisGuard proxy service even after receiving notice of reasonable evidence of actionable harm to trademark owners by Whoisguard's Licensees.

149.   Namecheap also routinely refuses to disclose the identities and contact information for its customers after receiving notice of reasonable evidence of actionable harm to trademark owners being caused by Namecheap's customers.

150.   After WhoisGuard was notified that the Infringing Domain Names infringed Plaintiffs' Trademarks, Whoisguard continued to maintain the registration and traffic in, the Infringing Domain Names.

151.   After Namecheap was notified that the Infringing Domain Names infringed Plaintiffs' Trademarks, including for the Infringing Domain Names on which Namecheap hosted its revenue-generating parking pages, Namecheap continued to traffic in and use certain Infringing Domain Names to host revenue-generating parking pages.

152.   For example, despite receiving notice from WhatsApp of reasonable evidence of actionable harm caused by the domain name grouplinkswhatsapp.com, Whoisguard continues to license the domain name to Namecheap, and Namecheap continues to monetize this domain name by setting up revenue-generating advertising "parking pages" that diverted consumers away from WhatsApp's legitimate websites. *See* Exhibit 18, pg. 61.

153.   Namecheap also continues to host revenue-generating parking pages on at least the following Infringing Domain Names, after being provided notice of actionable harm and over nine months after this lawsuit concerning these Infringing Domain Names was filed: facebookvideodownload.online, freewhatsappspy.com, freewhatsapptracker.com, and whatsappsex.club. Screen captures of the parking pages hosted at these Infringing Domain Names taken on December 1, 2020, are attached to the First Amended Complaint as Exhibit 18. *See* Exhibit 18, pgs. 41, 58, 59 and 223.

95.154.   Moreover, Plaintiffs have prevailed in severalnumerous UDRP complaints against Whoisguard, recovering domain names that were identical or confusingly similar to Plaintiffs' Trademarks.

96.155.   When an attorney for Facebook sent its January 23, 2019, notice to Namecheap and Whoisguard regarding the infringing domain name xn--faceboo-jhb.net

FIRST AMENDED COMPLAINT

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

(facebooк.net)[1] and requesting the identity of the Licensee, Namecheap made misrepresentations in its reply, stating in part:

> "[i]f the Whois contact information of the domain is protected by the WhoisGuard proxy service, we must emphasize that under the WhoisGuard ~~Service~~proxy service Agreement at https://www.namecheap.com/legal/whoisguard/whoisguard-agreement.aspx no disclosure of contact details is possible until we are in receipt of a US Court Order."

~~97.~~156.    In truth, however, the agreement Namecheap cited actually states that Namecheap "reserves the right in its sole judgment and discretion to disclose your [the Licensee's] personal protected information, or instruct Whoisguard to disclose such information, in the event any of the following occur: If the Protected Domain(s) is (are) alleged to violate or infringe a third party's trademark, trade name, copyright interests or other legal rights of third parties."

157.    Namecheap, therefore, is intentionally and deliberately refusing to disclose the identities of its customers even after it has been presented with reasonable evidence of actionable harm, even when its agreements authorize it to disclose such information, and it is misrepresenting the basis for its refusal to disclose.

~~98.~~158.    Whoisguard also made a misrepresentation in its reply to the January 23, 2019, notice stating in part: "[p]lease be advised that WhoisGuard does not own, administer, host or provide registration services to the Domain, but simply provides anonymous privacy protection services to a domain registrant. We cannot remove any content, or links, from the website, provide the registrant contact information, or terminate the Privacy Protection as we do not have control over the service."

---

[1] Because the domain name system only supports the ASCII character set (e.g., a-z, 0-9), a method of encoding other internationalized characters was created. The domain name xn--faceboo-jhb.net, when displayed on a user's browser, simply replaces the letter ASCII character "k" with the Ancient Greek "к" and is displayed as facebooк.net.

FIRST AMENDED COMPLAINT

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

99.159.      In truth, however, Whoisguard's Proxy Agreement with its Licensees plainly states: "[b]y subscribing to the Namecheap WHOIS Privacy Protection Services . . . . you [the Licensee] are engaging Whoisguard to administer and register each domain name controlled by you . . . . in the name of WhoisGuard." *See* Exhibit 2.

100.160.      Whoisguard's Proxy Agreement also states that it can disclose the identity of Licensee if the domain name at issue is "alleged to violate or infringe a third party's trademark, trade name, copyright interests or other legal rights of third parties."

101.   Whoisguard's Proxy Agreements make clear that Whoisguard provides the proxy service for the xn--faceboo-jhb.net (facebоok.net) domain name. *See* Exhibit 2.²

102.161.      Whoisguard's reply to Facebook's January 23, 2019, notice intentionally provided material and misleading false contact information regarding the xn--faceboo-jhb.net (facebоok.net) domain name to Facebook. That is, Whoisguard stated that "WhoisGuard does not own [or] administer . . . . the Domain," when in fact, Whoisguard both owned and administered the domain name. *See* Exhibit 2.

103.162.      When Whoisguard receives ~~notices~~ from trademark owners notices of reasonable evidence of actionable harm caused by domain names Whoisguard owns, Whoisguard routinely advises the trademark owner that it does not own or administer the domain name.

104.163.      Whoisguard has engaged in a pattern of conduct where it intentionally provides material and misleading false contact information for domain names it owns and administers.

