**ROME & ASSOCIATES, A.P.C.**
Eugene Rome (admitted pro hac vice)
Sridavi Ganesan (admitted pro hac vice)
Brianna Dahlberg (admitted pro hac vice)
2029 Century Park East, Suite 450
Los Angeles, CA  90067
Telephone:    310-282-0690
Facsimile:    310-282-0691
erome@romeandassociates.com
sganesan@romeandassociates.com
bdahlberg@romeandassociates.com

**FENNEMORE CRAIG, P.C.**
Ray K. Harris (No. 007408)
Mario C. Vasta (No. 033254)
2394 E. Camelback Road
Suite 600
Phoenix, AZ 85016
Telephone: (602) 916-5000
rharris@fennemorelaw.com
mvasta@fennemorelaw.com

Attorneys for Defendants
Namecheap, Inc. and WhoisGuard, Inc.

## UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| Facebook, Inc., a Delaware corporation; Instagram, LLC, a Delaware limited liability company; and WhatsApp Inc., a Delaware corporation,<br><br>                  Plaintiffs,<br><br>    v.<br><br>Namecheap, Inc., a Delaware corporation, and Whoisguard, Inc., a Republic of Panama corporation,<br><br>                  Defendants. | CASE NO. 2:20-cv-00470-GMS<br><br>**DEFENDANTS NAMECHEAP, INC. AND WHOISGUARD, INC.'S MOTION TO DISMISS AND/OR STRIKE THE FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Federal Rules of Civil Procedure 12(b)(6) and 12(f)]<br><br>(Oral Argument Requested) |

<u>**CERTIFICATION PURSUANT TO LR 12(c)**</u>

Defendants Namecheap, Inc. ("Namecheap") and WhoisGuard, Inc. ("WhoisGuard") (collectively, "Defendants") certify that their counsel met and conferred with counsel for Plaintiffs Facebook, Inc. ("Facebook"), Instagram, LLC, and WhatsApp Inc. (collectively, "Plaintiffs") on January 7, 2021 at 4:00 p.m. via video conference. Defendants notified Plaintiffs of the issues asserted in the following motion, and the parties discussed the issues for approximately one hour. The parties were unable to agree that the pleading was curable in any part. As no resolution could be reached, Defendants file the instant motion.


By: _s/ *Eugene Rome*_____

Counsel for Defendants
Namecheap, Inc. and Whoisguard, Inc.

Pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6): (1) Defendant Namecheap, Inc. ("Namecheap") moves to dismiss the First Amended Complaint ("FAC") (Doc. 56) for failure to state a claim; and (2) Defendant WhoisGuard, Inc. ("WhoisGuard") moves to dismiss the FAC's new claims based on approximately 950 newly alleged domain names for failure to state a claim and for exceeding the scope of the Court's Order granting leave to amend. Additionally, pursuant to Rule 12(f), both Namecheap and WhoisGuard (collectively, "Defendants") move to strike all paragraphs in the FAC containing immaterial allegations of Defendants' purported involvement to cybercrime.

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

### I.        INTRODUCTION

Namecheap is the second largest domain registrar in the world with over 12 million domain names. Facebook, for its part is a well-known social media company and, more significantly, is arguably the worst privacy violator of all time, having recently been fined $5 billion over breaches of its own users' privacy. Through this ill-conceived action against Namecheap rather than the actual individuals who registered the domain names at issue in this litigation, Facebook and its co-plaintiffs are, in effect, requesting that the Court validate its claims and, in the process, destroy the privacy rights of millions of users who employ domain privacy services for legitimate reasons. Additionally, Plaintiffs seek to upend the entire domain name registration system by imposing liability upon Defendants for cybersquatting and trademark violations ***by Defendants' customers***, despite well-established precedent holding that it would be untenable for domain registrars to perform the gatekeeper role Plaintiffs seek to impose here.

After the Court largely rejected Plaintiffs' legal theories in its Order on Defendants' original motions to dismiss, Plaintiffs increased the number of disputed domain names from 45 to approximately 1,000 in their FAC. For the vast majority of these new domains, Plaintiffs' claims are based only on Defendants' actions as service providers. These claims fail as a matter of law because the Anticybersquatting Consumer Protection Act (ACPA) expressly immunizes registrars and other domain name authorities from liability for the

registration or maintenance of a domain name for another absent a showing of a bad faith intent to profit. Significantly, following the enactment of the European Union's General Data Protection Regulation 2016/679 ("GDPR"), which now legally mandates Defendants to protect the privacy of their customers' personal information, the domain privacy service challenged by Plaintiffs is now a core registration service that is protected under the registrar safe harbor. Moreover, a prior court has held Defendants' use of the privacy service at issue to be "indisputably legal."

Additionally, Plaintiffs have failed to sufficiently allege the element of a "bad faith intent to profit" under the ACPA. This element is not simply general bad faith, but requires a showing that Defendants specifically intended to profit *from Plaintiffs' trademarks.*

Plaintiffs have twice tried and failed to allege plausible claims against Namecheap for violation of the ACPA or their other counts. The Court should dismiss all claims against Namecheap pursuant to Federal Rule of Civil Procedure 12(b)(6) without leave to amend. Likewise, the new claims against WhoisGuard based on the nearly 1,000 new domains for which WhoisGuard merely acted as a service provider should be dismissed under Rule 12(b)(6) for failure to state a viable claim or, alternatively, because Plaintiffs have exceeded the scope of the Court's Order granting leave to amend "as to Defendant Namecheap."

Finally, having failed to plausibly allege their claims, Plaintiffs have resorted to making immaterial and absolutely false allegations regarding Defendants' purported involvement in cybercrime. These allegations have no relevance to Plaintiffs' claims and are intended to smear Namecheap and detract from its reputation in a lawsuit that has received some media attention. Thus, the Court should strike these allegations under Rule 12(f).

## II.     FACTS ALLEGED IN THE FAC

### A. Background on Namecheap

Namecheap is an ICANN-accredited domain name registrar. FAC, ¶ 3. Customers who elect Namecheap to be their domain name registrar are subject to Namecheap's Domain Registration Agreement. FAC at Exh. 1. As an ICANN-accredited registrar, Namecheap is subject to ICANN's Registrar Accreditation Agreement ("RAA"), which requires that

certain terms must be included in the Domain Registration Agreement. *Id.* at ¶ 78, Exh. 7. One of the RAA's provisions—paragraph 3.7.7.3—requires Namecheap's domain registration agreement to include a provision that the <u>registered name holder</u> shall accept liability for harm caused by wrongful use of a registered domain name, unless it discloses within 7 days the name and contact information of the licensee to the third party providing reasonable evidence of harm. *Id.* at Exh. 7, ¶ 3.7.7.3 (emphasis added). The RAA also requires that Namecheap's Domain Name Registration Agreement include the Uniform Domain Name Dispute Resolution Policy ("UDRP")[1] as a method for resolving disputes with respect to registered domain names. *See* FAC at Exh. 1, ¶ 9.

