David G. Barker (#024657)
dbarker@swlaw.com
Jacob C. Jones (#029971)
jcjones@swlaw.com
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070

TUCKER ELLIS LLP
David J. Steele (*pro hac vice*)
david.steele@tuckerellis.com
Howard A. Kroll (*pro hac vice*)
howard.kroll@tuckerellis.com
Steven E. Lauridsen (*pro hac vice*)
steven.lauridsen@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223
Telephone: (213) 430-3400
Facsimile: (213) 430-3409

Attorneys for Plaintiff and
Counterclaim Defendant,
Facebook, Inc.

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Facebook, Inc., Instagram, LLC, And WhatsApp Inc., <br><br> Plaintiffs, <br><br> v. <br><br> Namecheap, Inc. And Whoisguard, Inc., <br><br> Defendants. <br><br> Whoisguard, Inc. <br><br> Counterclaimant <br><br> v. <br><br> Facebook, Inc. <br><br> Counterclaim Defendant. | Case No. CV-20-470-PHX-GMS <br><br> **FACEBOOK'S MOTION TO DISMISS WHOISGUARD'S FIRST AMENDED COUNTERCLAIM PURSUANT TO FED. R. CIV. P. 12(b)(6) AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION** <br><br> (Oral Argument Requested) |

Pursuant to Fed. R. Civ. P. 12(b)(6), Counterclaim Defendant Facebook, Inc. ("Facebook") moves to dismiss the First Amended Counterclaim ("Counterclaim") filed by Counterclaimant Whoisguard, Inc. ("Whoisguard"). Pursuant to LRCiv 12.1(c), Facebook certifies that its counsel met and conferred with Whoisguard's counsel on January 26, 2021, at 1:00 p.m. PST via Zoom to discuss the issues raised in this Motion. In attendance were David Steele, Howard Kroll and Steven Lauridsen on behalf of Facebook and Eugene Rome and Brianna Dahlberg on behalf of Whoisguard. The conference lasted approximately 20 minutes. During the conference, counsel discussed the presented issues at length. Whoisguard did not agree that Facebook's proposed motion had any merit, did not propose any amendment that would cure the pleading, and refused to withdraw its Counterclaim. As no resolution could be reached between the parties, Facebook files this Rule 12(b)(6) Motion to Dismiss Defendant Whoisguard's First Amended Counterclaim (Facebook's "Motion").

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Whoisguard's First Amended Counterclaim ("Amended Counterclaim") to cancel the registrations for Facebook's FB Mark[1] on grounds of abandonment and fraud has no basis in law or fact and should be dismissed. Indeed, the Amended Counterclaim contains factual allegations that refute the very claims Whoisguard is attempting to state.

For example, in support of its abandonment claim, Whoisguard alleges that "Facebook has not used the FB Mark as a service mark for the identified services under the FB Registrations for a period of at least three consecutive years" (Countercl. ¶ 69) and that "[t]he specimens submitted by Facebook do not show the FB Mark in use in commerce in connection with all of the services specified in the FB Registrations" (Countercl. ¶ 22). Yet, even a cursory review of the specimens submitted to the U.S. Patent and Trademark Office ("PTO") in connection with the FB Registrations for the FB Mark—which Whoisguard relies on and incorporates into its Amended Counterclaim—demonstrates that the specimens do show such use, rendering Whoisguard's allegations patently false. Declaration of David J. Steele ("Steele Decl.") ¶¶ 2–5 & Exs. A-D. Furthermore, after

---

[1] The "FB Mark" refers to Facebook's FB mark, which is the subject mark of the following U.S. Service Mark Registrations: 4,659,777 (issued December 23, 2014, reciting the following services in class 035: Promoting the goods and services of others over the Internet); 4,764,764 (issued June 30, 2015, reciting the following services in class 042: Computer services, namely, hosting online web facilities for others for organizing and conducting online meetings, gatherings, and interactive discussions; computer services in the nature of customized web pages featuring user defined information, personal profiles and information); 4,782,234 (issued July 28, 2015, reciting the following services in class 045: Internet based social introduction and social networking services); and 4,782,235 (issued July 28, 2015, reciting the following services in class 038: Providing online chat rooms and electronic bulletin boards for transmission of messages among registered users in the fields of collegiate life, general interest, classifieds, virtual community, and for social networking; and peer-to-peer photo sharing services, namely, electronic transmission of digital images among Internet and mobile device users). Collectively, these registrations are referred to as the "FB Registrations."

