David G. Barker (#024657)
dbarker@swlaw.com
Jacob C. Jones (#029971)
jcjones@swlaw.com
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070

TUCKER ELLIS LLP
David J. Steele (*pro hac vice*)
david.steele@tuckerellis.com
Howard A. Kroll (*pro hac vice*)
howard.kroll@tuckerellis.com
Steven E. Lauridsen (*pro hac vice*)
steven.lauridsen@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223
Telephone: (213) 430-3400
Facsimile: (213) 430-3409

Attorneys for Plaintiffs,
Facebook, Inc., Instagram, LLC and
WhatsApp Inc.

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Facebook, Inc., a Delaware corporation; Instagram, LLC, a Delaware limited liability company; and WhatsApp Inc., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> Namecheap, Inc., a Delaware corporation, and Whoisguard, Inc., a Republic of Panama corporation, <br><br> Defendants. | Case No. CV-20-470-PHX-GMS <br><br> **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND/OR STRIKE THE FIRST AMENDED COMPLAINT** <br><br> [Federal Rules of Civil Procedure 12(b)(6) and 12(f)] <br><br> (Oral Argument Requested) |

## I.    INTRODUCTION

Plaintiffs' First Amended Complaint ("FAC") cures the defects identified by the Court in the Original Complaint as to Defendant Namecheap, and Plaintiffs have stated viable claims against both Defendants. The FAC adds significant new allegations and exhibits showing that Namecheap registered,[1] trafficked in, or used at least 229 Infringing Domain Names to operate revenue-generating, advertising webpages ("commercial parking pages") with bad faith intent to profit. (FAC (Doc. 56) ¶¶ 97–118, 126–81, 249, 254–60 & Exs. 17–24.)  These new allegations show that Namecheap is liable to Plaintiffs under the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), and Lanham Act, 15 U.S.C. §§ 1114, 1125(a), (c). The FAC also adds significant new allegations showing that Whoisguard is Namecheap's alter ego and that Namecheap is a direct participant in Whoisguard's actions. (FAC ¶¶182–242.)

Defendants' Motion to Dismiss and/or Strike the First Amended Complaint ("Motion") seeks to obfuscate the well-pleaded claims in the FAC. This case is not, as Defendants assert (Mot. (Doc. 76) 9–10), about Namecheap's actions *as a registrar* that might fall under the ACPA's limited safe harbor provision.[2] This limited safe harbor does not apply because Namecheap registered domain names in its own name as the registrant, trafficked in domain names, and used domain names to operate commercial parking pages. *See Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1105 (C.D. Cal. 2009) (Namecheap acted as the registrant of a domain name and used the name, which "would support the imposition of liability."), *abrogated on other grounds by Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 737 F.3d 546 (9th Cir. 2013) ("*Petronas*"). Also, because Whoisguard is not a domain name registrar, it does not qualify for safe harbor.

---

[1] Although Namecheap is a registrar, it did not register these Infringing Domain Names for a third party in its capacity as a registrar. Rather, Namecheap registered at least 82 Infringing Domain Names for itself, in its own name, as the registrant.

[2] *See* 15 U.S.C. § 1114(2)(D)(iii).

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Additionally, Namecheap implausibly argues the FAC fails to allege facts demonstrating bad faith intent to profit under the ACPA. (Mot. 10–17.) Namecheap ignores (and thus concedes) the FAC's numerous allegations of Defendants' bad faith under the nine factors set forth in the ACPA.[3] Defendants' bad faith intent to profit is also demonstrated by their *continuing* to register, traffic in, and use Infringing Domain Names even *after* notice of infringement. Defendants do not dispute these allegations.

Furthermore, Namecheap argues the commercial parking pages were not used in commerce in connection with a sale of goods or services, as required under the Lanham Act. But because Namecheap's commercial parking pages actually use Plaintiffs' Marks (or a substantially similar designation) in connection with Namecheap's service of using domain names to host advertising parking pages, this argument is nonsensical.

Finally, despite denial of its prior Motion to Dismiss,[4] Whoisguard moves to dismiss the allegations in the FAC that Whoisguard is liable for registering and trafficking in nearly 1,000 additional Infringing Domain Names. (Mot. 23–24.) However, the FAC only adds to the *number* of Infringing Domain Names at issue and does not alter the existing theory of liability that this Court already held was satisfactorily pleaded.

For these reasons, and as discussed below, Defendant's Motion should be denied.

## II.    FACTUAL ALLEGATIONS

### A.    The Parties

Plaintiffs own numerous famous and distinctive trademarks, including FACEBOOK, INSTAGRAM, and WHATSAPP (collectively, "Plaintiffs' Marks"). (FAC

---

[3] *See* 15 U.S.C. § 1125(d)(1)(B)(i).

[4] The Court denied Whoisguard's Motion to Dismiss the Original Complaint and held that "[o]nce a Namecheap customer elects to use WhoisGuard's proxy service, Whoisguard becomes the domain name registrant for that customer's domain." (Order (Doc. 52) 5:7–8.) The Court also held that Plaintiffs plausibly alleged "WhoisGuard is a party to the [Namecheap] Registration agreement[,] . . . that [Plaintiffs] are third party beneficiaries to the Registration Agreement[,] . . . that [RAA] Section 3.7.7.3's language is incorporated into the [Namecheap] Registration Agreement[,] and that this language makes WhoisGuard liable." (*Id.* at 6:13–14, 21–22, 7:7–8.)

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

¶¶ 59–77.) Namecheap is an Internet Corporation for Assigned Names and Numbers ("ICANN") accredited registrar. *Id.* ¶ 3. Whoisguard, Namecheap's alter ego, is a proxy service established by Namecheap and used exclusively by Namecheap's customers to hide their identities. *Id.* ¶¶ 7–12. To provide this service, Whoisguard registers domain names in its own name and licenses them to Namecheap's customers (the "Licensees"). *Id.* ¶¶ 13, 17–18, 82–85 & Ex. 8. As the domain name registrant, Whoisguard is the owner of the domain name, and Whoisguard—not the Licensee—is listed as the registrant in the WHOIS information. *Id.* As the domain name owner, Whoisguard acts similarly to a landlord, leasing use of domain name properties to Licensees.

**B.      Defendants Registered, Trafficked In, and Used Infringing Domain Names.**

Defendants' direct liability under the ACPA is distinct from Defendants' liability for the actions of their Licensees arising from Whoisguard's failure to provide timely and accurate contact information for Licensees (and the resultant liability for harm pursuant to § 3.7.7.3). The FAC alleges Defendants registered, trafficked in, and used in commerce, with bad faith intent to profit, almost 1,000 Infringing Domain Names[5] that are identical or confusingly similar to Plaintiffs' Marks. (FAC ¶¶ 78–118, 126–81.)

Namecheap also registered and used at least 82 Infringing Domain Names. (FAC ¶¶ 110, 114–16.) Namecheap is listed as the registrant in the public WHOIS directory. *Id.* ¶ 111. For some of these Infringing Domain Names, Namecheap assumed the registration (becoming the registrant) after a customer did not renew the registration. *Id.* ¶ 112. Namecheap then used these domain names to operate commercial parking pages that diverted customers from Plaintiffs' legitimate websites. *Id.* ¶ 113.

