**ROME & ASSOCIATES, A.P.C.**
Eugene Rome (admitted pro hac vice)
Sridavi Ganesan (admitted pro hac vice)
Brianna Dahlberg (admitted pro hac vice)
2029 Century Park East, Suite 450
Los Angeles, CA  90067
Telephone:    310-282-0690
Facsimile:    310-282-0691
erome@romeandassociates.com
sganesan@romeandassociates.com
bdahlberg@romeandassociates.com

**FENNEMORE CRAIG, P.C.**
Ray K. Harris (No. 007408)
Mario C. Vasta (No. 033254)
2394 E. Camelback Road
Suite 600
Phoenix, AZ 85016
Telephone: (602) 916-5000
rharris@fennemorelaw.com
mvasta@fennemorelaw.com

Attorneys for Defendant Namecheap, Inc. and
Defendant/Counterclaimant WhoisGuard, Inc.

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Facebook, Inc., a Delaware corporation; Instagram, LLC, a Delaware limited liability company; and WhatsApp Inc., a Delaware corporation, | CASE NO. 2:20-cv-00470-GMS |
| Plaintiffs, | **WHOISGUARD, INC.'S RESPONSE IN OPPOSITION TO FACEBOOK, INC.'S MOTION TO DISMISS FIRST AMENDED COUNTERCLAIM PURSUANT TO FED. R. CIV. P. 12(b)(6)** |
| v. | |
| Namecheap, Inc., a Delaware corporation, and Whoisguard, Inc., a Republic of Panama corporation, | (Oral Argument Requested) |
| Defendants. | |
| WhoisGuard, Inc., a Republic of Panama corporation, | |
| Counterclaimant, | |
| v. | |
| Facebook, Inc., a Delaware corporation, | |
| Counterclaim Defendant. | |

## I.      INTRODUCTION

Plaintiff and Counterclaim Defendant Facebook, Inc. ("Facebook") has moved to dismiss Defendant and Counterclaimant WhoisGuard, Inc.'s ("WhoisGuard") First Amended Counterclaim (ECF No. 68) ("FACC") for cancellation of four of Facebook's "FB" service mark registrations on the grounds of fraud and abandonment.

Facebook's Rule 12(b)(6) Motion is made on the misguided grounds that it disagrees with the truth of WhoisGuard's allegations. In support of its Motion, Facebook offers screenshots from its social media profiles and altered versions of the specimens of use which Facebook submitted to the United States Patent and Trademark Office ("USPTO") in support of its service mark applications. Facebook contends these extrinsic materials show that it did not make any fraudulent misrepresentations or abandon the mark for the services recited in the registrations. Facebook ignores, however, that at the pleading stage courts presume the truth of well-pleaded allegations and generally cannot consider matters outside the complaint without converting the motion into one for summary judgment. Facebook's extrinsic materials do not prove that the FACC's allegations are "false" as Facebook argues; at best, they merely demonstrate that the facts are disputed. The Court should reject Facebook's improper requests for the Court to consider extrinsic documents, which do not form the basis of WhoisGuard's claims, to try to create a factual defense to the well-pled allegations in the FACC. WhoisGuard has alleged sufficient facts which, when presumed true and construed in the light most favorable to WhoisGuard, allow the Court to reasonably infer that WhoisGuard's allegations are plausible. On its fraudulent procurement claim, it has alleged the "who, what, when, where, and how" of the misrepresentations to the USPTO, meeting the heightened pleading standard of Rule 9(b).

Accordingly, the Court should deny Facebook's Motion to Dismiss.

## II.     BACKGROUND

Starting on July 14, 2008, Facebook filed a series of intent-to-use service mark applications in the USPTO for the mark "FB" in standard characters ("FB Mark"). FACC, ¶¶ 7-11. The first four applications (collectively, "FB Registrations") were filed as follows:

1

2        a.  July 14, 2008 ("'777 Registration")—For "[p]romoting the goods and services of

3            others over the Internet;"

4        b.  July 14, 2008 ("'764 Registration")—For "[c]omputer services, namely, hosting

5            online web facilities for others for organizing and conducting online meetings,

6            gatherings, and interactive discussions; computer services in the nature of

7            customized web pages featuring user defined information, personal profiles and

8            information;"

9        c.  March 6, 2012 ("'235 Registration")—For "[p]roviding online chat rooms and

10           electronic bulletin boards for transmission of messages among registered users in

11           the fields of collegiate life, general interest, classifieds, virtual community, and

12           for social networking; and peer-to-peer photo sharing services, namely, electronic

13           transmission of digital images among Internet and mobile device users;" and

14       d.  March 12, 2012 ("'234 Registration")—For "[i]nternet based social introduction

15           and social networking services."

