**ROME & ASSOCIATES, A.P.C.**
Eugene Rome (admitted pro hac vice)
Sridavi Ganesan (admitted pro hac vice)
Brianna Dahlberg (admitted pro hac vice)
2029 Century Park East, Suite 450
Los Angeles, CA  90067
Telephone:   310-282-0690
Facsimile:    310-282-0691
erome@romeandassociates.com
sganesan@romeandassociates.com
bdahlberg@romeandassociates.com

**FENNEMORE CRAIG, P.C.**
Ray K. Harris (No. 007408)
Mario C. Vasta (No. 033254)
2394 E. Camelback Road
Suite 600
Phoenix, AZ 85016
Telephone: (602) 916-5000
rharris@fennemorelaw.com
mvasta@fennemorelaw.com

Attorneys for Defendant Namecheap, Inc. and
Defendant/Counterclaimant WhoisGuard, Inc.

### UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| Facebook, Inc., a Delaware corporation; Instagram, LLC, a Delaware limited liability company; and WhatsApp Inc., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>Namecheap, Inc., a Delaware corporation, and Whoisguard, Inc., a Republic of Panama corporation,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIM | CASE NO. 2:20-cv-00470-GMS<br><br>**DEFENDANTS NAMECHEAP, INC. AND WHOISGUARD, INC.'S REPLY IN SUPPORT OF THEIR MOTION TO DISMISS AND/OR STRIKE THE FIRST AMENDED COMPLAINT**<br><br>(Oral Argument Requested) |

i

# I.  INTRODUCTION

Plaintiffs Facebook, Inc., Instagram, LLC, and WhatsApp Inc. (collectively, "Plaintiffs") fail to refute the arguments in Defendants Namecheap, Inc. ("Namecheap") and WhoisGuard, Inc.'s ("WhoisGuard") (collectively, "Defendants") Motion to Dismiss and/or Strike the First Amended Complaint ("FAC"). The FAC inappropriately attempts to bootstrap new cybersquatting and trademark claims into the case based on 700+ new domain names for which there are no allegations that Namecheap operated parking pages or otherwise "registered," "trafficked in," or "used" the domains under the Anticybersquatting Consumer Protection Act ("ACPA"), other than in its role as registrar. To the extent Plaintiffs' claims are based on these domains, they fail as a matter of law because Namecheap is protected by the registrar safe harbor, and because the allegations do not even remotely suggest that Defendants perpetrated the core harm the ACPA was enacted to address.

In a misguided attempt to state *some* viable claim against Namecheap, Plaintiffs now allege that Namecheap used 229 domains to operate parking pages containing revenue-generating keyword advertising—a practice which is standard in the industry. Yet, a prior court considering an identical parked pages program operated by the registrar GoDaddy held that such a program does not establish a "bad faith intent to profit" from the goodwill of specific trademarks under the ACPA. There are no allegations in the FAC that Namecheap selected any of the domains at issue, or that any Namecheap personnel was directly involved in placing them in the parked pages program; all domains were selected *by customers*.

Plaintiffs' argument that Namecheap's bad faith is established by its "continuing" to host parking pages after receiving infringement notices is equally unavailing, as Plaintiffs never complained about any specific parking pages until they filed the FAC. *See* Mot. to Dismiss Order (Doc. 52) at 9:12-14 ("…Plaintiffs do not allege Namecheap used the Infringing Domain Names to set up parking pages anywhere in their Complaint."). Moreover, Plaintiffs do not allege anywhere in their FAC that the parking pages used Plaintiffs' marks as a designation of source for Namecheap's own goods or services or plausibly allege that consumers would be confused, as required to state viable trademark,

false designation of origin, or dilution claims. Also, on their alter ego and direct participant theories, the only new allegations merely consist of formulaic labels and conclusions.

As to WhoisGuard, the FAC has not merely increased the number of domains at issue, as Plaintiff argue. Plaintiffs' original allegations based on 45 domains were based on a theory that WhoisGuard contractually assumed liability for the customers' wrongful use of domains unless it disclosed the customers' contact information as required under terms allegedly incorporated into the contract. *Id*. at 7:21-24. Plaintiffs specifically alleged that WhoisGuard did not disclose the customer information for the 45 original domains, but they *do* allege that WhoisGuard disclosed the information for the new domains. FAC, ¶ 124. Thus, the FAC does not allege viable claims against WhoisGuard based on the existing contractual theory of liability. Instead, Plaintiffs have expanded their claims to attempt to hold WhoisGuard liable for cybersquatting and trademark violations by the customers *solely* based on its role as a privacy service. This theory is contrary to established case law holding that offering domain privacy services *does not* constitute bad faith intent to profit under the ACPA.

