**ROME & ASSOCIATES, A.P.C.**
Eugene Rome (admitted pro hac vice)
Sridavi Ganesan (admitted pro hac vice)
Brianna Dahlberg (admitted pro hac vice)
2029 Century Park East, Suite 450
Los Angeles, CA  90067
Telephone:    310-282-0690
Facsimile:    310-282-0691
erome@romeandassociates.com
sganesan@romeandassociates.com
bdahlberg@romeandassociates.com

**FENNEMORE CRAIG, P.C.**
Ray K. Harris (No. 007408)
Mario C. Vasta (No. 033254)
2394 E. Camelback Road
Suite 600
Phoenix, AZ 85016
Telephone: (602) 916-5000
rharris@fennemorelaw.com
mvasta@fennemorelaw.com

Attorneys for Defendant Namecheap, Inc. and Defendant/Counterclaimant WhoisGuard, Inc.

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Facebook, Inc., a Delaware corporation; Instagram, LLC, a Delaware limited liability company; and WhatsApp Inc., a Delaware corporation,<br><br>                        Plaintiffs,<br><br>          v.<br><br>Namecheap, Inc., a Delaware corporation, and Whoisguard, Inc., a Republic of Panama corporation,<br><br>                        Defendants. | CASE NO. 2:20-cv-00470-GMS<br><br>**DEFENDANT NAMECHEAP, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE LODGING OF REGISTRAR'S CERTIFICATES; REQUEST FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**<br><br>Filed with: Declaration of Hillan Klein; Declaration of Eugene Rome<br><br> (Oral Argument Requested) |
| WhoisGuard, Inc., a Republic of Panama corporation,<br><br>                        Counterclaimant,<br><br>          v.<br><br>Facebook, Inc., a Delaware corporation,<br><br>                        Counterclaim Defendant. | |

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiff and Counterclaim Defendant Facebook, Inc. ("Facebook") and Plaintiffs Instagram, LLC, and WhatsApp Inc.'s ("WhatsApp") (collectively, "Plaintiffs") Motion to Enforce Lodging of Registrar's Certificates is based on inaccurate representations and mischaracterizations. In fact, Namecheap, Inc. ("Namecheap") voluntarily submitted the Registrar's Certificates and was under no obligation to do so. The representations made in the Registrar's Certificates were accurate and made in good faith. Namecheap has not transferred any disputed domain names away from the Court's control, nor has it announced any intention to do so. Plaintiffs were aware Namecheap has no control over the expiration of domain names; expiration codes are controlled by the domain registries, not by Namecheap. Plaintiffs were aware that the domains listed in the Certificates included those in demand letters sent by Plaintiffs. Plaintiffs' Motion is unsupported by fact or law.

Plaintiffs' Motion is a veiled attempt to seek unfettered access to Defendant and Counterclaimant Namecheap's Inc.'s ("Namecheap") private WHOIS database containing customer information millions of Namecheap domains. In essence Plaintiffs' Motion is ***an improper motion for mandatory injunctive relief*** devoid of legal or evidentiary support. Plaintiffs have not presented a single legal authority to justify their requested extraordinary relief, which, if granted, would amount to a gross overreach and violation of the privacy rights of Namecheap's customers.

Defendants provided, in good faith, customer information for over 1,900 allegedly infringing domains identified in 12 demand letters from Plaintiffs over the last five months. Namecheap set registrar codes to lock the disputed domains identified in Plaintiffs' First Amended Complaint ("FAC") and the demand letters in order to prevent the customers who own the domains from transferring them to another registry to evade this Court's jurisdiction (*i.e.*, "cyberflight"). Namecheap already set the specific codes Plaintiffs request in their Motion, where possible. Namecheap ***voluntarily*** lodged these domains with the Court to inform the Court of the status of these domains, the registrar's locks placed upon them, and

to demonstrate Namecheap's disinterest in the ownership of the domains.

As addressed below, none of Plaintiffs' requested relief should be granted. Further, Namecheap requests this Court to impose sanctions against Plaintiffs, their attorneys David Steele and Jacob Jones and their respective law firms, Tucker Ellis LLP and Snell & Wilmer LLP, pursuant to 28 U.S.C. § 1927 and the Court's inherent powers for bringing this frivolous Motion in bad faith.

## II. RELEVANT FACTUAL BACKGROUND

### A. Defendants Locked the Domains, Lodged Registrar Certificates, and Disclosed Customer Information in Good Faith

On November 10, 2020, the Court issued an Order finding that the complaint sufficiently alleged that Defendant WhoisGuard, Inc. ("WhoisGuard") contractually assumed liability for its customers' actions with respect to 45 infringing domain names because WhoisGuard had allegedly failed to disclose the identity and contact information of customers to Plaintiffs after being presented with "reasonable evidence" of the customers' infringement. *Id*. at 7-8. Plaintiffs immediately seized on the opportunity presented by the Order and began barraging Defendants with over a thousand requests for customer information for additional allegedly infringing domains.

