EXHIBIT 1

SNELL & WILMER L.L.P.
David G. Barker (#024657)
dbarker@swlaw.com
Jacob C. Jones (#029971)
jcjones@swlaw.com
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070

TUCKER ELLIS LLP
David J. Steele (*pro hac vice*)
david.steele@tuckerellis.com
Howard A. Kroll (*pro hac vice*)
howard.kroll@tuckerellis.com
Steven E. Lauridsen (*pro hac vice*)
steven.lauridsen@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223
Telephone: (213) 430-3400
Facsimile: (213) 430-3409

Attorneys for Plaintiffs,
Facebook, Inc., Instagram, LLC and
WhatsApp Inc.

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Facebook, Inc., a Delaware corporation; Instagram, LLC, a Delaware limited liability company; and WhatsApp Inc., a Delaware corporation, | Case No. CV-20-470-PHX-GMS |
| Plaintiffs, | **PLAINTIFFS' MANDATORY INITIAL DISCOVERY RESPONSES** |
| v. | |
| Namecheap, Inc., a Delaware corporation, and Whoisguard, Inc., a Republic of Panama corporation, | |
| Defendants. | |
| And Related Counterclaim. | |

*TUCKER ELLIS LLP*
Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

**INITIAL DISCOVERY REQUEST NO. 1**

State the names and, if known, the addresses and telephone numbers of all persons who you believe are likely to have discoverable information relevant to any party's claims or defenses, and provide a fair description of the nature of the information each such person is believed to possess.

**RESPONSE TO INITIAL DISCOVERY REQUEST NO. 1:**

Plaintiffs disclose the following persons who they believe are likely to have discoverable information relevant to any party's claims or defenses.

1.      Corporate Representative of Facebook, Inc. ("Facebook"), to be contacted solely through counsel of record for Plaintiffs (Facebook's trademark and service mark rights, including the registration of its trademarks and service marks as well as the fame of Facebook's marks; the notices of reasonable evidence of actionable harm Facebook sent to Defendants; Defendants' failure to respond to those notices; Defendants' infringing conduct; Defendants' false designation of origin; Defendants' cybersquatting, including the registration, trafficking in, and use of the domain names at issue in this action; Defendants' dilution of the Facebook marks; and the harm done to Facebook by the use of, registration of, and trafficking in the domain names at issue in this action, including the harm resulting from the ensuing trademark infringement, false designation of origin, dilution, and cybersquatting).

2.      Corporate Representative of Instagram, LLC ("Instagram"), to be contacted solely through counsel of record for Plaintiffs (Instagram's trademark and service mark rights, including the registration of its trademarks and service marks as well as the fame of Instagram's marks; the notices of reasonable evidence of actionable harm Instagram sent to Defendants; Defendants' failure to respond to those notices; Defendants' infringing conduct; Defendants' false designation of origin; Defendants' cybersquatting, including the registration, trafficking in, and use of the domain names at issue in this action; Defendants' dilution of the Instagram marks; and the harm done to Instagram by the use of, registration of, and trafficking in the domain names at issue in this action,

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

including the harm resulting from the ensuing trademark infringement, false designation of origin, dilution, and cybersquatting).

3.    Corporate Representative of WhatsApp Inc. ("WhatsApp"), to be contacted solely through counsel of record for Plaintiffs (WhatsApp's trademark and service mark rights, including the registration of its trademarks and service marks; the notices of reasonable evidence of actionable harm WhatsApp sent to Defendants; Defendants' failure to respond to those notices; Defendants' infringing conduct; Defendants' false designation of origin; Defendants' cybersquatting, including the registration, trafficking in, and use of the domain names at issue in this action; and the harm done to WhatsApp by the use of, registration of, and trafficking in the domain names at issue in this action, including the harm resulting from the ensuing trademark infringement, false designation of origin, and cybersquatting).

4.    Corporate Representative of Namecheap, Inc. ("Namecheap") (Defendants' infringing conduct; Defendants' false designation of origin; Defendants' cybersquatting; Defendants' dilution of the Facebook marks and Instagram marks; Defendants' selection of, registration of, trafficking in, use of, and deletion of domain names; notices of infringement, cybersquatting, or reasonable evidence of actionable harm sent to Defendants (including, but not limited to, those sent by Plaintiffs), including the receipt of those notices and Defendants' failure to respond; Defendants' bad faith intent to profit, including their history of cybersquatting; Defendants' use of aliases and/or false identities; Defendants' failure to comply with all applicable policies or contracts as required by Internet Corporation for Assigned Names and Numbers ("ICANN"); Namecheap's direct participation in the activities of Whoisguard Service Co., Limited ("Whoisguard"); evidence that Defendants are alter egos and instrumentalities of one another, including financial and corporate records; Whoisguard's activities in the United States and in Arizona, including any activities that would form the basis for personal jurisdiction before this Court; and Defendants' profits from their illegal activity).

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

5.     Corporate Representative of Whoisguard (Defendants' infringing conduct; Defendants' false designation of origin; Defendants' cybersquatting; Defendants' dilution of the Facebook marks and Instagram marks; Defendants' selection of, registration of, trafficking in, use of, and deletion of domain names; notices of infringement, cybersquatting, or reasonable evidence of actionable harm sent to Defendants (including, but not limited to, those sent by Plaintiffs), including the receipt of those notices and Defendants' failure to respond; Defendants' bad faith intent to profit, including their history of cybersquatting; Defendants' use of aliases and/or false identities; Defendants' failure to comply with all applicable policies or contracts as required by ICANN; Namecheap's direct participation in the activities of Whoisguard; evidence that Defendants are alter egos and instrumentalities of one another, including financial and corporate records; Whoisguard's activities in the United States and in Arizona, including any activities that would form the basis for personal jurisdiction before this Court; and Defendants' profits from their illegal activity).

