# Exhibit 12



Rome *&* Associates

2029 Century Park East, Suite 450     Phone: **310.282.0690**
Los Angeles, CA 90067             Fax:    **310.282.0691**

www.romeandassociates.com

Brianna Dahlberg
bdahlberg@romeandassociates.com
Cell: 818.274.1357

September 29, 2021

**VIA EMAIL ONLY**

David Steele
Tucker Ellis LLP
515 Flower Street, Suite 4200
Los Angeles, CA 90071
Email: david.steele@tuckerellis.com

> **Re:**    *Facebook v. Namecheap – September 21, 2021 meet and confer conference*

Dear David,

This letter substantively responds to your two letters sent on September 23, 2021 regarding the discovery issues discussed on the September 21 conference call.  As I noted in my email to Steven Lauridsen on September 23, Plaintiffs have inaccurately represented a number of our positions, which require clarification.

> ### *AEO Designation of WhoisGuard Services Agreement*

Defendants have appropriately designated the WhoisGuard Service Agreement CONFIDENTIAL – ATTORNEYS EYES ONLY ("AEO"). The terms of Namecheap's agreements with its vendors, including WhoisGuard, are proprietary and should not be made publicly available or shared with Defendants' competitors. The domain name services market is highly competitive and Defendants have legitimate interests in keeping the terms of their agreement out of the hands of their competitors, who could use the terms to their advantage and to Defendants' disadvantage.[1] Courts routinely find that an AEO designation for contracts and other sensitive business documents is warranted to protect parties from the specific harm of providing proprietary information to competitors. *See, e.g.*, *Cabell v. Zorro Productions, Inc.*, 294 F.R.D. 604, 610 (W.D. Wash. 2013) (finding AEO designation to be appropriate to shield license agreements from potential competitor).

This includes disclosure to Facebook, who is presently a competitor of Namecheap in the domain industry. Facebook owns two wholly-owned subsidiaries, RegistrarSEC and RegistrarSafe, that are ICANN-accredited registrars. They offer the exact same service as Namecheap: registering domain names.

---

[1] If this dispute must be resolved by Judge Snow, Defendants will submit declaration testimony attesting to the existence of the risk of competitive harm.

September 29, 2021
David Steele
Tucker Ellis LLP
Page 2

While you argued that Namecheap and Facebook are *not* competitors because Facebook's registrars do not offer their services to the general public, that does not mean that Namecheap's fear of competitive harm is not legitimate. The case of *Nutratech, Inc. v. Syntech (SSPF) International, Inc*., 242 F.R.D. 552 (C.D. Cal. 2007) is directly on point. In that case, the court directly refuted the same argument Facebook makes here: "Although Nutratech argues that it is not in direct competition with Syntech, it nonetheless admits that is sells the same product . . . Although Nutratech asserts that it currently sells to different buyers, this assertion does not mean that Nutratech will not choose to become a direct competitor of Syntech in the future." *Id*. at 555. The same is true here.

Furthermore, Plaintiffs have not shown any need for its business employees to see the terms of the WhoisGuard Service Agreement. Under the AEO designation, Plaintiffs' outside counsel and designated house counsel can access the document. Plaintiffs have failed to offer any reason why their non-legal employees would need to see the document.

Finally, Defendants disagree with your contention that the document has been over-designated. It would be impractical and burdensome for the parties to redact all their proprietary documents produced on a line-by-line basis, as Plaintiffs propose. However, in the interest of avoiding burdening the Court with unnecessary disputes, we are enclosing a marked-up copy of the document on which we have highlighted proposed redactions. Our proposed redactions reflect that the terms of the agreement are highly confidential, not just the payment amount. We hope that our proposal resolves the dispute.

<u>Plaintiffs' Addition of New Disputed Domain Names</u>

On the September 21 call, we also discussed Plaintiffs' late addition of hundreds of additional domain names, which Plaintiffs had previously represented to the Court were *not* at issue in the case and which Plaintiffs had requested Namecheap to *remove* from the Court's control. Plaintiffs' late disclosures and flip-flopping on whether domains are in the case or not violate the MIDP Order, which requires Plaintiffs to disclose all new information no later than 30 days after it is discovered or revealed to a party. Doc. 7 at ¶ 8. If Plaintiffs learn of new disputed domains, they must disclose them no later than 30 days after discovery in order to comply with the MIDP Order. Nothing in the MIDP Order permits Plaintiffs to delay disclosing information beyond that timeframe on the grounds that they are still "completing [their] analysis," as you propose in your letter.