164.   On May 9, 2020, Facebook's attorneys sent Namecheap an urgent notice, with supporting evidence, that the Namecheap-registered domain name copyrights-fb.com was being used to send phishing emails impersonating "The Facebook

---

² Because the domain name system only supports the ASCII character set (e.g., a-z, 0-9), a method of encoding other internationalized characters was created. The domain name xn--faceboo-jhb.net, when displayed on a user's browser, simply replaces the letter ASCII character "k" with the Ancient Greek "κ" and is displayed as facebоok.net.

Team" to threaten Facebook users with permanent account deletion based on allegations that the user had "shared fake news and misleading information about pandemic COVID19." These phishing emails involved attempts to illegally obtain user information.

165.    After Namecheap failed to respond, Facebook's attorneys sent a follow up request on May 26, 2020, again putting Namecheap on notice that the domain name copyrights-fb.com was being used for phishing and urgently requesting Namecheap to disable the domain name.

166.    After Namecheap again failed to respond, on June 5, 2020, counsel for Facebook in this case sent Namecheap's counsel an email advising once again that the copyrights-fb.com domain name was being used in connection with phishing, that the domain name was registered with Namecheap and used the WhoisGuard proxy service, and that the domain name used namecheaphosting.com DNS servers.

167.    After Namecheap's counsel failed to respond, Facebook's counsel again emailed Namecheap's counsel on June 8, 2020, again requesting that Namecheap disable the copyrights-fb.com domain name that was being used for phishing.

168.    Finally, on June 10, 2020, Namecheap's counsel responded and claimed that "Namecheap has not received any complaints regarding copyrights-fb.com," and that "we have failed to confirm the mentioned phishing email activity from the domain," despite being presented with evidence of phishing. Namecheap's counsel then asked that Facebook again provide an example of abusive emails.

169.    On June 10, 2020, counsel for Facebook responded, attaching copies of both the prior notices, .pdf printouts of two separate emails evidencing use of the copyrights-fb.com domain name in connection with phishing, and evidence that the domain name was configured to send and receive emails using Namecheap's facilities to send phishing attacks.

170.    Namecheap took no action to disable this domain name. Ultimately, Facebook recovered the domain name (after the phishing attack had long since stopped) in a UDRP proceeding.

**H.      Defendants engage in a pattern and practice of refusing to disclose customer information, and continuing to provide services, in order to attract business from cybercriminals and trademark infringers.**

171.    Upon information and belief, Namecheap profits from providing the WhoisGuard proxy service to Namecheap's customers for free because the WhoisGuard proxy service induces customers to use Namecheap's registrar services and other related services.

172.    Whoisguard's actions, and Namecheap's actions as the alter ego of WhoisGuard and direct participant in those actions, are part of a deliberate scheme by Namecheap and Whoisguard to shield the identity of Licensees (including, at times, Namecheap) to aid them in cybersquatting, including cybersquatting on Plaintiffs' Trademarks, in order to further Namecheap's business interests as the registrar of choice for cybersquatters.

173.    Namecheap and Whoisguard knowingly and intentionally shield the identities of Licensees who are trademark infringers and cybersquatters, including those who infringe and cybersquat on Plaintiffs' Trademarks.

174.    Many of the Infringing Domain Names at issue in this complaint are licensed to Licensees who have infringed and cybersquatted on numerous other famous trademarks. For example, the registrant of Infringing Domain Name inrstagram.com, Taeho Kim, has been the subject of numerous prior UDRP complaints, including: *AMPO, S. COOP v. Contact Privacy.com Taeho Kim, Philippine*, D2009-0177 (WIPO Mar. 4, 2009) (Registration and use of ampo.com in violation of AMPO mark); *Solvay Pharmaceuticals, Inc. v. Philippine, Inc. Taeho Kim*, D2002-0162 (WIPO Apr. 22, 2002) (Registration and use of estratest.com in violation of ESTRATEST mark); *AstraZeneca UK Limited v. Taeho Kim*, D2003-0670 (WIPO Nov. 14, 2003) (Registration and use of merrem.com in violation of MERREM mark); *Novell, Inc. v. Taeho Kim*, FA167964 (NAF Oct. 24, 2003) (Registration and use of novellsolutions.com in violation of NOVELL mark); *Public Broadcasting Service v. Taeho Kim aka SMS*, FA331247 (NAF

FIRST AMENDED COMPLAINT

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Jul. 23, 2010) (Registration and use of pbsnews.org and pbsnews.com in violation of PBS mark); *F. Hoffmann-La Roche AG v. Whois Privacy Services Pty Ltd / SMS, Taeho Kim*, D2010-1080 (WIPO Aug. 18, 2010) (Registration and use of valiun.com in violation of VALIUM mark); *Comerica Incorporated v. Dzone Inc., Taeho Kim / Whois Privacy Services Pty Ltd.*, D2011-0895 (WIPO Jul. 27, 2011) (Registration and use of wwwcomerica.net in violation of COMERICA mark).

175.   Similarly, Domink Tamasi, the registrant of Infringing Domain Name gr-whatsapp.com, was the Respondent (along with WhoisGuard) in *Carrefour v. WhoisGuard, Inc., WhoisGuard Protected / Domink Tamasi*, D2018-1938 (WIPO Oct. 17, 2018) (Registration and use of carrefour.gift in violation of CARREFOUR mark).

176.   Namecheap and Whoisguard have an economic incentive to resist any attempts to expose the identities of its Licensees, including when Namecheap acts as a Licensee, even when presented with reasonable evidence of actionable harm by Plaintiffs and others.

177.   Namecheap's CEO has promoted the lengths Namecheap, and its alter ego Whoisguard, will go to resist disclosing customers' identities.