**B.  Background on WhoisGuard**

WhoisGuard provides a privacy service to Namecheap's customers which protects the customers' information from being made available in the WHOIS database, a public directory that contains the identity and contact information of domain name registrants. WhoisGuard, acting as a "proxy" for the customer, registers the domain names selected and purchased by the customers, and licenses the use of the domain names back to the customers who purchased them. FAC at ¶ 82, Exh. 2, ¶ 2. As a result, the public WHOIS database lists WhoisGuard's name and contact information instead of the customer's name. *Id.* at ¶ 85, Exh. 2, ¶ 2. That is the full extent of the services provided by WhoisGuard to its customers. *Id.* at Exh. 2, ¶ 2. The domains are otherwise in the customers' full control. *See id.*

**C.  All Customers Warrant That the Domains They Select Are Non-Infringing**

Namecheap "respects the copyrights, trademarks and other intellectual property rights of others." FAC, Exh. 1, ¶ 21. As part of its trademark protection practices, Namecheap requires every customer using its domain name registration services to represent and warrant (1) that to the best of the user's knowledge and belief, "NEITHER THE REGISTRATION OF A DOMAIN NAME NOR THE MANNER IN WHICH IT IS DIRECTLY OR

---

[1]  The UDRP "establishes an expedited and inexpensive arbitration process for resolving cybersquatting claims. . . The purpose of the UDRP procedure is to remove registrars from participation in domain name disputes." *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 737 F.3d 546, 548, n.1 (9th Cir. 2013).

INDIRECTLY USED . . . INFRINGES THE LEGAL RIGHTS OF A THIRD PARTY;" and (2) that "ALL INFORMATION PROVIDED BY [the customer] IN CONNECTION WITH [the customer's] PROCUREMENT OF THE SERVICE(S) IS ACCURATE." *Id.* at ¶ 27. When consenting to WhoisGuard's privacy services at the time of registration, each customer must represent and warrant in their respective WHOIS Proxy Agreements that "[he/she has] no knowledge or reason to believe that [his/her] Protected Domain or content found at any associated IP address infringes upon or conflicts with the legal rights of any third party or any third party's trademark or tradename." FAC, Exh. 2, ¶ 7.

Finally, Namecheap requires every customer to agree that they will not use Namecheap's services for illegal or improper purposes. *See* FAC, Exh. 1, ¶ 6. Namecheap is a signatory to the DNS Abuse Framework, a voluntary domain name industry initiative to address malware, botnets, phishing, and other forms of domain abuse. *See* FAC ¶ 146.

**D. Plaintiffs' Cybersquatting and Trademark Allegations**

Plaintiffs allege that they own the exclusive rights to certain trademarks used in connection with their services and own numerous trademark registrations issued by the U.S. Patent and Trademark Office. FAC ¶¶ 59-77. Plaintiffs allege that certain domains registered with Namecheap are identical or confusingly similar to their marks. *See id.* at ¶¶ 20. Notwithstanding the fact that Defendants are merely service providers and did not select or control the disputed domains, Plaintiffs filed this action against Defendants for (1) cybersquatting, (2) trademark infringement, (3) false designation of origin, and (4) dilution.

**E. The Court's Order on the Motions to Dismiss the Original Complaint**

Both Defendants filed motions to dismiss the original complaint in this action pursuant to Rule 12(b)(6), which the Court granted as to the claims against Namecheap and denied as to the claims against WhoisGuard. *See* Doc. 52.[2]

In the original complaint, Plaintiffs alleged that between October 2018 and February 2020, they contacted WhoisGuard about 45 specific disputed domains and requested that

---

[2] WhoisGuard also moved to dismiss for lack of personal jurisdiction. The Court's denial of that motion is the subject of a pending motion for interlocutory appeal. *See* Doc. 55.

WhoisGuard disclose the customers' identities. Compl., ¶ 83. Plaintiffs alleged that WhoisGuard, as the "registered name holder," assumed liability on behalf of its licensees when it failed to disclose the identity or contact information of its licensees within 7 days pursuant to Section 3.7.7.3 of the RAA. *Id*. at ¶¶ 80, 84. Under this theory, the Court accepted that Plaintiffs had plausibly alleged that WhoisGuard is liable for its licensees' actions on all four counts. Doc. 52 at 16.

As to Namecheap, the Court held that Plaintiffs had failed to sufficiently allege that Namecheap had "used, registered, or trafficked" in the disputed domain names, which is one of the required elements of an ACPA claim. *Id*. at 9. As Plaintiffs failed to sufficiently plead this element, the Court did not address whether Plaintiffs had sufficiently alleged that Namecheap had a "bad faith intent to profit," a required element of an ACPA claim. *Id*. The Court also held that Plaintiffs had failed to allege that Namecheap had used Plaintiffs' trademarks in commerce, a required element of the claims for trademark infringement, false designation origin, and dilution. *Id*. at 9.

As to the original complaint's allegations that Namecheap is liable for WhoisGuard's tortious conduct as its alter ego, the Court held that Plaintiffs had failed to adequately allege a "unity of interest" sufficient to satisfy the first prong of the alter ego test. *Id*. at 11. The Court held that Plaintiffs also failed to sufficiently plead direct participant liability because they failed to allege that WhoisGuard is Namecheap's subsidiary. *Id*. at 11. Thus, Namecheap could not be held liable for WhoisGuard's conduct. *Id*. The Court granted leave to amend "as to Defendant Namecheap." *Id*. at 1, 12.

**F. Plaintiffs' New Allegations in the FAC**

In the FAC, Plaintiffs added new allegations that Namecheap and WhoisGuard have registered, trafficked in, or used "at least 996 domain names" that are identical or confusingly similar to Plaintiffs' trademarks. FAC ¶ 20. Of these, the FAC alleges that WhoisGuard "registered at least 914" domains and "trafficked in" an unspecified number of domains; and that Namecheap "trafficked in and used at least 229" of the disputed domains by licensing them for its own use. *Id*. at ¶¶ 87, 97.

### 1. *Plaintiffs' New Allegations as to Namecheap*

<u>"Used" the disputed domains.</u> The FAC alleges that Namecheap used many of the disputed domains to operate "parking pages" containing revenue-generating advertising. *Id.* at ¶ 98. A "parking page" is a default webpage for a domain that has not been associated with a website. A registrar's use of parking pages solves a technological problem that would otherwise result from unresolved domain name server queries and prevents users who type the domain name into their Internet browser from receiving error messages. *See Academy of Motion Picture Arts & Scis. v. GoDaddy.com, Inc.*, No. CV 10-03738-AB (CWx), 2015 WL 5311085, at *2-3 (C.D. Cal. Sept. 10, 2015) ("*AMPAS*"). Plaintiffs allege that Namecheap earns revenue from the advertisements. FAC ¶¶ 98, 107. The parking pages display Namecheap's logo and the statement, "This domain was recently registered at Namecheap. Please check back later!" FAC, Exh. 18. Every parking page includes a disclaimer stating, "The Sponsored Listings displayed above are served automatically by a third party. Neither Parkingcrew[3] nor the domain owner maintain any relationship with the advertisers." *Id.* The FAC contains no allegations that Namecheap played any role in selecting the sponsored advertising links that appear.