Whoisguard filed its original Counterclaim, Facebook provided Whoisguard with ample evidence of past and current use of the FB Mark, Steele Decl. ¶¶ 6–12 & Exs. E–J., which Whoisguard ignores and miscasts in its amended pleading.

Whoisguard also alleges that Facebook made misrepresentations to the PTO in its prosecution of the FB Registrations. Whoisguard apparently believes that Facebook committed fraud when it represented that the FB Mark had been first used in commerce in April 2014, even though Facebook requested extensions of time to submit a statement of use after April 2014 while asserting a continued bona fide intention to use the FB Mark in commerce. (Countercl. ¶¶ 18-20, 66-67). Whoisguard's allegations, however, reflect a fundamental misunderstanding of the mechanics of trademark prosecution. Indeed, a trademark applicant may claim a bona fide intent to use a mark even if the mark is already being used in commerce with some or all of the services in the application. *See Trademark Manual Of Examining Procedure* ("TMEP") §§ 903 (an applicant may state dates of use earlier than the filing of the application) and 1104.03(a) (an applicant may not "allege use until the mark has been in use in commerce on or in connection with all goods/services for which the applicant seeks registration").

In short, Whoisguard's Amended Counterclaim for cancellation of the FB Registrations due to abandonment should be dismissed because the FB Mark was and is being used in commerce in connection with the services recited. Whoisguard's Amended Counterclaim for cancellation of the FB Registrations due to fraud on the PTO should be dismissed because the FB Mark was in use in commerce and because Facebook did not make any misrepresentations to the PTO when it claimed an intent to use the FB Mark. For these and other reasons explained in greater detail below, this Court should grant Facebook's Motion to Dismiss Whoisguard's Amended Counterclaim with prejudice.

## II.  WHOISGUARD'S CLAIMS EACH FAIL AS A MATTER OF LAW.

### A.  Fed. R. Civ. P. 12(b)(6) Motion to Dismiss Standard

To survive a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a complaint must contain more than a "formulaic recitation of the elements of a

2

cause of action"; it must contain factual allegations sufficient to "raise the right of relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). When analyzing a complaint on a Rule 12(b)(6) motion, "allegations of material fact are taken as true and construed in the light most favorable to the non-moving party." *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996). However, legal conclusions couched as factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998); *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). Similarly, if there is an "obvious" and legal alternative explanation for the conduct at issue, the facts alleged will not "plausibly establish" the alleged improper purpose. *See Ashcroft v. Iqbal*, 556 US 662, 682 (2009).

Furthermore, the Court need not accept as true allegations contradicted by judicially noticeable facts, *see Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and it "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment. *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). Nor must the Court "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (internal quotation marks omitted). "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Thus, the Court "may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

**B.   Whoisguard's Amended Counterclaim contains allegations and claims of Facebook's abandonment of the FB Mark that lack legal or factual foundation.**

While Whoisguard alleges that Facebook never used the FB Mark for the services

3

recited in the FB Registrations (Countercl. ¶¶ 28, 32, 35, 42, 48-53)[2], the allegations in Whoisguard's own counterclaim demonstrate Facebook's continued, ongoing use of the FB Mark. Whoisguard further claims that Facebook stopped using and thereby abandoned the FB Mark in 2016 when the FB Newswire page ceased operating (Countercl. ¶ 27). This is yet another allegation refuted by the very facts contained in Whoisguard's counterclaims. Pursuant to the Lanham Act, "A mark shall be deemed to be 'abandoned' if . . . its use has been discontinued with intent not to resume use." 15 U.S.C. § 1127. Because the FB Mark is still in use, it cannot have been abandoned as a matter of law.