Namecheap also trafficked in and used at least 229 Infringing Domain Names by

---

[5] Some examples of the Infringing Domain Names include facebo0k-login.com, faceooklogin.com, m-facebook.com, fbcopyrights.com, instagram-login.site, and whatsappp.net. (FAC ¶¶ 88–91.)

licensing the domain names and using them to operate commercial parking pages. (FAC ¶¶ 97–109 & Ex. 1, § 22 at 13 (licensing domain names to Namecheap to "display advertising in conjunction therewith through the use of" various advertising mechanisms).)[6] For example, Namecheap licensed and used facbooklogin.online to operate a commercial parking page that—like the other commercial parking pages at issue— prominently displayed one of Plaintiffs' Marks (or a substantially similar designation thereto) along with commercial advertisements and Namecheap's logo. *Id.* ¶¶ 100, 106– 107. Namecheap operates these commercial parking pages to earn advertising revenue and advertise its own services. *Id.* ¶¶ 100–03, 106–07.[7]

Whoisguard registered, as the registrant, at least 914 Infringing Domain Names. (FAC ¶¶ 78–93.) Whoisguard also trafficked in many Infringing Domain Names by licensing them to Licensees, including to Namecheap. *Id.* ¶¶ 94–96. For at least 46 Infringing Domain Names, Whoisguard failed to timely disclose Licensee contact and identity information upon being presented with reasonable evidence of actionable harm by Plaintiffs. *Id.* ¶¶ 119–23. After this Court denied Whoisguard's Motion to Dismiss, Whoisguard began responding to additional notices sent by Plaintiffs. *Id.* ¶ 124. While Whoisguard did begin disclosing Licensee contact and identity information, Whoisguard did not always fully comply with § 3.7.7.3's disclosure requirements because some of the information provided included fake identities and false contact information or were late.[8]

---

[6] By licensing the Infringing Domain Names for its own use in operating commercial parking pages that diverted consumers away from Plaintiffs' legitimate websites (FAC ¶¶ 97–109 & Ex. 18), Namecheap acted as an authorized licensee and both used and trafficked in the Infringing Domain Names.

[7] Namecheap suggests parking pages are needed to solve "a technological problem" and prevent error messages that will result if a web page is not set up at a domain name. (Mot. 6:4–7.) But there is no requirement that a domain name resolve to a web page, which Namecheap acknowledges in its Registration Agreement. (FAC Ex. 1, § 23, at 13 (noting domain names may be directed "to no IP address").) And there is certainly no requirement that a registrar use a parking page to generate revenue for itself, as Namecheap has done.

[8] For example, Whoisguard identified "dwqhb buywgqyug" at the fictitious address "limas

## C. Defendants' Bad Faith Intent to Profit

The FAC alleges Defendants acted with bad faith intent under the statutory factors Congress included in the ACPA. (FAC ¶¶ 254–60.) Additionally, Defendants acted with bad faith intent to profit from Plaintiffs' Marks when, after receiving notices as to Infringing Domain Names, they continued to register, traffic in, and use domain names to operate commercial parking pages, and continued to provide the proxy service to hide the identities of the Licensees. *Id.* ¶¶ 24, 150–53 & Ex. 18 at 41, 58, 59, 65 (Doc. 56-4 at 41, 58, 59, 65) & Ex. 18 at 223 (Doc. 56-5 at 109). Similarly, Whoisguard has been named in numerous complaints filed in Federal Court and under ICANN's Uniform Domain Name Dispute Resolution Policy ("UDRP") and forced to transfer domain names to owners whose marks were being infringed. *Id.* ¶¶ 135–36 & Ex. 25.[9] Numerous UDRP complaints have involved domain names Whoisguard registered and trafficked in, which Whoisguard knew or should have known were identical or confusingly similar to marks of others. *Id.* ¶ 138 & Ex. 27.[10] Despite scores of adverse UDRP decisions and default judgments, Defendants continued to refuse to reveal Licensee information when presented with reasonable evidence of actionable harm.[11] Defendants' conduct demonstrates a knowing disregard of legal and contractual obligations, the rights of those being harmed, and harm

---

st 66, Dallas, TX 75011" as the contact for the domain name facebook-marketplace.us. (FAC ¶ 125.) The domain names for which Whoisguard did not provide timely or accurate contact information are the only domain names for which Plaintiffs seek liability under § 3.7.7.3.

[9] Whoisguard has also been subject to default judgments for millions of dollars in numerous ACPA cases where the WhoisGuard proxy service was used to shield cybercriminals infringing the trademarks of others. (FAC ¶ 137 & Ex. 26.)

[10] Defendants are aware that the WhoisGuard service is used extensively to facilitate cybersquatting because, in their roles as registrar and registrant, they receive notice of every UDRP complaint and adverse decision against Whoisguard. (FAC ¶ 139.)

[11] Many of the Infringing Domain Names at issue in the FAC are licensed to Licensees who have infringed and cybersquatted on numerous other famous trademarks, yet Defendants continue to shield the Licensees' unlawful conduct. (FAC ¶¶ 173–75.)

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

to third parties victims to the cybercrime Defendants facilitate. *Id.* ¶¶ 140–41 & Ex. 30.

Finally, Namecheap has long used the WhoisGuard Service, which it now provides through its alter ego Whoisguard, as an instrumentality to facilitate and shield cybercrime. (FAC ¶¶ 7–10, 126, 129.)[12] This history of conduct evidences Namecheap's deliberate scheme to attract business from cybercriminals in order to profit from cybercrime and has made Namecheap the registrar of choice for cybercriminals. *Id.* ¶¶ 4–6, 25–28, 35–36, 133–34. Countless domain names registered by Whoisguard are used in connection with cybercrime, including the Infringing Domain Names in this case. *Id.* ¶¶ 19, 174–75.

### D.   Namecheap is responsible for Whoisguard's actions.

Namecheap is responsible for Whoisguard's actions because Whoisguard is Namecheap's alter ego (FAC ¶¶ 7–10, 182–242) and Namecheap is a direct participant in those actions, *id.* ¶¶ 183, 189–93, 196–97, 199–201, 210–13, 216, 219–22, 229, 233–36.

Namecheap established and operates Whoisguard as a paper company in Panama for the sole purpose of avoiding U.S. jurisdiction and shielding Namecheap from liability. *Id.* ¶¶ 238–39. Whoisguard is a shell company that does not have any actual presence in Panama. *Id.* ¶¶ 240–42. Namecheap exercises complete control over the WhoisGuard service and controls all day-to-day business operations. *Id.* ¶¶190–93, 199, 201. Whoisguard is inadequately capitalized and has no source of revenue. *Id.* ¶¶ 225–26.