16  FACC, ¶¶ 6-9.

17       The Lanham Act allows trademark applicants to file an intent-to-use application

18  without using a mark in commerce, so long as the applicant has "a bona fide intention, under

19  circumstances showing the good faith of such person," to use the mark in commerce. *Spin*

20  *Master, Ltd. v. Zombondo Ent., LLC*, 778 F. Supp. 2d 1052, 1060 (C. D. Cal. 2011) (citing

21  15 U.S.C. § 1051(d)(1) (2002)).[1] Once the USPTO issues a notice of allowance for the mark,

22  the applicant has six months to demonstrate to the USPTO that is using the mark in

23  commerce. *Id.*  Here, for each of the FB Registrations, Facebook submitted requests for two

24

25  _____

26       [1] The Trademark Modernization Act of 2020 amended certain sections of the Lanham
    Act but will not be fully implemented until December 27, 2021. Pub. L. No. 116-260,
27  Subtitle B § 221-228, 134 Stat 1182 (2020). Accordingly, WhoisGuard cites to the previous
    versions of the Act's sections where the amendments have not yet been implemented.
28

to three years of extensions of time to submit proof that it was using the mark in commerce for the services in the registrations. FACC, ¶¶ 12-16.

In each of its requests for extensions, Facebook's Associate General Counsel, Kathleen Johnston, represented to the USPTO on Facebook's behalf that Facebook had "a continued bona fide intention" to use the FB Mark in commerce in connection with all of the services and Facebook had "made the following ongoing efforts to use the mark in commerce on or in connection with each of those goods/services covered by the extension request: product or service research or development." *Id*. at ¶¶ 17, 64. In some of the extension requests, Facebook also stated that its ongoing efforts included "market research." *Id*. Thus, identical boilerplate grounds for extensions were repeatedly made by Facebook about its alleged ongoing efforts to use the FB Mark in commerce.

When each of the FB Registrations approached the three-year mark after allowance, Facebook filed Statements of Use and specimens purporting to show use in commerce of the mark in connection with the services. In each Statement of Use, Ms. Johnston represented to the USPTO on Facebook's behalf that "the applicant or the applicant's related company or licensee is using the mark in commerce on or in connection with all of the goods/services in the application," and that "the specimen(s) shows the mark as used on or in connection with the goods/services in commerce." *Id*. at ¶¶ 57-60. Facebook did not subsequently modify any of the services. *Id*. at ¶ 61.

For each of the FB Registrations, the specimens consisted of screenshots from an "FB Newswire" Facebook page. *Id*. at ¶ 21. The specimens submitted by Facebook do not show the FB Mark in use in commerce in connection with all of the services specified in the FB Registrations. *Id*. at ¶ 22. Indeed, the USPTO Examining Attorney for the first FB Registration ('777 Registration) **rejected** the FB Newswire screenshots as "unacceptable" because they do not demonstrate that Facebook was using the FB Mark as a trademark for a service of "promoting the goods and services of others over the Internet." *Id*. at ¶ 25. Oddly, however, the USPTO granted the registration anyway, without receiving any written

1    response from Facebook or withdrawing the Office Action containing the rejection of the

2    specimen, or noting any informal discussion to resolve the rejection. *Id.*

3       The Examining Attorney for the second FB Registration ('764 Registration) also

4    ***rejected*** the FB Newswire screenshots as "unacceptable" because "the specimen does not

5    show the applied-for mark in use in commerce in connection with any of the services

6    specified in the statement of use." *Id.* at ¶ 26. The Examining Attorney further noted:

7    ***"Specifically, the specimen shows use of the mark with a news and current events page***

8    ***and does not demonstrate use with the identified services."*** *Id.* In response to the rejection,

9    Facebook submitted additional screenshots from the *same* FB Newswire page. *Id.* This time,

10    however, the USPTO accepted the specimens and granted the registration, although the

11    specimens and proof needed to support a Statement of Use were lacking. *Id.* Facebook also

12    proceeded to submit the same FB Newswire screenshots as specimens for the other FB

13    Registrations once they were approaching the three-year mark after allowance. *Id.* at ¶ 21.

14       The FB Newswire page which Facebook used to obtain the FB Registrations ceased

15    operating on or about October 18, 2016, after Facebook had obtained the FB Registrations.

16    *Id.* at ¶ 27. Upon information and belief, Facebook made no trademark use of the FB Mark

17    in commerce in connection with any of the services in the FB Registrations for at least three

18    years after the FB Newswire page was shut down. *Id.* at ¶ 28. Instead, after obtaining the FB

19    Registrations, it appears that Facebook's primary use of the FB Registrations has been for

20    the purpose of initiating domain name dispute proceedings targeting domains that contain

21    the character string "FB." *Id.* at ¶ 29. This, of course, is not a trademark use in commerce of

22    the FB mark. *Id.* at ¶ 66(e).