The repeated assertions that Namecheap has exceeded its role as a registrar by offering privacy services though WhoisGuard entirely ignore the new legal requirements imposed upon Namecheap by the European Union's General Data Protection Regulation 2016/679 ("GDPR"), which bars registrars from disclosing customers' personal data in the WHOIS record—the exact service WhoisGuard provides. Recognizing this fatal defect in their argument, Plaintiffs simply gloss over the GDPR in their Opposition brief.

For all these reasons, the Court should (1) dismiss all claims against Namecheap, and (2) dismiss all new claims against WhoisGuard based on the newly added domains. The Court should also strike the FAC's inflammatory allegations of Defendants' purported involvement in cybercrime, which are wholly unrelated to Plaintiffs or their trademarks.

## II.    THE FAC FAILS TO ALLEGE VIABLE CLAIMS AGAINST NAMECHEAP

### A.  Plaintiffs Fail to Allege a Violation of the ACPA by Namecheap

#### 1.  *For 700+ New Domains, Namecheap Merely Acted as a Registrar*

For the large majority of disputed domains, Namecheap only performed the functions

of a registrar.[1] The parties agree that the ACPA registrar safe harbor shields Namecheap from liability when it "*acts as a registrar*." Opp. at 8:14-16.

In *Academy of Motion Picture Arts & Sciences v. GoDaddy.com*, which involved cybersquatting allegations against the registrar GoDaddy, the Academy could not allege a violation "based merely on GoDaddy's registration of the Accused Domains" because GoDaddy was shielded by the registrar safe harbor. No. CV 10-03738-AB (CWx), 2015 WL 5311085 at *36 (C.D. Cal. Sept. 10, 2015) ("*AMPAS*"). Likewise, here, Plaintiffs cannot allege a violation of the ACPA based merely on Namecheap's registration of the disputed domains. The claims within Plaintiffs' cybersquatting cause of action based on this subset of 700+ domains should therefore be dismissed as to Namecheap. Under Rule 12(b)(6), a court may dismiss claims regardless of how they are grouped together within a single cause of action. *Perez v. Banana Republic, LLC*, No. 14-cv-01132-JSC, 2014 WL 2918421, at *2 (N.D. Cal. June 26, 2014).

Plaintiffs argue that, for "at least 82" domains, Namecheap is not entitled to the safe harbor because it "registered" these domains in its own name, but the facts alleged in the FAC demonstrate that Namecheap did this in its capacity as a registrar because the domains were in a brief grace period after expiration. Plaintiffs do not dispute that the exhibits to the FAC show that every one of these 82 domains was ***expired***. *See* FAC, Exh. 20, 22, 24. The FAC alleges that Namecheap "assumed the registration" after its customers did not renew them, during the period before the domains were removed by the registry operator. FAC, ¶ 112. Plaintiffs do not dispute that ICANN requires all registrars to offer a 30-day grace period after a domain expires.[2] A registrar that briefly "becomes the registrant" for expired domains during the grace period to comply with mandatory ICANN rules is acting in its capacity as

[1] For a smaller subset of domains, the FAC alleges Namecheap "used" the domains to host parking pages. For these domains, the FAC fails to sufficiently allege Namecheap acted with a "bad faith intent to profit" from Plaintiffs' marks, as addressed below in Section II.A.2.

[2] Plaintiffs argue that ICANN does not expressly require the registrar to list itself in the WHOIS fields for expired domains, but if the customer's registration is expired, it cannot continue to be listed as the registrant. Namecheap cannot leave the registrant field empty.

a registrar. In this scenario Namecheap is not the party who "presents a domain for registration" and cannot be held liable as a matter of law. *See Lockheed Martin Corp. v. Network Sols., Inc.*, 141 F. Supp. 2d 648, 655 (N.D. Tex. 2001) ("*Lockheed II*"). Thus, the FAC's claims based on Namecheap assuming registration of expired domains pending their removal fail because (1) Namecheap is shielded by the safe harbor, and (2) it did not "register" the domains within the meaning of the ACPA.

### 2. *Plaintiffs Have Failed to Plausibly Allege a "Bad Faith Intent to Profit"*

Plaintiffs' Opposition also fails to demonstrate that the FAC contains allegations sufficient to plausibly establish the element of a "bad faith intent to profit" under the ACPA.