On November 14, 2020, Plaintiffs' counsel sent a letter to Defendants' counsel identifying 285 allegedly infringing domain names. On November 16, Plaintiffs' counsel sent a letter "on behalf of Facebook, Inc." identifying an additional domain alleged to infringe Facebook's OCULUS trademark. On November 22, 2020, Plaintiffs sent a letter identifying an additional domain alleged to infringe Facebook's MESSENGER trademark. On November 28, 2020, Plaintiffs' counsel sent a letter on behalf of Plaintiffs as well as Facebook Technologies, LLC, identifying an additional 146 disputed domain names. On December 3, 2020 and December 5, 2020, Plaintiffs identified an additional 28 and 731 disputed domain names, respectively. In each of their letters, Plaintiffs demanded that Defendants' counsel disclose the customers' identity and contact information pursuant to the same contractual provision giving rise to Plaintiffs' claims in this case. ***Defendants complied***

*and disclosed the customer information*. Decl. of Eugene Rome ("Rome Decl."), ¶ 3, Exh. A; *see* Doc. 56 at ¶ 124.

On December 10, 2020, Plaintiffs filed their operative FAC in which they identified at least 1,186 allegedly infringing domain names, most of which overlapped with those in their demand letters. *See* Doc. 56. at Exhs. 9, 11, 13, 15, 18, 19, 21, 23. Following the filing of the FAC, on December 16, 2020, Plaintiffs' counsel sent Defendants' counsel another letter identifying an additional 190 allegedly infringing domain names. Rome Decl., ¶ 4, Exh. B. ***Again, Defendants disclosed the customer information despite their assessment that the GDRP does not authorize such disclosure***. *Id*. On January 15, 2021, Namecheap tendered to the Court a Registrar's Certificate lodging 1,150 domains.[1] Doc. 71. Namecheap's COO, Hillan Klein, certified that the domains have been placed on registrar lock, thus preventing them from being transferred, modified, or otherwise manipulated by the customers. Decl. of Hillan Klein ("Klein Decl."), ¶ 3. Namecheap voluntarily took this action in good faith, to prevent the customers who own the domains from transferring them to other domain registrars in an attempt to evade the Court's jurisdiction. *Id*. at ¶ 4. Namecheap, as a domain registrar, does not assert ownership of any of the domains at issue. Klein Decl., ¶ 4. All of these domains were selected and are owned by Namecheap's customers. *See id*. at ¶ 11.

On February 9, Plaintiffs sent Defendants a letter identifying an additional 356 disputed domains. Rome Decl., ¶ 5, Exh. C. On February 22, Namecheap tendered to the Court a second Registrar's Certificate lodging those additional 356 domains, which have been placed on registrar lock. Doc. 81; Klein Decl., ¶ 3. On February 23, March 11, and 15, Plaintiffs identified a total of 171 additional allegedly infringing domains. Rome Decl., ¶ 5, Exh. C. ***As before, Defendants responded by disclosing the customer information.*** *Id*.

---

[1] This included all domains in the FAC and Plaintiffs' notices of infringement to date, except for those domains which were already expired. As set forth in Defendants' pending motion to dismiss the FAC, Plaintiffs are asserting claims against Namecheap based on at least 82 domains that were expired and in a grace period pending their deletion from the registry. *See* Doc. 76 at 6.

In total, Plaintiffs have sent 12 letters to Namecheap identifying over 1,909 allegedly infringing domains, for which Namecheap has complied and provided registrants' identifying information.[2] Rome Decl., ¶¶ 3-5, Exhs. A-C. Defendants provided the information in good faith despite Plaintiffs' failure to offer "reasonable evidence of actionable harm" caused by the customers' wrongful use of the domain names.[3] *Id*. at ¶ 6. In light of Court's Order denying in part their motions to dismiss, Defendants complied with Plaintiffs' requests for customer information. *Id*.

### B. Namecheap Informed Plaintiffs' Counsel That They Would Need to Pay Renewal Fees in Order to Prevent Locked Domains from Expiring

While Namecheap can set a status code preventing *the customer* from deleting a domain, Namecheap lacks the ability to set a code to prevent a domain from expiring, even if it is locked. Namecheap also lacks the ability to set codes for expired domains that are pending deletion or that are no longer in its database. Klein Decl., ¶ 5. ***Only the domains' respective registries can set codes to prevent a domain from expiring or being deleted after expiration.*** *Id*.