6.     Vernon Emmanuel Salazar Zurita, Director of Barrowgate International, Inc., which is the President of Whoisguard (Defendants' infringing conduct; Defendants' false designation of origin; Defendants' cybersquatting; Defendants' dilution of the Facebook marks and Instagram marks; Defendants' selection of, registration of, trafficking in, use of, and deletion of domain names; notices of infringement, cybersquatting, or reasonable evidence of actionable harm sent to Defendants (including, but not limited to, those sent by Plaintiffs), including the receipt of those notices and Defendants' failure to respond; Defendants' bad faith intent to profit, including their history of cybersquatting; Defendants' use of aliases and/or false identities; Defendants' failure to comply with all applicable policies or contracts as required by ICANN; Namecheap's direct participation in the activities of Whoisguard; evidence that Defendants are alter egos and instrumentalities of one another; Whoisguard's activities in the United States and in Arizona, including any activities that would form the basis for

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

personal jurisdiction before this Court;  Defendants' profits from their illegal activity; and

providing services as a mail drop for shell companies).

7.    Corporate representative of Barrowgate International, Inc., which is the

President of Whoisguard (Defendants' infringing conduct; Defendants' false designation

of origin; Defendants' cybersquatting; Defendants' dilution of the Facebook marks and

Instagram marks; Defendants' selection of, registration of, trafficking in, use of, and

deletion of domain names; notices of infringement, cybersquatting, or reasonable

evidence of actionable harm sent to Defendants (including, but not limited to, those sent

by Plaintiffs), including the receipt of those notices and Defendants' failure to respond;

Defendants' bad faith intent to profit, including their history of cybersquatting;

Defendants' use of aliases and/or false identities; Defendants' failure to comply with all

applicable policies or contracts as required by ICANN; Namecheap's direct participation

in the activities of Whoisguard; evidence that Defendants are alter egos and

instrumentalities of one another; Whoisguard's activities in the United States and in

Arizona, including any activities that would form the basis for personal jurisdiction before

this Court; Defendants' profits from their illegal activity; and providing services as a mail

drop for shell companies).

8.    Person(s) at ICANN, 12025 Waterfront Drive Suite 300, Los Angeles,

California 90094-2536 (Defendants' selection of, registration of, trafficking in, use of, and

deletion of domain names; Defendants' compliance with, or violation of, ICANN

policies; notices of domain name abuse; notices of reasonable evidence of actionable harm

sent to Defendants, ICANN policies for domain name registration).

9.    Corporate Representative of Team Internet AG d/b/a ParkingCrew,

Liebherrstr 22, 80538 Munich, Germany (Defendants' use of the domain names at issue

in this action, the financial benefit Defendants receive from certain of their uses).

**INITIAL DISCOVERY REQUEST NO. 2**

State the names and, if known, the addresses and telephone numbers of all persons

who you believe have given written or recorded statements relevant to any party's claims

or defenses.  Unless you assert a privilege or work product protection against disclosure under applicable law, attach a copy of each such statement if it is in your possession, custody, or control.  If not in your possession, custody, or control, state the name and, if known, the address and telephone number of each person who you believe has custody of a copy.

**RESPONSE TO INITIAL DISCOVERY REQUEST NO. 2**

Corporate representatives of Plaintiffs give statements that could potentially be relevant to the policy and other issues involved in this litigation, but Plaintiffs object to identifying every possible relevant statement as unduly burdensome and not proportional to the needs of the case and to the extent this request seeks information protected by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, immunity, and/or protection. Plaintiffs will supplement this response should they become aware of any non-privileged specific statement that is relevant to any party's claims or defenses. The following persons have given written or recorded statements relevant to any party's claims or defenses.

Christen Dubois, Director and Associate General Counsel, IP Litigation, provided a written statement titled "Protecting People from Domain Name Fraud on March 5, 2020 (accessible at: https://about.fb.com/news/2020/03/domain-name-lawsuit/. This statement is being produced with these responses.

Richard Kirkendall, CEO of Namecheap, provided a written statements titled "The Secret Fight For Your Personal Information" on June 18, 2020 (accessible at: https://www.namecheap.com/blog/the-secret-fight-for-your-personal-information),   and "European Center for Digital Rights Joins Privacy Fight" on December 3, 2020 (accessible   at:   https://www.namecheap.com/blog/european-center-for-digital-rights-joins-privacy-fight/). These statements are being produced with these responses.

**INITIAL DISCOVERY REQUEST NO.  3**

List the documents, electronically stored information ("ESI"), tangible things, land, or other property known by you to exist, whether or not in your possession, custody

or control, that you believe may be relevant to any party's claims or defenses. To the extent the volume of any such materials makes listing them individually impracticable, you may group similar documents or ESI into categories and describe the specific categories with particularity. Include in your response the names and, if known, the addresses and telephone numbers of the custodians of the documents, ESI, or tangible things, land, or other property that are not in your possession, custody, or control. For documents and tangible things in your possession, custody, or control, you may produce them with your response, or make them available for inspection on the date of the response, instead of listing them. Production of ESI will occur in accordance with paragraph C.2 in the MIDP Order.

**RESPONSE TO INITIAL DISCOVERY REQUEST NO. 3**

Plaintiffs object to the extent that producing all ESI is unduly burdensome and not proportional to the needs of the case and the extent it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, immunity, and/or protection. Plaintiffs disclose the following relevant categories of documents currently in their possession, custody, or control:

- Documents concerning Plaintiffs' trademark rights, including but not limited to, the enforcement of, and validity of, Plaintiffs' trademark rights.