Next, your letter incorrectly asserts that the parties agreed on specific attestation language. While we thank you for providing proposed language, we did not agree that that specific language was acceptable on the call. The Court's July 8 Order states that "Plaintiffs may provide Namecheap with a list of the domain names at issue, ***along with***

September 29, 2021
David Steele
Tucker Ellis LLP
Page 3

*an attestation that no other domain names are subject to the dispute*." Doc. 109 at 9 (emphasis added). Your proposal is missing this critical language. Plaintiffs' refusal to confirm which domain names are at issue improperly makes the case into a moving target. It also burdens our client and creates unnecessarily complications when it must lock, unlock, and re-lock the same domain names due to Plaintiffs' disorganization.

Please let us know whether Plaintiffs will provide an attestation that complies with the Court's July 8 Order. As stated on the call and in past letters, if Plaintiffs would like to include a qualification that these are the disputed domains currently known to Plaintiffs, that would be acceptable to Defendants.

Plaintiffs' ESI Production

On the call, we also discussed the timing of Plaintiffs' ESI production. Plaintiffs stated that their production would be coming within one week. While Plaintiffs did make a production on September 22, that production appears to be severely deficient and incomplete. For example, it appears to contain no internal documents from any of the Plaintiffs. There are 19 documents for which the custodian is stated as "Facebook," but these all appear to be printouts of public websites or other publicly available documents. Thus far, we have located no "evidence of actionable harm" that was provided to Defendants. If any such evidence exists, Plaintiffs cannot delay producing it any longer. Under the timetable set in the MIDP Order, the evidence supporting Plaintiffs' claims should have been produced months ago.

We also note that on September 27, Plaintiffs served their responses to WhoisGuard's RFPs stating that documents responsive to some requests "will" be produced, but the responses failed to specify a date by which production will be completed as required by Rule 34. The responses are also ambiguous as to whether responsive documents even exist. I sent an email to Steven on September 27 asking, "Do Plaintiffs intend to produce additional documents? If so, when will we receive them?" but I did not receive any response.

**Please let us know whether Plaintiffs will be producing further documents, and if so, by when.** If Plaintiffs continue to ignore our communications and to fail to comply with their obligations under the MIDP Order and Federal Rules, Defendants will have no choice but to move for sanctions.

Privilege Logs

On the September 21 call, we agreed that the parties would exchange privilege logs within two weeks after making a production. With respect to the format, the logs

September 29, 2021
David Steele
Tucker Ellis LLP
Page 4

must contain sufficient information to enable other parties to assess the claim. As for the titles of individuals, I stated that we would not be including the title as a column in the report as in the Rutter Guide format because it would be difficult to generate using our e-discovery software. To clarify, however, the parties should provide individuals' titles if they are necessary in order to evaluate the claim of privilege. The title information may appear in a separate legend or some other format other than a column in the log.

Production of Database ESI

A. <u>Plaintiffs' Refusal to Produce Any Database ESI</u>

You state in your letter that Plaintiffs object to searching for or producing any information from their databases on grounds of relevance, but this objection is not well-taken.

With respect to Plaintiffs' own registrar database(s), we have learned that in the past, Plaintiffs previously owned some of the disputed domain names. Data contained in Plaintiffs' registration database(s) would show the time period in which Plaintiffs owned the domains, and how and why Plaintiffs lost or relinquished their ownership of them. This evidence is directly relevant to Defendants' affirmative defense of waiver. It is also relevant to issues of harm and damages. Plaintiffs must produce all ESI relevant to the disputed domain names. Publicly available WHOIS records are not an acceptable substitute.

Plaintiffs' complaint database(s) would contain any communications from their users or other parties regarding the disputed domains, responsive to RFP 2. These communications are directly relevant to testing Plaintiffs' allegations that their own users were confused by the disputed domain names, or were victims of phishing, malware, or other forms of alleged abuse related to the disputed domains. ESI contained in the complaint database(s) is also centrally relevant to Plaintiffs' failure to police the exact same forms of alleged infringement and abuse on their own platforms, which pertains to Defendants' defense of unclean hands. Plaintiffs' offer to produce "non-user-specific" exemplars cherry-picked by counsel in response to RFP 12 is not an acceptable substitute for a diligent, good faith search of all relevant sources of data. As discussed in our prior meet-and-confer calls and correspondence, we need at least a representative sample of documents in response to RFP 12. Plaintiffs' databases must be part of this search.