178.   In one instance, Namecheap's CEO stated: "Let me just start by saying not all privacy services are created equal. While you may think that all it takes is simply changing your information and masking it, what happens when an attorney or someone else comes knocking threatening legal action? That's when you will know that you get what you pay for. Many services will simply turn off or handover your information at the first sign of trouble. Whoisguard will fight for that right and has gone to court many times defending client rights for access to info. In fact, Namecheap has been included in many lawsuits without ever settling because we did not turn over customer information."

179.   Defendants' history of conduct demonstrates a deliberate scheme by Namecheap to attract business from cybercriminals who seek anonymity to shield their illegal actions.

180.   Defendants' history of conduct provides a competitive advantage over other

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

registrars who would, as required by the RAA, take "… steps to investigate and respond appropriately to any reports of abuse."

181.   This scheme demonstrates Namecheap's bad faith intent to profit from Plaintiffs' Trademarks, as well as the marks of others, by earning revenue from cybercriminals who exploit those marks for unlawful purposes.

**I.   Namecheap is responsible for the actions of Whoisguard because Whoisguard is an alter ego of Namecheap, and Namecheap is a direct participant in those actions.**

182.   At all times material to this action, Whoisguard was the alter ego of Namecheap. All relevant acts of Whoisguard as alleged in this First Amended Complaint were undertaken in the scope of such relationship. In doing the acts and failing to act as alleged in this First Amended Complaint, each Defendant acted with the knowledge, permission, and consent of the other Defendant, and each Defendant aided and abetted the other Defendant in the acts or omissions alleged in this First Amended Complaint.

183.   In addition, Namecheap is liable for the actions of Whoisguard, as alleged in this First Amended Complaint, under the theory of direct participant liability because Namecheap, in exercising complete control over all of Whoisguard's actions, was a direct participant in all of Whoisguard's actions, including those giving rise to liability in this case.

184.   Previously, Namecheap provided its WhoisGuard proxy service to customers directly and under Namecheap's own name.

185.   At that time, when a customer used the WhoisGuard proxy service, Namecheap became the registered owner of the domain name and then licensed the domain name to the customer.

186.   As the registered owner of domain names registered through the WhoisGuard proxy service, Namecheap was listed as the registrant for the domain names in the public Whois database.

187.   In a 2009 lawsuit, *Solid Host, NL, v. Namecheap, Inc.*, a federal court

rejected Namecheap's argument that its actions in providing the WhoisGuard proxy service were immune from liability under the ACPA.

188.     The *Solid Host* court held that, "to the extent that NameCheap was the registrant of the domain name and 'used' the name, this section [of the ACPA] would support the imposition of liability on it, not a grant of immunity to it."

189.     As a result of this holding, Namecheap subsequently spun off the portion of its business that provides the WhoisGuard proxy service and began operating the service through a wholly-controlled Panamanian shell company it created for that purpose, namely, Whoisguard.

190.     Namecheap continues to exercise complete control over the WhoisGuard proxy service, even though it is nominally provided by Whoisguard.

191.     Whoisguard does not exercise control over the WhoisGuard proxy service operated under its name.

192.     For example, in response to one of Plaintiffs' Notices, Whoisguard stated that it "does not own, administer, host or provide registration services to the Domain, but simply provides anonymous privacy protection services to a domain registrant. We cannot remove any content, or links, from the website, provide the registrant contact information, or terminate the Privacy Protection *as we do not have control over the service*." (emphasis added).

193.     The fact that Whoisguard does not have any control over the WhoisGuard proxy service it nominally provides demonstrates that Namecheap exercises complete control and direction over Whoisguard's day-to-day business operations.

194.     Whoisguard was established by Namecheap for the sole purpose of providing a paper company that Namecheap can point to as providing the WhoisGuard proxy service.

195.     Namecheap established WhoisGuard as a Panamanian shell company in an attempt by Namecheap to escape United States jurisdiction and ACPA liability for Namecheap's provision of the WhoisGuard proxy service, as contemplated in the *Solid*

FIRST AMENDED COMPLAINT

*Host* holding.

196.    On information and belief, Namecheap owns Whoisguard or Namecheap and Whoisguard share common ownership.

197.    On information and belief, Whoisguard is not a separate autonomous entity from Namecheap.

198.    On information and belief, Whoisguard has no business interest independent of serving Namecheap's business interests.

199.    On information and belief, Namecheap controls all business operations of Whoisguard.

200.    On information and belief, Whoisguard is a subsidiary of Namecheap.

201.    On information and belief, Namecheap exercises complete control over Whoisguard's day-to-day operations and decision making.

202.    On information and belief, Namecheap and Whoisguard do not properly document transactions between each other.

203.    On information and belief, Namecheap and Whoisguard do not properly compensate each other for services.

204.    On information and belief, Namecheap and Whoisguard comingle assets and finances.

205.    On information and belief, Namecheap directly pays Whoisguard's expenses.

206.    No public information is available demonstrating Namecheap and Whoisguard engage in proper corporate formalities between each other.

207.    On information and belief, Namecheap and Whoisguard do not observe proper corporate formalities between each other. Namecheap describes the WhoisGuard proxy service as "WhoisGuard by Namecheap." An annotated screen capture of Namecheap's webpage is attached to this First Amended complaint as Exhibit 28. Whoisguard provides a domain name registration proxy service on behalf of Namecheap.

208.    Namecheap's CEO has admitted that Namecheap itself, as the registrar, is

FIRST AMENDED COMPLAINT

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

also the proxy service that registers domain names on behalf of its customers, stating "Most services you will encounter are Whois proxy services. The proxy is the domain registrar (such as Namecheap.com) which registers the domain on your behalf."