<u>"Registered" and "used" expired domains.</u> The FAC also alleges that Namecheap "registered, as the registrant, and used at least 82" of the disputed domains. FAC ¶ 110. Plaintiffs allege that for some domains, "Namecheap assumed the registration (became the registrant) after its customers did not renew the registration but before the domain name was removed by the registry operator." *Id.* at ¶ 112. The WHOIS data for this subset of domains reflects that these domains are expired. *See* Exh. 20, 22, 24. ICANN *requires* all registrars, including Namecheap, to offer a Redemption Grace Period of 30 days after a domain expires.[4] During this period, the expired domain will not resolve (*i.e.*, the customer's website

---

[3] Parkingcrew is Namecheap's third-party partner that provides the parking pages. "Displaying advertisements on parked pages is standard in the industry and many other companies have done so." *AMPAS*, 2015 WL 5311085, at *3.

[4] ICANN Expired Registration Recovery Policy ("ERRP"), attached as Exhibit "C" hereto at § 3. Pursuant to Federal Rule of Evidence 201(c)(2), the Court may take judicial

1    and email will not work). *See* Exh. C at § 3.2 (registry must disable DNS resolution).

2         <u>Alter ego and subsidiary status.</u> With respect to the alter ego allegations, Plaintiffs

3    added new conclusory allegations made on information and belief regarding Namecheap's

4    alleged control of WhoisGuard. *See* FAC ¶¶ 196–205. The FAC alleges that "no public

5    information is available" demonstrating that Namecheap and WhoisGuard engage in proper

6    corporate formalities. FAC ¶ 206. Plaintiffs also allege, on information and belief, that

7    WhoisGuard is a subsidiary of Namecheap. *Id.* at ¶ 200.

8         <u>Use of Plaintiffs' trademarks in commerce.</u> With respect to the counts for trademark

9    infringement, false designation of origin, and dilution, the FAC now alleges that Namecheap

10   has used Plaintiff's trademarks in commerce, whereas the original counts alleged use only

11   by licensees. *See* FAC ¶¶ 276, 286, 295.

12                    **2.   *Plaintiffs' New Allegations as to WhoisGuard***

13        The FAC adds allegations against WhoisGuard based upon hundreds of new domains

14   for which there is no allegation that WhoisGuard failed to provide the customer's identity or

15   contact information. The FAC contains the same allegations as the original complaint

16   regarding Plaintiffs' notices to WhoisGuard about 45 disputed domains. *See* FAC ¶ 122.

17   Plaintiffs concede in the FAC that after the Court denied WhoisGuard's motion to dismiss,

18   WhoisGuard began responding to additional notices sent by Plaintiffs requesting the identity

19   and contact information for additional disputed domains. FAC ¶ 124.

20        In the FAC, Plaintiffs **do not** allege that WhoisGuard failed to disclose the contact

21   information and identity of the licensees of the approximately 950 new disputed domains

22   after being provided with reasonable evidence of actionable harm—a requirement for

23   liability under Section 3.7.7.3 of the RAA. Nonetheless, the FAC alleges that WhoisGuard

24   is liable with respect to the 950 new domains because it "registered" and "trafficked in" the

25   domains in the course of providing the privacy service. *See id.* at ¶¶ 84, 94.

26   _____

27   notice of the ERRP, which was created by ICANN and is publicly available on ICANN's
     website at <<https://www.icann.org/resources/pages/errp-2013-02-28-en>>. *See In re*
28   *Facebook, Inc. Sec. Lit.*, 405 F. Supp. 3d 809, 827 (N.D. Cal. 2019).

### 3. *__Plaintiffs' New Allegations Regarding Cybercrime__*

The FAC adds allegations regarding Defendants' supposed facilitation of cybercrime:

- "Namecheap is the registrar of choice for cybercriminals . . ." FAC ¶ 25.

- A ransomware email scam reported on in 2018 involved numerous domain names unrelated to Plaintiffs or their trademarks, which the scammers registered through Namecheap. *Id*. at ¶¶ 27-28.

- Defendants "facilitated a predatory wire fraud scheme exploiting the COVID-19 pandemic" involving the domain name coronavirusmedicalkit.com, which the scammers registered through Namecheap. *Id*. at ¶¶ 29-34. Again, the domain involved was unrelated to Plaintiffs or their trademarks.

- "Namecheap and [WhoisGuard] have acted to further an intentional and continuous scheme to attract cybersquatters to use their services to infringe trademarks through the *fraudulent registration of domain names used for malicious activity, including phishing, malware, spam, fraud, and trademark infringement. Id*. at ¶ 35 (emphasis added); *see also id*. at ¶¶ 133, 179.

- "Defendants have a history of facilitating the actions of cybercriminals through provision of the WhoisGuard proxy service." *Id*. at ¶ 126; *see also id*. at ¶¶ 7, 143.

As explained below, these allegations are immaterial to the claims Plaintiffs are asserting for cybersquatting and trademark infringement.

## III.   THE FAC FAILS TO STATE A CLAIM AGAINST NAMECHEAP

### A. Federal Rule of Civil Procedure 12(b)(6)

To survive dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must contain more than a "formulaic recitation of the elements of a cause of action"; it must contain factual allegations sufficient to "raise the right of relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). When analyzing a complaint for failure to state a claim, "allegations of material fact made in the complaint are taken as true and construed in the light most favorable to the plaintiff." *Gordon v. City of Oakland*, 627 F.3d 1092, 1095 (9th Cir. 2010). However, legal conclusions couched as factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). As demonstrated below, Plaintiffs' claims fail to meet this standard.

**B.  Plaintiffs Fail to Allege a Violation of the ACPA by Namecheap**

### *1.  The Elements of a Cybersquatting Claim*

To allege a cause of action for cybersquatting under the ACPA, a trademark owner must establish that: "(1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit." *Bosley Med. Inst., Inc. v. Kremer*, 403 F. 3d 672, 680 (9th Cir. 2005) (quoting *DaimlerChrysler v. The Net Inc.*, 388 F. 3d 201, 204 (6th Cir. 2004)).

"Because the ACPA has the potential to encompass a broad array of online conduct, courts are reluctant to interpret the ACPA's liability provisions in an overly aggressive manner." *AMPAS*, 2015 WL 5311085, at *23 (internal quotation omitted). The ACPA is intended to impose liability on a narrow class of cybersquatters who hold domains ransom in exchange for money. *Id.* (citing *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 370 (D.N.J. 2004)); H.R. REP. NO. 106-412, at 10 (1999); S. REP. NO. 106-40 at 13 (1999); *Ford Motor Co. v. Greatdomains.Com, Inc.*, 177 F. Supp. 2d 635, 642 (the "ACPA was designed to target persons who commandeer a domain name for no reason other than to profit by extortion, yet bypass persons with legitimate interests in the domain name.").

As such, the ACPA includes a safe harbor that immunizes a registrar or other "domain name authority" from liability "for the registration or maintenance of a domain name for another absent a showing of bad faith intent to profit from such registration or maintenance of the domain name."15 U.S.C. § 1114(2)(D)(iii). The ACPA also provides a safe harbor to ***any person*** who registers, uses, or traffics in domain names where that person "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." *AMPAS*, 2015 WL 5311085, at *50 (quoting 15 U.S.C. § 1125(d)(1)(B)).