        **1.**       **Facebook's specimens of use incorporated into Whoisguard's Amended Counterclaim conclusively demonstrate that Facebook has used the FB Mark in commerce in connection with the relevant services.**

The specimens of use submitted by Facebook to the PTO for the FB Mark, partial copies of which Whoisguard reprinted in its Counterclaim (Countercl. ¶ 21), demonstrate that Facebook used the FB Mark in commerce in connection with the services recited in the FB Registrations. "[B]ecause by its very nature a service mark can be used in a wide variety of ways, the types of specimens which may be submitted as evidence of use are varied." *In re Metriplex, Inc.*, 23 USPQ2d 1315, 1316 (TTAB 1992). The "specimen must show the mark as actually used in the sale or advertising of the services. The specimen must show a direct association between the mark and the services." 37 C.F.R. § 2.56(b)(2); *see also* 15 U.S.C. § 1127. "A designation in the body of an Internet Web site can be used in such a way as to identify and distinguish the source of services rendered via the Internet." McCarthy § 16:33. *See On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1088 (Fed. Cir. 2000) (indicating that an online menu item bearing the mark ONLINE TODAY was proper service mark use in connection with "providing access to online computer

---

[2] Whoisguard also alleges that the specimens submitted by Facebook do not show use for the services specified in the FB Registrations. (Countercl. ¶¶ 22-24, 26.)

4

services offering computer-industry news, commentary and product reviews" because, inter alia, the "menu items are the mechanisms by which users obtained access to a particular online service"); *In re Metriplex, Inc.*, 23 USPQ2d at 1316 (indicating that a specimen that does not explicitly refer to the services may be acceptable if it "show[s] use of the mark in the rendering, i.e., sale, of the services"). As a result, "if the web site uses the mark in close proximity to links to documents used in rendering the services, that is sufficient." McCarthy § 16:33; *see also In re McGowan Publishing Co., Inc.*, 111 U.S.P.Q.2d 2000, 2014 WL 4628772 (TTAB 2014) ("[T]he links to these documents create an association between the mark and the offered service activity.").

The specimen of use submitted to the PTO for the '777 Registration (for "Promoting the goods and services of others over the Internet") shows the FB Mark on a webpage accessed over the Internet, which displays two advertisements for the goods and services of others (including an ad for food delivery). (Steele Decl. ¶ 2 & Steele Decl. Ex. A (annotated copy of '777 Registration specimen).).

Similarly, the specimen of use submitted for what would eventually become the '764, '234, and '235 Registrations[3] also demonstrates Facebook's use of the FB Mark in

---

[3] As in its original Counterclaim, Whoisguard's Amended Counterclaim only reproduces the first of three pages of this specimen of use. It should be noted that Facebook brought this issue to Whoisguard's attention and that Whoisguard's decision not to include the full specimen of use in the Amended Counterclaim is not accidental. When a pleading relies on "only portions of documents that support [a party's] claims, while omitting portions of those very documents that weaken—or doom—[the party's] claims," the court treats the complete "documents as though they are part of the [pleading] itself" in order to prevent a party "from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

In addition, Facebook respectfully requests, pursuant to Fed. R. Evid. 201(b)(2), that the Court take judicial notice of the entire filed specimen of use for the FB Registrations. Each specimen is a public record that can be accessed at the PTO website. *See Khoja,* 899 F.3d at 999 (Evidence Rule 201 permits a court to take judicial notice of matters of public record).

5

commerce in connection with the services recited in those registrations. The specimen shows:

- a video by the New Zealand Police department shared on a webpage with public comments, which supports use of the FB Mark for the '764 Registration in connection with computer services in the nature of hosting web facilities for others and interactive discussions (Steele Decl. ¶ 3 & Steele Decl. Ex. B (annotated copy of '764 Registration specimen));

- the ability to like, follow, and invite friends to like the webpage, which supports use of the FB Mark for the '234 Registration in connection with Internet based social introduction and social networking services (Steele Decl. ¶ 4 & Steele Decl. Ex. C (annotated copy of '234 Registration specimen));

- message boards and photo sharing services on a webpage, which supports use of the FB Mark for the '235 Registration in connection with providing online chat rooms, bulletin boards, and peer-to-peer photo sharing services (Steele Decl. ¶ 5 & Steele Decl. Ex. D (annotated copy of '235 Registration specimen)).

Rather than support Whoisguard's Amended Counterclaim, the specimens presented in Amended Counterclaim ¶ 21 directly refute Whoisguard's allegations in ¶¶ 22-24 that the specimens do not show the FB Mark's use in commerce in connection with the recited services.