Namecheap's CEO has admitted that Namecheap, the registrar, is really the proxy service that registers domain names on behalf of its customers: "The proxy is the domain registrar (such as Namecheap.com) which registers the domain on your behalf." *Id.* ¶ 208. He also has acknowledged that Namecheap "set up" Whoisguard to replace customers' identifying information and that "when *we* do that *we* are exposed to all of the legal issues that come with the territory, which costs quite a bit to defend. *We* spend millions of dollars per year safeguarding user information and not simply turning off whoisguard without a

---

[12] For example, Defendants provide WhoisGuard for free to induce customers to use Namecheap's registrar services, and then knowingly shield the Licensees' identities after being presented with evidence of unlawful conduct. (FAC ¶¶ 127, 131–32.)

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

proper legal order." *Id.* ¶ 209 (emphases added).

Namecheap also directly participates in providing the Whoisguard service and registering domain names because it exercises complete control over Whoisguard and its operation of the WhoisGuard service. *Id.* ¶¶ 210–11. Whoisguard has no control over who its customers are, *id.* ¶ 219, and Whoisguard admits that it does not have control over its proxy service, *id.* ¶ 192. Namecheap, not Whoisguard, decided that WhoisGuard would simply be a free feature of Namecheap. *Id.* ¶¶ 220–22. Namecheap customers are enrolled in WhoisGuard exclusively through Namecheap's website, and the WhoisGuard service cannot be accessed through Whoisguard's website. *Id.* ¶¶ 215–18. Namecheap receives notices from trademark holders that WhoisGuard-enabled domain names are causing actionable harm, and Namecheap decides whether Whoisguard will reveal customer information. *Id.* ¶¶ 212–13, 227–29.

## III.   ARGUMENT

### A.   Fed. R. Civ. P. 12(b)(6) Motion to Dismiss Standard

On a motion to dismiss, the court accepts the complaint's factual allegations as true. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 5 (2010). All reasonable inferences from the alleged facts are drawn in the plaintiff's favor. *Barker v. Riverside County Office of Ed.*, 584 F.3d 821, 824 (9th Cir. 2009). When allegations are capable of more than one inference, the court must adopt any plausible inference that supports a valid claim. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Courts do not evaluate whether the allegations will be proven true; they merely ask whether the pleadings, if proven, would support a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

### B.   Plaintiffs have stated claims against Defendants under the ACPA.

#### 1.   Violation of the ACPA

To state an ACPA cybersquatting claim, a plaintiff must allege (1) ownership of a valid mark; (2) that the mark is distinctive or famous; (3) the existence of a domain name that is identical or confusingly similar to, or in the case of a famous mark, dilutive of, the

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

owner's mark; and (4) that a defendant registered, trafficked in,[13] or used the domain name (5) with bad faith intent to profit from the mark. *See* 15 U.S.C. § 1125(d)(1); *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2005).[14]

Defendants do not dispute that Plaintiffs adequately alleged ownership of valid marks, that those marks are distinctive or famous, and that the Infringing Domain Names are identical, confusingly similar to, and/or dilutive of Plaintiffs' Marks. Nor do Defendants dispute that they registered, trafficked in, or used the Infringing Domain Names. (Mot. 9–17.) Rather, Defendants contend they are entitled to safe harbor because they are being sued for acting merely as a registrar. In addition, Defendants argue Plaintiffs did not properly allege bad faith intent to profit. As demonstrated below, none of these arguments have any basis in law or fact.

### 2.    Defendants are not entitled to the ACPA's limited safe harbor.

The ACPA provides a limitation on liability for registrars when they perform a narrow set of specific registrar functions. The *Solid Host* court explained that this safe harbor shields a registrar from liability only when the registrar "*acts [as] a registrar*, i.e., when it accepts registrations for domain names from customers." 652 F. Supp. 2d at 1104. It does not apply if Namecheap "was the registrant of the domain name." *Id.* at 1105; *see also Transamerica Corp. v. Moniker Online Servs., LLC*, 672 F. Supp. 2d 1353, 1365 (S.D. Fla. 2009) (holding ACPA safe harbor does not apply when registrar is also registrant). In its Motion, Namecheap does not dispute that it registered, as the registrant, at least 82

---

[13] Section 1125(d)(1)(E) defines "traffics in" as engaging in "transactions that include but are not limited to, sales, purchases, loans, pledges, *licenses*, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration." (emphasis added).

[14] The ACPA was written broadly to impose liability for registering, trafficking, *or* using a domain name. *See DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1219 (9th Cir. 2010); *Bosley*, 403 F.3d at 680–81; *Acad. of Motion Pictures Arts & Scis. v. GoDaddy.com, Inc.*, No. CV 10-3738 ABC (CWX), 2013 WL 12122689, at *6 (C.D. Cal. June 21, 2013) ("*AMPAS I*").

Infringing Domain Names. (FAC. ¶¶ 110–18 & Exs. 19–24.) For these Infringing Domain Names, Namecheap is liable under the ACPA as the registrant—not the registrar—and is not entitled to safe harbor.

Furthermore, Namecheap is liable under the ACPA because it trafficked in and used at least 229 Infringing Domain Names by licensing the domain names and using them to operate commercial parking pages.[15] *Id.* ¶¶ 97–109 & Ex. 1, § 22 at 13. The ACPA's limited safe harbor does not apply to trafficking in domain names or using them to operate commercial parking pages. *See AMPAS I*, 2013 WL 12122689, at *6–7. This conduct falls outside of the ACPA's limited safe harbor for registrar activities. *See id.* at *5–6 (holding registrar's activity "[c]reating webpages, placing ads, and collecting ad revenue is not registration activity" entitled to safe harbor); *Solid Host*, 652 F. Supp. 2d at 1105 (noting that *Lockheed Martin II*[16] did not suggest a registrar could invoke the ACPA's limited safe harbor when acting in a capacity other than as a registrar).

Finally, Defendants argue that because the act of providing a proxy service itself is "indisputably legal," Whoisguard's provision of the service falls under the ACPA's safe harbor for registrars. (Mot. 13:10–15:6.) Plaintiffs never suggest proxy services are *per se* illegal.[17] Regardless, Whoisguard does not qualify for safe harbor because it is neither a

---

[15] Namecheap objects that it did not select the specific advertisements displayed on its commercial parking pages because it contracted with a third party to provide advertisements. (Mot. 6.) Yet, engaging these third parties does not shield Namecheap from liability for its own trafficking and use. *See Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 763–64 (N.D. Ill. 2008) (holding plaintiff stated an ACPA claim against domain name licensee alleged to have contracted with third-party advertising service to license and monetize domain names).

[16] Defendants improperly rely on *Lockheed Martin Corp. v. Network Solutions, Inc.*, 141 F. Supp. 2d 648, 654–55 (N.D. Tex. 2001) ("*Lockheed II*"), as the defendant in that case was sued solely for its actions as a registrar. (Mot. 10.) Here, Defendants have been sued for their non-registrar acts of registering, as the registrant, trafficking in, and using domain names.