23       Several years later on November 4, 2019, Facebook filed another intent-to-use

24    application for the FB Mark for more than 400 different services—including services that

25    overlap with, or are nearly identical to, those in the FB Registrations. *Id.* at ¶¶ 31, 34. The

26    2019 FB Application is currently under examination, although it is suspended. *Id.* at ¶ 30.

27    **III.   LEGAL STANDARD**

28       Under Rule 12(b)(6), dismissal is appropriate only when the pleading does not give

1  the defendant fair notice of a legally cognizable claim and the grounds on which it rests. *Bell*

2  *Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A pleading must allege "enough facts to

3  state a claim to relief that is plausible on its face." *Id*. at 570. A claim is facially plausible

4  when a plaintiff pleads "factual content that allows the court to draw the reasonable inference

5  that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

6  (2009). When considering a 12(b)(6) motion to dismiss, a court is to accept "all factual

7  allegations in the complaint as true and construe the pleadings in the light most favorable to

8  the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029-30 (9th Cir.

9  2009) (quoting *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005)). Because the FACC

10  has stated facially plausible claims under this standard, Facebook's Motion should be denied.

11  **IV.    ARGUMENT**

12      The Lanham Act gives federal courts authority to cancel an invalid trademark

13  registration. 15 U.S.C. § 1119. Because Facebook is using its FB Registrations as a basis for

14  suing WhoisGuard for infringement and cybersquatting, WhoisGuard has standing to seek

15  cancellation of the FB Registrations. *Petroliam Nasional Berhad v. GoDaddy.com, Inc*., 897

16  F.Supp.2d 856, 870 (N.D. Cal. 2012). Facebook does not challenge WhoisGuard's standing

17  to bring its claims.

18      Federal courts may cancel registrations on the same grounds that would be applied by

19  the USPTO. *Id*. at 869. One of those grounds is that the registration was obtained

20  fraudulently. 15 U.S.C. § 1064(3) (2006). Another is abandonment. *Id*. As demonstrated

21  below, WhoisGuard has alleged viable claims for cancellation under both theories.

22      **A.    WhoisGuard Has Adequately Alleged Fraud as a Basis for Cancellation**

23      To state a claim for fraudulent procurement of marks, a plaintiff must allege: "(1) a

24  false representation regarding a material fact; (2) the registrant's knowledge or belief that

25  the representation is false; (3) the registrant's intent to induce reliance upon the

26  misrepresentation; (4) actual, reasonable reliance on the misrepresentation; and (5) damages

27  proximately cause by that reliance." *OTR Wheel Eng'g, Inc. v. West Worldwide Servs*., 897

28  F.3d 1008, 1019 (9th Cir. 2018). Because the claim sounds in fraud, a plaintiff must plead

fraudulent procurement with particularity under Rule 9(b). *AirWair Int'l Ltd. v. Schultz*, 84 F. Supp. 3d 943, 951 n.3 (N.D. Cal. 2015). This means that "[a]verments of fraud must be accompanied by the 'who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

### 1. *WhoisGuard Has Alleged the Fraudulent Misrepresentations with Particularity*

WhoisGuard has alleged that Facebook's Associate General Counsel, Ms. Johnston, falsely represented to the USPTO on Facebook's behalf in each of the Statements of Use that Facebook or its related company or licensee was at that time using the FB Mark in commerce in connection with all the services stated in the respective FB Registrations, and that the specimens Facebook submitted showed the FB Mark as used in connection with the services in commerce. FACC, ¶¶ 57-60. Additionally, in each request for extension of time to submit a Statement of Use and specimen, Ms. Johnston falsely represented to the USPTO that Facebook was making ongoing efforts to use the FB Mark in commerce in connection with the covered services consisting of "product or service research or development" and/or "market research," and that Facebook had "a continued bona fide intention" to use the FB Mark in commerce in connection with all of the services at that time. *Id*. at ¶¶ 17, 64. The FACC specifically identifies each document containing Ms. Johnston's misrepresentations filed with the USPTO. *See id*. at ¶¶ 12-17, 57-60. Thus, WhoisGuard has alleged the "who, what, when, where, and how" of the misrepresentations as required by Rule 9(b).