### (a) Under the Nine Factors, the Facts Alleged Favor Defendants

Plaintiffs argue they have alleged the nine permissive bad faith factors enumerated in the ACPA. *See* 15 U.S.C. § 1125(d)(1)(B)(i). But they ignore the Ninth Circuit and other courts have "departed from strict adherence to the statutory factors" in favor of "a more case-specific approach to bad faith." *AMPAS*, 2015 WL 5311085 at *23 (citing *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946-47 (9th Cir. 2002) and *Sporty's Farm LLC v. Sportsman's Market, Inc.*, 202 F.3d 489, 499 (2d Cir. 2002)). A court's inquiry into bad faith is guided by an assessment of how close a defendant's conduct falls to the kind of harm the ACPA was designed to prevent. *Id*. The *AMPAS* court observed that the nine factors are "difficult to apply" in the context of a registrar operating a parking pages program on domains it did not select, and that some factors are inapplicable. *Id*. at *40.

Nonetheless, even if the nine factors govern, the FAC contains only a "formulaic recitation" of the factors, which is insufficient. *See* Opp. at 10:13-16, citing FAC, ¶¶ 254-60, 263-69; *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The specific facts alleged elsewhere in the FAC establish that most of the nine factors weigh in Defendants' favor.

Factor 1: Trademark or Other Rights in the Domain Name. The *AMPAS* court concluded this factor weighed in GoDaddy's favor where it set up parking pages as its customers' authorized licensee, with the reasonable belief that the customers had the rights to use the domains. *AMPAS*, 2015 WL 5311085, at *40. Similarly, here, the FAC alleges that

4

1    when Namecheap "used" the disputed domains, it did so as a licensee of the customer. FAC,

2    ¶ 103. And, similar to GoDaddy, the FAC shows that Namecheap's customers warrant that

3    the domains they select are non-infringing at the time of registration. *Id.*, Exh. 1 at ¶ 27.

4         Plaintiffs argue that Defendants were no longer entitled to rely on their customers'

5    representations after receiving notices of infringement, but the FAC does not allege that

6    Namecheap had received any such notices at the time the parking pages were set up. While

7    Plaintiffs allege that Namecheap continued to use the parking pages after the lawsuit was

8    filed, they misleadingly omit that the parking page allegations were not part of the original

9    Complaint. *See* Mot. to Dismiss Order (Doc. 52) at 9:12-14 ("…Plaintiffs do not allege

10   Namecheap used the Infringing Domain Names to set up parking pages anywhere in their

11   Complaint."). Once Plaintiffs filed their FAC alleging that specific parking pages were

12   infringing, Namecheap disabled them. The FAC does not allege otherwise.

13        Plaintiffs also argue that Namecheap was required to suspend registration based on

14   notices of alleged infringement, but the Ninth Circuit has held the opposite: registrars have

15   no obligation to inject themselves into disputes between customers and trademark owners.

16   *Petroliam Nasional Berhad v. GoDaddy.com, Inc*., 737 F.3d 546, 553-54 (9th Cir. 2013)

17   (*Petronas*). This is because it would be impossible for registrars to continue to exist if they

18   had to bear the costs of such disputes, given that they oversee millions of domains.[3] Likewise,

19   WhoisGuard is not required to suspend its privacy services based merely upon unproven

20   allegations of infringement. "The proliferation of such a practice would undermine the entire

21   privacy services industry…The collapse of the market for privacy services would make it

22   easier for [intellectual property] holders to obtain satisfaction, but it would do so at the

23   expense of individuals who derive legitimate benefits from anonymity." *Rosen v.*

24

25   [3] Plaintiffs try to distinguish *AMPAS* by claiming that Defendants "routinely fail to respond"
     to infringement notices (Opp. at 12:19-20), but the allegations they cite actually allege only
26   that Namecheap "frequently does not disable the domain names" upon receiving such
     notices. FAC, ¶ 5. *AMPAS* did not find that GoDaddy disabled domains upon receipt of
27   notices. To the contrary, the court found that "[t]he UDRP expressly prohibits GoDaddy
     from unilaterally cancelling the registration of a domain name without a court order,
28   arbitration process, or the agreement of the registrant." 2015 WL 5311085, at *8.

*Imagevenue.com*, 2013 WL 12132052, *6 (C.D. Cal. Nov. 26, 2013).