Mr. Steele is aware of this fact. First, he has extensive experience engaging with domain registrars and registries on behalf of his clients with respect to cybersquatting or infringement claims. *See* Rome Decl., ¶ 20, Exh. L. Second, in a March 2, 2021 email, Namecheap informed Plaintiffs and Mr. Steele that if a locked domain is expiring and Plaintiffs wished to prevent it from being deleted by the registry, Plaintiffs should follow the established process that applies in Uniform Domain-Name Dispute Resolution Policy

---

[2] On March 10, Plaintiffs sent another letter disclosing an additional 543 domains unrelated to Plaintiffs' trademarks, which Plaintiffs asserted had been used in a malware attack. Namecheap immediately investigated the issue, confirmed all of the domains with Namecheap were already suspended and/or were inactive, and disclosed to Plaintiffs the current customer information in its possession (many of the domains were actually registered with other registrars, not Namecheap). Rome Decl., ¶ 7. Included with these, Namecheap has provided customer information for a total of 2,452 domains to Plaintiffs pursuant to their demand for the same since November 12, 2020.

[3] Rather, Plaintiffs' letters simply state that Plaintiffs own certain trademarks, and, in Plaintiffs' view, the subject domains contain or are confusingly similar to the marks. *Id*.

("UDRP") disputes.[4] Rome Decl., ¶ 12, Exh. G. That process would require Plaintiffs to open an account with Namecheap and deposit the renewal fees for the domains, just as Plaintiffs would need to do if they were the owners of the domains. *Id*; Klein Decl., ¶ 7. Mr. Steele has used this procedure with Namecheap in the past, as recently as a week ago, and his law firm maintains such an account with Namecheap for this very purpose. Klein Decl., ¶ 8.

Namecheap again reminded Plaintiffs of the domain expiration issue and its proposed resolution in an email to Plaintiffs' attorneys on March 12, but Plaintiffs never provided any response or comment to either email. Rome Decl., ¶ 14, Exh. H. Instead, Plaintiffs deliberately chose to wait until at least 13 domains expired (*i.e.,* after the March 2 warning) to bring their Motion. *See* Steele Decl., ¶ 2, Exh. 1. Plaintiffs' Motion makes accusations regarding a result Plaintiffs knew full well they could have prevented by following the procedure Namecheap suggested.[5]

        **C.**      **Namecheap Lodged the Disputed Domains That Plaintiffs Identified in Their Demand Letters**

Plaintiffs assert that their UDRP enforcement efforts have been impeded because Namecheap erroneously lodged domains that are not "at issue" in the case. This is plainly false. Rather, in March 2021, Namecheap received notice of decisions of UDRP proceedings filed by Plaintiff WhatsApp Inc. ("WhatsApp") concerning two disputed domains that had been previously identified in Plaintiffs' infringement letters. WhatsApp is represented by Hogan Lovells in the UDRP proceedings. The UDRP panels ruled that the two domains should be transferred to WhatsApp. However, those domains are presently locked and included in the Registrar's Certificates in this case, preventing Namecheap from transferring them. Rome Decl., ¶ 15.

---

[4] The UDRP "establishes an expedited and inexpensive arbitration process for resolving cybersquatting claims." *Petroliam Nasional Berhad v. GoDaddy.com, Inc*., 737 F.3d 546, 548 n1 (9th Cir. 2013).

[5] Alternatively, Plaintiffs could have sought, with Defendants' consent, an order directing the Registry to lock the domain names. *See* Sec. II.E below. Plaintiffs did not seek the requisite order.

On March 18, Namecheap's counsel Eugene Rome, emailed WhatsApp's UDRP counsel and copied Mr. Steele, suggesting that the parties resolve this issue by stipulating to transfer of the domains to WhatsApp. Mr. Steele responded that he would get back to Mr. Rome on the issue, but never did. *Id.* at ¶ 16, Exh. I.

Instead, on March 23, Plaintiffs filed their Motion complaining that Namecheap purposefully made the Registrar's Certificates overinclusive and has therefore impeded Plaintiffs' enforcement actions in administrative proceedings. Conveniently, Plaintiffs do not explain how submitting domains to the control of the Court "impedes" their efforts to recover the subject domains.

Plaintiffs now claim that the only domains "at issue" are those identified in the FAC, and that the Registrar's Certificates should not have included those domains identified in Plaintiffs' letters to Defendants. *See* Mot. at 5:15-6:6. However, the Motion was the very first time Plaintiffs ever made this assertion to Namecheap, long after the Registrar's Certificates were lodged with the Court on January 15 and February 22. Rome Decl., ¶ 17. This new position by Plaintiffs, aimed at fabricating a purported violation where none exists, is a 180-degree reversal from Mr. Steele's prior indication where, in a proposed stipulation he provided to Defendants, Plaintiffs and Mr. Steele identified the domains in their December 16, 2020 and February 9, 2021 letters as being "at issue" in this case. *Id.* at ¶ 10, Exh. F at ¶¶ 3-4.