- Documents concerning Defendants' alleged registration, trafficking in, and use of domain names, including those containing terms confusingly similar to Plaintiffs' trademarks and the trademarks of others;

- Documents concerning whether Defendants had a bad faith intent to profit, including Defendants' history of cybersquatting;

- Documents concerning whether Defendant Whoisguard is an alter ego of Defendant Namecheap and whether Namecheap is a direct participant in the actions of Whoisguard;

- Documents concerning notices of abuse or of reasonable evidence of actionable harm sent to Defendants (including those sent by Plaintiffs);

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

- Documents concerning Defendants' compliance, or lack thereof, with Plaintiffs' requests to identify the registrants of the domain names at issue, including Defendants' responses, or lack thereof, to Plaintiffs' notices of reasonable evidence of actionable harm;

- Documents concerning Defendants' compliance with applicable policies or contracts as required by ICANN;

- Documents concerning Defendant Whoisguard's activities in the United States and in Arizona, including any activities that would form the basis for this Court's personal jurisdiction over Whoisguard (in the possession of Defendants and third parties);

- Documents concerning any prior lawsuits against any Defendant or any of Defendants' customers or licensees (collectively, "Licensees") for cybersquatting as well as any UDRP complaints and decisions;

- Documents concerning Defendants' use of aliases and/or false identities;

- Documents concerning the identities of Defendants' customers or licensees (in the possession of Defendants and third parties); and

- Documents concerning Plaintiffs' damages, including its actual damages and Defendants' profits.

**INITIAL DISCOVERY REQUEST NO. 4**

For each of your claims or defenses, state the facts relevant to it and the legal theories upon which it is based.

**RESPONSE TO INITIAL DISCOVERY REQUEST NO. 4**

**I.    Cybersquatting on Plaintiffs' Trademarks Under 15 U.S.C. § 1125(d) in Violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA")**

**A. Relevant Facts**

Plaintiffs own numerous famous and/or distinctive trademarks, including FACEBOOK, FB, INSTAGRAM, and WHATSAPP (collectively, "Plaintiffs' Marks"). Plaintiffs seek to enforce the rights and protect the public from malicious domain names that are identical or confusingly similar to Plaintiffs' Marks, including all the domain

names in this action (the "Infringing Domain Names"). Plaintiffs are currently aware of well over 900 Infringing Domain Names including, but not limited to, facebeOk-login.com, faceboksecurity.com, lnstagrambusinesshelp.com, instagramlogin.org, whatapp.services, whatsappsex.club, that were unlawfully registered, trafficked in, or used by Defendants or their customers or licensees for unlawful activities. Many of these domain names are used in connection with phishing attacks, installing malware on consumers' computers, to steal Plaintiffs' users personal and financial information by deception, or to generate revenue through commercial parking pages or other unlawful commercial activity. Several examples include: facebo0k-login.com, faceb0ok-security-dept.com, facebokloginpage.site, faceooklogin.com, and m-faceebook.com.

Defendant Namecheap is an Internet Corporation for Assigned Names and Numbers ("ICANN") accredited domain name registrar. Whoisguard is a proxy service established by Namecheap and used exclusively by Namecheap's customers to hide their identity. As an ICANN-accredited domain name registrar, Namecheap is subject to ICANN's Registrar Accreditation Agreement ("RAA"). The RAA is a standard agreement required by ICANN describing the rules and policies governing all generic domain name registrations and the obligations applicable to registrants in order to create accountability for the registration and use of domain names. The RAA requires "Registered Name Holders to enter into an electronic or paper registration agreement with Registrar." The RAA also requires that the agreement between Registrars and Registered Name Holders (*i.e.*, the registrant) include language requiring registrants to accept liability for harm caused by a domain name licensee's wrongful use of the registrant's domain name unless the registrant promptly discloses the licensee's identity and contact information upon the registrant being provided with "reasonable evidence of actionable harm." Namecheap's registration agreement with its Registered Name Holders ("Namecheap Registration Agreement") includes these required terms. The Namecheap Registration Agreement does not include any limitation on third party beneficiaries.

Namecheap and Whoisguard entered into the Namecheap Registration Agreement for domain name registration services.

Defendants and/or their Licensees registered multiple domain names that infringe the trademark rights of third parties. In fact, Whoisguard has been a named respondent in complaints filed under ICANN's Uniform Domain Name Dispute Resolution Policy ("UDPR"), with the result that Whoisguard was forced to transfer the domain name to the owner of the mark being infringed. A search of UDRP complaints found over one thousand UDRP complaints filed against Whoisguard for cybersquatting, with the vast majority of these UDRP complaints decided against Whoisguard, resulting in the transfer of the domain name(s) to the trademark owner bringing the complaint. Whoisguard and has also been subject to default judgment in numerous ACPA complaints, in which the WhoisGuard proxy service was used to shield the identities of individuals or entities infringing the trademark rights of trademark owners. Similarly, Namecheap has been subject to default judgment in at least one ACPA complaint, in which the WhoisGuard proxy service was used to shield the identities of individuals or entities infringing the trademark rights of trademark owners. In addition to Whoisguard being the named respondent in numerous UDRP complaints, Whoisguard's Licensees have been the subject of numerous UDRP complaints.

Namecheap and Whoisguard also directly used some of the Infringing Domain Names to set up revenue-generating advertising "parking pages" that divert consumers away from Plaintiffs' legitimate websites. The Licensees have also used some of the Infringing Domain Names to host infringing websites as well as those that contain malicious content.

As the domain name registrant, Whoisguard is listed in the WHOIS record for domain names utilizing the WhoisGuard service, which uses a capital 'G' to distinguish itself from the Whoisguard entity. Upon registering each domain name that utilizes the WhoisGuard service, including all of the Infringing Domain Names, Whoisguard agreed under the Namecheap Registration Agreement to

accept liability for harm caused by wrongful use of the Registered Name, unless it discloses the current contact information provided by the licensee and the identity of the licensee within seven (7) days to a party providing [Whoisguard] reasonable evidence of actionable harm.