B. <u>Scope and Format of Database ESI Productions</u>

As for the format and scope of Defendants' own database ESI production, we have proposed producing responsive information as Excel files (or a similar format). Plaintiffs

September 29, 2021
David Steele
Tucker Ellis LLP
Page 5

insist that this is insufficient and that the database native files must be produced under the ESI Order, but your characterization of the requirements of the ESI Order is not correct. Plaintiffs assert that the ESI Order requires that "[d]atabase files will be produced in native format whenever possible," but this language appears in Appendix I to the ESI Order. The body of the ESI Order itself provides that the parties agree to produce document "in the formats described in Appendix 1 to this Order ***or in another reasonably usable form that will enable the receiving party to have the same ability to access, search, and display the ESI as the producing party.***" Doc. 92 at 6. The ESI Order further provides, "[t]o avoid doubt, information will be considered reasonably usable when produced in CSV format, tab-delimited text format, Microsoft Excel format, or Microsoft Access format." *Id*. at 13. Thus, Excel format is sufficient. We propose that the same format requirements should apply to Plaintiffs, as well.

As for the scope of production of database ESI, we agree to search for each of the disputed domain names in the August 27 and September 14 letters and propose to produce the following data points associated with the domains (to the extent they exist):

> 1. Domain Logs - contains information about domain actions with a timestamp, user_id, and technical info. Actions: register, renew, reactivate, push, expire, transfer in, transfer out.
> 2. Domain Locks - contains information about locked domains: reason, timestamp, user_id, lock type
> 3. Order info - contains information about the action (register, transfer in, renew, reactivate) with prices, order_ip.
> 4. Order address - contains information about billing address, organization, job title, etc., that was inputted during order.
> 5. Transactions - contains information about transaction amount, payment method, and some technical info.
> 6. Domain Contacts - contains logs about domain contacts: registrant, admin, tech, and billing.
> 7. Transfer in requests - contains information about transfer in requests (EPP codes).
> 8. Transfer out requests - contains information about transfer in requests (EPP codes).
> 9. Parking page info - contains information about delete timestamp.

We would request that Plaintiffs produce these same data points for each of the disputed domains from their own registrar database(s), as well, to the extent they exist.

September 29, 2021
David Steele
Tucker Ellis LLP
Page 6

In addition to the above data points for the disputed domains, we are also willing to search for relevant customer correspondence and other communications contained Namecheap's ticket database, which is stored separately from the registration data. We note that that in response to our RFPs seeking relevant communications, Plaintiffs limited their search the past three years and agreed to use the disputed domains as search keywords. We propose that the same three-year time limitation and search keywords apply to both sides' searches for communications from their respective complaint/ticket database(s) to locate relevant communications that are related to the disputed domains.

Plaintiffs also requested Defendants to produce additional information related to all additional domain names registered by each customer. This would be unduly burdensome and not proportional to the needs of the case, particularly because there are over 1,200 disputed domains in the case. Producing discovery on every other domain registered by the customers would vastly dilate the scope of discovery but produce little information of value to the case. While we understand your view that one of the ACPA bad faith factors concerns the registration of multiple infringing domain names, in cases involving domain name registrars, courts have found that factor to be either inapplicable or to weigh strongly in the registrar's favor. *E.g., AMPAS v. GoDaddy.com, Inc.*, 2015 WL 5311085, *47 (C.D. Cal. Sept. 10, 2015).

Finally, we have evaluated your proposed list of additional keywords (*e.g.*, "abuse," "actionable," "disclose," "identify," "reveal," "trademark," etc.). Each of these proposed terms will return a vast number of hits which would not be feasible for either side's lawyers to review. For example, Namecheap has a Legal and Abuse department, and therefore the term "abuse" would return practically every document associated with this department. We suggest that Plaintiffs reevaluate their list and propose keywords that are tailored to the specific allegations of this case.

Please let me know if Plaintiffs will agree to the compromises proposed above. Should you wish to schedule a further meet-and-confer call, please let me know.

Sincerely,

*Brianna Dahlberg*

Brianna Dahlberg

Attachment:  WIG005829 highlighted (ATTORNEYS EYES ONLY)