209.   Namecheap's CEO has made public statements to customers referencing Namecheap and Whoisguard as interchangeable entities, acknowledging that Namecheap "set up" Whoisguard to replace customers' identifying information and that "when we do that we are exposed to all the legal issues that come with the territory, which costs quite a bit to defend. We spend millions of dollars per year safeguarding user information and not simply turning off whoisguard without a proper legal order."

210.   Namecheap directly participates in the provision of the WhoisGuard proxy service by exercising complete control over Whoisguard's provision of the WhoisGuard proxy service.

211.   Namecheap directly participates in the registration of domain names in Whoisguard's name by exercising complete control over Whoisguard's provision of the WhoisGuard proxy service

212.   Namecheap, as a direct participant in Whoisguard's actions, receives notices from trademark holders of domain names that are registered by Whoisguard, as the registrant, that are causing actionable harm to the trademark holder.

213.   Namecheap, as a direct participant in Whoisguard's actions, decides whether or not Whoisguard will reveal customer information when presented with reasonable evidence of actionable harm.

214.   The WhoisGuard proxy service is integrated within Namecheap's own website, and Namecheap's customers obtain the WhoisGuard proxy service directly from their Namecheap user account. A copy of Namecheap's support page for the question: "How do I enable WhoisGuard for my domain?" is attached to this First Amended Complaint as Exhibit 29.

215.   When a Namecheap customer complained to Namecheap's CEO about having to manually add WhoisGuard to his cart when purchasing a domain name through

Namecheap, Namecheap's CEO responded that this "is coming on our next iteration and Whoisguard will simply be a feature in the future."

216.    Namecheap refers to its WhoisGuard service as a feature of Namecheap's service in blog posts on Namecheap's website.

217.    Namecheap customers are enrolled in the WhoisGuard proxy service exclusively through Namecheap's website.

218.    Customers cannot access the WhoisGuard proxy service through Whoisguard's website, but only through the customer's Namecheap user account.

219.    Whoisguard has no control over who its customers are.

220.    Namecheap, not Whoisguard, decided that the WhoisGuard proxy service would simply be a feature of Namecheap.

221.    Namecheap does not charge its customers for the WhoisGuard proxy service. Namecheap simply provides Namecheap's WhoisGuard proxy service to its customers as a part of Namecheap's regular service.

222.    Namecheap, not Whoisguard, decided that WhoisGuard proxy service would be provided to customers for free.

223.    Namecheap's website explains that "WhoisGuard subscriptions can be used on domains registered with Namecheap only."

224.    Because the WhoisGuard proxy service is provided by Namecheap for free and is exclusive to Namecheap, Whoisguard is financially captive to Namecheap for its existence.

225.    On information and belief, Whoisguard has no source of revenue because its sole function is providing the WhoisGuard proxy service exclusively to Namecheap's customers for free.

226.    On information and belief, Whoisguard is inadequately capitalized because it earns no revenue from any source.

227.    In the past, when Whoisguard was served with reasonable evidence of actionable harm and a request for Whoisguard's Licensees' information, Namecheap,

FIRST AMENDED COMPLAINT

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

instead of Whoisguard, provided the responsive information concerning the Whoisguard Licensee to the noticing party. As discussed further in this First Amended Complaint, Namecheap and Whoisguard now fail to disclose the responsive information to the noticing party.

228.   On information and belief, when Whoisguard is served with a subpoena seeking Whoisguard's Licensees' information, Namecheap, instead of Whoisguard, responds to and provides the responsive information concerning Whoisguard's Licensees.

229.   Namecheap, not Whoisguard, decides whether or not Whoisguard will disclose responsive information to noticing parties.

230.   When some customers have used Namecheap's free WhoisGuard proxy service, they had their contact email information changed to legal@namecheap.com.

231.   When administrative domain name complaints are filed against Whoisguard's Licensees using the WhoisGuard proxy service, Namecheap, instead of Whoisguard, discloses the name of Whoisguard's Licensees to the dispute provider's administrator.

232.   According to historic WHOIS information for whoisguard.com (Whoisguard's domain name), Namecheap owned the domain name in the past, and Namecheap was also listed as the technical contact. Today, the WHOIS information for whoisguard.com is hidden by the WhoisGuard proxy service.

233.   On information and belief, Namecheap still operates the whoisguard.com domain name and controls the content available on the website available at whoisguard.com.

234.   On information and belief, Whoisguard does not have any employees.

235.   On information and belief, all Whoisguard functions are performed by Namecheap employees. For example, a public search of the LinkedIn pages for Namecheap's current and past employees reveal that numerous employees were involved in the technical development and business analysis of the WhoisGuard proxy service.

236.   On information and belief, all strategic and business decisions of

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

FIRST AMENDED COMPLAINT

Whoisguard are made by Namecheap.

237.   In view of the facts above, observing the separate corporate form of Whoisguard from Namecheap would sanction a fraud and promote injustice.

238.   Whoisguard was created and operates solely to shield Namecheap from liability for Namecheap's provision of the WhoisGuard proxy service.

239.   Whoisguard was established in Panama in an attempt to avoid U.S. jurisdiction and liability.

240.   Whoisguard is a shell Panamanian company that does not have any actual offices or presence in Panama.

241.   Whoisguard lists its address as Quijano & Associates, Salduba Building, Third Floor, 53rd East Street, Urbanización Marbella, Panama City, Republic of Panama.

242.   Whoisguard's listed address is the address of a law firm that, according to that law firm's web site, serves as a "Jurisdictional Presence" for companies seeking a business address in Panama, as well as Belize, Switzerland, Seychelles, and the British Virgin Islands.