### *2.  Plaintiffs Cannot State a Viable ACPA Claim for the Domains for Which Namecheap Merely Acted as a Registrar*

Of the "at least 996" disputed domains, Plaintiffs allege that Namecheap "trafficked

9

in" or "used" a subset of only approximately 229 domains for its own use (*i.e.*, by setting up parking pages). Plaintiffs' ACPA claims against Namecheap based on the remaining disputed domains for which Namecheap is alleged *only* to have acted as registrar must be dismissed. "The word 'registers,' when considered in context, obviously refers to a person who presents a domain name for registration, not to the registrar." *Lockheed Martin Corp. v. Network Sols., Inc*., 141 F. Supp. 2d 648, 655 (N.D. Tex. 2001) ("*Lockheed II*").

As this Court already found, the allegations of the original complaint, which did not include the allegations about parking pages, failed to sufficiently plead that Namecheap "used, registered, or trafficked in" the disputed domains. Doc. 52 at 9; *see also AMPAS*, 2015 WL 5311085 at *36 (Academy could not allege a violation of the ACPA "based merely on GoDaddy's registration of the Accused Domains" because GoDaddy's actions were shielded from liability by the registrar safe harbor). Accordingly, Plaintiffs' ACPA claims based on the larger subset of domains which Namecheap merely "registered" for others should be dismissed with prejudice. *See Perez v. Banana Republic, LLC*, No. 14-cv-01132-JSC, 2014 WL 2918421, at *2 (N.D. Cal June 26, 2014) (under Rule 12(b)(6), a court may dismiss a claim that is grouped together with other claims in a single cause of action).

### 3. *Plaintiffs Have Failed to Allege a Bad Faith Intent to Profit*

Plaintiffs' new claims against Namecheap based on the parking pages and assuming the registration of expired domains should be also dismissed because Plaintiffs have not and cannot allege that Namecheap had "a bad faith intent to profit" from Plaintiffs' trademarks.

Absent allegations that Namecheap had a bad faith intent to profit from Plaintiffs' trademarks, an ACPA claim fails as a matter of law. *See Interstellar Starship Servs., Ltd. v. Epix, Inc*., 304 F.3d 936, 947 (9th Cir. 2002). "Bad faith intent to profit" within the meaning of the ACPA is not simply general bad faith, but instead "bad faith intent to profit ***from the mark***," 15 U.S.C. § 1125(d)(1)(A)(i) (emphasis added); *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.,* 202 F. 3d 489, 499, n. 13 (2d Cir. 2000) ("We expressly note that 'bad faith [and] intent to profit' are terms of art in the ACPA and hence should not necessarily be equated with 'bad faith' in other contexts."). Thus, the defendant must intend to profit ***specifically***

from the goodwill associated with another's trademark. *See Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F. 3d 806, 810 (6th Cir. 2004) ("In its report on the ACPA, the Senate Judiciary Committee distilled the crucial elements of bad faith to mean an 'intent to trade on the goodwill of another's mark[.]'") (quoting S. REP. NO. 106–140, at 9). In other words, Plaintiffs must demonstrate that Defendants subjectively intended to profit from Plaintiffs' *specific marks* in *bad faith*. *See Petroliam Nasional Berhad*, 737 F. 3d at 553-55.

Here, Plaintiffs allege that Namecheap profits when domain names are registered and *not* used because Namecheap can host revenue-generating parking pages. FAC ¶ 128. Plaintiffs also allege upon information and belief that Namecheap profits from providing WhoisGuard's privacy services to its customers at no additional cost because the free service induces customers to register their domains with Namecheap. *Id*. at ¶ 127. Plaintiffs also allege that Defendants resist attempts to reveal their customers' identities, even when presented with "reasonable evidence" of cybersquatting, and continue to provide services. *Id*. at ¶¶ 129-132. Finally, Plaintiffs allege that Defendants have a history of "facilitating cybercrime" and deliberately attract business from cybersquatters. *Id*. at ¶¶ 7, 126, 133. These allegations are insufficient to plead bad faith intent to profit for the reasons below.

### (a) Plaintiffs Fail to Allege Bad Faith Intent to Profit *from the Specific Trademarks*

Plaintiffs' ACPA claim fails as a matter of law because they do not sufficiently plead a bad faith intent to profit from the specific marks at issue, as required under the ACPA.

Parking Pages. Domains are registered on a first-come, first-served basis through an *automated* process: if a domain is available, it is registered. *See Sporty's Farm L.L.C.*, 202 F. 3d at 493. Likewise, Namecheap's parking pages, which are associated with a domain by default if the domain lacks a website, are set up and associated with a domain through automated processes. Therefore Plaintiffs do not and cannot allege any volitional conduct by Namecheap, let alone the subjective intent necessary to establish a bad faith intent to profit specific to Plaintiffs' trademarks. *See  AMPAS*, 2015 WL 5311085 at *29 ("Given the entirely automated nature of GoDaddy's parked page system, GoDaddy lacked the subjective

intent necessary to support a finding that it had any intent to profit from the specific AMPAS Marks at issue in this litigation, let alone a bad faith intent to do so with respect to any of the Accused Domains."). Indeed, there is no allegation in the FAC that Namecheap selected any of the disputed domain names at issue or the third-party advertisements on the parking pages.

In *Academy of Motion Picture Arts and Sciences v. GoDaddy.com*, which similarly involved allegations that a registrar's parked pages program violated the ACPA, the court found it was reasonable for domain name registrar GoDaddy to rely on and accept the truth of similar representations made by its registrants in its domain registration agreements. *AMPAS*, 2015 WL 5311085 at *26-28. As such, Namecheap was also entitled to rely on its customers' representations that their domains did not infringe any marks of third parties made at the time of registration. Registrars are not required to act as gatekeepers for trademark owners. *Lockheed II*, 141 F. Supp. 2d at 654-55.

Here, the only facts Defendants allege to show some connection between Defendants' intent and Plaintiffs' specific trademarks concern Defendants' responses to Plaintiffs' email notices of cybersquatting. *See* FAC ¶¶ 148-170. However, in *Lockheed Martin Corp. v. Network Sols.*, 985 F. Supp. 949, 963-63 (C.D. Cal. 1997), *aff'd on other grounds*, 194 F. 3d 980 (9th Cir. 1999) ("*Lockheed I*"), the court concluded that a "trademark owner's demand letter is insufficient to resolve th[e] inherent uncertainty" in questions of infringement, and held that "[t]he mere assertion by a trademark owner [of infringement] … is not sufficient to impute knowledge of infringement" to a domain name registrar, given the registrar's limited role. The Ninth Circuit has affirmed that registrars have no obligation to adjudicate disputes between customers and trademark owners. *Petroliam Nasional Berhad*, 737 F.3d at 553-54; *see also Lockheed II*, 141 F. Supp. 2d at 655 (registrars could not function "if they had to become entangled in, and bear the expense of, disputes regarding the right of a registrant to use a particular domain name.").