In an attempt to circumvent this conclusion, Whoisguard also alleges that the specimens show the designation "FBNewswire" and not the FB Mark. Countercl. ¶ 24. This is false. A simple review of the specimens shows that there is a distinct space between "FB" and "Newswire," and that "FB" appears in a different color than "Newswire" in certain portions of the specimen. Further, a simple Google or dictionary search shows "newswire" is a generic term for a service that provides news, which is what the particular Facebook page in the specimen does.

Whoisguard also alleges that "[t]he website screenshots are also missing important information such as a URL or browser tab and are displayed in a way that suggest they

were not published." *Id.* Yet, the PTO did not require website specimens to show their URL until 2020, after Facebook had already submitted the specimens for these registrations. *Cf.* 37 C.F.R. § 2.56(c) (effective July 11, 2015 to February 14, 2020) with 37 C.F.R. § 2.56(c). Whoisguard also could have confirmed whether the page was published by reviewing one of the 60 historic archives of the webpage available at archive.org.

Accordingly, use of the FB Mark is supported by specimens submitted to the PTO. Equally significant, the specimens refute Whoisguard's allegations that the FB Mark was *never* used in commerce or in connection with the relevant services.

### 2. The Amended Counterclaim conclusively demonstrates that Facebook continues to use the FB Mark.

Whoisguard alleges that Facebook ceased using (and therefore abandoned) the FB Mark. Countercl. ¶¶ 48, 71. This is demonstrably false, as evidenced by the Amended Counterclaim as well as by numerous prominent, publicly available examples of Facebook's continuing use of the FB Mark Counterclaim.

First, as shown in the Amended Counterclaim ¶ 45, the FB Mark is used prominently on Facebook's social media page, available at www.facebook.com/facebook. Use of the FB Mark on Facebook's own Facebook page is "liked" by over 20,000,000 people and followed by over 21,000,000 people. Steele Decl. ¶ 8 & Ex. G.[4]

---

[4] Facebook provided Whoisguard several screen captures of Facebook's social media pages where Facebook uses the FB Mark. In its Amended Counterclaim, however, Whoisguard included only one screen capture, miscasting this page as evidence that the FB Mark was not in use with the services, while omitting the other screen captures because they doom its claim. Whoisguard then references these other screen captures, without showing them in its Amended Counterclaim, concluding "[t]he social media pages [provided by Facebook] do not display or use the FB Mark in the sale or advertising of the services in the FB Registration." Countercl. ¶ 49. Facebook asks that the Court incorporate by reference these additional screen captures, the content of which is shown below, into Whoisguard's Amended Counterclaim because Whoisguard "refers extensively to the document or the document forms the basis of [Whoisguard's] claim." *Khoja*, 899 F.3d at 1002 (explaining incorporation-by-reference doctrine when portions of documents that

7

As to the '777 Registration, Facebook's Facebook page displays the FB Mark and promotes the goods and services of others over the Internet, such as a December 2, 2020, post promoting small businesses and asking customers of small businesses to share "what makes the business they love special." Steele Decl.¶ 9 & Ex. H.

As to the '764 Registration, Facebook's Facebook page displays the FB Mark and includes posts, with comments by users, events, and links to users' own customized web pages that they customize with their own content, personal profiles, and information. Steele Decl.¶ 10 & Ex. H.

As to the '234 and '235 Registrations, Facebook's Facebook page displays the FB Mark and includes Internet-based social introductions and social networking services through Facebook's posts linking users to others and their stories, including bulletin board services transmitting message and photo sharing among registered users. For example, a post on December 1, 2020, asks users what they are "giving back this Giving Season" and shows the story of Emergency RV, which donates refurbished RVs to families who have lost their homes in natural disasters. The post shares a picture and invites others to share their stories. The post has received over 212,000 reactions, 11,000 comments, and 15,000 shares. Steele Decl. ¶ 11 & Ex. I.

Furthermore, the FB Mark is used by Facebook on other social medial platforms to advertise Facebook's services, including the services recited in the FB Registrations. Steele Decl., ¶ 12 & Ex. J. For example, the use of the FB Mark on Facebook's Twitter pages,[5]

---

weaken a claim are omitted from the pleading). *Khoja, supra.*

In addition, Facebook respectfully requests the Court, pursuant to Fed. R. Evid. 201(b)(2), take judicial notice of Facebook's Facebook page, which is a publicly available website. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (Rule 201 permits a court to take judicial notice of publicly accessible websites whose accuracy and authenticity is not subject to dispute).