[17] The fact that proxy services can be used for legitimate purposes does not legitimize their use in specific instances when they are used for illegitimate purposes, such as

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

registrar nor other "domain name authority." *Id.* at 9:19–22; *see Vizer v. Vizernews.com*, 869 F. Supp. 2d 75, 82–83 (D.D.C. 2012) (explaining "domain name authority" under the statute "covers only entities that perform the functions of the registrar and registry by registering or assigning domain names"). Value-added services that registrars choose to provide, including proxy services, are not registrar services and do not fall under the ACPA's safe harbor. *Solid Host*, 652 F. Supp. 2d at 1103–05 (rejecting Namecheap's argument that the WhoisGuard service falls under ACPA safe harbor).

> **3.**   **Plaintiffs have pleaded that Defendants acted with bad faith intent to profit from Plaintiffs' Marks.**
>
>> **a.**   **The FAC contains more than sufficient allegations that Defendants acted with bad faith intent to profit from Plaintiffs' Marks.**

The FAC contains multiple allegations of Defendants' bad faith intent to profit under the statutory factors set forth by Congress in the ACPA. *See* 15 U.S.C § 1125(d)(1)(B)(i) ("[A] court may consider factors such as, but not limited to . . . "); (FAC ¶¶ 254–60, 263–69). "An analysis of whether a defendant's actions constitute bad faith within the meaning of the ACPA usually begins with consideration of several factors, nine of which are listed in the ACPA." *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004); *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 498 (2d Cir. 2000) (explaining courts are not limited to considering just the nine factors listed in the statute in evaluating bad faith intent).

Defendants do not dispute that the FAC contains well-pled facts supporting the statutory factors: (a) Defendants have no trademark or intellectual property rights in the Infringing Domain Names, (b) the Infringing Domain Names do not consist of Defendants' legal name or a name commonly used to identify them, (c) Defendants have not made any

---

Whoisguard's shielding the operator of the phishing attack perpetrated from email-Instagram.com (FAC ¶ 244 & Ex. 30 at 16) or the predatory wire fraud scheme perpetrated from coronavirusmedicalkit.com, *id.* ¶¶ 29–34.

prior use of any Infringing Domain Name in connection with the *bona fide* offering of any goods or services, (d) Defendants have not made any *bona fide* noncommercial or fair use of Plaintiffs' Marks on a website accessible at any of the Infringing Domain Names, (e) Namecheap intended to divert consumers from Plaintiffs' websites to Namecheap's commercial parking pages when, after notice of the Infringing Domain Names, Namecheap continued to use these parking pages on the Infringing Domain Names, (f) Defendants provided material and misleading false contact information,[18] (g) Defendants registered multiple domain names they knew were identical or confusingly similar to the marks of others (FAC ¶¶ 20, 87–93, 110–18 & Exs. 9–24), and (h) Plaintiffs' Marks are distinctive and famous. 15 U.S.C § 1125(d)(1)(b)(i)(I)–(IX).

**b.  Defendants acted with bad faith intent to profit by continuing to cybersquat after receiving notice from Plaintiffs.**

Defendants also acted with bad faith intent to profit from Plaintiffs' Marks when, after receiving notices as to each Infringing Domain Name, (a) Whoisguard continued to traffic in the domain names by continuing to license them, (b) Whoisguard chose not to reveal Licensees' contact information, (c) Namecheap continued to traffic in, as a Licensee, and use many of the Infringing Domain Names to operate commercial parking pages, and (d) Namecheap registered (as the registrant) or maintained registration for Infringing Domain Names it was using to operate commercial parking pages, including for example facbooklogin.online and grouplinkswhatsapp.com. (FAC ¶¶ 100, 104–05 & Exs. 17–18.)

In an attempt to avoid the consequences of this blatant disregard for Plaintiffs' rights, Defendants assert that a registrar can never have bad faith intent to profit when it

---

[18] The Namecheap WHOIS Proxy Agreement states that Whoisguard administers and registers the Infringing Domain Names. But when contacted by Plaintiffs regarding the Infringing Domain Names, Whoisguard falsely replied that it did not own, administer, host or provide registration services to the domain and could not provide the registrant contact information. (FAC ¶¶ 158, 192.) Further, to the extent Whoisguard maintains it is not the registrant of Infringing Domain Names, listing Whoisguard instead of the customer in the WHOIS data is material and misleading false contact information.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

(1) utilizes an automated process for its proxy service or (2) relies on customer representations of non-infringement. (Mot. 11:17–12:25 (citing *Acad. of Motion Pictures Arts & Scis. v. GoDaddy.com, Inc.*, No. CV 10-3738 AB (CWX), 2015 WL 5311085 (C.D. Cal. Sept. 10, 2015) ("*AMPAS II*").) These contentions are without merit. *AMPAS II* does not support Defendants' argument because that opinion was issued after a bench trial where the court made specific factual findings refuting allegations that GoDaddy acted with a bad faith intent to profit from the plaintiff's marks. The court found GoDaddy did not act with bad faith because, in part, GoDaddy "developed policies and procedures to assist intellectual property right owners in the protection of their brands" (*id.* at \*7, Finding of Fact 72); manually overrode its automated system and disabled webpage advertisements after notice of infringement by a trademark owner (*id.* at \*9, Finding of Fact 89); and "responded to each cease and desist letter" from AMPAS (*id.* at \*10, Finding of Fact 97).[19]

Unlike in *AMPAS II*, and contrary to GoDaddy's actions in that case, Defendants have neither adopted nor implemented a program to prevent cybersquatting or assist trademark owners in resolving their claims against infringers, but instead adopted a business model to exploit cybersquatting and other cybercrime for profit. *See Solid Host*, 652 F. Supp. 2d at 1105 (noting ACPA sought to "encourage domain name registrars and registries to work with trademark owners to prevent cybersquatting" (alteration marks in original omitted) (quoting S. Rep. No. 106-140, at 11 (1999))). For example, Defendants routinely fail to respond to intellectual property owners' notices of infringement, and when Defendants did respond to one of Plaintiffs' notices, they actually misrepresented their involvement in the ownership and use of the domain name at issue. (FAC ¶¶ 5, 7, 22, 23, 155, 158.) As significantly, unlike GoDaddy, Defendants continued to traffic in and use the Infringing Domain Names *after* receiving notice from Plaintiffs. (*Id.* ¶¶ 150–53.)