### 2. *The Date of First Use Is Not One of the Alleged Misrepresentations*

Contrary to Facebook's argument, the misrepresentations to the USPTO were material. Facebook asserts that the "date of first use" alleged in a statement of use is not material to the USPTO's decision to register a mark, but this is a strawman argument. WhoisGuard's fraud claim is not based on an inaccurate date of first use. WhoisGuard's allegations with respect to the Statements of Use are that Ms. Johnston, on Facebook's behalf, falsely represented that the FB Mark was at those times being used in commerce in

connection with the covered services, and that the specimens showed such use. These misrepresentations were undeniably material to the USPTO's decision to grant the FB Registrations. *See* USPTO Trademark Manual of Examining Procedure (TMEP) (Oct. 2018) § 902 ("Before a registration will issue [] the mark must be in actual use in commerce on or in connection with all of the goods or services specified in the application . . .").

Ms. Johnston's misrepresentations made on Facebook's behalf in the requests for extension were also material. The Lanham Act requires that a statement of use be filed within six months after the issuance of the notice of allowance for an intent-to-use application, or before the expiration of a previously granted extension, otherwise the application is deemed abandoned. 15 U.S.C. § 1051(d) (2002); TMEP § 1108 ("If the mark is not in use in commerce before the expiration of the six-month period following the issuance of the notice of allowance, the applicant must file a request for extension of time to file a statement of use within the six-month period ***to avoid abandonment of the application.***") (emphasis added). As Facebook acknowledges, each extension request must be accompanied by a verified statement that "the applicant has a continued bona fide intention to use the mark in commerce[.]" Mot. at 13 (citing 15 U.S.C. § 1051(d)(2)). After the first sixth-month extension, the applicant must make a showing of good cause to obtain further extensions. 37 C.F.R. § 2.89(c); *see* 15 U.S.C. § 1051(d)(2) (2002). Thus, without Ms. Johnston's false representations in Facebook's requests for extension, the USPTO would not have granted the extensions and the FB Registrations would have been deemed abandoned. Accordingly, these false representations, too, are material.

WhoisGuard has alleged the remaining elements of its claim for fraudulent procurement. As Facebook's Associate General Counsel, Ms. Johnston necessarily would have been aware that the representations were false. FACC, ¶¶ 63, 66. Facebook caused the fraudulent Statements of Use and requests for extension to be filed with the intent of deceiving the USPTO into granting the FB Registrations. *Id.* at ¶¶ 66, 68. The USPTO did grant the FB Registrations. *See id.* at ¶ 5. As a result of Facebook's fraudulent registrations, WhoisGuard has been damaged because Facebook is suing it for cybersquatting and

trademark infringement based on the FB Registrations. FACC, ¶ 73. Accordingly, WhoisGuard has adequately alleged its claim for cancellation based on fraud.

Facebook argues that WhoisGuard's fraud claim does not have "any merit" because the alleged representations regarding its use of the FB Mark in commerce were not false (*see* Mot. at 11:19-24), but at the motion to dismiss stage, the Court accepts all material allegations as true and construes them in the light most favorable to WhoisGuard. *See Rowe*, 559 F.3d at 1029-30. WhoisGuard has pled sufficient facts from which it can be inferred that Ms. Johnston's representations were false: (a) in November 2019, Facebook submitted a new intent-to-use application for the FB Mark for services which are identical or overlap with those in the FB Registrations—an action which would make no sense if Facebook had been using the FB Mark for those same services since 2014 and believed its existing registrations were valid; (b) the FB Newswire screenshots that Facebook submitted as alleged specimens do not show trademark use of the FB Mark in commerce in connection with the services; (c) Facebook's trademark counsel is sophisticated and must have known that the representations were false, particularly after the Examining Attorneys for the first two applications *rejected* the FB Newswire specimens; (d) the FB Newswire page ceased operating in 2016 after the USPTO granted the FB Registrations; (e) Facebook's primary use of the FB Registrations has been for initiating domain name dispute proceedings, which of course is not a trademark use of the FB Mark in commerce; (f) Facebook's conduct is part of a larger pattern of trademark abuse, including filing overbroad intent-to-use applications with no bona fide intent to actually use the mark for each of the goods/services claimed. FACC, ¶¶ 37-38, 66(a)-(f). Additionally, with respect to the representations in the requests for extensions of time, the false and fraudulent nature of the representations can be inferred the facts (a) that Facebook's reasons for the requests and alleged efforts to use the FB Mark were identical and boilerplate ("product or service research or development" and "market research"); and (b) that for two of the applications, Facebook sought extensions of time as late as April 2015, but when it ultimately filed its Statements of Use for those registrations it represented that it had first used the FB Mark in commerce on "04/00/2014" and submitted the same FB

1     Newswire screenshots from an earlier application. *Id*. at ¶ 67; *see id.* at ¶ 21.

2         Additionally, the falsity of all of the representations is also supported by the large

3 number of requests for extension that Facebook filed. *See* FACC, ¶¶ 12-16. The Senate