Factor 2: Extent to Which Accused Domains Consist of the Registrant's Name. Plaintiffs allege that none of the disputed domains consist of the legal names of Defendants, or a name commonly used to identify them (FAC, ¶ 255), but the relevant inquiry is whether the *customers* who selected the domains are known by such names. *See AMPAS*, 2015 WL 5311085, at *41. Plaintiffs cannot plausibly allege that *none* of the customers for the nearly 1,000 domains are known by such names. There are many other registered trademarks similar to Plaintiffs' marks that are not owned or controlled by Plaintiffs. A search of USPTO registration records for "FB" returns 600 different marks, and a search for the phrase "Insta" returns 1,293 marks. Exhs. D & E attached hereto.[4] Moreover, the *AMPAS* court in evaluating this factor considered that because GoDaddy is a registrar with millions of domain names, "it would have been difficult if not commercially impractical for [it] to make this determination before placing domains in its Parked Page Programs." *AMPAS*, 2015 WL 5311085, at *41. The same applies to Namecheap. Thus, this factor does not support a bad faith intent to profit in this context.

Factor 3: Prior Use of Domains In *Bona Fide* Offering of Goods or Services. The *AMPAS* court also held that this factor was inapplicable in the context of a registrar using parked pages because it "presumes a level of individualized intervention or knowledge by [the registrar] that is simply inconsistent with the sort of automated systems at issue here." *Id*. Thus, this factor is also inapplicable here.

Factor 4: *Bona Fide* Noncommercial or Fair Use of the Mark. The FAC conclusorily alleges that Defendants have made no *bona fide* noncommercial or fair use of Plaintiffs' marks, but advertisements incorporating trademarks in lists of "sponsored links" like those on Namecheap's parking pages have been held to be nominative fair use. *Id.* at *50 (compiling cases).

---

[4] Defendants request the Court to take judicial notice of the USPTO search results attached as Exhs. D and E, which are "not subject to reasonable dispute" and "can be accurately and readily determined" from a government website, tmsearch.uspto.gov. Fed. R. Evid. 201(b).

Factor 5: Intent to Divert Consumers for Commercial Gain or With Intent to Tarnish the Mark. Plaintiffs do not allege anywhere in the FAC (a) that Namecheap selected any of the domains, (b) that Namecheap is a competitor of Plaintiffs or used the parking pages to compete with them,[5] (c) that any consumers hoping to find Plaintiffs' sites were actually diverted to the parking pages, or (d) that the parking pages tarnished Plaintiffs' marks or harmed their goodwill. Based on the same facts, the *AMPAS* court held this factor weighed in GoDaddy's favor. *Id.* at *45.

Factor 6: Whether the Person Offered to Sell the Domains to the Mark Owner. The FAC includes no allegations of any offers to sell the domains to Plaintiffs. Plaintiffs concede that ransoming domains for money is the "paradigmatic" and "classic" harm under the ACPA, but the FAC does not allege Defendants engaged in such misconduct here.

Factor 7: False or Misleading Contact Information. The seventh factor concerns whether the person "applying for the registration of the domain name" provided false contact information, so that he or she could not be easily identified or served with process. *AMPAS*, 2015 WL 5311085, at *46 (citing 4 McCarthy on Trademarks and Unfair Competition § 25:78). Plaintiffs do not accuse either Defendant of providing false contact information for themselves when they "registered" the domains. As for the customers, WhoisGuard began providing their information after the Court's November 10, 2020 Motion to Dismiss Order. FAC, ¶ 124. Plaintiffs complain that some domains had false contact information, but it would be impossible for registrars to manually review and verify all of their customers' contact information for millions of domains.[6]

Factor 8: Registration or Acquisition of Multiple Domain Names that Are Identical

[5] In their Opposition, Plaintiffs assert that they and Namecheap are competitors in the area of online advertising (Opp. at 21:10-11), but this is not alleged anywhere in the FAC.

[6] Namecheap verifies customer email addresses and validates the other contact information provided through automated processes. If Namecheap learns that information appears to be fake, it asks the customer to correct the issue. If the customer fails to do so, the domain is suspended. *See* https://www.namecheap.com/support/knowledgebase/article.aspx/9305/5/icanns-whois-verification-process/. The FAC does not allege that any of the domains which had fake information were still active.

7

1  or Confusingly Similar to Others' Marks. This factor targets the "warehousing" of domains

2  that mirror others' trademarks. H.R. REP. NO. 106-412, at *13.  But the FAC does not allege

3  that *Defendants* selected any of the disputed domains, and thus fails to allege that they

4  engaged in warehousing. Thus, this factor favors Defendants.

5      Factor 9: Extent to Which Plaintiffs' Marks Are Distinctive or Famous. The strength

6  of Plaintiffs' marks is "a double-edged sword," as the holders of valuable marks have "both

7  the legal obligation and the economic incentive to diligently police their use, even at

8  considerable expense." *AMPAS*, 2015 WL 5311085, at *48. Plaintiffs cannot hold

9  Defendants liable for failing to do the policing work that they, as the mark holders, are both

10  legally required and in the better position to do themselves. *Id*.  Thus, as in *AMPAS*, this

11  factor also weighs in Defendants' favor. *See id.*

12      Accordingly, even if all of the facts in the FAC are taken as true, Plaintiffs have failed

13  to plausibly establish a "bad faith intent to profit" under the nine statutory factors.