On March 25, Mr. Rome wrote again to Ms. Seager and Mr. Steele to follow up on his email of March 18 about his proposed stipulation to transfer the domains subject to the UDRP actions to WhatsApp. Mr. Steele responded that Plaintiffs would only agree to Defendants' proposed stipulation if the Court denied this Motion. *Id.* at ¶ 18, Exh. J.

### D. Namecheap Did Not Transfer Any Domains

On March 4, 2021 Namecheap announced that it was changing its privacy service from WhoisGuard to a new provider, Withheld for Privacy ("WFP"). Klein Decl., ¶ 10. However, ***none*** of the domains lodged with the Court have been or will be impacted by the change and all will remain with WhoisGuard's proxy service during the pendency of this

litigation. *Id*. at ¶ 12. The public WHOIS Records demonstrate that the lodged domains have not been transferred to date. Rome Decl., ¶ 19, Exh. K.

### E. Namecheap Applied the Requested Codes to the Disputed Domains

On January 26, 2021, the parties held a meet and confer conference on Facebook's motion to dismiss WhoisGuard's First Amended Counterclaim. Rome Decl., ¶ 8. During that call, Mr. Steele indicated that Plaintiffs had "several issues" regarding the Registrar's Certificates, but was not clear as to what the issues were, or which domains were impacted.[6] *Id*. Defendants' counsel invited Plaintiffs to identify their issues in writing along and specify the locked domains at issue. *Id*. After hearing nothing from Plaintiffs for approximately one week, Defendants sent a follow up email on February 1, again inviting Plaintiffs to identify their concerns. *Id.* at ¶ 9, Exh. D.

On February 25, Plaintiffs' counsel finally responded to Defendants' February 1 email by alleging, without identifying the domains at issue, that "a number of domains that were lodged with the Court were not properly locked and were allowed to expire," that "some were not locked to prevent transfer to other registrars, and some were disabled but others were not." Rome Decl., Exh. E. Plaintiffs requested that Defendants enter into a proposed stipulation requiring the ***registries*** (*i.e*., not Namecheap) to set the server status code which would prevent the disputed domains from expiring (among other codes to be set by the registries, Namecheap, and other registrars). *Id*. at ¶ 10, Exhs. E-F.

In response, Defendants' counsel agreed to confirm that Plaintiffs' requested registrar lock codes were set for all disputed domains identified in the proposed stipulation, but objected to setting certain codes which would disable the customers' websites (in their instant Motion, Plaintiffs have abandoned this overreaching request).[7] Defendants further

---

[6] The singaporepools.online domain discussed in Plaintiffs' Motion is mentioned in an Exhibit to the FAC but on the parties' call, Plaintiffs confirmed that it is not at issue in this case. Rome Decl., ¶ 8, fn.1.

[7] Namecheap had already set the registrar code disabling use of the domains ("clientHold") for all domains that engaged in phishing or other abuse—in many cases, prior to receipt of any notice from Plaintiffs about the domains. *See* Rome Decl., ¶ 13 at Exh. H.

informed Plaintiffs that if Plaintiffs intended to move the Court for an order requiring the registries to set codes, Namecheap would not oppose the motion so long as it imposed no additional obligations on Namecheap, and Namecheap's customers' websites would not be disabled. *Id*. at ¶ 11, Exh. G.[8]

In a further show of good faith, pursuant to Plaintiffs' request, Namecheap provided a spreadsheet on March 12 demonstrating that the specific registrar codes requested by Plaintiffs had been set for all disputed domains, where possible. *Id*. at ¶ 13, Exh. H; Klein Decl., ¶ 13. In this email, Defendants also again requested that if Plaintiffs believed Namecheap had overlooked any domains, they should simply let Defendants know. Rome Dec., ¶ 13, Exh. H. Plaintiffs declined to respond to this reasonable proposal and, instead, filed this Motion. *Id*.

### III. <u>LEGAL ARGUMENT</u>

#### A. **Plaintiffs' Motion Is Not Supported by Law**

Plaintiffs' Motion is nothing more than a deficient and mistitled motion for mandatory injunctive relief. Specifically, Plaintiffs ask this Court to order Namecheap to turn over its entire customer information database based upon their complaints of Namecheap's ***voluntary*** submission of Registrar's Certificates to the Court. Plaintiffs' position has no basis in law or, for that matter, common sense.

Indeed, Plaintiffs do not identify any legal case (either binding or persuasive) or statute (1) governing the voluntarily lodged Registrar's Certificates or the domains to be included in them (*e.g.*, only those listed in the underlying complaint); (2) setting forth any legal obligation requiring Namecheap to prevent the expiration of any disputed domain names listed in the Registrar's Certificates; or (3) dictating the status codes that Namecheap is required to set for each of the disputed domains. Plaintiffs cite to authority for the relief they seek for failure to comply with any of these purported obligations. Plaintiffs cannot cite

---

[8] Several of the status codes in Plaintiffs' proposed stipulation ("inactive," "serverHold," and "clientHold") would have caused the customers' ability to use the domains to be disabled, which goes beyond locking the domains to prevent cyberflight. Klein Decl., ¶ 14.