*See* Namecheap Registration Agreement.

Further, Whoisguard's Proxy Agreement provides, "[b]y subscribing to the Namecheap WHOIS Privacy Protection Services . . . you [the Licensee] are engaging Whoisguard to administer and register each domain name controlled by you . . . in the name of WhoisGuard." This language plainly shows that Whoisguard is the registrant of the domain names for which its services are used.

Because Whoisguard was listed as the registrant of the Infringing Domain Names in the ownership records (the WHOIS data), Whoisguard registered, and thus is the legal owner of, each of the infringing domain names. Whoisguard trafficked in the Infringing Domain Names because it licenses those domain names for use by its customers/Licensees.

Between October 2018 and February 2020, Plaintiffs' authorized representatives sent Whoisguard notices with reasonable evidence that the Infringing Domain Names caused Plaintiffs actionable harm and requested that Whoisguard disclose its customers' (aka the "Licensees") identities and contact information. After receiving these notices, Whoisguard failed to disclose the identity or contact information of any of the Licensee(s). In addition to this failure to disclose, Namecheap, Whoisguard, and their Licensees engaged in numerous acts that demonstrate bad faith intent to profit from using, registering, and trafficking in the Infringing Domain Names. Indeed, they continued to license and directly use the Infringing Domain Names, and continued to permit unlawful use, even after receiving Plaintiffs' notices of infringement. Because Defendants refuse to take steps to respond to domain name abuse or disclose the identities of Licensees when presented with reasonable evidence that Licensees are using Whoisguard's domain names to cause harm, Namecheap has become the world's most popular domain name registrar

for malicious actors. When Defendants do provide information related to the Infringing Domain Names some of the information was plainly false.

At all times material to this action, Whoisguard was the alter ego of Namecheap. All relevant acts of Whoisguard were undertaken in the scope of such relationship. In doing the acts and failing to act as Plaintiffs have alleged each Defendant acted with the knowledge, permission, and consent of the other Defendant, and each Defendant aided and abetted the other Defendant in the acts or omissions alleged in this First Amended Complaint. In addition, Namecheap is liable for the actions of Whoisguard under the theory of direct participant liability because Namecheap, in exercising complete control over all of Whoisguard's actions, was a direct participant in all of Whoisguard's actions, including those giving rise to liability in this case. This alter ego relationship and direct participation is shown by the following facts.

Previously, Namecheap provided its WhoisGuard proxy service to customers directly and under Namecheap's own name. At that time, when a customer used the WhoisGuard proxy service, Namecheap became the registered owner of the domain name and then licensed the domain name to the customer. As the registered owner of domain names registered through the WhoisGuard proxy service, Namecheap was listed as the registrant for the domain names in the public WHOIS database.

In a 2009 lawsuit, *Solid Host, NL, v. Namecheap, Inc.*, 652 F. Supp. 2d 1092,1103–05 (C.D. Cal. 2009) a federal court rejected Namecheap's argument that its actions in providing the WhoisGuard proxy service were immune from liability under the ACPA. The *Solid Host* court held that, "to the extent that NameCheap was the registrant of the domain name and 'used' the name, this section [of the ACPA] would support the imposition of liability on it, not a grant of immunity to it." As a result of this holding, Namecheap subsequently spun off the portion of its business that provides the WhoisGuard proxy service and began operating the service through a wholly-controlled Panamanian shell company it created for that purpose, namely, Whoisguard.

Namecheap continues to exercise complete control over the WhoisGuard proxy service, even though it is nominally provided by Whoisguard. Whoisguard does not exercise control over the WhoisGuard proxy service operated under its name. For example, in response to one of Plaintiffs' notices, Whoisguard stated that it "does not own, administer, host or provide registration services to the Domain, but simply provides anonymous privacy protection services to a domain registrant. We cannot remove any content, or links, from the website, provide the registrant contact information, or terminate the Privacy Protection as we do not have control over the service."

The fact that Whoisguard does not have any control over the WhoisGuard proxy service it nominally provides demonstrates that Namecheap exercises complete control and direction over Whoisguard's day-to-day business operations. Whoisguard was established by Namecheap for the sole purpose of providing a paper company that Namecheap can point to as providing the WhoisGuard proxy service.

Namecheap established WhoisGuard as a Panamanian shell company in an attempt by Namecheap to escape United States jurisdiction and ACPA liability for Namecheap's provision of the WhoisGuard proxy service, as contemplated in the *Solid Host* holding. No public information is available demonstrating Namecheap and Whoisguard engage in proper corporate formalities between each other. Namecheap's CEO has admitted that Namecheap itself, as the registrar, is also the proxy service that registers domain names on behalf of its customers, stating "Most services you will encounter are Whois proxy services. The proxy is the domain registrar (such as Namecheap.com) which registers the domain on your behalf."

Namecheap's CEO has also made public statements to customers referencing Namecheap and Whoisguard as interchangeable entities, acknowledging that Namecheap "set up" Whoisguard to replace customers' identifying information and that "when we do that we are exposed to all the legal issues that come with the territory, which costs quite a bit to defend. We spend millions of dollars per year safeguarding user information and not simply turning off whoisguard without a proper legal order."

Namecheap directly participates in the registration of domain names in Whoisguard's name by exercising complete control over Whoisguard's provision of the WhoisGuard proxy service. Namecheap, as a direct participant in Whoisguard's actions, receives notices from trademark holders of domain names that are registered by Whoisguard, as the registrant, that are causing actionable harm to the trademark holder. Namecheap, as a direct participant in Whoisguard's actions, decides whether Whoisguard will reveal customer information when presented with reasonable evidence of actionable harm. The WhoisGuard proxy service is integrated within Namecheap's own website, and Namecheap's customers obtain the WhoisGuard proxy service directly from their Namecheap user account.