**J.     Licensees Trafficked In and Used the Infringing Domain Names With a Bad Faith Intent to Profit From Plaintiffs' Trademarks**

243.   The Licensees of the Infringing Domain Names, including Namecheap through its use of revenue-generating parking pages, intended to divert consumers to websites using domain names that were identical or confusingly similar to the Facebook Trademarks, the FB Trademarks, the Instagram Trademarks, and the WhatsApp Trademarks.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

244.   In some instances, the Infringing Domain Names have been used for malicious activity, including misdirecting visitors to commercial sites or to websites involved in scams, phishing, and selling purported tools for hacking. For example, the screen capture below shows the webpage hosted at email-Instagram.com, which is used in connection with a phishing attack.

Screenshots of many of these websites hosted at the Infringing Domain Names, are



attached to this First Amended Complaint as Exhibit 30.

245.   In some instances, the Infringing Domain Names have been used by Namecheap, as the Licensee, as discussed above, to host revenue-generating parking pages. *See* Exhibit 18.

246.   One or more of the Licensees also used some of the Infringing Domain Names in connection with email services (sending and/or receiving emails from the Infringing Domain Names that are confusingly similar to the Facebook Trademarks, the FB Trademarks, the Instagram Trademarks, and the WhatsApp Trademarks). Specifically, of the nearly 1,000 Infringing Domain Names, 417 domain names had domain name servers configured with email exchange records so as to facilitate email.

247.   Many of the Licensees have registered, trafficked in, or used multiple domain names which the Licensees knew were identical or confusingly similar to marks of others that were distinctive at the time of registration of such domain names, including

FIRST AMENDED COMPLAINT

Plaintiffs' Trademarks.

## FIRST CAUSE OF ACTION

### [Cybersquatting on Plaintiffs' Trademarks Under 15 U.S.C. § 1125(d)]

105.248.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

106.249.    Plaintiffs' Trademarks were distinctive or famous and federally registered at the United States Patent and Trademark Office at the time Defendants registered (as the registrant), trafficked in, or used in the Infringing Domain Names.

250.    Plaintiffs' Trademarks were distinctive or famous and federally registered at the United States Patent and Trademark Office at the time the Licensees registered, trafficked in, or used the Infringing Domain Names

107.251.    One or more of the Infringing Domain Names are confusingly similar to one or more of Plaintiffs' Trademarks.

108.252.    One or more of the Infringing Domain Names are dilutive of the Facebook Trademarks or Instagram Trademarks.

109.253.    Defendants registered (as the registrant), trafficked in, or used one or more of the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Trademarks.

110.    Licensees registered, trafficked in, or used one or more of the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Trademarks.

111.254.    Defendants and Licensees do not have any trademark or other intellectual property rights in the Infringing Domain Names.

112.    TheNone of the Infringing Domain Names do not consist of the legal name of the Defendants or the Licensees, nor do they the Infringing Domain Names consist of a name that is otherwise commonly used to identify them.

255.    the Defendants and Licensees.

113.256.    Defendants have not made any prior use of any of the Infringing Domain Names in connection with the *bona fide* offering of any goods or services.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

114.257.   Defendants and Licensees have not made any *bona fide* noncommercial or fair use of Plaintiffs' Trademarks on a website accessible at any of the Infringing Domain Names.

115.258.   Defendants registered (as the registrant), trafficked in, or used one or more of the Infringing Domain Names to divert consumers from Plaintiffs' legitimate websites to websites accessible under the Infringing Domain Names for Defendants' commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of their websites.

116.   Licensees registered (as the registrant), trafficked in, or used one or more of the Infringing Domain Names to divert consumers from Plaintiffs' legitimate websites to websites accessible under the Infringing Domain Names for Licensees' commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of their websites.

117.259.   Defendants registered multiple domain names which Defendants knew were identical or confusingly similar to marks of others that were distinctive at the time of registration of such domain names.

118.260.   Defendants have provided material and misleading false contact information, as well as made other misrepresentations, in response to notices from trademark owners in an effort to shield and protect the Licensees from liability for cybersquatting and trademark infringement.

119.261.   Defendants' registration, use, and/or trafficking in the Infringing Domain Names constitutes cybersquatting in violation of 15 U.S.C. § 1125(d), entitling Plaintiffs to relief.

262.   Licensees' registration, use, and/or trafficking inThe Licensees registered, trafficked in or used one or more of the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Trademarks.

263.   None of the Infringing Domain Names consist of the legal name of the Licensees nor do the Infringing Domain Names consist of a name that is otherwise

commonly used to identify the Licensees.

264.   The Licensees do not have any trademark or other intellectual property rights in the Infringing Domain Names.

265.   The Licensees have not made any prior use of any of the Infringing Domain Names in connection with the *bona fide* offering of any goods or services.

266.   The Licensees have not made any *bona fide* noncommercial or fair use of Plaintiffs' Trademarks on a website accessible at any of the Infringing Domain Names.

267.   Licensees registered, trafficked in, or used one or more of the Infringing Domain Names to divert consumers from Plaintiffs' legitimate websites to websites accessible under the Infringing Domain Names for Licensees' commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of their websites.

268.   The Licensees registered multiple domain names which the Licensees knew were identical or confusingly similar to marks of others that were distinctive at the time of registration of such domain names.

269.   The Licensees have provided material and misleading false contact information for the Infringing Domain Names.

~~120.~~270.   Licensees' registration, trafficking in or use of the Infringing Domain Names constitutes cybersquatting in violation of 15 U.S.C. § 1125(d), and has harmed Plaintiffs.