<u>Assuming Registration of Expired Domains.</u> When Namecheap assumes the registrations of expired domains pending their deletion, its processes are similarly automated; therefore, Plaintiffs have not, and cannot, allege that Namecheap acted with the

1    subjective intent specific to Plaintiffs' trademarks necessary to demonstrate a "bad faith

2    intent to profit." Furthermore, for this subset of domains, Namecheap's conduct does not

3    constitute "use," "registration," or "trafficking in" the domains within the meaning of the

4    ACPA, which is intended to impose liability on a narrow class of cybersquatters who hold

5    domains ransom in exchange for money. *See Mayflower Transit, LLC*, 314 F. Supp. 2d at

6    370. When Namecheap briefly assumes the registration of an expired domain pending its

7    deletion from the registry, it is acting in accordance with ***mandatory*** ICANN requirements.

8    *See* Exh. C hereto. It is not holding the domains ransom. In short, this is not the type of

9    conduct the ACPA is intended to target.

10                  **(b) WhoisGuard's "Indisputably Legal" Privacy Service Does Not**

11                  **Constitute Evidence of Bad Faith Under the ACPA**

12          Courts have unequivocally validated privacy services, such as those offered by

13   WhoisGuard, as legal and necessary. In fact, the court in *Solid Host, NL v. Namecheap, Inc.*

14   652 F. Supp. 2d 1092 (C.D. Cal. 2009), *rev'd on other grounds*, *Petroliam Nasional Berhad*,

15   737 F.3d 546, addressed this very issue with respect to the WhoisGuard privacy service.[5] In

16   that case, the plaintiff asserted an ACPA against Namecheap. Similar to Plaintiffs here, the

17   plaintiff in *Solid Host* alleged that Namecheap acted in bad faith by refusing to reveal the

18   identity of the Doe defendant who had stolen the plaintiff's domain. *Id*. at 1109. The plaintiff

19   further alleged that Namecheap profited by charging a fee for the WhoisGuard privacy

20   service (it was not free at that time) and by maintaining anonymous registration despite being

21   provided with reasonable evidence that the plaintiff's domain was stolen by the Doe

22   Defendant, and that "Namecheap has an economic incentive to resist any attempts to expose

23   [its customers'] identities[.]" *Id.*

24          The court found that these allegations were insufficient to demonstrate bad faith intent

25   to profit from the plaintiff's marks, holding that Namecheap's provision of an "indisputably

26   _____

27          [5]  While the *Solid Host* court found that the plaintiff had alleged sufficient facts to plead
     a claim for contributory cybersquatting, the Ninth Circuit subsequently held that such a claim
28   may not be asserted under the ACPA. *Petroliam Nasional Berhad*, 737 F.3d at 553.

legal" anonymous registration service and its refusal to reveal the identity of its customers did not constitute a bad faith intent to profit under the ACPA. Much like with Plaintiffs, the plaintiff in *Solid Host* alleged that Namecheap acted in bad faith by refusing to reveal the identity of the Doe defendant who stole the plaintiff's domain name. *Id.* at 1109. The plaintiff further alleged that Namecheap profited by charging a fee for the WhoisGuard privacy service (it was not free at that time) and by maintaining anonymous registration despite being provided with reasonable evidence that the plaintiff's domain was stolen by the Doe Defendant, and that "Namecheap has an economic incentive to resist any attempts to expose [its customers'] identities[.]" *Id.*

The court found that these allegations were insufficient, holding that Namecheap's provision of its "indisputably legal" anonymous registration service and its refusal to reveal the identity of its customers did not support a bad faith intent to profit under the ACPA. *Id.* at 1110. What was missing were the crucial factual allegations showing that Namecheap intended to profit from the goodwill associated with plaintiff's trademarks specifically. *See id.* Likewise, there are no such allegations here. And, given that the privacy service is now free, there is even less basis for claiming an intent to profit.

Other courts' opinions following *Solid Host* have confirmed that privacy services like WhoisGuard serve a legitimate purpose in protecting the identities of individuals engaging in free speech both in the United States and around the world, even though they may also be used by some for improper purposes. *See Rosen v. Imagevenue.com*, No. CV 13-01742 SJO (MANx), 2013 WL 12132052, at *5 (C.D. Cal. 2013, Nov. 11, 2013). Indeed, privacy protection has become a paramount issue for consumers and lawmakers alike in the last few years, recognizing that without these protections, consumer information may be used for nefarious purposes by ***any*** third party that has access to it.[6]

---

[6] Facebook certainly understands this all too well, having been held accountable by customers and various governmental entities alike for famously allowing Cambridge Analytica to harvest data from millions of Facebook users without their consent. The fiasco culminated with Mark Zuckerberg, CEO of Facebook, testifying before Congress on April 10, 2018 and apologizing for Facebook's failings with respect to protecting its customers'

Defendants' refusal to reveal their customers' identity upon Plaintiffs' request does not demonstrate bad faith, either. Courts have held that registrars and privacy services should ***not*** have to decide whether their customers are infringing on third parties' intellectual property rights based on information provided by third parties in determining whether to provide the requested customer information. Instead, "[t]his is the province of the courts." *Rosen*, 2013 WL 12132052, at *5; *Lockheed II*, 141 F. Supp. 2d at 655.

### (c) Under the GDPR, the Privacy Services Provided by Namecheap Through WhoisGuard Are Now Mandatory

In addition to the privacy services offered by Namecheap through WhoisGuard being unquestionably legal, they are now ***mandatory*** under new privacy legislation—further undercutting Plaintiffs' contentions that Defendants acted with a bad faith intent to profit.

Specifically, following the implementation of the GDPR[7] on May 25, 2018 by the European Union, Internet service providers like Defendants cannot disclose or publish the personal data of customers without the risk of draconian penalties. For domains registered by natural persons, publishing a customer's personal data in the WHOIS database is a violation of the GDPR, absent explicit, opt-in consent from the customer. *See* Exh. A, attached hereto, Art. 6(1) & Art. 7. To comply with the GDPR, ICANN now requires registrars like Namecheap to redact certain WHOIS fields so that they are not publicly displayed unless the registrant has consented to the publication of their information.[8] *See*

---

data. In mid-2019, Facebook ultimately paid a $5 billion penalty to the Federal Trade Commission. *See* "FTC settlement imposes historic penalty, and significant requirements to boost accountability and transparency," <https://www.ftc.gov/news-events/press-releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions>, (last visited Jan. 25, 2021). Remarkably, Facebook is now challenging Defendants' practices aimed at affording netizens much needed privacy protection.

[7] Pursuant to Federal Rule of Evidence 201(c)(2), Namecheap requests that the Court take judicial notice of relevant excerpts of the GDPR, attached hereto as Exhibit "A." Given that the GDPR is a regulation in European Union law, it is appropriate for judicial notice. *See In re Ex Parte Application of Caterpillar, Inc.*, No. 3:19-mc-0031, 2020 WL 1923227, n.5 (M.D. Tenn. Apr. 21, 2020) (granting judicial notice of provisions of European law).