[5] Facebook also provided Facebook's Twitter account page to Whoisguard, which Whoisguard has ignored in the Amended Counterclaim. Facebook respectfully requests,

8

shows the FB Mark page used in connection with promoting the goods and services of others over the Internet (in this instance supporting small businesses).

Facebook has also been enforcing the FB Mark by filing complaints in Uniform Domain Name Resolution Policy ("UDRP") proceedings, including at least three against Whoisguard in 2019. *See* Exhibit 27 to the First Amended Complaint (Dkt. 56.06).[6] Despite Whoisguard's knowledge of Facebook's enforcement efforts, Whoisguard paradoxically alleges that Facebook has abandoned the FB Mark. (Countercl. ¶¶ 48, 71).

Faced with these obvious instances of use, Whoisguard alleges that the marks shown above are "not the FB Mark." Countercl. ¶ 50. In particular, Whoisguard alleges, without any support, that the "picture of 'FB' surrounded in a rainbow-colored circle . . . conveys a different commercial impression" than the FB Mark. *Id.* This conclusory allegation is legally deficient. Each registration for the FB Mark is for what is known as a standard character registration. "A standard character registration provides a registrant with the broadest form of coverage for the registered mark because such a registration gives the registrant rights in the mark in block letters ***as well as in 'depictions of the standard character mark regardless of font style, size or color.'***" *In re Calphalon Corp.*, 122 U.S.P.Q.2d 1153, 1160 n.8, 2017 WL 1476288 (TTAB 2017) (emphasis added); *see also Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014) ("Pom Wonderful's exclusive right to use the 'POM' mark covers all design variations of the word because 'POM' was registered as a standard character mark."). Whoisguard's claim that these are not depictions of the FB Mark has no merit.

---

pursuant to Fed. R. Evid. 201(b)(2), that the Court take judicial notice of Facebook's Twitter account page, which is a publicly available website. *See Daniels-Hall,* 629 F.3d at 998–99.

[6] The domain names involved in these UDRP proceedings include fb-nuoma.info; fbnuoma.info; fb-live.xyz; fb-liveports.stream; fb-tv.xyz; fbleadscraper.com and fbmailextractor.com.

9

### 3.   The Facebook Brand Resource Center lists the FB Mark.

Whoisguard alleges that Facebook's Brand Resource Center website, located at en.facebookbrand.com, does not mention Facebook using "FB" as a trademark for either the Facebook company or app or any services provided by Facebook. Countercl. ¶ 41. This allegation is false, as the website both uses the FB Mark and lists "FB" as one of Facebook's trademarks.

First, Facebook currently uses the FB Mark as the favicon for the Brand Resource Center website available at en.facebookbrand.com, which is cited in Whoisguard's Counterclaim ¶¶ 39-41. Steele Decl. ¶ 6 & Ex. E.

Second, at the bottom of the en.facebookbrand.com webpage is a link to "Our Trademarks." That link directs users to the Trademark Glossary of Facebook's Brand Resource Center, which lists the FB Mark and explains the mark is used in connection with "App, Platform, Service, Social Network"—general categories of services that include the services recited in the FB Mark registrations.[7] Steele Decl. ¶ 7 & Ex. F.

Whoisguard alleges that the fact the Brand Resources pages "provide no guidelines or instructions on how to use any alleged FB Mark . . . is further indicia that Facebook is not using the alleged FB Mark in commerce." Countercl. ¶¶ 41-42. This is a red herring: whether Facebook provides guidelines or instructions to third parties concerning how to use certain of its marks has no bearing on Facebook's *own* use of its marks. Instead, that the FB Mark is listed among the company's other marks on the Brand Resource Center evidences that the mark is both in use and that the company has not ceased use with the intent not to resume use.

A mark is only deemed abandoned "[w]hen its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1027; *Electro Source v. Brandess-Kalt-Aetna Group, Inc.*, 458 F. 3d 931 (9th Cir. 2006) ("… abandonment requires complete cessation or

---

[7] Facebook asks that the Court incorporate by reference the en.facebookbrand.com webpage into Whoisguard's Amended Counterclaim. *Khoja*, 899 F.3d at 1002.