---

[19] It is also worth noting that the GoDaddy-affiliated proxy service, Domains by Proxy, is a Delaware corporation, *see* 2015 WL 531108, at \*1; whereas here, Namecheap showed further bad faith by establishing Whoisguard in Panama to try to avoid U.S. jurisdiction.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Furthermore, any arguable good faith reliance by Namecheap in using an automated process[20] or its customers' representations of non-infringement vanishes after Plaintiffs notified Defendants of the Infringing Domain Names. *AMPAS II*, 2015 WL 5311085, at *26 ("GoDaddy reasonably relied in good faith on the representations made by the registrants of the Accused Domains . . . ***until such time as GoDaddy received notice by a third party of a potential issue***." (emphasis added)). Defendants cannot rely on an automated process or their customers' representations of non-infringement ***after receiving notice*** that a specific Infringing Domain Name is infringing one of Plaintiffs' Marks. *Id.* By refusing to disclose and continuing to traffic in and use Infringing Domain Names— including continuing to operate commercial parking pages—***after*** notification, Defendants consciously and deliberately trafficked in and used those Infringing Domain Names with bad faith intent to profit from Plaintiffs' Marks.[21]

Defendants' reliance on *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949 (C.D. Cal. 1997) ("*Lockheed I*") and *Petronas* is likewise misplaced. (Mot. 12:13–25). *Lockheed I* was a pre-ACPA summary judgment decision holding that a registrar *acting merely as a registrar* could not be held liable for contributory trademark

---

[20] In the ACPA's legislative history, "Congress described the use of automated computer programs to register thousands of domain names at a time as one of the 'abuses of the domain name registrations systems' the new law was targeting. S. Rep. No. 106-140, 6–7 (1999)." *Verizon California Inc. v. Lead Networks Domains Private Limited*, CV09-613-ABC (CWx), 2009 WL 10700112, at *7 n.3 (C.D. Cal. Feb. 17, 2009).

[21] Contrary to Defendants' suggestion (Mot. 17:5–6), bad faith intent giving rise to ACPA liability can arise after registration. *See* §§ 1125(d)(1)(B)(i)(III), (IV), (VI), (VII) (bad faith statutory factors necessarily look to post-registration conduct); *Nahum*, 624 F.3d at 1219 ("Though there was no evidence of anything wrong with Nahum's registration of the domain name to himself, the evidence supported a verdict that Nahum subsequently, years later, used the domain name to get leverage for his claim for commissions."); *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 385 (2d Cir. 2003) ("Congress intended the cybersquatting statute to make rights to a domain name registration contingent on ongoing conduct rather than to make them fixed at the time of registration."); *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2002) ("Evidence of bad faith may arise well after registration of the domain name.")

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

infringement based on a demand letter because there was uncertainty as to whether a non-infringing domain name was being used to operate a website for an infringing purpose. 985 F. Supp. at 964–65. Similarly, the portion of *Petronas* cited by Defendants rejects holding a registrar *acting solely as a registrar* liable for the contributory cybersquatting of a customer. 737 F.3d at 553–54. Here, Defendants have moved to dismiss after being provided notice of ACPA violations concerning domain names that *Defendants themselves* registered, trafficked in, or used and where there is no dispute that the domain names at issue are identical or confusingly similar to Plaintiffs' Marks.[22]

### c. Defendants also acted with bad faith intent to profit through their scheme to attract cybersquatters.

Defendants have a history of adverse ACPA judgments with millions of dollars in aggregate damages and UDRP decisions forcing them to transfer domain names to the owners of the trademarks being infringed. (FAC ¶¶ 135–39 & Ex. 26.) Despite these adverse ACPA and UDRP decisions, Defendants continued to refuse to reveal the contact information of their Licensees. *Id.* ¶¶ 140–41. Defendants' refusal attracts cybersquatters to use their services to infringe Plaintiffs' and others' trademarks. Through this scheme, Namecheap profits from cybersquatters' registration fees, gains access to domain names to operate commercial parking pages that infringe trademarks, and becomes the registrant and auctions off profitable domain names on the secondary market prior to deletion. *Id.* ¶¶ 4–8, 19, 25–36, 40, 127–28, 133–34, 171–75, 181. This bad faith intent was present at the time each Infringing Domain Name was registered, since Namecheap's Registration Agreement allows Namecheap to operate commercial parking pages on customers' unused

---

[22] Defendants are not being asked to "adjudicate disputes between customers and trademark owners" (Mot. 12:21–25) as a result of their role as a registrar; they are being held accountable for their role as a registrant for falsely claiming they could continue to rely in good faith on an automated process and representations of customers despite receiving specific notices of infringement of specific marks.

1    domain names and to register in its own name, use, and resell expiring domain names.[23] *Id.*

2    ¶¶ 97–118 & Ex. 1 at §§ 23–24.

3        Allegations of operating such a deliberate scheme to profit from widespread

4    cybersquatting are sufficient to survive a motion to dismiss on the bad faith element. *See*

5    *Transamerica*, 672 F. Supp. 2d at 1367 (holding bad faith pleaded under ACPA where

6    defendant registrar had history of adverse UDRP decisions on trademarks and defendant

7    continued to register domain names substantially similar to well-known trade names to

8    known cybersquatters, which suggested knowledge or reckless disregard of domain name

9    abuse); *see also Dell Inc. v. BelgiumDomains, LLC*, No. 07-22674-CIV, 2007 WL

10   6862342, at *10 (S.D. Fla. Nov. 21, 2007) ("Here, Defendant registrars are in a position of

11   trust as ICANN-accredited registrars. By concealing their unlawful activities, however,

12   they have grossly abused their position of trust to the detriment of Plaintiffs' customers

13   and the general public, as well as Plaintiffs and countless other trademark owners. This

14   abuse of trust further supports, and indeed amplifies, Defendants' bad-faith intent.").

15       The only case Defendants cite to argue their cybersquatting scheme does not qualify

16   as bad faith intent under the ACPA, *InvenTel Prods., LLC v. Li*, 406 F. Supp. 3d 396, 402

17   (D.N.J. 2019) (Mot. 16:22–17:4), did not involve any ACPA claims. Rather, it held that 15

18   U.S.C. § 1114's safe harbor applied to a § 1125(a) Lanham Act claim against a registrar

19   because *the domain name itself did not infringe any trademarks*. The registrar could not

20   know that a registrant would use a non-infringing domain name for illicit conduct just

21   because that customer had used other websites to commit unlawful acts. *Li*, 406 F. Supp. 3d

22

23   _____

24   [23] Contrary to Namecheap's argument that ICANN requires it to register customers' expiring domain names in order to offer a Redemption Grace Period (Mot. 6:17–7:1,

25   12:26–13:9), ICANN imposes no such requirement (Mot. Ex. C at 4–5). Specifically, in offering a Redemption Grace Period, there is no requirement that a registrar register an

26   expired domain name in its own name, no requirement that the expired domain name resolve to a live webpage, and certainly no requirement that a registrar use the expired

27   domain name to host a commercial parking page. Namecheap's conduct is voluntary and engaged in for the sole purpose of maximizing Namecheap's profits.

28

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

at 402–03. In *Li*, unlike here, there were no allegations that the registrar itself engaged in cybersquatting, and nothing about the domain name itself suggested its registration was for an unlawful purpose.