4 Report on the legislation which created the intent to use system noted that "only the rare

5 applicant" would make use of all possible extensions, and that there is a "clear expectation"

6 that for most applicants, the statement of use will be filed early because it is in the applicant's

7 best interest. S. REP. NO. 100-515, at *32 (1988). Here, however, Facebook filed the

8 maximum (or close to the maximum) number of extensions for every FB Registration. Taken

9 together and construed in the light most favorable to WhoisGuard, all of these facts allow

10 the Court to draw the reasonable inference that Ms. Johnston's representations on

11 Facebook's behalf to the USPTO were fraudulent, rendering WhoisGuard's claim facially

12 plausible under *Iqbal* and *Twombly*.

13         Facebook argues that it is not plausible to infer that the representations were

14 fraudulent because the USPTO allows an intent-to-use applicant to state dates of first use

15 that are earlier than the filing date of the application (Mot. at 12:19-21), but even if

16 technically allowed, this does not provide a "legal and obvious" alternative explanation for

17 Facebook's conduct. As WhoisGuard alleges, if Facebook was already using the FB Mark

18 in commerce for the services covered, it presumably would have filed its application based

19 on that use in commerce, rather than as an intent-to-use application. FACC, ¶ 32. And,

20 Facebook also fails to offer any explanation why, if it believed its existing FB Registrations

21 were valid, it included the same services in its new intent-to-use application for the FB Mark

22 filed in November 2019. Finally, Facebook's filing of its November 2019 intent-to-use

23 application for the FB Mark is just one fact among many facts which, taken in context,

24 establish that WhoisGuard's allegations of fraud are plausible. *See id.* at ¶¶ 66-67.

25                 3.   *Facebook's Request for the Court to Take Judicial Notice of the*

26                     *Marked-Up Specimens Should Be Denied*

27         Facebook argues that the FACC's allegations that the FB Mark was not in use in

28 commerce are "directly refuted" by the marked-up specimens attached as exhibits to the

Steele Declaration (Mot. at 11:25-26), but this argument is unavailing. Generally, courts may not consider material outside the complaint when assessing the sufficiency of a pleading under Rule 12(b)(6) without converting the 12(b)(6) motion into a motion for summary judgment and giving the parties the opportunity "to present all the material that is pertinent to the motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). There are two exceptions to this rule: judicial notice under Federal Rule of Evidence 201, and incorporation-by-reference doctrine. *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 998 (9th Cir. 2018).

In connection with the fraudulent procurement allegations, Facebook asks the Court to take judicial notice of marked-up versions of the FB Newswire specimens. Mot. at 5 n.3; *see* Steele Decl., Exhs. A-D. Judicial notice under Federal Rule of Evidence 201 permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id*.  While a "court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment . . . a court cannot take judicial notice of disputed facts contained in such public records." *Khoja*, 899 F.3d at 999. Moreover, "accuracy is only part of the inquiry under Rule 201(b). A court must also consider—and identify—which fact or facts it is noticing from [the document.]" *Id*. at 998.

Facebook has not specified which fact or facts within the specimens it is requesting the Court to judicially notice. *See* Mot. at 5 n.3. To the extent Facebook is requesting the Court to judicially notice that Facebook used the FB Marks in commerce in connection with all of the services in the FB Registrations in order to dispute the factual allegations of the FACC, judicial notice is improper. This is because the FB Newswire specimens themselves do not establish any such fact beyond "reasonable dispute"—indeed, the USPTO twice ***rejected*** these specimens as unacceptable proof of use in commerce. FACC, ¶¶ 25-26.

To constitute acceptable proof of use of a mark in commerce, a service mark specimen must show the mark as actually used *in the sale or advertising of the services* recited in the

application and must show *a direct association* between the mark and the services. TMEP § 1301.04; 37 C.F.R. § 2.56(b)(2). "Put another way, the applicant must use the mark in a manner that would be perceived by potential purchasers as identifying the applicant's services and indicating their source." *RGB Plastic, LLC v. First Pack, LLC*, 184 F. Supp. 3d 649, 657 (N.D. Ill. 2016) (internal quotation marks and citation omitted).

Facebook's specimens fail to meet these criteria. For example, the marked-up specimen in Exhibit A to the Steele Declaration shows a banner ad along the right side of the FB Newswire page. Steele Decl., Exh. A. Facebook asserts that this shows use of the FB Mark for "[p]romoting the goods and services of others over the Internet"). *Id.*; Mot at 5:10-14. But the specimen does not show use of the FB Mark in *Facebook's sale or advertising* of *its service* of "promoting the goods and services of others"—*i.e.,* that companies who use Facebook to promote their goods and services are shown the FB Mark in connection with Facebook either selling or advertising that promotional service.