14      **(b)    Plaintiffs' Attempts to Distinguish *AMPAS* Are Unavailing**

15      Plaintiffs argue that *AMPAS* is inapplicable because the opinion was issued after a

16  bench trial, but the facts found by the court closely match the detailed allegations in the FAC.

17  The *AMPAS* case shows that even if the facts in the FAC were proven true, the claims would

18  still fail. Plaintiffs also argue that *AMPAS* is distinguishable because GoDaddy "developed

19  policies and procedures to assist intellectual property right owners" (*id*. at *7, Finding of

20  Fact 72), but the FAC shows that Namecheap employed many policies and procedures

21  identical to GoDaddy's. For example, it requires all customers to warrant that the domain

22  names they select are non-infringing and requires them to agree to submit cybersquatting

23  disputes to the UDRP.[7] Also, the Namecheap blog post submitted with Plaintiffs' Opposition

24  shows that Namecheap provides guidance to its customers on how to *avoid* cybersquatting,

25  undermining Plaintiffs' accusations that Defendants encourage it. *See* Doc 82-1.

26  _____

27  [7] It is unsurprising that the actions both Namecheap and GoDaddy take (or refuse to take) in
   response to cease and desist letters would be the same given that, as accredited registrars,
   their actions in response to such letters are "generally dictated" by ICANN. *AMPAS*, 2015

28  WL 5311085, at *8, Finding of Fact 77.

1

**(c) Prior UDRP and Court Decisions Requiring Defendants to Transfer Customers' Domains Are Not "Adverse" Rulings**

The Uniform Domain Name Dispute Resolution Policy ("UDRP") "establishes an expedited and inexpensive arbitration process for resolving cybersquatting claims" that exists for the very purpose of removing registrars from participation in domain name disputes. *Petronas*, 737 F.3d at 548, n1.[8] As the UDRP specifically limits the registrar's role to transferring a disputed domain in accordance with an arbitration decision or court order, it is disingenuous for Plaintiffs to argue that "scores" of UDPR decisions in which Defendants were "forced to transfer domains" of their customers is a sign of Defendants' "bad faith intent to profit." *See id.* (UDRP provides registrars need only intervene in disputes "upon order of a court or arbitration decision.").

Similarly, WhoisGuard routinely provides the identity of alleged infringers in response to court actions, consistent with its legal obligations. *See Rosen*, 2013 WL 12132052, at *5 (aggrieved copyright holders may uncover infringers' identities from privacy services through "John Doe" lawsuits or subpoenas). Thus, the decisions Plaintiffs cite are not proceedings that Defendants have "lost," as Plaintiffs inaccurately contend. Rather, these are cases which the actual registrants of the domains lost or failed to contest.

**(d) Defendants' Automated Processes Treat All Domains the Same**

Plaintiffs also fail to refute the argument that the automated nature of Defendants' services precludes Plaintiffs from alleging the subjective intent necessary to establish a bad faith intent to profit from Plaintiffs' marks. Plaintiffs have not alleged that Defendants subjectively intended to profit ***from Plaintiffs' specific marks*** as required by the ACPA.[9] Defendants are not accused of using their automated processes to deliberately identify and register misspellings of famous trademarks, in contrast to the allegations in *Verizon*

---

[8] In response to Plaintiffs' notices of alleged infringement, WhoisGuard provided instructions on how to submit a UDRP complaint, undercutting Plaintiffs' allegations that Defendants are bad actors who refused to assist them. *See* Doc. 37 at Exh. 1 (full copy of WhoisGuard Support response email partially quoted in FAC, ¶¶ 155-58).

[9] Plaintiffs contend that Namecheap's blog shows that the ACPA actually prohibits a broader range of conduct, but Namecheap's blog is not a legal authority.

*California v. Lead Networks Domains*, CV 09-613-ABC (CWx), 2009 WL 10700112, at *7 (C.D. Cal. Feb. 17, 2009). There are no allegations anywhere in the FAC that Defendants did anything to single out domains containing Plaintiffs' marks. While Plaintiffs contend that Namecheap "auctions off profitable domain names on the secondary market prior to deletion" (Opp. at 14:19), this is yet another brand-new accusation that is not alleged anywhere in the FAC. Plaintiffs also argue that, because Namecheap's Registration Agreement allows it to operate commercial parking pages on *any* unused domain, Namecheap must have had a bad faith intent to profit at the time the customers registered the disputed domains. Instead, this fact shows that Defendants did *not* treat the disputed domains any differently than other domains.