8

to any such authority because none exists.

Left with no legal authority, Plaintiffs falsely assert that Namecheap has deceived the Court with its certifications. Plaintiffs themselves were not plainly deceived, as evidenced by the actions discussed above. And Namecheap acted in good faith, as evidenced by the same actions discussed above.

Plaintiffs seek extraordinary relief—full unfettered access to Namecheap's entire, private WHOIS database containing the identity and contact information for *all* of its customers. The ostensible purpose of this relief, per the Motion, is to ensure that Namecheap has actually locked the domains at issue, presumably because Namecheap cannot be trusted. As discussed in detail below, Plaintiffs have blatantly misrepresented and mischaracterized the truth in order to distract from the fact that their Motion and requested relief simply lack legal support.

As Plaintiffs have not identified any legal authority to support its Motion or justify the requested relief, the Court should deny Plaintiffs' Motion on this basis alone.

**B.  Namecheap Has Not Transferred Any Domains Lodged with the Court**

Plaintiffs and their attorneys, Mr. Steele and Mr. Jones, attest that Namecheap has acted in contradiction of its certification with the Court that the lodged domains will not be transferred because Namecheap purportedly announced on March 4, 2021 that it would be transferring "***the domains that it lodged with the Court***" from WhoisGuard to its new privacy provider, WFP, and therefore out of the Court's custody. *See* Mot. at 6:7-9; Decl. of David Steele is support of Motion ("Steele Decl.") (Doc. 88-1), ¶ 8. Plain and simple: this is a bold-faced lie to the Court by attorneys who know better.

***None*** of the domains lodged with the Court have been transferred or will be transferred while this litigation is pending, and WhoisGuard remains the proxy service for these domains. Klein Decl., ¶ 12. Namecheap's press release that Plaintiffs and Mr. Steele rely upon merely states that Namecheap will be switching its ***privacy services*** from WhoisGuard to WFP, with ***no mention*** of the domains lodged with the Court. *See* Steele Decl., Exh. 6. Critically, the press release says nothing about any transfer as no such event

has or will occur. Furthermore, Plaintiffs have not provided a shred of evidence that any of the lodged domains have been transferred from WhoisGuard to WFP.

Plaintiffs and their counsel have therefore made bold accusations against Namecheap without any basis of fact. The public WHOIS records for the lodged domains confirm that ***WhoisGuard is still listed as the registrant***. *See*, *e.g.* Rome Decl., ¶ 19, Exh. K. Moreover, if Plaintiffs' counsel even had a good faith concern that Defendants were going to cause lodged domains to be transferred in the near future, they should have contacted Namecheap's counsel to learn the truth. Instead, Plaintiffs' frivolous Motion wastes the Court's time to adjudicate a Motion based upon false assertions.

**C.    Namecheap Has No Control over the Status Codes That Prevent Domains from Expiring, as Plaintiffs Are Aware**

Namecheap lodged Registrar's Certificates with the Court in a show of good faith to demonstrate that they do not in fact have an ownership interest in the lodged domains. Klein Decl., ¶ 4. There is no legal requirement or obligation for Namecheap to make such a lodging. Nor did Plaintiffs demand that Namecheap lodge the Certificates. Further, Namecheap locked these domains to prevent its customers from transferring them to another registrar to escape the Court's jurisdiction. *Id*. However, setting a registrar's lock does not prevent a domain from expiring. Namecheap simply does not have the ability to set codes to prevent the domains from expiring, or from being deleted after expiration; ***that power lies with entirely with the registries, as Mr. Steele is well aware.*** *Id*. at ¶ 5.

Namecheap reminded Mr. Steele and the members of his firm at least twice that it is not responsible for tracking expiring domains, and that Plaintiffs can prevent locked domains from expiring by opening an account with Namecheap and depositing the renewal fees for the expiring domains, just as a party claiming infringement would do in a UDRP action. *See* Rome Decl., ¶¶ 12, 14, Exhs. G-H. Plaintiffs and Mr. Steele never responded to Namecheap's warnings and proposed solution to keep the locked domains from expiring. *Id*. Alternatively, Plaintiffs could have sought from the Court an order requiring the *registries* to set status codes preventing the domains from expiring—a solution which the parties discussed, and

which Namecheap informed Plaintiffs it did not oppose. Instead, Plaintiffs waited until domains expired, and then filed this Motion unfairly blaming Namecheap.