When a Namecheap customer complained to Namecheap's CEO about having to manually add WhoisGuard to his cart when purchasing a domain name through Namecheap, Namecheap's CEO responded that this "is coming on our next iteration and Whoisguard will simply be a feature in the future." In fact, Namecheap refers to its WhoisGuard service as a feature of Namecheap's service in blog posts on Namecheap's website. Namecheap customers are enrolled in the WhoisGuard proxy service exclusively through Namecheap's website. Customers cannot access the WhoisGuard proxy service through Whoisguard's website, but only through the customer's Namecheap user account.

It is evident that Whoisguard has no control over who its customers are. Namecheap, not Whoisguard, decided that the WhoisGuard proxy service would simply be a feature of Namecheap. Namecheap does not charge its customers for the WhoisGuard proxy service. Namecheap simply provides Namecheap's WhoisGuard proxy service to its customers as a part of Namecheap's regular service. Namecheap, not Whoisguard, decided that WhoisGuard proxy service would be provided to customers for free. Namecheap's website explains that "WhoisGuard subscriptions can be used on domains registered with Namecheap only." Because the WhoisGuard proxy service is provided by Namecheap for free and is exclusive to Namecheap, Whoisguard is financially captive to Namecheap for its existence. In the past, when Whoisguard was served with reasonable

evidence of actionable harm and a request for Whoisguard's Licensees' information, Namecheap, instead of Whoisguard, provided the responsive information concerning the Whoisguard Licensee to the noticing party. Namecheap and Whoisguard now fail to disclose the responsive information to the noticing party.

When some customers have used Namecheap's free WhoisGuard proxy service, they had their contact email information changed to legal@namecheap.com. When administrative domain name complaints are filed against Whoisguard's Licensees using the WhoisGuard proxy service, Namecheap, instead of Whoisguard, discloses the name of Whoisguard's Licensees to the dispute provider's administrator. According to historic WHOIS information for whoisguard.com (Whoisguard's domain name), Namecheap owned the domain name in the past, and Namecheap was also listed as the technical contact. Today, the WHOIS information for whoisguard.com is hidden by the WhoisGuard proxy service.

In view of the facts above, observing the separate corporate form of Whoisguard from Namecheap would sanction a fraud and promote injustice. Whoisguard was created and operates solely to shield Namecheap from liability for Namecheap's provision of the WhoisGuard proxy service.

## B. Legal Theories

Cybersquatting

Namecheap and Whoisguard have continuously engaged in a scheme to attract cybersquatters to use their services to infringe others' trademarks through the fraudulent registrations of domain names used for malicious activity, including phishing, malware, spam, fraud, and trademark infringement. Namecheap is a direct participant in the actions of Whoisguard. Whoisguard is also Namecheap's alter ego and provides a proxy service known as "WhoisGuard" to Namecheap's customers. To provide this service, Whoisguard registers domain names in its own name and licenses them to Namecheap's Licensees. Namecheap sometimes uses domain names registered by Whoisguard under a license provided by its registration agreement, and therefore is also one of the Licensees.

To prove cybersquatting under the ACPA, a plaintiff must show that a "person" registered, trafficked in, or used a domain name that is identical or confusingly similar to a distinctive or famous mark (at the time the domain name was registered, trafficked in, or used) with bad faith intent to profit from the plaintiff's mark. 15 U.S.C. § 1125(d); *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2005).

Plaintiffs' Marks are distinctive. A registered trademark is presumed to be distinctive. *Zobmondo Entm't, Ltd. Liab. Co. v. Falls Media, Ltd. Liab. Co.*, 602 F.3d 1108, 1113-14 (9th Cir. 2010) ("Where the PTO issues a registration without requiring proof of secondary meaning, the presumption is that the mark is inherently distinctive."). Further, a certificate of registration constitutes "prima facie evidence of the validity of the trademark and of the facts stated in the certificate." 15 U.S.C. § 1057(b). As a result, Plaintiffs' registered trademarks are presumed valid and Defendants bear the burden of proving invalidity. *See Filipino Yellow Pages, Inc. v. Asian Journal Publs., Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999). In short, Plaintiffs' Marks are unique and distinctive and designate a single source of origin.

Further, the Facebook marks and Instagram marks are famous within the meaning of 15 U.S.C. § 1125(c)(2)(A) because they are widely recognized by the general consuming public of the United States as a designation of source.

Because Whoisguard was listed as the registrant of the Infringing Domain Names in the ownership records (the WHOIS data), and because Defendants' agreements and marketing documents make clear that Whoisguard is the registrant of the Infringing Domain Names, Whoisguard registered, and thus is the legal owner of, each of the Infringing Domain Names. Whoisguard trafficked in the Infringing Domain Names because it licenses those domain names for use by its customers/Licensees. The ACPA defines "traffics in" to refer to transactions that include, among other things, sales, licenses, and any other transfer for consideration. 15 U.S.C. § 1125(d)(1)(B)(i)(E). "Trafficking in" is a separate and distinct act that creates liability under the ACPA. *See Acad. of Motion Pictures Arts & Scis. v. GoDaddy.com, Inc.*, ("*AMPAS I*") No. CV 10-

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

3738 ABC (CWX), 2013 WL 12122689, at *6 (C.D. Cal. June 21, 2013) ("The ACPA imposes liability for `register[ing], traffic[king] in, or us[ing]' a domain name that is identical to or confusingly similar to a distinctive mark. 15 U.S.C. § 1125(d)(1)(A). The disjunctive 'or' shows that only one type of conduct is sufficient to establish liability.").