~~121.~~271.   Since Defendants ~~agreed that they~~did not timely and accurately disclose the current contact information provided by the Licensees and the identity of the Licensees in response to Plaintiffs' Notices, Defendants are liable for the harm to Plaintiffs caused by ~~the~~those Licensees' registration, use, and/or trafficking in the Infringing Domain Names in violation of the Lanham Act.

~~122.   Since Defendants did not disclose the name of the Licensees in response to Plaintiffs' Notices, Defendants are liable for the harm to Plaintiffs caused by the Licensees' registration, use, and/or trafficking in the Infringing Domain Names in~~

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

FIRST AMENDED COMPLAINT

1   ~~violation of the Lanham Act.~~

2   ~~123.~~272.   Plaintiffs' remedy at law is not adequate to compensate them for the

3   injuries Defendants inflicted on Plaintiffs. Accordingly, Plaintiffs are entitled to

4   permanent injunctive relief pursuant to 15 U.S.C. § 1116.

5   ~~124.~~273.   Plaintiffs are entitled to recover Defendants' and Licensees' profits,

6   Plaintiffs' actual damages, and the costs of this action. Instead of actual damages and

7   profits, Plaintiffs may alternatively elect to an award of statutory damages under

8   15 U.S.C. § 1117(d) in an amount of $100,000 per domain name.

9   ~~125.~~274.   This is an exceptional case, entitling Plaintiffs to an award of

10   reasonable attorneys' fees under 15 U.S.C. § 1117.

11                       **SECOND CAUSE OF ACTION**

12              **[Trademark and Service Mark Infringement of**

13              **Plaintiffs' Trademarks Under 15 U.S.C. § 1114]**

14   ~~126.~~275.   Plaintiffs reallege and incorporate by reference all of the preceding

15   paragraphs.

16   276.   Namecheap has used Plaintiffs' Trademarks in interstate commerce.

17   Namecheap's use of Plaintiffs' Trademarks is likely to cause confusion, mistake, or

18   deception as to the origin, sponsorship, or approval by Plaintiffs of Namecheap's parking

19   pages.

20   ~~127.~~277.   The Licensees have used Plaintiffs' Trademarks in interstate

21   commerce. The Licensees' use of Plaintiffs' Trademarks is likely to cause confusion,

22   mistake, or deception as to the origin, sponsorship, or approval by Plaintiffs of the

23   Licensees' websites.

24   ~~128.~~278.   The above-described acts of Namecheap and Licensees constitute

25   trademark and service mark infringement in violation of 15 U.S.C. § 1114(1) and entitle

26   Plaintiffs to relief.

27   ~~129.~~279.   Namecheap and Licensees have unfairly profited from the alleged

28   trademark and service mark infringement.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

FIRST AMENDED COMPLAINT

1    130.280.    By reason of Namecheap's and Licensees' acts of trademark and

2    service mark infringement, Plaintiffs have suffered damage to the goodwill associated

3    with Plaintiffs' Trademarks.

4    131.   Defendants agreed that they are liable for the harm to Plaintiffs caused by

5    the Licensees' use of the Infringing Domain Names in violation of the Lanham Act.

6    132.281.    Since Defendants did not timely and accurately disclose the

7    namecurrent contact information provided by the Licensees and the identity of the

8    Licensees in response to Plaintiffs' Notices, Defendants are liable for the harm to

9    Plaintiffs caused by thethose Licensees' use of the Infringing Domain Names in violation

10   of the Lanham Act.

11   133.282.    Plaintiffs are entitled to recover Namecheap's and Licensees'

12   profits, Plaintiffs' actual damages, and the costs of this action. Plaintiffs are also entitled

13   to have their, and those damages should be trebled underpursuant to 15 U.S.C. § 1117(a)..

14   134.283.    This is an exceptional case, making Plaintiffs eligible for an award

15   of reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a).

16                           **THIRD CAUSE OF ACTION**

17          **[Trademark and Service Mark Infringement of Plaintiffs' Trademarks**

18              **and False Designation of Origin Under 15 U.S.C. § 1125(a)]**

19   135.284.    Plaintiffs reallege and incorporate by reference all of the preceding

20   paragraphs.

21   136.285.    Plaintiffs' Trademarks are distinctive marks that are associated with

22   Plaintiffs and exclusively identify their respective businesses, products, and services.

23   137.286.    Licensees'Namecheap's use in commerce of Plaintiffs' Trademarks,

24   and variations thereof, is likely to cause confusion, or to cause mistake, or to deceive the

25   relevant public that Licensees'Namecheap's goods and services are authorized,

26   sponsored, or approved by, or are affiliated with, Plaintiffs.

27   287.   The Licensees' use in commerce of Plaintiffs' Trademarks, and variations

28   thereof, is likely to cause confusion, or to cause mistake, or to deceive the relevant public

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

that the Licensees' goods and services are authorized, sponsored, or approved by, or are affiliated with, Plaintiffs.

138.288.    Namecheap's and Licensees' acts constitute trademark and service mark infringement of Plaintiffs' Trademarks, as well as false designation of origin, in violation of 15 U.S.C. § 1125(a), entitling Plaintiffs to relief.

139.289.    Namecheap and Licensees have unfairly profited from their conduct.

140.290.    By reason of the above-described acts of Namecheap and Licensees, Plaintiffs have suffered damage to the goodwill associated with Plaintiffs' Trademarks.

141.    Defendants agreed that they are liable for the harm to Plaintiffs caused by the Licensees' use of the Infringing Domain Names in violation of the Lanham Act.