[8] Pursuant to Federal Rule of Evidence 201(c)(2), Namecheap requests that the Court take judicial notice of the ICANN Temporary Specification for gTLD Registration attached hereto as Exhibit "B." It was created by ICANN and is publicly available on ICANN's

Exh. B, attached hereto, Appx. A, § 2.3. The GDPR applies to all companies processing and holding the personal data of subjects residing in the European Union, regardless of the company's location. *Id*. at Art. 3(2); *see In re Facebook, Inc. Sec. Lit*., 405 F. Supp. 3d at 821, n.2. Given that Defendants' customers include those in the European Union, the GDPR applies to Defendants.[9]

The penalties for non-compliance with the GDPR are severe. Authorities can impose fines up to €20 million, or 4% of the company's total worldwide revenue from the preceding financial year, whichever is higher. *See* Exh. A, attached hereto, Art. 83-84. Accordingly, after the enactment of the GDPR, Namecheap began enabling WhoisGuard's privacy service to all customer accounts by default, free of charge. *See* FAC, ¶ 11.

As evident from the new requirements imposed upon Namecheap by the GDPR, protecting customers' privacy is a legal requirement carrying extraordinary penalties for non-compliance. To balance the interests of rightsholders, such as Plaintiffs, Defendants will disclose the underlying data in compliance with court orders. This procedure has been recognized by U.S. courts as the appropriate mechanism for procuring the registrant's identity. *See Rosen,* 2013 WL 12132052 at *5. In sum, Namecheap's compliance with the law cannot be deemed to constitute "bad faith" under the ACPA.

### (d) Plaintiffs' Allegations Regarding a Generalized "Scheme" to Attract Cybersquatters and Criminals Are Immaterial

The prior instances of alleged misconduct involving other unrelated domains are insufficient to establish a subjective intent to profit from the goodwill of Plaintiffs' marks. In *InvenTel Products, LLC v. Li*, the court held that allegations that GoDaddy was provided with multiple notices of the same customers' infringement were insufficient to allege a "bad faith intent to profit" where those notices concerned "*other websites.*" 406 F. Supp. 396, 402 (D.N.J. 2019) (emphasis in original). Without a warning that a specific domain name

---

website at <https://www.icann.org/resources/pages/gtld-registration-data-specs-en/#temp-spec>. As such, it is appropriate for judicial notice. *See In re Facebook*, 405 F. Supp. at 827.

[9] Because it is not feasible to limit GDPR protections to EU residents, ICANN permits registrars to apply the protections across the board to all registrants. Exh. B, Appx. A, § 3.

being registered would be used for an illicit purpose, the plaintiff could not establish that GoDaddy had a "bad faith intent to profit" from the automatic registration of the domain. *Id*. ("Plaintiff provides no basis for the proposition that GoDaddy must predict which URLs will be used for infringement purposes and proactively stop them from being registered."). Here too, Plaintiffs fail to allege that Namecheap was provided with any warnings that the specific domains at issue would be used for illicit purposes ***at the time of registration***. If Plaintiffs' attempt to hold Defendants liable merely for acting as service providers were accepted, by the same token, telephone services should be rendered illegal as scammers use the phones to trick victims, mail should be outlawed as scams are often consummated by mail, and all Internet services should be deemed illegal due to scams being operated online. Clearly, this is not the law, nor can it be.

Accordingly, Plaintiffs have failed to state a viable claim under the ACPA against Namecheap. Having twice tried and failed to state a claim for ACPA liability against Namecheap, the Court should deny further leave to amend.

## C. Plaintiffs' Claims for Trademark Infringement, False Designation of Origin, and Dilution Against Namecheap Fail as a Matter of Law

Plaintiffs' counts two, three, and four for trademark infringement, false designation of origin, and dilution must be dismissed as to Namecheap for two reasons. First, for all three counts the FAC fails to allege that Namecheap has used Plaintiffs' trademarks as a designation of source for Namecheap's own goods or services. Second, counts two and three should be dismissed for the separate reason that the FAC fails to plausibly allege that consumers viewing Namecheap's parking pages would be likely to be confused.

No Use as a Designation of Source. To allege a claim for trademark infringement, false designation of origin, or dilution, a plaintiff must allege the infringer used the plaintiff's marks "in commerce." Doc. 52 at 9 (citing 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)). Additionally, the Ninth Circuit has instructed that trademark infringement claims "are subject to a commercial use requirement." *Bosley*, 403 F.3d at 676 (citing 15. U.S.C. § 1114(1)(a)). The commercial use requirement protects against confusion in mistaken

purchasing decisions rather than against confusion generally. *Id*. at 677. "A party's commercial use is properly determined by assessing whether the use was '***in connection with a sale of goods or services.***'" *Dent v. Lotto Sport Italia SpA*, No. CV 17-00651-PHX-DMF, 2020 WL 1170840, at *12 (D. Ariz. March 11, 2020) (quoting *Bosley*, 403 F.3d at 677) (emphasis added). Likewise, a false designation of origin claim requires that the defendant falsely represented that it was the "source" of goods or services offered for sale when it was not. *Dastar Corp. v. Twentieth Century Fox Film Corp*., 539 U.S. 23, 31 (2003). Similarly, the Lanham Act provides that the use of a mark "***other than as a designation of source for the person's own goods or services***" shall not be actionable as dilution. 15 U.S.C. § 1125(c)(3)(A) (emphasis added). Moreover, a "mere registration of a domain name is not sufficient to constitute commercial use for purposes of the Lanham Act." *Brookfield Commc'ns., Inc. v. West Coast Entm't Corp*., 174 F.3d 1036, 1052 (9th Cir. 1999).

In the FAC, Plaintiffs added new allegations regarding Namecheap's use of parking pages which depict Plaintiffs' trademarks or "a substantially similar designation thereto" in lists of sponsored links. FAC ¶ 106; *see* Exh. 18. The FAC still fails to state any viable claim.

Plaintiffs have failed to identify any accused goods or services advertised or sold by Namecheap using Plaintiffs' trademarks. The FAC contains no facts regarding any goods or services sold though the sponsored links at issue, or even where these links take visitors who click them. Because the FAC fails to allege that Namecheap used Plaintiffs' trademarks "in connection with a sale of goods or services," Plaintiffs have failed to sufficiently plead their trademark infringement claim. *Bosley*, 403 F.3d at 677; *see also Murray v. Cable Nat'l Broad. Co.*, 86 F.3d 858, 861 (9th Cir. 1996) (where services are unrelated, there is no likelihood of consumer confusion as a matter of law and granting motion to dismiss is proper). Moreover, because the FAC fails to allege that Namecheap has used Plaintiffs' marks "as a designation of source for [Namecheap's] own goods or services," Plaintiffs have failed to state an actionable dilution claim. *See* 15 U.S.C. § 1125(c)(3)(A).

<u>No Likelihood of Confusion.</u> Plaintiffs' counts two and three also fail for a separate reason—they do not plausibly allege that consumers viewing Namecheap's parking pages

are likely to be confused, a required element of these counts. "A likelihood of confusion exists when a consumer viewing a service mark is likely to purchase the services under a mistaken belief that the services are, or associated with, the services of another provider." *Murray*, 86 F.3d at 860. A defendant can use a plaintiff's trademark if doing so does not cause "confusion about the source of [the] defendant's product or the mark-holder's sponsorship or affiliation." *Merck & Co. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 413 (S.D.N.Y. 2006).