10

discontinuance of trademark use."). Here, Facebook's actual and continued use of the mark evidences its intent to continue use. Indeed, Facebook's enforcement of the FB Mark through UDRP proceedings and against Whoisguard shows that Facebook has not ceased use of the FB Mark with the intent not to resume use.

Simply put, the FB Mark is still in use in commerce in connection with all services listed in the FB Registrations, and thus cannot have been abandoned as a matter of law. The abandonment claim should therefore be dismissed with prejudice.

### C. Whoisguard's fraud claim fails as a matter of law.

The Lanham Act permits a third party to petition to cancel a trademark whose "registration was obtained fraudulently." 15 U.S.C. § 1064(3). The Lanham Act creates a cause of action for damages and/or cancellation of a defendant's mark if the defendant obtained its mark by making fraudulent representations to the PTO. *See* 15 U.S.C. § 1054(3); 15 U.S.C. §§ 1119-1120. To assert a claim for fraudulent procurement of marks, a plaintiff must establish: "(1) a false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) the registrant's intent to induce reliance upon the misrepresentation; (4) actual, reasonable reliance on the misrepresentation; and (5) damages proximately caused by that reliance." *OTR Wheel Eng'g, Inc. v. West Worldwide Servs.*, 897 F.3d 1008, 1019 (9th Cir. 2018).

In an attempt to make out a claim for fraud, Whoisguard alleges: (1) the FB Mark was not in use when the statements of use were filed, and (2) Facebook's statement that it had a continued bona fide intent to use the FB Mark in commerce when it filed its requests for an extension of time to file a statement of use implies the marks were not yet in use when those requests were made. Countercl. ¶¶ 8-22, 38, 62, 66-67, 70. Neither contention has any merit.

That the FB Mark was not in use is directly refuted by the specimens discussed above and shown in the Steele Decl. exhibits. The remainder of Whoisguard's fraud argument is predicated on Facebook's statements of use for the FB Mark with a date of first use (April 2014) that predated both the filing of the statements of use and the extension

11

requests. And that Facebook's verified statements that it had a continued bona fide intent to use the FB Mark implies the mark was not actually in use as of the claimed date of first use. Countercl. ¶ 67. Contrary to Whoisguard's assertion, a trademark owner *can* properly claim a bona fide intention to use a mark if it already is using that mark.

The "intent to use" ("ITU") trademark registration system allows an applicant to seek registration without using a mark in commerce, so long as the applicant has "a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce." 15 U.S.C. § 1051(b)(1). Once a "notice of allowance" for the mark in an ITU application issues, the applicant has six months to file a statement of use. *Id.* § 1051(d)(1). The applicant may seek an initial six-month extension, and, upon a showing of "good cause," may seek up to four additional six-month extensions. *Id.* § 1051(d)(2). Each extension request must be accompanied by a verified statement that "the applicant has a continued bona fide intention to use the mark in commerce . . . ." *Id.* As a result of these provisions, an applicant has up to three years after the notice of allowance to file a statement of use, provided that, during that period, the applicant maintains the bona fide intent to use the mark in commerce. *Id.*[8]

While an ITU applicant must provide a verified statement that it has a bona fide intent to use the mark in commerce, this statement does not equate to non-use of the mark in any way. Indeed, an ITU application may be filed even if the mark is in use, for a "§1(b) [ITU] applicant may state dates of use that are earlier than the filing date of the application in an amendment to allege use or statement of use." TMEP § 903; *see also* TMEP § 1104.05 ("If an applicant files an intent-to-use application . . . and, at the same time, files an amendment to allege use asserting dates of use before the filing date of the application, the applicant will be required to comply with all requirements related to the amendment to

---

[8] Whoisguard admits that a Statement of Use was timely filed for each FB Registration within three years after each notice of allowance. (Countercl. ¶¶ 13-16).