        **d.**      **Bad faith intent to profit under the ACPA is not narrow.**

      Contrary to Defendants' suggestion, the ACPA does not only apply to a narrow set of conduct—holding domains ransom in exchange for money. (Mot. 9:12–18, 13:2–6 (citing *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 370 (D.N.J. 2004) (describing ransoming as "paradigmatic" and "classic"—but not exclusive—harm ACPA was enacted to address)).) Namecheap's argument is also contradicted by its own blog post explaining cybersquatting, where Namecheap admits that cybersquatters "hope they can ***either*** sell the domain to the owner of the trademark ***or leverage the trademark owner's reputation***."[24]

      Defendants also argue that Plaintiffs' claims must fail to the extent they have not alleged a specific, subjective bad faith intent to profit from Plaintiffs' specific Marks. (Mot. 10:18–11:6.) Bad faith intent to profit under the ACPA, however, is not so narrow. First, the ACPA statutory bad faith factors point to a wide range of conduct that is not so narrowly focused, such as "the person's provision of material and misleading false contact information . . . or the person's prior conduct indicating a pattern of such conduct," and "the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration . . . without regard to the goods or services of the parties." 15 U.S.C.

---

[24] *See Are You a Domain Name Cybersquatter?* (Dec. 15, 2016) (emphases added), available at https://www.namecheap.com/blog/domain-name-cybersquatter (the "Namecheap Blog"). A copy of this blog post is attached to this Opposition as Exhibit A. Facebook respectfully requests the Court, pursuant to Fed. R. Evid. 201(b)(2), take judicial notice of the Namecheap Blog, which is a publicly available website. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (Rule 201 permits a court to take judicial notice of publicly accessible websites whose accuracy and authenticity is not subject to dispute.)

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

§ 1125(d)(1)(B)(i)(VII)–(VIII). Second, the ACPA permits courts to consider other factors. 15 U.S.C. § 1125(d)(1)(B)(i); *Sporty's*, 202 F.3d at 498 (courts not limited to nine statutory factors). Third, case law holds that when defendants cast a broad cybersquatting net and facilitate cybercrime, the bad faith intent element is satisfied. *See Transamerica*, 672 F. Supp. 2d at 1367; *BelgiumDomains*, 2007 WL 6862342, at *10.[25] Fourth, Namecheap recognizes such precise bad faith is not required in warning its customers not to become "unintentional cybersquatters" by registering a domain name that incorporates a popular trademarked name and advises customers to search for potential trademark conflicts at Trademark247.com. *See* Namecheap Blog, *supra* n.24.

### e. Defendants misrepresent their obligations and duties under GDPR as an ICANN registrar and proxy service.

Finally, in an attempt to avoid liability for their bad faith intent to profit under the ACPA, Defendants misrepresent restrictions on registrars and proxy services disclosing customer data. (Mot. 15:12–16:17.) For example, Defendants claim that they "cannot disclose or publish the personal data of customers without the risk of draconian penalties." *Id.* at 15:12–14. Defendants further state that they will only "disclose the underlying data in compliance with court orders." *Id.* at 16:13–14. Yet, Defendants have now disclosed customer names to Plaintiffs *without a court order*. (FAC ¶ 124.) Defendants' reliance on GDPR is a red herring.

---

[25] Defendants seek to strike allegations regarding their involvement in and facilitation of cybercrime. (Mot. 24–25.) The Motion is improper because allegations of Defendants' prior registration of domain names infringing or dilutive of others' trademarks is one of the bad faith factors specifically identified in the ACPA. 15 U.S.C. § 1125(d)(1)(B)(i)(VII). These allegations are also relevant to bad faith intent to profit under the ACPA because they demonstrate Namecheap's business strategy and intentional scheme to shield cybercriminals in order to increase revenue. *See Transamerica*, 672 F. Supp. 2d at 1367. Because allegations regarding Defendants' involvement in cybercrime are relevant to the bad faith intent to profit element, the Motion should be denied. *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010) ("Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being plead.")

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Furthermore, Defendants suggest the WhoisGuard proxy service is now mandatory under GDPR. (Mot. 15:9–11.) Nothing in GDPR requires listing a proxy company's information instead of an actual customer's information in the WHOIS directory, which is what a proxy service like WhoisGuard does. Indeed, as Defendants concede, ICANN only requires that registrars **redact** some contact information that would otherwise be listed publicly in the WHOIS directory and that such redacted information must be disclosed on request for legitimate purposes, including consumer protection, investigation of cybercrime, DNS abuse, and intellectual property protection. *Id.* at 15:17–19 & n.8; *see* ICANN's Temporary Specification, Appx. A §§ 2.2–2.3 (Mot. Ex. B at 23–24).[26]

## C. Defendants are liable for violation of the Lanham Act.

### 1. Namecheap's operation of commercial parking pages is use in commerce.

Namecheap used Infringing Domain Names to operate commercial parking pages that diverted consumers away from Plaintiffs' legitimate websites. (FAC ¶ 98.) Namecheap argues this use does not violate the Lanham Act because the FAC does not allege Namecheap used Plaintiffs' Marks as a designation of source for Namecheap's own goods or services. (Mot. 17:17–18:26.) But the FAC alleges Namecheap used Infringing Domain Names to operate commercial parking pages that prominently display Plaintiffs' Marks alongside an advertisement for Namecheap itself, as well as other sponsored advertising links from which Namecheap earns revenue. (FAC ¶¶ 98, 100, 107 & Ex. 18; Mot. 6:1–16.) For example, Namecheap operated a commercial parking page at facbooklogin.online which diverted consumers to other unknown sites using links labeled "Security Application," "Access My Account," "Email Security," "My Account," "Logon," and "Facebook Login My Account." (FAC ¶ 100 & Ex. 18 at 21.)

Beyond directly advertising Namecheap's own services, the commercial parking

---

[26] Defendants' suggestion that providing a proxy service is now a core registrar service protected by the ACPA's safe harbor is meritless, as it suggests that U.S. law has been somehow amended by the EU's implementation of GDPR.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

pages use Plaintiffs' Marks in connection with Namecheap's service of using domain names to host advertising parking pages. *See, e.g.*, U.S. Reg. No. 4,213,990 for the mark NAMECHEAP (reciting, among other services, "Parking domain names for others, namely, providing computer servers for facilitation of the storage of domain name addresses" and claiming first use in commerce in 2000).[27] Namecheap therefore used Plaintiffs' Marks in connection with the sale of its own services.

### 2. Plaintiffs have alleged likelihood of confusion.

Both Plaintiffs' and Namecheap's businesses include delivering advertisements over the Internet.[28] Namecheap uses the Infringing Domain Names to operate commercial parking pages that prominently display Plaintiffs' Marks alongside advertisements for Namecheap's own services and the services of others. Drawing all reasonable inferences in Plaintiffs' favor, this at a minimum creates a factual issue as to whether there is a likelihood of confusion not appropriate for resolution on a motion to dismiss. *See Mastro's Restaurants LLC v. Dominick Grp. LLC*, No. CV 11-1996-PHX-PGR, 2012 WL 2091535, at *5 (D. Ariz. June 11, 2012) ("[T]he likelihood of confusion is a fact-specific inquiry best left for decision after discovery." (quoting *Vulcan Golf*, 552 F. Supp. 2d at 769)).[29]

---

[27] Namecheap's counsel of record, Eugene Rome, signed the Combined Declaration of Use and Incontestability under Sections 8 & 15 (Nov. 14, 2018), declaring in part, "the mark is in use in commerce on or in connection with all of the goods/all of the services." A copy of this declaration is attached to this Opposition as Exhibit B. Plaintiffs request that the Court take judicial notice of this document under Fed. R. Evid. 201(b)(2).