The specimens are also defective for the separate reason that they do not show a direct association between the FB Mark and any services at issue. The banner ads appear under the generic heading, "Sponsored," and "FB" does not appear anywhere near them. *See* Steele Decl., Exh. A. The sponsored ads also appear in the same position on the page on other Facebook webpages, not just the FB Newswire page, further weakening any claimed association. FACC, ¶ 23. Also, the designation at the top center of the page shows "FBNewswire" (not "FB" alone), followed by the phrase, "POWERED BY storyful," which suggests that "storyful," not "FB," is the source of the content on the page. *See* FACC, ¶ 24.[2]

Moreover, the specimens are also missing information such as a URL or browser tab, which are characteristics the USPTO views as indicia that a specimen may be a digitally

---

[2] Facebook has added a text box to the version of the specimen in Exhibit A to the Steele Declaration that obscures the phrase "Newswire" from the top center designation, creating the misleading impression that the designation reads "FB" instead. Facebook's submission of inaccurate, altered versions of the documents is a further basis for the Court to deny Facebook's requests for judicial notice and incorporation by reference.

created or altered mockup.[3] *Id.* at ¶ 24. As such, the marked-up specimens do not "refute" WhoisGuard's factual allegations as Facebook asserts.

Because there is at least "a reasonable dispute" as to what the marked-up specimens establish, there are no facts from them that qualify for judicial notice under Rule 201(b). *Khoja*, 899 F.3d at 1000 (district court abused its discretion by taking judicial notice of a document when it "is subject to varying interpretation, and there is a reasonable dispute as to what the [document] establishes") (quoting *Reina-Rodriguez v. United States*, 655 F.3d 1182, 1193 (9th Cir. 2011)).  The Court should therefore reject Facebook's improper attempt to use extrinsic evidence to dispute the well-pled allegations of the FACC, which is inappropriate at the motion to dismiss stage. As the Ninth Circuit has observed, "the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery." *Khoja*, 899 F.3d 999-1000.

> ### 4. *Facebook Does Not Challenge the FACC's Fraud Allegations Premised on Grounds Other than Facebook's Nonuse of the FB Mark*

Finally, Facebook fails to adequately address the other false misrepresentations that form the basis for WhoisGuard's fraud claim and which do not depend on Facebook's nonuse of the FB Mark: that in each request Facebook filed for extension of time, Ms. Johnston falsely represented to the USPTO that Facebook was making ongoing efforts to use the FB Mark in commerce in connection with the covered services consisting of "product or service research or development" and "market research," and that Facebook had "a continued bona fide intention" to use the FB Mark in commerce in connection with all of the services as of

---

[3] As Facebook acknowledges, the USPTO now requires applicants to include the URL on website specimens. Mot. at 7:1-4. This new requirement was imposed as part of the USPTO's efforts to crack down on fraudulent specimens. *See* USPTO Examination Guide 3-19, Examination of Specimens for Use in Commerce: Digitally Created/Altered or Mockup Specimens (rev. Oct. 2020) at 2 (website screenshots missing URL or browser tab may indicate a digitally created/altered or mockup specimen). Facebook also argues WhoisGuard should have checked the content of the FB Newswire page on the website archive.org, but without the URL, this is not possible.

1   the dates the representations were made. FACC, ¶¶ 17, 64. The FACC alleges that these

2   representations were false, and that Facebook in fact lacked a progressive and ongoing bona

3   fide intent to use the FB Mark in commerce in connection with the services. *Id*. at ¶ 67.

4        In its Motion, Facebook denies that it made any misrepresentations to the USPTO

5   when it claimed an intent to use the FB Mark (Mot. at 2:21-22), but it ignores that at the

6   motion to dismiss stage, the Court must accept WhoisGuard's factual allegations as true.

7   Facebook otherwise ignores these alleged misrepresentations, preferring to miscast

8   WhoisGuard's allegations as entirely dependent on Facebook's nonuse of the FB Mark. *See*

9   Mot. at 14:34-26. As explained above in Sec. IV.A.2, these misrepresentations were material

10   because without them, the FB Registrations would have been deemed abandoned. Thus,

11   WhoisGuard has alleged sufficient facts to render its claims facially plausible.

12        Accordingly, the Court should deny Facebook's Motion to Dismiss WhoisGuard's

13   claim for cancellation of the FB Registrations based on fraudulent procurement.

14      **B.**     **WhoisGuard Has Adequately Alleged Abandonment**

15        WhoisGuard also alleges that the FB Registrations should be cancelled as abandoned

16   for insufficient use in commerce. FACC, ¶¶ 71. A registered trademark is considered

17   abandoned if its "use has been discontinued with intent not to resume such use." 15 U.S.C.