Plaintiffs contend that subjective bad faith intent to profit from the specific marks is *not* a requirement to establish bad faith intent under the ACPA because several of the bad faith statutory factors are not so narrowly focused, but no cited authority shows that any single factor, such as "the person's provision of material and misleading false contact information," would be sufficient to establish bad faith in the absence of other factors related to the specific marks. Contrary to Plaintiffs' argument, where the allegations "do not even remotely suggest that defendants perpetrated the core activities that threaten to result in the paradigmatic harm that the ACPA was enacted to eradicate"—*i.e.*, ransoming or "warehousing" domains that contain others' trademarks for profit—dismissal at the pleadings stage is appropriate, even if other statutory factors are present. *Lewittes v. Cohen*, No. 03 Civ. 189, 2004 WL 1171261, at *8 (S.D.N.Y. May 26, 2004).

**(e) Plaintiffs' Generalized "Scheme" Allegations Are Immaterial**

Finally, Plaintiffs argue that a "bad faith intent to profit" is established by their allegations that Defendants engaged in a generalized "scheme" to attract cybersquatters and criminals. Again, Plaintiffs have failed to connect these allegations to an intent to profit from Plaintiffs' marks, as required by the ACPA.

In support of this argument, Plaintiffs rely on two out-of-jurisdiction cases decided before the Ninth Circuit's 2013 *Petronas* opinion confirming that liability under the ACPA

is narrowly tailored: *Dell v. BelgiumDomains*, No. 07-22674-CIV, 2007 WL 6862342, at *10 (S.D. Fla. Nov. 21, 2007) and *Transamerica v. Moniker Online Services*, 672 F. Supp. 2d 1353, 1366 (S.D. Fla. 2009). In *Dell*, the registrars *themselves* identified domain names that they believed would be profitable because they consisted of misspellings of famous marks. 2007 WL 6862342, at *10, ¶ 18. In *Transamercia*, the court accepted that the registrar had "partial ownership" of the domains at issue. 672 F. Supp. 2d at 1366. In contrast, there are no allegations that Namecheap selected or owned the disputed domains here. In any case, neither decision is binding on this Court.

Plaintiffs also fail to demonstrate that the numerous allegations regarding Defendants' purported facilitation of cybercrime have any bearing whatsoever on Plaintiffs' claims. Because these allegations have nothing to do with Plaintiffs or their marks and "place undue emphasis on the criminal nature" of the alleged conduct, they should be stricken under Rule 12(f). *See Xcentric Ventures LLC v. Borodkin*, No. CV-11-1426-PHX-GMS, 2012 WL 692976, at *12 (D. Ariz. March 1, 2012) (striking broad, non-specific criminal allegations).

### 3. *Defendants Cannot Disclose Customer Data Under the GDPR*

Finally, Plaintiffs argue that Defendants have misrepresented their obligations under the GDPR because they have now disclosed the customer data for the disputed domains, but the FAC alleges that Defendants did so in response to the Court's Order on the prior motions to dismiss. *See* FAC, ¶ 124. While Defendants face the risk of draconian penalties under the GDPR in doing so, if WhoisGuard did *not* disclose the customer data, it would face possible statutory damages for its customers' cybersquatting in the range $100 million for the approximately 1,000 domains that are now in the case. *See* 15 § U.S.C. 1117(d).

Plaintiffs also argue that Defendants could have redacted customer information from the WHOIS directory rather than using a proxy service, but the end result is the same: the customer's data is not public, as required by the GDPR. Lastly, Plaintiffs contend that customer information "must be disclosed on request for legitimate purposes," but they ignore that "legitimate interest" is a legal term of art under the GDPR which triggers a balancing test by the data controller (here, Defendants). *See* GDPR Art. 6(1)(f) (previously filed as

Doc. 76-1) ("legitimate interests" may be "overridden by the interests or fundamental rights and freedoms of the data subject which require protection of personal data…"); European Comm. Comments on Temp Spec. (previously filed as Doc. 39-1) at 4 ("The existence of such a right needs to be substantiated and the necessity/proportionality of accessing that data ascertained."). Since trademark holders can achieve their "legitimate purposes" through less intrusive means, such as filing a UDRP action, a registrar disclosing customer data in response to a notice of alleged infringement is not considered a "necessary" disclosure under the GDPR. *See* Namecheap's Reply in support of prior Mot. to Dismiss (Doc. 39) at 11-12.