Plaintiffs demand that Namecheap pay the fees to renew the disputed domains. However, Namecheap does not assert an ownership interest in the domains. Plaintiffs, on the other hand, are the ones claiming ownership of the domains and/or the right to prevent their use by others, so it is only fair that they should pay for the renewal fees. Again, this is an accepted practice in UDRP proceedings by the party seeking to own or prevent use of the disputed domain, as Plaintiffs are doing here. *See* Klein Decl., ¶ 7. Mr. Steele is very familiar with this procedure since his firm already has an account with Namecheap that it uses to pay renewal fees for his clients for domains involved in other legal disputes. *Id.* at ¶ 8. Certainly, he can do the same for Plaintiffs here.

Further, the cost to renew each expiring domain for one year is minimal, about $12.98 for a ".com" domain. Klein Decl., ¶ 15. However, the cost to renew over 1,000 domains would be over $12,980. This is not a small price for Namecheap to bear as an unintended consequence for voluntarily lodging ***its customers***' disputed domains with the Court (domains over which Namecheap has no ownership interest) based upon Plaintiffs' thin accusations, and would be a punishment for being unable to prevent expiration, something that it lacked the administrative power to do in the first place. Such a result would be unjust.

Finally, Plaintiffs make much of the fact that Namecheap certified that by placing the domains under registrar lock, they would not be transferred and would be within the dominion and control of the Court, and assert that the fact that domains have expired or will be expiring means that Namecheap "allowed" this to happen and deceived the Court. But Namecheap cannot prevent something that it has no control over. Again, the power to set those codes preventing expiration or deletion lie with the registries, not with Namecheap. The certifications made by Namecheap were as to what it could control i.e., the registrar lock which would prevent the disputed domains from being "transferred, modified, or otherwise managed or manipulated" *by its customers*. Klein Decl., ¶ 6. Those domains were within the Court's dominion, but only during the period which Namecheap had the ability to keep it

within the Court's dominion (*i.e.*, up until expiration), not until the end of time. *Id*.

Therefore, Namecheap is not at fault for the lodged domains expiring, and it should not be forced to pay the fees to renew the disputed domains when it does not claim an ownership interest in the domains. Certainly, Plaintiffs point to no caselaw, statute, or administrative practice that supports imposing these fees on Namecheap.

### D. Plaintiffs Represented to Namecheap That the Domains Identified in Its Letters Were at Issue in This Action

The first Registrar's Certificate lodged with Court was based on over 1,000 domains identified by Plaintiffs throughout their FAC *as well as* Plaintiffs letters identifying allegedly infringing domains. The second Registrar's Certificate was lodged after receiving Plaintiffs' February 9, 2021 identifying an additional 365 domains.

Plaintiffs accuse Namecheap of being overinclusive with the domains listed in its Registrar's Certificates and claim that the only domains at issue in this action are those identified in the FAC. But the FAC included domains from many of Plaintiffs' letters sent between the ruling on the Motion to Dismiss and the filing of the FAC. *See* Doc. 56. at Exhs. 9, 11, 13, 15, 18, 19, 21, 23. Further, in a proposed stipulation sent to Defendants on February 25, 2021, Mr. Steele and Plaintiffs represented that the domains listed in Plaintiffs' letters from sent after the filing of the FAC were in fact also "at issue in this case." *See* Rome Decl., ¶ 10, Exh. F. Therefore, based upon Plaintiffs' actions and representations, Namecheap had no reason to believe that the disputed domains identified in Plaintiffs' letters were *not* at issue and should be excluded from the Registrar's Certificate. The record establishes the evident gamesmanship engaged in by Plaintiffs and their counsel here.

Plaintiffs and Mr. Steele only changed course when they realized that some of the domains listed in their letters were subject to pending UDRP actions, and that the lodging of these domains prevented them from being transferred to Plaintiffs after resolution of the UDRP actions. That these domains were lodged with the Court in the first place is the result of Plaintiffs' and Mr. Steele's own blunder in failing to communicate with Plaintiffs' UDRP counsel before sending the letters to Namecheap. In effect, Namecheap is placed in the

middle of competing expectations by Plaintiffs' own two separate sets of attorneys, Tucker Ellis and Hogan Lovells. Rather than cooperate between themselves, these two firms are abusing the situation to fault Namecheap for their own errors.

Still, Namecheap tried to assist Plaintiffs to resolve this situation amicably. Namecheap's counsel suggested a stipulation to transfer those domains that were the subject of the UDRP decisions. Rather than respond to that suggestion and resolve this issue at minimal cost to everyone, Mr. Steele chose instead to try and cover his own errors by asserting Namecheap acted from improper motives to impede resolution of UDRP administrative actions to which Namecheap is not a party. Plaintiffs' frivolous Motion subjects all parties to unnecessary attorney fees and wasted this Court's time.