Each of the Infringing Domain Names incorporates one or more of Plaintiffs' Marks, either partially or in their entirety, and a simple comparison shows that they are either identical or confusingly similar. Courts have found the ACPA only requires a facial comparison of the domain names to the mark at issue rather than the more involved comparison in a traditional trademark likelihood of confusion analysis. *See, e.g.*, *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 783 (8th Cir. 2004) ("The inquiry under the ACPA is thus narrower than the traditional multifactor likelihood of confusion test for trademark infringement"). Further, domain names that merely append a generic word to a distinctive or famous mark, or that merely add or delete characters to a mark, are also confusingly similar to the mark upon which they prey. *DSPT Intern., Inc. v. Nahum*, 624 F.3d 1213, 1222 (9th Cir. 2010) (upholding jury verdict that "eq-Italy.com" is confusingly similar to EQ mark); *see also, e.g.*, *Harrods Ltd. v. Sixty Internet Domain Names*, 157 F. Supp. 2d 658, 667-78 (E.D. Va. 2001), aff'd in part, rev'd in part, 302 F.3d 214 (4th Cir. 2002) (domain names adding descriptive or generic terms like "bank," "financial," and "shopping" to the mark HARRODS held confusingly similar); *see also* 145 Cong. Rec. S10513, S10515 (daily ed. Aug. 5, 1999) (citing "attphonecard.com" and "attcallingcard.com" as examples of confusingly similar domain names during passage of the ACPA).

Namecheap also directly used some of the Infringing Domain Names to set up revenue-generating advertising "parking pages" that divert consumers away from Plaintiffs' legitimate websites. This constitutes a use of the domain names within the meaning of the ACPA and is also outside of the registrar's safe harbor for registrar activities. *AMPUS I*, 2013 WL 12122689, at *6-7. In addition to using some of the Infringing Domain Names to set up parking pages, Namecheap registered as the registrant

at least eighty-two of the Infringing Domain Names. For some of those domain names that Namecheap registered, it assumed the registration (and thus became the registrant) after its customers did not renew the registration but before the domain name was removed by the registry operator. Namecheap licensed at least some of these domain names to its Licensees.

Next, the ACPA bad faith factors all favor a finding of cybersquatting. *See* 15 U.S.C. § 1125(d)(1)(B)(i) (enumerating factors to be considered in determining bad faith); *see also Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 498 (2d Cir. 2000) (courts are not limited to these listed factors in making a determination of a bad faith intent). None of the Infringing Domain Names is the name of any Defendant, and, because the Domain Names are being used for unlawful activity, Defendants cannot claim that they are offering or have in the past offered *bona fide* goods or services in connection with the Infringing Domain Names as a matter of law. The malicious activity and parking pages on the sites accessible at the Infringing Domain Names also defeats any claims of fair use. It is well settled that misdirecting Internet traffic by using another party's mark is unlawful. *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1059 (9th Cir. 1999); *see also Shields v. Zuccarini*, 254 F.3d 476, 484 (3d Cir. 2001) ("Cybersquatters often register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site, many of which are pornography sites that derive advertising revenue based on the number of visits, of 'hits,' the site receives.").

Whoisguard and Namecheap have shown their intent to divert Plaintiffs' customers to the Infringing Domain Names because they profit from providing their proxy service to the licensees of the domain names and from providing parking pages for those domain names. As a result, Defendants profit from hiding the identity of bad actors as part of a scheme to provide a haven for cybercriminals. In furtherance of this scheme, Defendants also provided false and misleading contact information when questioned about the provision of WhoisGuard service (stating that Whoisguard is not the registrant

of the Infringing Domain Names), which is another factor pointing toward bad faith. Further, Defendants and/or their Licensees registered multiple domain names that infringe the trademark rights of third parties. In fact, Whoisguard has been a named respondent in UDPR complaints, with the result that Whoisguard was forced to transfer the domain name to the owner of the mark being infringed. A search of UDRP complaints found over one thousand UDRP complaints filed against Whoisguard for cybersquatting, with the vast majority of these UDRP complaints decided against Whoisguard, resulting in the transfer of the domain name(s) to the trademark owner bringing the complaint. Whoisguard has also been subject to default judgments in numerous United States District Court actions for violations of the ACPA, in which the WhoisGuard proxy service was used to shield the identities of individuals or entities infringing the trademark rights of trademark owners. In addition to Whoisguard being the named respondent in numerous UDRP complaints, Whoisguard's Licensees have been the subject of numerous UDRP complaints. Finally, Namecheap and Whoisguard have been repeatedly identified in industry reports as a haven for cybercriminals, and Namecheap is one of the top ranked registrars for abusive domain names. All of these facts point toward a finding of bad faith and thus violations of the ACPA.

Finally, bad faith intent giving rise to ACPA liability can arise after registration. Several of the bad faith statutory factors necessarily look to post- registration conduct. *See* 15 U.S.C. §§ 1125(d)(1)(B)(i)(III), (IV), (VI), (VII). And case law expressly holds that a party can be liable under the ACPA when bad faith intent arises after registration. *E.g.*, *DSPT Intern., Inc. v. Nahum*, 624 F.3d 1213, 1219 (9th Cir. 2010).

<u>Liability Shifting Under Section 3.7.7.3 of the RAA</u>

In addition, under the ICANN mandated language in the Namecheap Registration Agreement, Defendants have accepted liability for the harm caused by the wrongful use of the Infringing Domain Names because they failed to disclose the contact information of their customers in response to Plaintiffs' notices of infringement. In particular, per the terms of this agreement, Whoisguard, as the registrant of the Infringing Domain Names,

was required to provide the identity and contact information of its Licensees within seven days of receiving from Plaintiffs notices containing "reasonable evidence of actionable harm." Plaintiffs sent such notices for each of the Infringing Domain Names, but Whoisguard failed to provide the required information. Thus, per the terms of the Namecheap Registration Agreement, which incorporates Section 3.7.7.3 of the RAA, Whoisguard has accepted liability for all harm caused by the Infringing Domain Names.