142.291.    Since Defendants did not timely and accurately disclose the namecurrent contact information provided by the Licensees and the identity of the Licensees in response to Plaintiffs' Notices, Defendants are liable for the harm to Plaintiffs caused by thethose Licensees' use of the Infringing Domain Names in violation of the Lanham Act.

143.292.    Plaintiffs are entitled to recover Namecheap's and Licensees' profits, Plaintiffs' actual damages, and the costs of this action. Plaintiffs are also entitled to have their, and those damages should be trebled underpursuant to 15 U.S.C. § 1117(a)..

144.293.    This is an exceptional case, making Plaintiffs eligible for an award of reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

**FOURTH CAUSE OF ACTION**

**[Dilution of the Facebook Trademarks and Instagram**

**Trademarks Under 15 U.S.C. § 1125(c)]**

145.294.    Facebook and Instagram reallege and incorporate by reference all of the preceding paragraphs.

146.295.    The Facebook Trademarks and Instagram Trademarks are famous, as that term is used in 15 U.S.C. § 1125(c), and they were famous before Licensees' and Namecheap's use of them and variations of the trademarks in commerce. This fame is

based on, among other things, the inherent distinctiveness and federal registration of each of the Facebook Trademarks and Instagram Trademarks as well as the extensive and exclusive worldwide use, advertising, promotion, and recognition of them.

~~147.~~296.    Namecheap's and Licensees' use of the Facebook Trademarks and Instagram Trademarks, and variations thereof, in commerce is likely to cause dilution by blurring or dilution by tarnishment of these trademarks.

~~148.~~297.    Namecheap's and Licensees' acts constitute dilution by blurring and dilution by tarnishment in violation of 15 U.S.C. § 1125(c), entitling Facebook and Instagram to relief.

~~149.~~298.    Namecheap and Licensees have unfairly profited from their conduct.

~~150.~~299.    Namecheap and Licensees damaged the goodwill associated with the Facebook Trademarks and the Instagram Trademarks, and they will continue to cause irreparable harm.

~~151.    Defendants agreed that they are liable for the harm to Plaintiffs caused by the Licensees' use of the Infringing Domain Names in violation of the Lanham Act.~~

~~152.~~300.    Since Defendants did not timely and accurately disclose the ~~name~~current contact information provided by the Licensees and the identity of the Licensees in response to Plaintiffs' Notices, Defendants are liable for the harm to Plaintiffs caused by ~~the~~those Licensees' use of the Infringing Domain Names in violation of the Lanham Act.

~~153.~~301.    Because Namecheap and Licensees acted willfully, Facebook and Instagram are entitled to damages against Defendants, and those damages should be trebled pursuant to 15 U.S.C. § 1117.

~~154.~~302.    This is an exceptional case, making Plaintiffs eligible for an award of attorneys' fees pursuant to 15 U.S.C. § 1117.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request ~~judgment against Defendants as follows~~:

1.    That the Court find that ~~Defendants have~~Whoisguard has registered, and

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

trafficked in, one or more of the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(d).

1.2.    That the Court find that Namecheap has trafficked in and used one or more of the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(d).

2.3.    That the Court enter a judgment against Defendants that Defendants have infringed the rights of Plaintiffs in Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(d).

4.    That the Court order each of the Infringing Domain Names be transferred to Plaintiffs.

5.    That Plaintiffs be awarded Defendants' profits and Plaintiffs' actual damages, or, in the alternative, $100,000 in statutory damages per infringing domain name by reason of Defendants' cybersquatting, in accordance with the provisions of 15 U.S.C. § 1117(d).

6.    That the Court find that Namecheap has infringed the rights of Plaintiffs in the federally registered Facebook Trademarks, FB Trademarks, Instagram Trademarks, and WhatsApp Trademarks in violation of 15 U.S.C. § 1114(1).

7.    That the Court enter a judgment against Namecheap that Namecheap has infringed the rights of Plaintiffs in the federally registered Facebook Trademarks, FB Trademarks, Instagram Trademarks, and WhatsApp Trademarks in violation of 15 U.S.C. § 1114(1).

8.    That Plaintiffs be awarded Namecheap's profits and Plaintiffs' actual damages, and costs of the action, by reason of Namecheap's trademark infringement and that these damages be trebled due to Namecheap's willfulness in accordance with the provisions of 15 U.S.C. § 1117.

9.    That the Court find that Namecheap has infringed the rights of Plaintiffs in the Facebook Trademarks, FB Trademarks, Instagram Trademarks, and WhatsApp Trademarks in violation of 15 U.S.C. § 1125(a).

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

FIRST AMENDED COMPLAINT

10.     That the Court enter a judgment against Namecheap that Namecheap has infringed the rights of Plaintiffs in the Facebook Trademarks, FB Trademarks, Instagram Trademarks, and WhatsApp Trademarks in violation of 15 U.S.C. § 1125(a).

11.     That Plaintiffs be awarded Namecheap's profits and Plaintiffs' actual damages, and costs of the action, by reason of Namecheap's trademark infringement and that these damages be trebled due to Namecheap's willfulness in accordance with the provisions of 15 U.S.C. § 1117.

12.     That the Court find that Namecheap has diluted the federally registered Facebook Trademarks and Instagram Trademarks in violation of 15 U.S.C. § 1125(c).

13.     That the Court enter a judgment against Namecheap that Namecheap has diluted the federally registered Facebook Trademarks and Instagram Trademarks in violation of 15 U.S.C. § 1125(c).

14.     That Plaintiffs be awarded Namecheap's profits and Plaintiffs' actual damages, and costs of the action, by reason of Namecheap's dilution of the federally registered Facebook Trademarks and Instagram Trademarks and that these damages be trebled due to Namecheap's willfulness in accordance with the provisions of 15 U.S.C. § 1117.