Other courts evaluating "sponsored link" advertising on the Internet have concluded that such uses do not violate the Lanham Act because they do not create a likelihood of consumer confusion. *E.g.*, *Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117, 1123 (E.D. Cal. 2010) (sponsored links offered by Google do not violate Lanham Act); *Parts.com, LLC v. Yahoo! Inc.*, 996 F. Supp. 2d 933, 938 (S.D. Cal. 2013) ("[T]he mere fact that Yahoo displays an array of links when a user enters 'Parts.com' as a search term is not enough to suggest that Yahoo is affiliated with Parts.com."); *see also AMPAS*, 2015 WL 5311095 at *50 ("There is a growing consensus in the case authorities that keyword advertising does not violate the Lanham Act.") (compiling cases).

The opinion in *Jurin*, 695 F. Supp. 2d 1117 is on point. In that case, a plaintiff claimed that Google's publication of "Sponsored Links" in response to an online search for its trademark, "Styrotrim," diverted consumers to competitors' webpages. The court granted Google's motion to dismiss because Google had "in no way directly represented that it is the producer" of the plaintiffs' product, and it was "hardly likely" that several different sponsored links appearing on a page would confuse a consumer as to the source of the plaintiff's product even if the allegations of the complaint were accepted as true. *Id*. at 1122.

Here, too, there is no plausible likelihood of consumer confusion even if the allegations of the FAC are taken as true. Like Google, Namecheap has not directly represented that it is the producer of Plaintiffs' products or services. The allegedly infringing links appear in lists of numerous different sponsored links unrelated to Plaintiffs' trademarks. And, as in the *AMPAS* case concerning GoDaddy's similar advertisement-containing parked

pages, a review of the actual screenshots reveals that any allegation of consumer confusion is "tenuous." *AMPAS*, 2015 WL 5311085, at *43. The parked pages do not resemble Plaintiffs' own webpages. *See* FAC, Exh. 18. They display Namecheap's logo and state, "This domain was recently registered at Namecheap. Please check back later!" *Id*. Every parked page also contains a clear disclaimer stating that "[t]he Sponsored Listings displayed above are served automatically by a third party" and that there is no relationship with the advertisers. *Id*.  Thus, just as in the *AMPAS* case, "Internet users landing on a parked page resolving from one of the Accused Domains would be hard-pressed to believe that either the parked page or the advertisements contained thereon constituted [Plaintiffs'] official website or provided a link to a website sponsored by [Plaintiffs]." *AMPAS*, 2015 WL 5311085, at *43. Accordingly, counts two, three, and four should be dismissed as to Namecheap without further leave to amend.

### D. Plaintiffs Fail to Sufficiently Allege Namecheap's Alter Ego or Direct Participant Liability

This Court previously held that the original complaint failed to allege sufficient facts to allege that Namecheap is liable for the tortious conduct of WhoisGuard under either an alter ego or direct participant liability theory. The FAC fails to remedy the deficiencies identified by the Court.

#### 1. *Plaintiffs' Alter Ego Allegations Remain Deficient*

The Order sets forth the requirements to sufficiently allege alter ego liability:

> To state a claim for alter ego liability, there must be "such unity of interest and ownership" that the separate personalities of the two entities fail to exist and that failure to disregard the separate identities results in "fraud or injustice." *AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996). The unity and ownership prong requires a showing that the entity controls the other "to such a degree as to render the latter the mere instrumentality of the former." *Doe*, 248 F.3d at 926 (quoting *Calvert v. Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995)). There must be pervasive control, such as where a parent corporation "dictates "[e]very facet [of the subsidiary's] business-from broad policy decisions to routine matters of day- to-day operation[.]" *Id.* (quoting *Rollins Burdick Hunter of So. Cal., Inc. v. Alexander & Alexander Servs., Inc.,* 253 Cal. Rptr. 338, 344 (Ct. App. 1988)). Alter ego liability is not found where the two entities observe their corporate formalities or where the parent does not direct the subsidiary's routine day-to-day operations. *See Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073-75 (9th Cir. 2015).

Doc. 52 at 10.

The Court concluded:

> Other than the conclusory allegation that "WhoisGuard is not a separate autonomous entity from Namecheap," Plaintiffs do not allege anything about failure to observe corporate formalities. And, despite Plaintiffs' argument to the contrary, the mere fact Namecheap provides WhoisGuard's service to its customers for free does not support the inference that WhoisGuard is undercapitalized or that the two companies improperly commingle funds…Additional allegations are needed, however, to give rise to the plausible inference that Namecheap dictates *every facet* of WhoisGuard's business. As a result, Plaintiffs fail to adequately allege a "unity of interest" sufficient to satisfy the first prong of the alter ego test.

*Id*. at 11.

The FAC does not cure the deficiencies described in the Order. Rather than alleging particular facts to show an actual unity of interest between Defendants, Plaintiffs again assert a string of formulaic, summary conclusions. Specifically, Plaintiffs allege, *inter alia*, that: WhoisGuard is not a separate autonomous entity from Namecheap; Namecheap controls all its business operations and exercises complete control over its day-to-day operations and decision making; Namecheap and WhoisGuard do not properly document transactions between each other or properly compensate each other for services; and Namecheap and WhoisGuard comingle assets and finances. Each of these allegations is made on "information and belief." FAC, ¶¶ 197–204.

A pleading stating a claim for relief must set forth factual matter which, if accepted as true, would "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555 (internal quotation marks omitted). "[C]ourts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig*., 311 F.3d 198, 216 (3d Cir. 2002). "[B]are assertions," such as those that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim, are insufficient to state a claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

Plaintiffs' original complaint failed to adequately allege a "unity of interest" to satisfy

1    the first prong of the alter ego test. *AT&T Co.*, 94 F.3d at 591. The FAC still fails to satisfy

2    this requirement because it, too, contains only formulaic, conclusory statements.

3          Nor have Plaintiffs sufficiently alleged the second prong of the alter ego test, that

4    "fraud or injustice would result" if WhoisGuard's corporate form were not disregarded. As

5    discussed above, WhoisGuard's privacy services are "indisputably legal" and are offered to

6    all of Namecheap's customers, not just cybersquatters. Plaintiffs allege without evidence that

7    Namecheap set up WhoisGuard as a shell company to avoid liability, *see* FAC ¶ 195, but

8    "[c]onclusory allegations that [a defendant] structures companies to escape liability are

9    insufficient to confer personal jurisdiction. Something more is needed." *In re Boon Global*

10   *Ltd.*, 923 F.3d 643, 654 (9th Cir. 2019).

11                 **2.  *Plaintiffs' Direct Participant Liability Allegations Remain Deficient***

12          Plaintiffs allege: "Upon information and belief, WhoisGuard is a subsidiary of

13   Namecheap." FAC ¶ 10. Based on this unsupported conclusion, Plaintiffs contend that

14   Namecheap is liable for WhoisGuard's tortious conduct under the theory of direct participant

15   liability "because Namecheap, in exercising complete control over all of [WhoisGuard's]

16   actions, was a direct participant in all of [WhoisGuard's] actions." *Id.* at ¶ 183.

17         At best, Plaintiffs' allegations can be described as wishful thinking.  The notion that

18   WhoisGuard is a subsidiary is based on the identical recitation of conclusory statements on

19   which Plaintiffs' erroneous alter ego theory depends. *See* FAC, ¶¶ 197–204. Plaintiffs

20   assume the conclusion that Namecheap is a "direct participant" in all of WhoisGuard's

21   actions in order to create liability where none exists. Although this statement is repeated

22   throughout the FAC, no facts are alleged to support it.  In one instance, Plaintiffs allege:

23
24
25
26
> [I]n response to one of Plaintiffs' Notices, WhoisGuard stated that it "does not own, administer, host or provide registration services to the Domain, but simply provides anonymous privacy protection services to a domain registrant. We cannot remove any content, or links, from the website, provide the registrant contact information, or terminate the Privacy Protection as we do not have control over the service." (emphasis added).

27   FAC, ¶ 192.

28        From this statement, Plaintiffs extrapolate not only that WhoisGuard is a subsidiary

of Namecheap, but that Namecheap exerted control over its supposed unlawful activities. Plaintiffs go on to list a number of assumptions purporting to show Namecheap's "direct participation" in WhoisGuard's business activities. *See* FAC, ¶¶ 210-226. Again, this formulaic recitation of the elements of a claim for direct participant liability is insufficient to state a claim for relief. *See Iqbal*, 556 U.S. at 681.

## IV.    THE CLAIMS AGAINST WHOISGUARD FOR HUNDREDS OF NEW DOMAINS MUST BE DISMISSED

Despite the fact that Court's Order granting leave to amend was limited "as to Defendant Namecheap," (Doc. 52 at 1, 12) the FAC adds new allegations against WhoisGuard based upon nearly 1,000 disputed domain names. The original complaint asserted claims based only upon 45 domains. For all 45 of the original domains, Plaintiffs specifically alleged that they provided notices to WhoisGuard under Section 3.7.7.3 of the RAA requesting that it disclose the identity and contact information of the customers. In the Order, the Court accepted that the original complaint plausibly alleged that WhoisGuard made itself liable for infringements by the customers when it failed to disclose the identity of the customers under Section 3.7.7.3. Doc. 52 at 7-8.

With respect to the approximately 950 new domains added to the FAC, however, Plaintiffs ***do not*** allege that WhoisGuard failed to disclose the identity of the customers. To the contrary, Plaintiffs concede that WhoisGuard began providing responses to its RAA Section 3.7.7.3 notices after the Court denied WhoisGuard's motion to dismiss. FAC ¶ 124. Nonetheless, Plaintiffs allege WhoisGuard is liable for claims based on the new domains asserting that it "registered" and "trafficked in" the domains in providing privacy services.

The Court should reject Plaintiffs' attempt to bootstrap these new domains into the case, which cannot support a viable claim against WhoisGuard. Plaintiffs' theory that WhoisGuard accepted liability under Section 3.7.7.3 is inapplicable to the new domains. Plaintiffs allege no facts to establish that WhoisGuard acted with a bad faith intent to profit specifically from Plaintiffs' marks. *See Solid Host*, 652 F. Supp. at 1110. The "bad faith" element fails as to these claims for all of the same reasons addressed in Section III.B.3 above.

Moreover, the privacy services offered by WhoisGuard are now **mandated** by the GDPR. Finally, to the extent counts two, three, and four are based merely on WhoisGuard's actions in providing the privacy service rather than accepting the liability of others under Section 3.7.7.3, Plaintiffs have failed to allege a "use in commerce" of Plaintiffs' marks by WhoisGuard in connection with the sale or advertising of any goods or services. *See* Doc. 52 at 9-10; *see also* Sec. III.C.1 *supra*.

Accordingly, the claims against WhoisGuard based on the new domains should be dismissed for failure to state a viable claim. In the alternative, the Court may dismiss the new claims for exceeding the scope of its Order granting leave to amend "as to Defendant Namecheap." *See Beavers v. New Penn Fin. LLC*, No. 1:17-cv-00747-JLT, 2018 WL 385421, at *2 (E.D. Cal. Jan. 11, 2018) (where leave to amend is given to cure deficiencies in certain claims, new claims may be dismissed as exceeding the scope of the order).

## V.     THE COURT SHOULD STRIKE THE CYBERCRIME ALLEGATIONS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(f)

Rule 12(f) provides that the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The function of a Rule 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial. *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).

Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded. *Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds* 510 U.S. 517 (1994) (internal citations and quotations omitted). Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question. *Id.* Rule 12(f) motions may be granted if the challenged content has no logical connection to the controversy at issue and may prejudice the parties. *New York City Emps' Ret. Sys. v. Berry,* 667 F. Supp. 2d 1121, 1128 (N.D. Cal. 2009).

This is an action for cybersquatting and Lanham Act claims. The FAC includes numerous allegations regarding Defendants' purported connections to criminal activity that

have nothing to do with Plaintiffs' trademarks or the disputed domains or with the claims asserted against Defendants.  As examples, Plaintiffs allege: that an Internet security expert wrote in 2018 that Namecheap was the registrar of the domains used in a 2018 ransomware scam, including uscourtsgov.com (FAC, ¶¶ 27–28); and that Defendants "facilitated a predatory wire fraud scheme exploiting the COVID-19 pandemic" involving a website hosted at the domain coronavirusmedicalkit.com  (*id.* at ¶¶ 29–34). None of the domains involved in these matters have any relation to Plaintiffs or their trademarks. Additionally, the FAC alleges that "Namecheap is the registrar of choice for cybercriminals" (*id.* at ¶ 25), and that Defendants "facilitate" cybercrime and deliberately attract criminals to use their services for malicious activity (*id.* at ¶¶ 7, 35, 126, 133, 143, 179).

None of this alleged conduct has any bearing on the legal claims Plaintiffs assert. In particular, these allegations cannot be used to establish the element of "bad faith intent to profit" within the meaning of the ACPA, which is not simply general bad faith, but requires bad faith intent to profit ***specifically from Plaintiffs' trademarks***. *See* Sec. III.3(a) *supra*. Where, as here, allegations "place undue emphasis on the criminal nature of [the defendants'] conduct in terms that have no bearing on the claims [the plaintiff] is asserting," the allegations are properly stricken under Rule 12(f). *Xcentric Ventures LLC v. Borodkin*, No. CV-11-1426-PHX-GMS, 2012 WL 692976, at *12 (D. Ariz. March 1, 2012) (J. Snow).

Accordingly, the above-referenced allegations should be stricken under Rule 12(f).

## VI.   CONCLUSION

For all of the foregoing reasons, the Court should grant Defendants' Motion. Further leave to amend should be denied.

[SIGNATURES ON FOLLOWING PAGE]

1  DATED:  January 25, 2021          **ROME & ASSOCIATES, A.P.C.**

2

3                                     By:  *s/ Eugene Rome*
                                          Eugene Rome
4                                         Sridavi Ganesan
                                          Brianna Dahlberg
5

6

7                                     **FENNEMORE CRAIG, P.C.**

8                                     By:  *s/ Ray K. Harris*
                                          Ray K. Harris
9                                         Mario C. Vasta

10
                                      Attorneys for Defendants
11                                    Namecheap, Inc. and Whoisguard, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28