12

allege use").[9]

The intent-to-use system specifically contemplates that an applicant may claim a bona fide intent to use a mark even if the mark is already in use in commerce in connection with some or all of the services in the application. Thus, a legal and "obvious alternative explanation" for Facebook's conduct exists, which prevents Whoisguard from "plausibly establish[ing]" any improper purpose. *See Iqbal*, 556 U.S. at 682 (allegation that plaintiff's arrest was result of unlawful discrimination against Muslim men was ***not*** "plausible" in view of more likely explanation, *i.e.*, detention of individuals with potential connections to those who committed terrorist acts); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 (8th Cir. 2009) ("An inference pressed by the plaintiff is not plausible if the facts he points to are precisely the result one would expect from lawful conduct in which the defendant is known to have engaged").

Whoisguard's claim that the "registration was obtained fraudulently," 15 U.S.C. § 1064(3) further fails for the independent reason that Whoisguard cannot establish a false representation regarding a material fact. *OTR Wheel Eng'g, Inc. v. West Worldwide Servs.*, 897 F.3d 1008, 1019 (9th Cir. 2018). Under its usual meaning, "[a] fact is 'material' if the fact may affect the outcome of the case." *Far Out Productions, Inc., v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001). Likewise, "in the trademark context, a material misrepresentation arises only if the registration should not have issued if the truth were known to the examiner." *Alphaville Design, Inc. v. Knoll, Inc.*, 627 F. Supp. 2d 1121, 1132 (N.D. Cal.2009) (Patel, J.) (quotation marks omitted).

Courts hold, however, that the date of first use alleged in a statement of use is not material to the PTO's decision to register a mark and thus cannot support a claim for fraud.

---

[9] Whoisguard also alleges that, by later filing an ITU application to register FB for a number of services already covered by the FB Marks' existing registrations, Facebook is tacitly admitting that it is not using the FB Mark in connection with those services. Countercl. ¶ 31, 37. That an applicant may file for services already in use shows that this inference is incorrect as a matter of law.

13

*Teeter-Totter, LLC v. Palm Bay Int'l, Inc.*, 344 F. Supp. 3d 1100, 1109 (N.D. Cal. 2018); *Pony Exp. Courier Corp. of Am. v. Pony Exp. Delivery Serv.*, 872 F.2d 317, 319 (9th Cir. 1989) ("[t]he claim of a date of first use is not a material allegation as long as the first use in fact preceded the application date"); *accord Colt Industries Operating Corp. v. Olivetti Controllo Numerico S.P.A.*, 221 USPQ 73, 1983 WL 51834, at *3 (TTAB 1983) (an examining attorney "gives no consideration to alleged dates of first use," and "[t]he only fraud that could be perpetrated on the Office with respect to false dates of first use in an application would be where no use was made as of the filing date of the application."); *Std. Knitting Ltd. v. Toyota Jidosha Kabushiki Kaisha*, 77 U.S.P.Q.2d 1917, 2006 WL 173463 (TTAB 2006) ("[t]he critical question is whether the marks were in use in connection with the identified goods as of the ... filing date of the statement of use in the intent-to-use application . . . If the mark was in current use, then the first use, even if false is not fraud."). Accordingly, even if Whoisguard's conjecture regarding the first use date were correct (it is not), there would still be no fraud on the PTO as a matter of law because the alleged fraud would not be material.

Simply put, Facebook engaged in perfectly legal and routine activities during prosecution of the FB Registrations. Whoisguard cannot rely on mere speculation and inference to twist Facebook's permissible activities into fraud. Such allegations are insufficient to plead fraud as a matter of law. *See Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) ("the courts have no obligation to entertain pure speculation and conjecture").

## II.  CONCLUSION

The allegations in Whoisguard's own pleadings show that Facebook has, at all relevant times, used the FB Mark and is in fact still using that mark in commerce in connection with all of the services listed in its asserted registrations. Because each of Whoisguard's claims is predicated on this purported nonuse, each of those claims fails as a matter of law. Whoisguard's second attempt to allege that the FB Mark has been abandoned has not rectified the problems with its original Counterclaim. In view of the information presented, further amendments would be futile.

Facebook respectfully requests that the Court grant Facebook's Motion to Dismiss Whoisguard's First Amended Counterclaim in its entirety and with prejudice.

DATED: February 10, 2021

TUCKER ELLIS LLP

David J. Steele
Howard A. Kroll
Steven E. Lauridsen
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223

SNELL & WILMER L.L.P.

By: s/ David G. Barker
David G. Barker
Jacob C. Jones
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

Attorneys for Counterclaim Defendant, FACEBOOK, INC.