[28] (*See, e.g.*, FAC Ex. 3 at 2 ('770 registration recites "advertising and information distribution services, namely, providing classified advertising space via the global computer network; promoting the goods and services of others over the internet"); Ex. 4 at 1 ('777 registration recites "promoting the goods and services of others over the internet"); Ex. 5 at 5 ('754 registration recites "marketing, advertising and promoting services; dissemination of advertising for others via computer and communication networks; . . . promoting the goods and services of others via computer and communication networks"); Ex. 6 ('108 registration recites "promoting the goods and services of others via computer and communication networks").)

[29] "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service." *Dreamwerks*

Defendants cite cases involving "sponsored link" advertising to argue there is no possibility of confusion. (Mot. 19:8–20:12.) But those cases were both specific to sponsored links offered in conjunction with Internet search engines, namely Google and Yahoo![30] Even against this backdrop, *Parts.com* denied Yahoo!'s motion to dismiss the trademark infringement claim because whether "confusion is likely is a factual determination woven into the law that courts routinely treat as an issue of fact." 996 F. Supp. 2d at 936 (quoting *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356 (9th Cir. 1985)). By contrast, here Plaintiffs have pleaded likelihood of confusion by alleging that Defendants utilized domain names that are confusingly similar to Plaintiffs' Marks in order to confuse and draw customers to associated webpages that then display Plaintiffs' Marks (or a substantially similar designation thereto) to generate revenue. *See Transamerica*, 672 F. Supp. 2d at 1360–62; *Vulcan Golf,* 552 F. Supp. 2d at 760–61, 769 (allegations of scheme to use deceptive domain names to generate advertising dollars at plaintiffs' expense sufficiently alleged use in commerce and likelihood of confusion to survive motion to dismiss).[31]

In addition, while some, but not all, sponsored link advertising has been held not to create confusion under the Lanham Act, Defendants' parking pages also create actionable initial interest confusion. *See Brookfield Commc'ns. v. W. Coast Entm't*, 174 F.3d 1036, 1062 (9th Cir. 1999) (holding use of trademark in website metatags results in actionable initial interest confusion). Initial interest confusion is actionable under the Lanham Act

---

*Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998).

[30] *See Parts.com, LLC v. Yahoo! Inc.*, 996 F. Supp. 2d 933, 938 (S.D. Cal. 2013) (noting "sponsored links offered by search engine services do not present a false designation of origin because consumers would not believe that a search engine service such as Google 'in any way directly represented that it is the producer of plaintiff's trademarked product'" (alteration marks in original omitted) (quoting *Jurin v. Google Inc.*, 695 F. Supp. 2d 1117, 1121–22 (E.D. Cal. 2010))).

[31] Defendant's reliance on *AMPAS II* also is misplaced. That decision contained specific findings of fact after a bench trial and does not purport to explain whether sufficient likelihood of confusion was alleged in a complaint. 2015 WL 5311085, at *40, ¶ 90.

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

because, even if there is no source confusion at the time a sale is made, the diversion and resulting commerce generated by use of another's trademark provides an improper benefit from the goodwill that the trademark holder developed in its mark. *Id.*; *see also id.* at 1063–64 (collecting cases recognizing federal trademark protection against initial interest confusion). Here, even if a consumer ultimately realizes a commercial parking page operating on an Infringing Domain Name is not operated by Plaintiffs, "the fact that there is only initial consumer confusion does not alter the fact that" Namecheap has misappropriated Plaintiffs' acquired goodwill. *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 941 (9th Cir. 2002). Moreover, as Namecheap (1) uses domain names identical or confusingly similar to Plaintiffs' Marks, (2) both Namecheap and Plaintiffs use their Marks for directly competitive services (online advertising), and (3) the advertisements are transmitted over the Internet, the three critical factors for finding initial interest confusion on the Internet are present here. *Id.* at 942.

### D. Whoisguard is Namecheap's alter ego.

To state a claim under an alter ego theory, a plaintiff "must make out a prima facie case '(1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice.'" *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015) (alteration marks in original omitted). Alter ego "determinations are highly fact-based, and require considering the totality of the circumstances in which the instrumentality functions." *Pimal Prop., Inc. v. Capital Ins. Grp., Inc.*, No. CV11-02323-PHX-DGC, 2012 WL 608392, at *5 (D. Ariz. Feb. 27, 2012). In its November 10, 2020, Order, this Court held Plaintiffs failed to allege specific facts about failure to observe corporate formalities and Namecheap's dictating every facet of Whoisguard's business. (Order 11:4–14.) Plaintiffs allege additional facts in the FAC to support their claim.

#### 1. Unity of interest and ownership exist between Defendants.

Courts find that unity of interest and ownership exist when the parent controls the subsidiary "to such a degree as to render the latter the mere instrumentality of the former."

Tucker Ellis LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

*Ranza*, 793 F.3d at 1073. This can be shown through "pervasive control," when the parent "dictates every facet of the subsidiary's business." *Id*. Here, throughout the life cycle of an Infringing Domain Name, from registration through deletion, Namecheap and Whoisguard are intertwined: Namecheap controls and provides the proxy service nominally offered by Whoisguard; Whoisguard registers the Infringing Domain Name; Whoisguard hides the Licensee's information from trademark owners; Namecheap has the right to use the Infringing Domain Name if it is not being used; and, at expiration, Whoisguard transfers the Infringing Domain Name to Namecheap, who becomes the registrant and monetizes it with commercial parking pages.

The FAC alleges facts sufficient to establish Defendants fail to observe corporate formalities and that Namecheap dictates every facet of Whoisguard's business. For example, Whoisguard admits that it does not have any control over its proxy service. (FAC ¶ 192.) In addition, Namecheap's CEO has publicly stated that Namecheap itself provides the WhoisGuard proxy service, *id.* ¶ 208, that Namecheap set up and maintains Whoisguard even in the face of legal liability, *id.* ¶ 209, and that Namecheap was making Whoisguard simply a feature of Namecheap, *id.* ¶ 215. Furthermore, the WhoisGuard proxy service, which can only be used on domains registered with Namecheap, is integrated within Namecheap's own website, and Namecheap's customers obtain the proxy service directly from their Namecheap user account. *Id.* ¶¶ 214, 218, 223. Indeed, Namecheap refers to the WhoisGuard Service as WhoisGuard by Namecheap. *Id*. ¶ 207. Finally, Namecheap, not Whoisguard, decided that the proxy service would be provided to customers for free. *Id.* ¶¶ 221–22.[32]

Based on these facts, it is certainly plausible to infer that (1) Whoisguard is a subsidiary of Namecheap, *id.* ¶ 200; (2) Namecheap exercises complete control over

---

[32] Plaintiffs also allege that Whoisguard was created by Namecheap as a Panamanian shell company with no actual offices or presence in Panama, but merely a mailing address at a law firm that provides "Jurisdictional Presence" for companies seeking a business address in Panama. (FAC ¶¶ 238–42.)

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Whoisguard's day-to-day-operations and decision-making, *id.* ¶¶ 190–91, 201; (3) Whoisguard has no source of revenue and is thus inadequately capitalized, *id.* ¶¶ 225–26; (4) Whoisguard does not have any employees and all of its functions are performed by Namecheap employees, *id.* ¶¶ 234–35; (5) Namecheap and Whoisguard comingle assets, *id.* ¶ 204; and (6) Namecheap and Whoisguard do not engage in proper corporate formalities with each other, *id.* ¶¶ 202–03, 206–07. The facts alleged and plausible inferences derived therefrom would demonstrate that Namecheap has "pervasive control" over Whoisguard if proven at trial. "Whether Plaintiffs can adduce sufficient evidence to support their alter ego claim must be addressed at summary judgment and, if necessary, trial" but not at the pleading stage. *Haller v. Advanced Indus. Computer Inc.*, No. CV-13-02398-PHX-DGC, 2014 WL 4053445, at *3 (D. Ariz. Aug. 15, 2014).[33]

### 2. Failure to disregard Namecheap's and Whoisguard's separate identities would result in fraud or injustice.

At the pleading stage, a plaintiff need only "plausibly allege" an inequitable result. *See In re Packaged Seafood Prods. Antitrust Lit.*, 277 F. Supp. 3d 1167, 1188 (S.D. Cal. 2017). Observance of separate identities may result in fraud or injustice when doing so would deny recovery to a plaintiff. *See Gatecliff v. Great Republic Life Ins. Co.*, 170 Ariz. 34, 38 (1991) ("[O]bservance of the corporate form could permit the two corporations to confuse plaintiffs and frustrate their efforts to protect their rights before suit, while allowing the party responsible . . . to evade liability after suit."). Namecheap created Whoisguard as a Panamanian shell company after the *Solid Host* decision to avoid U.S. jurisdiction and liability. (FAC ¶¶ 187–95, 237–42.) Therefore, observing Whoisguard and Namecheap as separate entities would sanction fraud and abuse.

---

[33] If the Court finds that the FAC properly alleges Namecheap's direct liability under the ACPA and the Lanham Act, Plaintiffs request the ability to conduct discovery if the Court is not satisfied the factual allegations in the FAC are sufficient to plead alter ego since any additional information required to establish alter ego is in Defendants' exclusive control.

**E.      Namecheap is liable for Whoisguard's actions as a direct participant.**

Namecheap is liable for all of Whoisguard's actions because Namecheap is a direct participant in Whoisguard's unlawful activities. (FAC ¶ 183.) If Namecheap directly participated in the acts alleged in the FAC or directed Whoisguard to perform those acts, Namecheap is liable as a direct participant.[34] *Id*. ¶ 183. The Court held in its November 10, 2020, Order, that Plaintiffs had not adequately pleaded direct participant liability because there was no allegation that Whoisguard is Namecheap's subsidiary. (Order at 11:15–21.)[35] The FAC, however, expands allegations regarding Namecheap and Whoisguard's relationship, including that Whoisguard is Namecheap's subsidiary. (FAC ¶ 10.) And Plaintiffs added allegations regarding Namecheap's direct participation in the conduct at issue in this lawsuit, including that Namecheap itself provides the proxy service, Namecheap "set up" Whoisguard and decides whether to "turn[] off whoisguard"; and that Namecheap decided to make Whoisguard "simply . . . a feature" of Namecheap." (FAC ¶¶ 190–195, 208–211, 215, 220; *see also* Mot. 16:9–10 (admitting "*Namecheap* began enabling Whoisguard's privacy service to all customer accounts by default, free of charge" (emphasis added)).)

**F.      Plaintiffs properly allege Whoisguard is liable for newly-discovered Infringing Domain Names.**

Defendants argue Plaintiffs exceeded the scope of leave to amend by adding

---

[34] The direct participation theory is distinct from Plaintiffs' alter ego theory. *Allen v. Am. Cap. Ltd.*, 287 F. Supp. 3d 763, 806 (D. Ariz. 2017) ("A parent company can be liable for a subsidiary's acts where the parent directly participates [in] and directs the subsidiary's harmful activities.").

[35] Several courts, however, find direct participant liability when there is no parent-subsidiary relationship because direct participant liability stems from an entity's own wrongful acts. Therefore, a parent-subsidiary relationship between Namecheap and Whoisguard is not necessary to find Namecheap liable for its own acts. *See U.S. v. Bestfoods*, 524 U.S. 51, 65 (1998) ("the existence of the parent-subsidiary relationship under state corporate law is simply irrelevant to the issue of direct liability"); *L.B. Industries, Inc. v. Smith*, 817 F.2d 69, 71 (9th Cir. 1987) (minority shareholder and corporate director could be directly liable).

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

additional allegations regarding Whoisguard's role in newly-discovered infringing domain names. (Mot. 23:6–24:12.) Such a rigid view of amendment is inconsistent with the Federal Rules' liberal pleading standard, under which leave to amend should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). Here, after the Court granted leave to amend, Plaintiffs discovered additional Infringing Domain Names. Given the early stage of this litigation and the leave to amend the Original Complaint, judicial economy called for adding allegations regarding these additional domain names—based on the same theories alleged in the Original Complaint—rather than filing a separate lawsuit that Defendants would likely seek to consolidate. Further, as evidence of these additional domain names would come out during discovery, Plaintiffs would then have had the opportunity to seek amendment to conform the pleadings to the evidence at trial. Fed. R. Civ. P. 15(b)(2).[36]

## IV. CONCLUSION

Rather than seeking to "upend" the domain name registration system or privacy protections to Namecheap customers not engaged in unlawful conduct, Plaintiffs seek only to protect the public from harm, vindicate Plaintiffs' well-established trademark rights, and enforce the system of accountability built into the domain name registration system and recognized by U.S. law. Most of the Infringing Domain Names on their face show that they have no "legitimate reason" other than to be used for fraud and abuse and to confuse and harm the public.

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss and/or Strike in its entirety.

---

[36] *Beavers v. New Penn Fin. LLC*, No. 1:17-CV-00747-JLT, 2018 WL 385421 (E.D. Cal. Jan. 11, 2018), does not support Defendants' argument. (Mot. 24.) That case, and the cases cited therein, explain that when leave to amend is given as to "certain specified claims, . . . new claims alleged for the first time in the amended pleading should be dismissed or stricken." *Id.* at *2. Here, Plaintiffs have not added any new claims or parties. *Id.* at *2–3 (denying motion to strike new causes of action and noting lack of prejudice because case in infancy and defendants filed motion to dismiss same causes of action they seek to strike).

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

DATED: February 22, 2021

TUCKER ELLIS LLP

David J. Steele
Howard A. Kroll
Steven E. Lauridsen
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223

SNELL & WILMER L.L.P.

By: s/ David G. Barker
David G. Barker
Jacob C. Jones
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

Attorneys for Plaintiffs,
Facebook, Inc., Instagram, LLC,
and WhatsApp Inc.