18   § 1064(3) (2006). Intent not to resume use may be inferred from the circumstances. 15 U.S.C.

19   § 1127. Nonuse for three consecutive years shall be prima facie evidence of abandonment.

20   *Id*. The meaning of "use" necessarily signifies "use in commerce" under the *Lanham Act.*

21   *Marketquest Group, Inc. v. BIC Corporation*, 316 F. Supp. 3d 1234, 1283 (S.D. Cal. 2018).

22   A use must be "bona fide," in the ordinary course of trade, and not made merely to reserve a

23   right in the mark. *Electro Source, LLC v. Brandess-Kalt Aetna Group, Inc*., 458 F.3d 931,

24   936 (9th Cir. 2006). The Ninth Circuit applies a "totality of the circumstances" test to

25   determine if usage of the mark qualifies as a trademark use in the ordinary course of trade.

26   *Id*. at 940. "Neither promotional use of the mark on goods in a different course of trade nor

27   mere token use constitute 'use' under the Lanham Act." *Marketquest Group*, 316 F. Supp.

28   3d at 1283 (citing *Emergency One, Inc. v. Am. FireEagle Ltd*., 228 F.3d 531, 536 (4th Cir.

1    2000)). "Evaluating whether a use is in 'the ordinary course of trade' is often an intensely

2    factual undertaking." *Id*. (citing *Electro Source*, 458 F.3d at 940). Finally, a registration can

3    be partially abandoned if the mark is abandoned for some, but not all, of the goods or services

4    recited in the registration. *See Levi Strauss & Co. v. GTFM*, 196 F. Supp. 2d 971, 976 (N. D.

5    Cal. 2002) ("To establish partial abandonment, [the challenger] must show that [the

6    trademark owner] is not using the mark on the goods . . . that will be effectively excluded by

7    the proposed restriction.") (internal citations omitted).

         *1.  WhoisGuard Has Sufficiently Alleged the Elements for Abandonment*

9        Facebook argues that the specimens of use, including those reproduced in the FACC,

10   demonstrate that Facebook has used the FB Mark in commerce in connection with the

11   services in the FB Registrations, but even if this assertion was correct (it is not—*see*

12   discussion in Section IV.A.3 *supra*) it would not bar WhoisGuard's abandonment claim. The

13   FB Newswire page which Facebook submitted as specimens was taken down on or about

14   October 18, 2016, after Facebook obtained the FB Registrations. FACC, ¶ 27. The FACC

15   alleges that there was a period of nonuse for at least three consecutive years, which

16   constitutes prima facie evidence of abandonment. *Id*. at ¶ 69. Even assuming *arguendo* that

17   the specimens did qualify as a valid use in commerce in connection with the services (and

18   they do not), there was still a period of at least three years of nonuse after the FB Newswire

19   page was taken down.

20       The FACC also alleges that Facebook has no intent to use the FB Mark as a service

21   mark for the services identified in the FB Registrations. *Id*. at ¶ 70. Facebook's present

22   nonuse of the FB Mark for the services is supported by the fact that Facebook publishes

23   detailed rules on how to use the Facebook wordmark and other marks that it actually uses,

24   but it does not bother to provide any rules for the use of the FB Mark. FACC, ¶¶ 39-41. The

25   FACC also alleges that since Facebook obtained the FB Registrations, its primary use of the

26   registrations has been to initiate domain name proceedings rather than using the mark in

27   commerce for the listed services. *Id*. at ¶ 66(e). Thus, WhoisGuard has alleged specific facts

28   in support of both elements of its abandonment claim.

2.  *Facebook's Requests for the Court to Consider Extrinsic Documents Should Be Denied*

Facebook argues that WhoisGuard's allegation that Facebook ceased using the FB Marks should be rejected because it is "false," and requests that the Court consider publicly available examples of its purported continuing use of the FB Mark. Facebook asks the Court to incorporate by reference screen captures of Facebook's social media pages and a Trademark Glossary webpage from the site en.facebookbrand.com, which purportedly show Facebook's recent use of the FB Mark. Mot. at 7 n.4, 10 n.7; Steele Decl., Exhs. F-J. Facebook also requests the Court to judicially notice its own Facebook page and Twitter account page. Mot. at 8 n.4, 9 n.5.  The Court should reject these requests.

Incorporation by reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself. *Khoja*, 899 F.3d at 1002. In "rare instances . . . assessing the sufficiency of a claim requires that the document at issue be reviewed, even at the pleading stage." *Id*. However, where, as here, a document merely creates a defense to the well-pled allegations in the complaint, rather than forming the basis of the claim, courts should deny requests to incorporate documents by reference. *Id*. Because WhoisGuard's claims for cancellation do not depend on or refer extensively to Facebook's own social media pages or Trademark Glossary webpage, it would be improper to grant Facebook's requests. Facebook's submission of documents outside the FACC to attempt to create a defense is "nothing more than another way of disputing the factual allegations in the complaint, but with a perverse added benefit: unless the district court converts the defendant's motion to dismiss into a motion for summary judgment, the plaintiff receives no opportunity to respond to the defendant's new version of the facts . . . [T]he doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim." *Id*. at 1003.

Additionally, "what inferences a court may draw from an incorporated document should also be approached with caution." *Id*. Facebook argues that the materials "refute" the FACC's factual allegations, but "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint.

1   This admonition is, of course, consistent with the prohibition against resolving factual

2   disputes at the pleading stage." *Id*. (internal citations omitted). Similarly, it would be

3   improper for the Court to judicially notice Facebook's version of the facts from these same

4   documents, where there is at least a reasonable dispute as to what the documents establish.

5   *See* discussion in Sec. IV.A.3, *supra*; *Khoja*, 899 F.3d at 999.

6                   *3.   The Extrinsic Materials Do Not "Refute" the FACC's Allegations*

7          In any case, the extrinsic materials do not "refute" the FACC's factual allegations as

8   Facebook claims. Facebook argues that the FACC's abandonment allegations are proven

9   "false" by the social media pages attached to the Steele Declaration as well as by the

10  allegations of the FACC itself, citing a portion of the FACC which references Facebook's

11  corporate social media profiles. However, the FACC only raises the social media profiles for

12  the purpose of explaining why such uses *do not* constitute a valid use of the FB Mark that

13  can save the registrations from abandonment. *See* FACC, ¶¶ 48-49. The social media pages

14  do not display or use the FB Mark in the sale or advertising of the services in the FB

15  Registrations. For example, a social media post asking users to share "what makes the

16  business they love special" is not a trademark use of the FB Mark in commerce in connection

17  with the sale or advertising of *Facebook's own service* of "promoting the goods and services

18  of others over the Internet." *Id*. at ¶ 49; *see* Steele Decl., Exh. H. There is no indication that

19  the post is a commercial promotion, nor does the post show that Facebooks sells or advertises

20  its own promotional services under the FB Mark, or that companies who use Facebook for

21  promotion directly associate that service with the FB Mark. Similarly, Facebook's current

22  use on its corporate webpage of a small image file called a "favicon" that includes the letters

23  "FB" and is visible in some web browsers is not a trademark use that directly associates the

24  FB Mark with any of the services in the FB Registrations. *See* Steele Decl., Exh. E.

25         Furthermore, there is at least a disputed issue as to whether Facebook's very recent

26  change of its social media profile pictures to the letters "FB" surrounded in a

27  rainbow-colored circle is a token use made merely to reserve the right in the mark. Such uses

28  do not constitute a "use" that will save a mark from abandonment. *See Grocery Outlet Inc.*

*v. Albertsons, Inc.*, No. CV 06-2173, 2008 WL 5245962, at *7 (N.D. Cal. Dec. 7, 2008) (signage erected on advice of counsel for the purpose of maintaining an active registration is not considered active use in the ordinary course of trade).

Finally, Facebook argues that the fact that "FB" is included in the company's Trademark Glossary disproves the FACC's abandonment allegations, but claiming rights to a mark in a glossary is not a "bona fide" use in commerce "in the ordinary course of trade." *See Electro Source, LLC*, 458 F.3d at 936 (9th Cir. 2006). The same Glossary also shows that Facebook claims broad exclusive rights in common words like "Face" and "Book," and thus is a further example of Facebook's trademark overreach. *See* ECF No. 80-2 at 20. Facebook also argues that the fact it has used the FB Registrations for domain name dispute proceedings shows it has not abandoned the mark, but again, this is not a bona fide use in commerce in the ordinary course of trade that can save a mark from abandonment.

## V.    CONCLUSION

For all of the foregoing reasons, the Court should deny Facebook's Motion. If the Court is inclined to grant any portion of the Motion, leave to amend should be granted.

DATED:  February 24, 2021          **ROME & ASSOCIATES, A.P.C.**


By:   *s/ Eugene Rome*
              Eugene Rome
              Sridavi Ganesan
              Brianna Dahlberg


**FENNEMORE CRAIG, P.C.**

By:   *s/ Ray K. Harris*
              Ray K. Harris
              Mario C. Vasta

Attorneys for Defendant Namecheap, Inc. and
Defendant/Counterclaimant Whoisguard, Inc.