## B. Plaintiffs Fail to Allege Viable Lanham Act Claims

Unlike the ACPA, "[t]raditional trademark law only restricts the commercial use of another's protected mark in order to avoid consumer confusion as to the source of a particular product." *Petronas*, 737 F.3d at 552. Accordingly, Defendants' argument that the FAC fails to allege that Namecheap's parking pages used Plaintiffs' marks as a designation of source for any particular goods or services is not "nonsensical" as Plaintiffs assert. Opp. at 2. To be clear, Defendants' argument is not that the parking pages are not "commercial;" this is a strawman argument. Rather, the fatal flaw is that the FAC does not identify any accused goods or services advertised or sold using Plaintiffs' marks.  Plaintiffs in their Opposition contend for the first time that Namecheap used their marks (*i.e.*, "Facebook," "FB," "Instagram," "WhatsApp") as designations of source for Namecheap's own service of "using domain names to host advertising parking pages," but this is a brand-new allegation that is not anywhere in the FAC. *See* Opp. at 18-19 (citing FAC ¶¶ 98, 100, 107, which include no such allegations). Plaintiffs concede that the sponsored links on Namecheap's parking pages direct visitors to sites that are "unknown." Without any accused goods or services, the FAC fails to state viable claims for trademark infringement, false designation of origin, or dilution.

Additionally, the trademark and false designation claims also fail because the FAC does not plausibly allege that any consumers would be confused by Namecheap's parking pages, which state "This domain was recently registered at Namecheap. Please check back later!" and include a list of clearly identified "Sponsored Listings" "served automatically by

a third party" with disclaimers. FAC, Exh. 18. Contrary to Plaintiffs' argument, courts have dismissed trademark claims at the motion to dismiss stage where, as here, there is no plausible likelihood that a consumer would be confused by a list of sponsored links. *E.g., Jurin v. Google, Inc*., 695 F. Supp. 2d 1117, 1123 (E.D. Cal. 2010). Finally, Plaintiffs argue that Namecheap's parking pages could create initial interest confusion, but this theory is not alleged anywhere in the FAC.

### C.  Plaintiffs Have Failed to Allege Alter Ego or Direct Participant Liability

Plaintiffs' Opposition fails to refute Defendants' argument that the FAC has not alleged sufficient facts to demonstrate that Namecheap and WhoisGuard are alter egos of one another, or that Namecheap can be liable under a direct participation theory.

Plaintiffs' allegations in the FAC state no information about failure to observe corporate formalities and describe only a business services relationship between the two entities, not an alter ego relationship. That the service is called "WhoisGuard by Namecheap," or is offered on behalf of Namecheap to Namecheap customers only demonstrates that WhoisGuard is a vendor of Namecheap. Further, that the service is offered for free does not prove that WhoisGuard is undercapitalized; WhoisGuard may be separately paid by Namecheap for the service it provides. The Court already evaluated these very same allegations and found them lacking. *See* Mot. to Dismiss Order (Doc. 52) at 11.

Plaintiffs' description of the "life cycle of an Infringing Domain Name" is not material because it again describes only a business services relationship between the entities, not pervasive control. *See* Opp. at 22:1-9. Further, the statements attributed to Namecheap's CEO do not establish that Defendants fail to observe formalities or that Namecheap dictates every aspect of WhoisGuard's business. Moreover, Plaintiffs fail to allege whether those statements were made during the time period Namecheap provided the WhoisGuard proxy service under its own name. *See* FAC, ¶¶ 184-189, 208.[10]

---

[10] Plaintiffs also point to the fact that WhoisGuard's publicly listed address is a law firm (which also serves as its agent for service of process) but fail to appreciate that it may have legitimate reasons for keeping its actual address private, as many U.S. companies do.

The remainder of the allegations in the FAC relating to alter ego are all made on "information and belief," (*see* FAC, ¶¶ 10, 196-205, 207 225-226, 233-236) and are in substance factually unsupported conclusions that merely recite the factors used by courts in evaluating alter ego claims. *See Cavan v. Maron*, No. CV-15-02586-PHX-PG, 2016 WL 4429674, at *4 (D. Ariz. Aug 22, 2016). Other allegations stating that Namecheap exerts complete control over WhoisGuard's provision of the proxy service, or that WhoisGuard is a shell company created by Namecheap to escape liability, are also conclusory and unsupported by any facts.  *See* FAC, ¶¶ 210-211, 220, 222, 238-240. The allegations fail to meet *Twombly*'s pleading standard requiring more than just labels and conclusions.

With respect to the second prong of the alter-ego test—whether recognizing the companies as separate entities would result in fraud and injustice—Plaintiffs' sole argument is that WhoisGuard is a shell company created to escape jurisdiction and liability. There are *zero* well-pleaded facts required under *Twombly* to overcome a Rule 12(b)(6) challenge. Conclusory allegations that companies are structured to escape liability are insufficient to show fraud or injustice. *In re Boon Global Ltd*., 923 F.3d 643, 654 (9th Cir. 2019).

Finally, as this Court has recognized, direct participation liability requires a subsidiary relationship. Mot. to Dismiss Order (Doc. 52) at 11:18-19; *see Martinez v. E.I. DuPont De Nemours and Co., Inc.*, 82 A.3d 1, 9 (Del. Sup. 2012) (direct participant liability, where recognized, "makes the *parent* liable for a *subsidiary's* tortious conduct…"); *Allen v. Amer. Cap. Ltd.*, 287 F. Supp. 3d 763, 806 (D. Ariz. 2017) ("A parent company can be liable for a subsidiary's acts…"). The FAC does not allege any facts to show that WhoisGuard is a subsidiary of Namecheap.

Thus, the FAC's alter ego and direct participant theories remain defectively pled.

## III.  THE CLAIMS AGAINST WHOISGAURD BASED ON HUNDREDS OF NEW DOMAINS UNDER A NEW LEGAL THEORY SHOULD BE DISMISSED

Plaintiffs contend that the addition of new claims as to WhoisGuard, increasing the number of domains from 45 to approximately 1,000, merely reflects that Plaintiffs recently discovered more infringing domains. This argument is disingenuous. For all 45 of the original domains, the original claims were based on a theory that WhoisGuard contractually

agreed to be liable for harm caused by its customers because ***it did not disclose the customers' identity and contact information*** as required under terms which the Court accepted had been plausibly alleged to have been incorporated into the contract at issue. Mot. to Dismiss Order (Doc. 52) at 7:21-24. The original complaint contained specific allegations as to each domain about WhoisGuard's refusal to disclose the customer information.

Plaintiffs do not deny that the FAC contains no such allegations about WhoisGuard failing to disclose customer information as to the 950+ newly added domains. To the contrary, the FAC alleges that WhoisGuard began providing the requested information. FAC ¶ 124. The FAC does not allege that WhoisGuard is contractually liable for claims on the new domains because it failed to disclose information—instead, it seeks to hold WhoisGuard liable based merely on its role in "registering" and "trafficking in" domains in providing its privacy services. This is an entirely different theory. Plaintiffs assert that the new domains are ones which they just happened to "newly discover," but the new domains were first registered as early as ***August 14, 2006. See*** FAC, Exh. 10 (Doc. 56-2 at p. 342). The Court should reject Plaintiffs' attempt to exponentially expand this case by bootstrapping in ***new*** theories of liability against WhoisGuard which do not amount to viable claims.

Additionally, in so doing, Plaintiffs exceeded the scope of the Court's Order permitting leave to amend "as to Defendant Namecheap." Plaintiffs' argument that they did not exceed the Order because they have not added new claims or parties is unpersuasive, as the new allegations clearly set forth new, different, and previously unasserted claims against WhoisGuard based on 950+ new domains, despite the fact that they are not separately stated under their own "counts" or causes of action. Finally, Plaintiffs argue that the amendment should be allowed under Rule 15, but they ignore that they did not file a motion for leave to amend. Even if they had done so, the new allegations are futile because the FAC fails to establish WhoisGuard acted with a "bad faith intent to profit" from Plaintiffs' marks, among all of the other reasons set forth above.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court should grant Defendants' Motion.

**ROME & ASSOCIATES, A.P.C.**
DATED:  March 15, 2021

By:  *s/ Eugene Rome*
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
   Eugene Rome
   Sridavi Ganesan
   Brianna Dahlberg


**FENNEMORE CRAIG, P.C.**


  *s/ Mario C. Vasta*
Ray K. Harris
Mario C. Vasta


Attorneys for Defendants
Namecheap, Inc. and Whoisguard, Inc.

**ROME & ASSOCIATES, A.P.C.**

By:   *s/ Eugene Rome*
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
   Eugene Rome
   Sridavi Ganesan
   Brianna Dahlberg


**FENNEMORE CRAIG, P.C.**

By:   *s/ Ray K. Harris*
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
   Ray K. Harris
   Mario C. Vasta


Attorneys for Defendant Namecheap, Inc. and
Defendant and Counterclaimant Whoisguard, Inc.