Namecheap should not have to be forced to guess which of the domains identified by Plaintiffs may or may not be at issue in this litigation, as it apparently seems to be a moving target. If Plaintiffs want Namecheap to lodge a corrected Registrar's Certificate with the Court they should provide the full list to Namecheap, along with an attestation that no other domains are not subject to the dispute.[9] [10]

Plaintiffs' request for their fees and costs in connection with the Motion should be denied, given that there was no good reason to bring this Motion in the first place. As noted above, Namecheap has already verified to Plaintiffs well before the Motion was filed that the specific status codes requested were set. Rome Decl., ¶ 13, Exh. H. Rather, Plaintiffs and their counsel should be required to pay Namecheap's fees and costs in having to oppose their frivolous Motion as discussed below in Section III.F.

---

[9] Further, with respect to the status codes to be set by the registry operators for each of the lodged domain names, Namecheap has already told Plaintiffs and Mr. Steele that it does not object to Plaintiffs requesting the registries to set those status codes. *See id*. at ¶ 11, Exh. G.

[10] Plaintiffs claim that Namecheap made "matters worse" by setting the "clientRenewProhibited" status code for the lodged domains. **But this was a code Mr. Steele and Plaintiffs requested that Namecheap apply**, and Namecheap complied with that request.  *See* Rome Decl., ¶ 10, Exh. E.

### E. Plaintiffs' Request for Unrestricted Access to Namecheap's WHOIS Records Is a Gross Overreach and an Invasion of Privacy Rights

As part of their requested relief, Plaintiffs seek unfettered access to Namecheap's private WHOIS database so that they may "query" the database to ensure compliance with the Court's Order moving forward. The database contains the non-public, personal information of the majority of Namecheap's customers. Plaintiffs seek access to information even outside the domains at issue in this litigation, which would violate the privacy of millions of Namecheap customers.[11]

This request is without legal or factual justification. Again, Plaintiffs' Motion stems from (1) Namecheap's *voluntary* lodging of Registrar's Certificates as a sign of good faith that it does not have an ownership interest in the domains; (2) false accusations from Plaintiffs and Mr. Steele that Namecheap has transferred or is planning to transfer the lodged domains in violation of its certification to the Court; (3) the expiration of the lodged domains that Namecheap could not prevent, and for which Namecheap proffered alternative procedures for Plaintiffs to keep the domains from expiring; and (4) the "over-inclusion" of domain names to the Registrar's Certificates as a result of Plaintiffs' and Mr. Steele's letters identifying infringing domains. There is no factual or legal basis warranting unfettered access to Namecheap's WHOIS database. The relief is also unnecessary, as public WHOIS records to which Plaintiffs already have access contain information such as expiration dates, status codes, and registry information.[12]

### F. Plaintiffs and Their Counsel Should Be Sanctioned Under 28 U.S.C. § 1927 or the Court's Inherent Powers for Bringing the Motion

Under 28 U.S.C. § 1927, any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess

---

[11] This request for relief is of grave concern for Namecheap as Facebook has an ongoing problem of keeping its own customers' private information secure. *See*, *e.g.*, https://www.cnn.com/2021/04/04/tech/facebook-user-info-leaked/index.html.

[12] Moreover, Namecheap already voluntarily provided records confirming that the requested codes had been set in spreadsheet form as requested by Plaintiffs, for their convenience.

costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Section 1927 provides a district court with authority "to hold attorneys personally liable for excessive costs for unreasonably multiplying proceedings." *Gadda v. Ashcroft*, 377 F.3d 934, 943 n.4 (9th Cir. 2004). "Sanctions pursuant to section 1927 must be supported by a finding of subjective bad faith." *New Alaska Dev. Corp. v. Guetschow*, 869 F.2d 1298, 1306 (9th Cir. 1989). "Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument or argues a meritorious claim for the purpose of harassing an opponent." *Id*. (citation omitted). "Tactics undertaken with the intent to increase expenses, or delay, may also support a finding of bad faith." *Id*. (citations omitted). Indeed, "[e]ven if an attorney's arguments are meritorious, his conduct may be sanctionable if in bad faith." *Id*. (citation omitted).

A district court also has the inherent power to sanction a losing party who "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, delaying or disrupting litigation, or has taken actions in the litigation for an improper purpose." *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001). Under a court's inherent power, "a court 'certainly may assess [sanctions] against counsel who willfully abuse judicial processes.'" *Id*. at 991 (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980)). "Before awarding sanctions under its inherent powers, however, the court must make an explicit finding that counsel's conduct 'constituted or was tantamount to bad faith.'" *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997) (citation omitted).

Here, there is no question that Plaintiffs and their counsel have acted in bad faith in bringing Plaintiffs' Motion to Enforce.

***First***, Mr. Steele led Namecheap to believe up until the filing of this Motion that the domains identified in Plaintiffs letters did not need to be excluded from the Registrar's Certificates and were "at issue" in this case. Mr. Steele only became aware that some of the domains in the Registrar's Certificates were the subject of UDRP actions when Mr. Rome wrote to both WhatsApp's UDRP counsel and Mr. Steele and proposed an amicable solution via stipulation to transfer the two domains subject to the resolved UDRP actions to

15

WhatsApp. Realizing that his overzealousness in including these domains in his letters led to Plaintiffs' inability to have the domains transferred after prevailing in UDRP actions, Mr. Steele chose to cover up his blunder by bringing Plaintiffs' Motion (rather than enter into a stipulation) and accuse Namecheap of purposefully being overinclusive in its Registrar's Certificates. That this Motion is harassing, unnecessary, and brought in bad faith is only underscored by the fact that Mr. Steele told Mr. Rome that Plaintiff will stipulate to the transfer of the lodged domains subject to the UDRP proceedings ***only if*** the Court denies the Motion. *See* Rome Decl., Exh. J. In short, he brought a Motion seeking the same result he would have received by executing a stipulation. [13]

*__Second__*, in his declaration Mr. Steele made a knowing misrepresentation to the Court that Namecheap intends to transfer the lodged domains in contradiction of its certification to the Court. Steele Decl., ¶ 8, *compared with* Exh. 6 attached thereto. Plaintiffs repeated Mr. Steele's misrepresentation in their Motion, which is signed by their local counsel, Jacob Jones. *See* Mot. at 6:7-12. Even if Plaintiffs' counsel believed this to be true based on a press release by Namecheap that it was switching its privacy service from WhoisGuard to WFP,[14] they only needed to inquire with Namecheap *instead* of or before bringing the Motion. Further, Mr. Steele is clearly very familiar with the information available in public WHOIS records for domains since he has attached many such records as exhibits to his declaration in support of the Motion. *See* Steele Decl., Exhs 2-5. Therefore, he knows full well that the records for the lodged domains still show WhoisGuard as the registrant. *See e.g.* Rome Decl., ¶ 19, Exh. K.

*__Third__*, Namecheap informed Mr. Steele and Plaintiffs at least twice that Plaintiffs would need to open an account and deposit renewal fees to keep the locked domains from

---

[13] Indeed, Mr. Steele and Mr. Rome could have even entered into a stipulation to transfer all the domains subject to administrative proceedings, rather than file an unnecessary Motion with the Court to obtain the same outcome.

[14] Mr. Steele has a deep understanding of domain principles, practicing and teaching domain law for the better part of the last two decades, so he is fully aware that ownership of domains cannot be transferred to a privacy service. *See* Rome Decl., ¶ 20, Exh. L.

16

expiring, as one would do in a UDRP action. Mr. Steele is aware that Namecheap cannot otherwise prevent the domains from expiring, and is familiar with this procedure as he employed it himself many times on behalf of his clients; his firm even has an account open with Namecheap for the very purpose of paying renewal fees for domains involved in legal disputes. Mr. Steele and Plaintiffs' response was to ignore Namecheap's warnings and proposed solution, wait until a number of domains expired, and then bring Plaintiffs' Motion accusing Namecheap of not preventing the domains' expiration, even though this was outside Namecheap's control.

Mr. Steele's apparent purpose for making misrepresentations to the Court and accusing Namecheap of acting in contradiction of its voluntary certification is to paint Namecheap as a party whose word cannot be trusted. Plaintiffs' Motion was misleading, based on misrepresentations and mischaracterizations of the facts, and partly a result of Mr. Steele's and Plaintiffs' own actions. Moreover, the Motion was frivolous and unnecessary and was brought for improper purposes—to harass Namecheap and to seek an unprecedented Order that would be a serious invasion of privacy rights. Indeed, Plaintiffs do not cite to and cannot cite to any legal authority that would support such extraordinary relief given these circumstances.

As such, the Court should sanction Plaintiffs, Mr. Steele and Mr. Jones, and their respective law firms jointly under 28 U.S.C. § 1927 or pursuant to its inherent authority for bringing this frivolous Motion. While Mr. Steele is the attorney primarily responsible, sanctions should also be imposed upon Mr. Jones also bears responsibility as the attorney who signed the Motion. Imposing sanctions would both compensate Namecheap for the fees and costs incurred due to such abusive tactics, as well as deter such conduct going forward.

**IV.    CONCLUSION**

For all of the foregoing reasons, the Court should deny Plaintiffs' Motion in its entirety, and impose sanctions against Plaintiffs, Mr. Steele, Mr. Jones, and/or their respective law firms, Tucker Ellis LLP and Snell & Wilmer LLP, for bringing an unnecessary and frivolous Motion in bad faith.

DATED: April 6, 2021 **ROME & ASSOCIATES, A.P.C.**

By: *s/ Eugene Rome*
    Eugene Rome
    Sridavi Ganesan
    Brianna Dahlberg

**FENNEMORE CRAIG, P.C.**

By: *s/ Ray K. Harris*
    Ray K. Harris
    Mario C. Vasta

Attorneys for Defendant Namecheap, Inc. and Defendant/Counterclaimant Whoisguard, Inc.