<u>Alter Ego and Direct Participant</u>

In federal question cases, courts apply federal common law on alter ego, which borrows from state law. *See McGeachy v. Pinto Valley Mining Corp.*, No. 2:16-CV-03348 JWS, 2017 WL 3130639, at *4 (D. Ariz. July 24, 2017) (citing *Johnson v. Transportation, Inc.*, 141 F. Supp. 3d 974, 984 n.1 (N.D. Cal. 2015)). To state a claim under an alter ego theory, a plaintiff "must make out a prima facie case '(1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice.'" *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015) (alteration marks in original omitted). Arizona applies a similar alter ego standard. *See e.g.*, *Gatecliff v. Great Republic Life Ins. Co.*, 821 P.2d 725, 728 (Ariz. 1991) ("plaintiffs must prove both (1) unity of control and (2) that observance of the corporate form would sanction a fraud or injustice").

As discussed in the fact section above, numerous facts indicate that there is a unity of interest between Namecheap and Whoisguard and that Namecheap completely controls the operations of its shell company, Whoisguard. Given that Namecheap has essentially admitted that it created Whoisguard to shield it from liability stemming from its unlawful scheme to provide a haven for cybercriminals, the requisite bad faith is present to show that a fraud or injustice would occur if Namecheap and Whoisguard are treated as separate entities. This is particularly true because, as a shell company, Whoisguard does not have the assets to satisfy any judgment, for Whoisguard only provides its services to Namecheap and does so for free, meaning Whoisguard does not have any assets. Observance of separate identities may result in fraud or injustice when doing so would

deny recovery to a plaintiff. *See Gatecliff*, 821 P. 2d at 729. Thus, Namecheap is as liable as Whoisguard for the unlawful conduct discussed above.

Finally, because Whoisguard is a subsidiary of and is completely controlled by Namecheap, it is the direct participant in Whoisguard's unlawful acts and is therefore liable for this reason as well. "[A] significant body of case law supports the direct participant theory of liability." *Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227, 233-34 (Ill. 2007) (collecting state and federal cases); *see also Allen v. Amer. Cap. Ltd.*, 287 F. Supp. 3d 763, 806 (D. Ariz. 2017) ("A parent company can be liable for a subsidiary's acts where the parent directly participates [in] and directs the subsidiary's harmful activities."). Under this theory, a "parent corporation may be held liable for the wrongdoing of a subsidiary where the parent directly participated in the subsidiary's unlawful actions." *Esmark, Inc. v. Nat'l Labor Relations Bd.*, 887 F.2d 739, 756 (7th Cir. 1989); *Cher v. Forum Int'l, Ltd.*, 692 F.2d 634, 640 (9th Cir. 1982) (finding parent liable for actions of subsidiary where parent owned 80% of subsidiary's stock and participated in tortious conduct).

## II.  Trademark and Service Mark Infringement of Plaintiffs' Trademarks Under 15 U.S.C. § 1114

### A.  Relevant Facts

*See* Section I.A., above.

### B.  Legal Theories

To prevail on a claim of trademark infringement, a plaintiff must prove it holds a protectable mark and that the alleged infringer's use is likely to cause consumer confusion. *Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006); 15 U.S.C. §§ 1114, 1125.[1] A certificate of registration constitutes "prima

---

[1] Whereas 15 U.S.C. § 1114(1) provides protection only to registered marks, 15 U.S.C. § 1125(a) protects against infringement of unregistered marks as well as registered marks. *See, e.g.*, *Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1046 (9th Cir. 1998). "Despite these differences, the analysis under the two provisions is

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

facie evidence of the validity of the trademark and of the facts stated in the certificate." 15 U.S.C. § 1057(b). As a result, Plaintiff's registered service mark is presumed valid, and Defendants bear the burden of proving invalidity. *See Filipino Yellow Pages, Inc. v. Asian Journal Publs., Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999). To determine whether a defendant's use of a mark causes a likelihood of confusion, courts within the Ninth Circuit apply the *Sleekcraft* factors. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-349 (9th Cir. 1979); *Brookfield*, 174 F.3d at 1053; *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1141 (C.D. Cal. 1998), *aff'd*, 296 F.3d 894 (9th Cir. 2002).

In *Sleekcraft*, the Ninth Circuit provided a non-exhaustive list of factors that are relevant in "determining whether confusion between related goods or services is likely: (1) strength of the mark, (2) proximity or relatedness of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) type of goods and the degree of care likely to be exercised by the purchaser, (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of the product lines or services." *Sleekcraft*, 599 F.2d at 341; *Playboy Enters., Inc. v. Netscape Communs. Corp.*, 354 F.3d 1020, 1026 (9th Cir. 2004). However, not all of the *Sleekcraft* factors have equal weight, and not every factor will be at issue in every case. *See Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002). Each of the relevant *Sleekcraft* factors favors a finding of infringement. For instance, Plaintiffs' Marks are extremely strong and are adopted in whole or in part in the Infringing Domain Names. Finally, Defendants acted with intent to trade off the goodwill of Plaintiffs' Marks. *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1111 (9th Cir. 1999) ("Adopting a designation with knowledge of its trademark status permits a presumption of intent to deceive."). Because the relevant *Sleekcraft* factors favor a likelihood of confusion, Defendants have infringed Plaintiffs' Marks.

---

oftentimes identical." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999). Such is the case here.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

### III. Trademark and Service Mark Infringement of Plaintiffs' Trademarks and False Designation of Origin Under 15 U.S.C. § 1125(a)

#### A. Relevant Facts

*See* Section I.A., above.

#### B. Legal Theories

*See* Section II.B., above.

### IV. Dilution of the Facebook Trademarks and Instagram Trademarks Under 15 U.S.C. § 1125(c)

#### A. Relevant Facts

*See* Section I.A., above.

#### B. Legal Theories

Plaintiffs own famous marks that are distinctive, inherently or through acquired distinctiveness; and Defendants have engaged in "dilution by blurring" after the marks have become famous; or Defendants have engaged in "dilution by tarnishment" after the marks have become famous. 15 U.S.C. § 1125(c)(1)-(2). "[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A).

To determine fame, the courts may consider all relevant factors, including:

(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A)(i)-(iv).

Dilution by blurring "is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15

U.S.C. § 1125(c)(2)(B).

To determine dilution by blurring, the Court should consider all relevant factors, including:

(i) The degree of similarity between the mark or trade name and the famous mark.

(ii) The degree of inherent or acquired distinctiveness of the famous mark.

(iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

(iv) The degree of recognition of the famous mark.

(v) Whether the user of the mark or trade name intended to create an association with the famous mark.

(vi) Any actual association between the mark or trade name and the famous mark. 15 U.S.C. § 1125(c)(2)(B)(i)-(vi).

Dilution by tarnishment "is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C).

As discussed above, the Facebook marks and Instagram marks are famous, as that term is used in 15 U.S.C. § 1125(c), and they were famous before Licensees' and Namecheap's use of them and variations of the trademarks in commerce. This fame is based on, among other things, the inherent distinctiveness and federal registration of each of the Facebook Trademarks and Instagram Trademarks as well as the extensive and exclusive worldwide use, advertising, promotion, and recognition of them. Namecheap's and its Licensees' use of the Facebook Trademarks and Instagram Trademarks, and variations thereof, in commerce is likely to cause dilution by blurring or dilution by tarnishment of these trademarks. Since Defendants did not timely and accurately disclose the current contact information provided by the Licensees and the identity of the Licensees in response to Plaintiffs' Notices, Defendants are liable for the harm to Plaintiffs caused by those Licensees' use of the Infringing Domain Names in violation of the Lanham Act.

**INITIAL DISCOVERY REQUEST NO. 5**

Provide a computation of each category of damages claimed by you, and a description of the documents or other evidentiary material on which it is based, including materials bearing on the nature and extent of the injuries suffered. You may produce the documents or other evidentiary materials with your response instead of describing them.

**RESPONSE TO DISCOVERY REQUEST NO. 5**

It is unknown at this time the full extent to which Plaintiffs have been damaged. For Defendants' alleged acts of cybersquatting, Plaintiffs may seek statutory damages in the amount of $100,000 per domain name pursuant to 15 U.S.C. § 1117(d). Plaintiffs note that Namecheap sought statutory damages and was awarded judgment of $50,000 per domain name against cybersquatters who registered domain names confusingly similar to Namecheap's own service mark. Plaintiffs also may seek, in an amount according to proof, either their actual damages or Defendants' profits, as well as the costs of this action, for Defendants' alleged trademark and service mark infringement, false designation of origin, and willful dilution pursuant to 15 U.S.C. §§ 1114(1), 1125(a), and 1125(c). Plaintiffs will seek to have these damages trebled pursuant to 15 U.S.C. § 1117(a). Plaintiffs will further seek permanent injunctive relief pursuant to 15 U.S.C. § 1116. Finally, Plaintiffs will seek their reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a).

Plaintiffs' damages are also the subject of expert opinion and testimony, so Plaintiffs will supplement their response when they make their expert disclosures. Documents supporting these damages contentions including Defendants' financial documents are expected to be produced by Defendants during discovery, and Plaintiffs will supplement this response once Defendants produce these documents.

**INITIAL DISCOVERY REQUEST NO. 6**

Specifically identify and describe any insurance or other agreement under which an insurance business or other person or entity may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse a party for payments made

by the party to satisfy the judgment. You may produce a copy of the agreement with your

response instead of describing it.

**RESPONSE TO DISCOVERY REQUEST NO. 6**

Plaintiffs are not currently aware of any insurance policy under which an insurance

business may be liable to satisfy all or part of a possible judgment against Plaintiffs in

this action or to indemnify or reimburse for payments made to satisfy such a judgment.


DATED: December 24, 2020                     Respectfully submitted,

                                             TUCKER ELLIS LLP

                                             By: */s/ David Steele*
                                             David J. Steele
                                             Howard A. Kroll
                                             Steven E. Lauridsen
                                             515 South Flower Street
                                             Forty-Second Floor
                                             Los Angeles, CA 90071-2223

                                             SNELL & WILMER L.L.P.

                                             David G. Barker
                                             Jacob C. Jones
                                             One Arizona Center
                                             400 E. Van Buren, Suite 1900
                                             Phoenix, Arizona 85004-2202


                                             Attorneys for Plaintiffs,
                                             FACEBOOK, INC., INSTAGRAM, LLC,
                                             and WHATSAPP INC.

## VERIFICATION

I, Andrew Stirk, declare as follows:

I have read **PLAINTIFFS' MANDATORY INITIAL DISCOVERY RESPONSES**, I know the contents of the Responses, and I am authorized to sign the Responses on behalf of Plaintiff Facebook Inc. The facts set forth in the Responses are true to the best of my knowledge, after a reasonable inquiry.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this _18TH_ day of December, 2020.


_____
ANDREW STIRK

27

**<u>VERIFICATION</u>**

I, Karina Newton, declare as follows:

I have read **PLAINTIFFS' MANDATORY INITIAL DISCOVERY RESPONSES**, I know the contents of the Responses, and I am authorized to sign the Responses on behalf of Plaintiff Instagram, LLC.  The facts set forth in the Responses are true to the best of my knowledge, after a reasonable inquiry.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this *22* day of December, 2020.

KARINA NEWTON