~~3.~~15.   That the Court find that:

a.      Licensees have registered, trafficked in, or used one or more of the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(d);

b.      Licensees have infringed the rights of Plaintiffs in the federally registered Facebook Trademarks, FB Trademarks, Instagram Trademarks, and WhatsApp Trademarks in violation of 15 U.S.C. § 1114(1);

c.      Licensees have infringed the rights of Plaintiffs in the Facebook Trademarks, FB Trademarks, Instagram Trademarks, and WhatsApp Trademarks in violation of 15 U.S.C. § 1125(a); ~~and~~

d.      Licensees have ~~infringed the rights of Plaintiffs in~~ diluted the

1   federally registered Facebook Trademarks and Instagram Trademarks in violation

2   of 15 U.S.C. § 1125(c)~~).~~;

3   ~~4.1.     That each of the above acts was willful.~~

4        e.       Defendants did not timely and accurately disclose the current contact

5   information provided by the Licensee and the identity of the Licensee in response

6   to Plaintiffs' Notices providing reasonable evidence of actionable harm; and

7        f.       Defendants are liable for the harm to Plaintiffs caused by the

8   Licensees' wrongful use of the Infringing Domain Names.

9   ~~5.~~16.   That the Court enter a judgment against Defendants that Defendants are

10  liable for the harm caused to Plaintiffs by the ~~Licensees'~~Licensees cybersquatting,

11  trademark infringement and dilution of ~~the~~ Plaintiffs' Trademarks ~~in violation of the~~

12  ~~Lanham Act and that these damages be trebled due to Licensees' willfulness, in~~

13  ~~accordance with the provisions of 15 U.S.C. § 1117~~.

14  17.     That Plaintiffs be awarded the Licensees' profits and Plaintiffs' actual

15  damages, or, in the alternative, $100,000 in statutory damages per infringing domain

16  name by reason of the Licensees' cybersquatting, in accordance with the provisions of

17  15 U.S.C. § 1117(d).

18  18.     That Plaintiffs be awarded Licensees' profits and Plaintiffs' actual

19  damages, and costs of the action, by reason of Licensees' trademark infringement and

20  that these damages be trebled due to Licensees' willfulness in accordance with the

21  provisions of 15 U.S.C. § 1117.

22  19.     That Plaintiffs be awarded Licensees' profits and Plaintiffs' actual

23  damages, and costs of the action, by reason of Licensees' dilution of the federally

24  registered Facebook Trademarks and Instagram Trademarks and that these damages be

25  trebled due to Licensees' willfulness in accordance with the provisions of

26  15 U.S.C. § 1117.

27  20.     That the Court find that Whoisguard is an alter ego of Namecheap and that

28  Namecheap is liable for Whoisguard's unlawful acts.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

21.     That the Court find that Namecheap is the direct participant in the unlawful acts of Whoisguard, and thus is liable for the harm caused.

22.     That each of the above acts was willful.

6.23.   That the Court issue a permanent injunction enjoining and restraining Defendants, their officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participation with them, from registering, using, or trafficking in, with a bad faith intent to profit, any domain name that is identical or confusingly similar to the Facebook Trademarks, FB Trademarks, Instagram Trademarks, or WhatsApp Trademarks.

7.24.   That Defendants be ordered to account for and disgorge to Plaintiffs all amounts by which Defendants have been unjustly enriched by reason of the unlawful acts complained of.

8.      That Plaintiffs be awarded $100,000 in statutory damages per infringing domain name by reason of Defendants' cybersquatting, in accordance with the provisions of 15 U.S.C. § 1117.

9.25.   That Plaintiffs be awarded an amount sufficient to reimburse Plaintiffs for the costs of corrective advertising.

10.26. That Plaintiffs be awarded prejudgment interest on all infringement damages.

11.27. That the Court award Plaintiffs their reasonable attorneys' fees pursuant to 15 U.S.C. § 1117 and any other applicable provision of law.

12.28. That the Court award Plaintiffs their costs of suit incurred herein.

13.29. That the Court award such other or further relief as the Court may deem just and proper.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

FIRST AMENDED COMPLAINT

DATED: ~~March 04~~December 10, 2020 SNELL & WILMER L.L.P.


By: /s/David G. Barker
David G. Barker
Jacob C. Jones
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

TUCKER ELLIS LLP
David J. Steele
Howard A. Kroll
Steven E. Lauridsen
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223

Attorneys for Plaintiffs,
FACEBOOK, INC., INSTAGRAM, LLC,
and WHATSAPP, INC.

56

1

## DEMAND FOR TRIAL BY JURY

2        Plaintiffs Facebook, Inc., Instagram, LLC, and WhatsApp Inc. hereby demand a

3    trial by jury to decide all issues so triable in this case.

4

5    DATED: ~~March 04~~December 10, 2020 SNELL & WILMER L.L.P.

6

7

8                   By: /s/David G. Barker
               David G. Barker

9                   Jacob C. Jones

10                  One Arizona Center
               400 E. Van Buren, Suite 1900

11                  Phoenix, Arizona 85004-2202

12                  TUCKER ELLIS LLP

13                  David J. Steele
               Howard A. Kroll

14                  Steven E. Lauridsen
               515 South Flower Street

15                  Forty-Second Floor
               Los Angeles, CA 90071-2223

16

17                  Attorneys for Plaintiffs,

18                  FACEBOOK, INC., INSTAGRAM, LLC,
               and WHATSAPP, INC.

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis