SNELL & WILMER L.L.P.
David G. Barker (#024657)
dbarker@swlaw.com
Jacob C. Jones (#029971)
jcjones@swlaw.com
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070

TUCKER ELLIS LLP
David J. Steele (*pro hac vice*)
david.steele@tuckerellis.com
Howard A. Kroll (*pro hac vice*)
howard.kroll@tuckerellis.com
Steven E. Lauridsen (*pro hac vice*)
steven.lauridsen@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223
Telephone: (213) 430-3400
Facsimile: (213) 430-3409

Attorneys for Plaintiffs,
Meta Platforms, Inc. (fka Facebook, Inc.),
Instagram, LLC, and WhatsApp LLC

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Meta Platforms, Inc., et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>Namecheap, Inc., et al.,<br><br>　　　　　Defendants.<br>AND RELATED COUNTERCLAIMS. | Case No. CV-20-470-PHX-GMS<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL PLAINTIFFS TO PRODUCE DISCOVERY [161]**<br><br>**(ORAL ARGUMENT REQUESTED)** |

I. INTRODUCTION

Plaintiffs have produced over 50,000 pages comprising nearly 10,000 individual documents, and Plaintiffs continue to make rolling productions as documents become available. But Defendants have filed a premature motion to compel without first fully meeting and conferring, ignoring the Court's December 17, 2021 admonition to meet and confer more thoroughly to narrow any disputes before bringing them to the Court. *See* ECF No. 158. Defendants' failure to adequately meet and confer has resulted in an unwieldy motion that (a) seeks to compel documents that have already been produced, (b) disregards the parties' prior agreements, and (c) introduces new issues about which the parties have never met and conferred. Not only are these defects caused in large part from Defendants' failure to meet and confer in good faith, but they are also the result of Defendants having manufactured disputes in an attempt to justify their baseless request for monetary sanctions.

Perhaps the most egregious claim in Defendants' motion is that Plaintiffs have failed to produce *any* notices to Defendants containing reasonable evidence of actual harm, *any* examples of use of the FB mark, and certain customer correspondence. This is patently false. As discussed below, Plaintiffs have produced **hundreds of notices** coupled with **thousands of screenshots** showing infringing and malicious activity involving the infringing domain names. Plaintiffs have also produced dozens of examples of FB mark uses during the relevant period as well as numerous customer communications. While Defendants may dispute such notices or examples of use legally suffice for Plaintiffs to prove their case, that disagreement is not tantamount to Plaintiffs producing no documents at all. Similar meritless issues permeate Defendants' motion; it should be denied.

II. **DEFENDANTS' MOTION TO COMPEL IS A GROSS OVERREACH WITH MANUFACTURED DISPUTES, AND IT SHOULD THEREFORE BE DENIED.**

   A. **Defendants have grossly exaggerated the timeline for this discovery to mask their failure to properly meet and confer.**

      1. **Defendants never conferred on the substance of this motion.**

In an effort to paint Plaintiffs in a negative light, Defendants have grossly

1

exaggerated both the timeline for the discovery at issue as well as their meet and confer efforts. With respect to the timeline, Defendants assert they have been attempting to obtain the discovery purportedly at issue since March 2020. This is patently false as shown by the motion's record. Defendants' timeline ignores the fact that they served discovery responses in excess of the permissible number, causing the Court to order them to re-serve the correct number of requests. The Court subsequently stayed discovery, and once discovery resumed, the parties engaged in a legitimate discovery dispute as to whether Defendants had *once again* propounded an excess number of requests. The Court resolved this dispute on August 26, 2021 (ECF No. 131), and Plaintiffs served their responses on September 27, 2021, which was within the thirty-day period prescribed by Rule 34. ECF No. 136. Defendants' own papers show they filed their motion to compel one and a half months later without having ever met and conferred concerning these responses.[1]

In particular, despite a laundry list of alleged meet and confers, the only letter Defendants have put into the record that post-dates Plaintiffs having served their discovery responses was sent on September 29, 2021, two days after the September 27 response date, and this letter memorialized a conference that took place *six days before* Plaintiffs served their discovery responses. As shown in Defendants' motion, the only other time the parties met and conferred was on November 8, 2021, when the parties discussed Defendants' refusal to provide customer information and documents concerning the entity Withheld for Privacy ehf. Lauridsen Decl. ¶ 2. During this conference, Defendants asked for an update concerning Plaintiffs' document production, which Plaintiffs provided. *Id.*[2] For Defendants

---

[1] Defendants also assert they granted numerous extensions of time to respond to this discovery, but that is not true. When the Court lifted the discovery stay in this action, Plaintiffs requested a single week to finalize their responses. ECF No. 161-5. The only other "extension" occurred when the Court ruled that Defendants' second attempt at serving discovery did not exceed the Court's numerical limit, and Defendants relented from their demand that Plaintiffs provide documents within ten days despite knowing two of Plaintiffs' attorneys would be on vacation. ECF No. 161-10; Lauridsen Decl. ¶¶ 3-4.

[2] Defendants also assert they contacted Plaintiffs numerous times to ask for documents and that Plaintiffs failed to provide the courtesy of a response. This stretches the truth. For

to then turn around and file this motion while representing that Plaintiffs have produced no documents and have kept Defendants in the dark is simply gamesmanship.

**2. Defendants refused to meet and confer regarding ESI Search terms, resulting in a purported delay of their own making.**

Although the ESI Order in this case requires the parties to meet and confer regarding ESI search terms for responding to Rule 34 discovery requests (ECF No. 92 at ¶ 5(a)), Defendants have refused to do so, claiming that requests to meet and confer on search terms was somehow a delay tactic by Plaintiffs. ECF No. 161-8 at 2 ("Plaintiffs cannot use this [ESI search term objection] as an excuse to avoid producing any documents"). Despite repeated requests, Defendants *never* provided any proposed ESI Search terms. Lauridsen Decl. ¶ 5; *see also* August 2, 2021 letter to B. Dahlberg, ECF No. 161-7 at 4 ("Plaintiffs have not refused to meet and confer concerning ESI search terms as a delay tactic. . . . Plaintiffs will meet and confer regarding appropriate ESI search terms"). Although no search terms had been discussed, Defendants asserted no meet and confer was necessary. *See* ECF No. 161-8 at 2 (August 8 letter); ECF No. 161-11 (August 26 email). Despite repeated requests, Defendants never provided search terms, forcing Plaintiffs to unilaterally develop their own. Lauridsen Decl. ¶ 5.

**B.  Plaintiffs are complying with their discovery obligations.**

**1.  Plaintiffs have been producing the exact types of documents Defendants assert have not been produced.**

**a.  Plaintiffs have produced notices of actionable harm.**

Defendants state they have not "located any notices providing 'reasonable evidence

---

instance, in response to Mr. Lauridsen's 7:49 p.m. email on September 27, 2021 serving Plaintiffs' discovery responses, Ms. Dahlberg emailed five minutes later asking, "Do Plaintiffs intend to produce additional documents? If so, when will we receive them?" ECF No. 161-13. Plaintiffs already made their third rolling production five days earlier, and they had already informed Defendants multiple times that Plaintiffs would make rolling productions, including on October 4. ECF No. 161-10 ("*we intend to produce supplemental ESI in connection with the MIDP on October 4 . . . . a number of those documents will be responsive to Whoisguard's discovery requests.*") (emphasis added). Another response was not needed.

3

of actionable harm' of wrongful use of the domains." ECF No. 161-2 ¶ 27. What exactly constitutes "reasonable evidence of actionable harm" is not defined in the RAA; however, these notices include proof of infringement, phishing, malware attacks, and websites diverting Plaintiffs' users to illegitimate websites. Plaintiffs have produced at least approximately 409 notices of harm coupled with approximately 4,037 screenshots of the websites accessible at the infringing domain names. Lauridsen Decl. ¶ 6. These notices were sent by Plaintiffs' various security vendors, and Plaintiffs are still receiving and producing additional notices as they arrive. *Id.* Defendants should already possess these notices anyway, though Plaintiffs are complying with their obligation to produce them.

For instance, Plaintiffs have produced as FB_NAME_00031078-91 a notice plus contemporaneously captured screenshots for the website at ads-faceobook.com, which comprises a spoof login page for the Facebook platform designed to steal user login information. *Id.* ¶ 7. It is facially apparent that a website and domain name masquerading as a legitimate login page is both diverting users from the Facebook platform and targeting those users for a phishing attack aiming to steal their login credentials. Regardless, Plaintiffs' vendors sent notices identifying the domain names at issue and providing information concerning Plaintiffs' trademark rights. Such notice is sufficient, particularly for domain names like instagramlogin.org, which is highly likely to have been used in the past—or to be used in the future—for phishing even if the website is currently blank.

Plaintiffs have identified these notices repeatedly and have also repeatedly explained them to Defendants. Plaintiffs have also produced over 200 articles and investigation reports concerning malicious activity on these types of sites, including reports and articles concerning this activity at domain names registered at Namecheap. Defendants may contest whether these documents are sufficient to support an RAA Section 3.7.7.3 claim, but that is argument going to the merits of this litigation and does not warrant a motion to compel and for sanctions claiming no such notices have been produced.

### b. Customer correspondence was not withheld.

Defendants assert that some of their customers' communications with Plaintiffs

4

have not been produced. Once again, this "dispute" simply reveals that this motion is premature and that Defendants are seeking to discredit Plaintiffs through manufactured issues. According to Defendants, Plaintiffs are withholding communications with Defendants' customers. ECF No. 161 at 10-11. These communications purportedly show that Plaintiffs knew the identity of some customers all along and that some websites at issue were not active. This is a red herring. Turning to Defendants' first example for the domain name uninstagrammable.com, Plaintiffs sent Defendants a notice of actionable harm on October 11, 2021. Lauridsen Decl. ¶¶ 8-9. Under Section 3.7.7.3 of the RAA, Defendants were themselves required to disclose the contact information of this customer within seven days. Instead, Defendants' own evidence shows that, rather than comply with their obligations under the RAA, they instead simply forwarded the request to the purported customer. ECF No. 161-15 at 2. Section 3.7.7.3 does not relieve Defendants of liability if the purported customer contacts Plaintiffs. Because such correspondence does not negate any claims, Plaintiffs not only have no reason to withhold it but they also are in fact not withholding any such correspondence.[3] Regardless, had Defendants raised this issue before filing their motion, the parties could have discussed the purportedly missing correspondence and potentially resolved any concerns.

      **c. Plaintiffs have produced exemplar uses of the FB Mark.**

Defendants further complain that Plaintiffs have not produced any examples of use the FB Mark. Once again, this is patently false. Plaintiffs have produced at least twenty-four exemplars of use of the FB Mark during the period relevant for Defendants' abandonment claim. Lauridsen Decl. ¶ 11. It should be noted that use during the relevant period is fatal to Defendants' abandonment claim, for even a "single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith."

---

[3] A system shutdown at Plaintiffs' vendor caused this email never to have been received. Lauridsen Decl. ¶ 9. The remaining correspondence represents a similar non-issue. The second item of correspondence regarding the domain name bestwhatsappimages.com was recently provided by one of Plaintiffs' vendors, was already tagged and slated for production when the instant motion was filed, and was subsequently produced on December 8, facts a proper meet and confer would reveal. *Id.* ¶ 10. Finally, the third item of correspondence in the exhibit is not directed at Plaintiffs. ECF No. 161-15 at 6-10.

5

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072 (9th Cir. 2014), *as amended* (Mar. 11, 2014). Thus, just one of the FB mark uses Plaintiffs produced defeats Defendants' abandonment claim, though this ultimate issue is not a discovery dispute.

### 2. Plaintiffs have been diligently producing documents.

Contrary to Defendants' assertions, Plaintiffs have been diligent in their document search, collection, and production, and they have kept Defendants apprised of their progress. Defendants, however, do not seem to appreciate the complexity of an ESI data collection spanning offices around the globe in a large and complex organization.

To date, Plaintiffs have interviewed twenty internal custodians who possess potentially responsive documents and ESI. When Plaintiffs' e-Discovery team and outside counsel interviewed potential custodians for this case, additional potential custodians who may possess potentially responsive documents and ESI were identified. Plaintiffs therefore scheduled and interviewed each additional custodian who was identified. Custodial interviews are conducted to help identify key custodians who may possess potentially responsive documents and ESI. Identifying key custodians helps to target potentially responsive documents and ESI and reduce overcollection. The final set of key custodians is an iterative process and cannot be finalized until all custodial interviews are substantially complete. Wong Decl. ¶¶ 3-4.

By conducting twenty custodian interviews in this case, Plaintiffs have identified twenty-nine key custodians to date, including some former employees. *Id.* ¶ 5. Data for the twenty-nine custodians identified must be collected, filtered through various keyword searches (which Defendants still have not provided), de-duplicated, and processed in accordance with the ESI Order in this action. *Id.*; ECF No. 92 at ¶¶ 5(d)-(e). When handling a large number of custodians across numerous departments in a large organization, as is the case here, this process is most efficient when the list of key custodians is finalized and all data from the list of key custodians has been collected in order to avoid performing the process numerous times. Wong Decl. ¶ 6.

Data for the currently known key custodians has been identified and is being

6

collected. Out of the twenty-nine key custodians, Plaintiffs have identified priority custodians whose email data has been identified, collected, filtered through keyword searches, and de-duplicated. *Id.* at ¶ 7. Email data for the prioritized key custodians is being uploaded to Plaintiffs' e-discovery vendor for processing in accordance with the ESI Order. *Id.* Further, Plaintiffs have already produced documents for one of the key custodians, Kathleen Johnston, the Meta in-house counsel who signed the submissions to the PTO for the FB mark that Defendants assert were fraudulent.[4] Lauridsen Decl. ¶ 12. Plaintiffs also produced the prosecution file for this mark. *Id.*

During the parties' most recent November 8, 2021 conference of counsel concerning Plaintiffs' own motions to compel, Defendants inquired about the status of Plaintiffs' production. Lauridsen Decl. ¶ 2. Plaintiffs explained the complexity of the task and where they were in the process. *Id.* Plaintiffs further explained that they would be in a better position to provide a date certain for a final production once they knew the volume of data. Defendants did not raise this issue again, either with Plaintiffs or with the Court when the parties conducted a telephonic discovery hearing on Plaintiffs' own motions to compel and the Court asked if there were any further outstanding discovery issues. *Id.* Instead, Defendants filed their motion two days later, highlighting their lack of good faith.

### 3.  Plaintiffs have not engaged in abusive tactics like "data dumps."

Defendants accuse Plaintiffs of having made a "data dump of irrelevant documents, such as blank pages, duplicate documents, and illegible documents." ECF No. 161 at 9. Defendants do not identify such documents with any particularity, which is no surprise given this is an issue that has never been raised and appears to be manufactured in an attempt to downplay the volume of documents produced. Because Defendants have raised this issue for the first time in their motion, Plaintiffs are unsure exactly to what Defendants

---

[4] Defendants have complained that many of these documents were privileged, but that is to be expected of in-house counsel. Further, Plaintiffs promptly provided a log of all privileged communications and received no challenge. Lauridsen Decl. ¶ 13. Further, while Defendants assert there are missing documents from the log, the parties agreed that they would only log communications after they were identified and withheld from a specific production, and Plaintiffs have logged all such documents to date. *Id.* ¶ 14.

are referring. Plaintiffs suspect that any blank pages consist of screenshots of the infringing domain name websites that have been automatically captured from time to time, as is the case with the screenshot produced as FB_NAME_00021772. Lauridsen Decl. ¶ 15. If Defendants had properly met and conferred before filing their motion, Plaintiffs would have been able to use the metadata of the "blank" files at issue to determine whether those files were screenshots, documents that experienced a technical error when being produced by Plaintiffs' vendor, or some other issue. Instead, Plaintiffs were not asked to investigate during meet and confer, and Defendants want the Court to consider this issue in a vacuum.

Similarly, Plaintiffs are not aware of duplicate documents in their productions. In accordance with the ESI Order in this action, Plaintiffs' ESI vendor performed an automated global de-duplication process on all documents before they were reviewed by Plaintiffs' attorneys. *Id.* ¶ 16. This process is, however, imperfect and may not catch every duplicate in a large document population. *Id.* Again, if there truly are an excess—as opposed to a few—number of duplicate documents, a simple conference between counsel would have allowed Plaintiffs to investigate this allegation before it came before the Court.

Next, Plaintiffs are unaware of any illegible documents in their productions. *Id.* ¶ 17. Any illegible documents are therefore most likely the result of a processing error during those documents' production. *Id.* Thus, once again, had Defendants met and conferred, the parties would almost certainly have been able to resolve this issue. But Defendants chose instead to lie in wait to use these "issues" as ammunition in their motion to compel.

Finally, Defendants' allegations concerning irrelevant documents is plainly false. As detailed in Section II.B, *supra*, Plaintiffs suspect that Defendants dispute the extent to which these documents support the merits of Plaintiffs' claims and defenses as opposed to their actual relevance. Again, a meet and confer would have obviated this purported issue.

**C.      Defendants have disregarded their discovery agreements.**

Perhaps most surprising in Defendants' motion to compel is that they have completely disregarded the fact the parties met and conferred proactively and reached various agreements concerning the vast majority of the requests at issue ***even before***

*Plaintiffs served their responses*. Without further discussion or warning, Defendants have now moved to compel and for sanctions. Although Defendants move on almost every request, a careful examination of Defendants' separate statement shows that only several requests are truly at issue, and Defendants paid only the briefest lip service to argue the merits for any of those requests. ECF No. 161 at Exs. 4-6; ECF No. 161-1.

### 1.     Only a fraction of the RFPs identified are at issue.

- **Request No. 3:** This request seeks communications with *third parties* concerning Defendants and the domain names at issue. Defendants now argue that Plaintiffs previously owned some of the domain names at issue and that Plaintiffs should therefore produce communications with Plaintiffs' own registrar regarding those domain names and any purported ownership. This demand is squarely outside the scope of the request. Defendants have acknowledged that Plaintiff Meta Platforms, Inc. (fka Facebook, Inc.) "has two *wholly owned subsidiaries* that are ICANN-accredited domain name registrars." ECF No. 145 at 1:9-11. Wholly owned subsidiaries are not third parties, and thus any correspondence with these subsidiaries would not be responsive. Regardless, Defendants have not cited any authority showing how prior ownership and relinquishment of a domain name relieves another from liability for later cybersquatting. As for the customer correspondence, that has been and is being produced, as discussed above.

- **Request No. 6:** This request seeks the date and circumstances under which Plaintiffs learned of the uses of their marks forming the bases for their claims. As the response shows, the parties agreed Plaintiffs could produce a chart containing the information. The rest of Defendants' arguments are therefore just noise.

- **Request No. 7:** This request seeks any complaints reflecting actual confusion from Defendants' infringement from Plaintiffs' billions of users, rendering it wildly overly broad and unduly burdensome to search for this data. Plaintiffs have offered to search for a representative sample as a compromise, an offer Defendants did not accept.

- **Request No. 11:** Defendants seek all coexistence and consent agreements related to the FB Mark. In support, Defendants cite *Healthier Choice Flooring, LLC v. CCA Global*

9

*Partners, Inc.*, 2013 WL 12101905, at *7 (N.D. Ga. Jan. 4, 2013). This case simply states that a witness may be deposed concerning certain consent and coexistence agreements because they may have a bearing on registrability. However, the only potential "registrability" issues in this litigation revolve around whether the FB mark registrations were procured by fraud and whether the FB mark has been abandoned. And Defendants have not explained how searching through sixteen years of data for such agreements would have any bearing on whether Plaintiffs used the mark and what statements they made during prosecution of the mark. Finally, Defendants identify a purported co-existence agreement specific to the FB mark, but once again, as a result of having failed to properly meet and confer, Plaintiffs have not been able to discuss this issue with Defendants.

- **Request No. 12:** This request grossly overreaches by seeking all documents related to any complaints about any online abuse any of Plaintiffs' *billions* of users have made over a nearly three-year period. If even 1% of Plaintiffs users have lodged such a complaint, tens-of-millions of documents would exist. As a compromise, Plaintiffs offered an anonymized representative sample of how they respond to various sorts of cyber threats, but Defendants declined because they were concerned that Plaintiffs would somehow "cherry pick" what would essentially be template responses. *See* ECF No. 161-1 at 25.

Defendants do not even attempt to explain how activity on Plaintiffs' platforms bears relevance to their own unlawful activity. During a conference of counsel, Defendants argued that cybercrime on Plaintiffs' own platforms is relevant to Defendants' unclean hands defense, but that theory is not legally cognizable. The "misconduct that forms the basis for the unclean hands defense [must be] directly related to plaintiff's use or acquisition of the right in suit." *Pom Wonderful LLC v. Welch Foods, Inc.*, 737 F. Supp. 2d 1105, 1110 (C.D. Cal. 2010) (alteration in original) (citing *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987); *see also U–Haul Int'l, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1254 (D. Ariz. 1981), *aff'd*, 681 F.2d 1159 (9th Cir.1982). Such a limitation is required because "[t]he unclean hands maxim is not a search warrant authorizing the defendant to probe into all the possible types of inequitable conduct ever

engaged in by the plaintiff." McCarthy, J. Thomas, McCarthy on Trademarks and Unfair Competition § 31:48 (5th ed.). Finally, "[c]ourts typically do not apply the doctrine of unclean hands where the defendant has suffered no harm as a result of the plaintiff's actions." *Chitkin v. Lincoln Nat. Ins. Co.*, 879 F. Supp. 841, 854 (S.D. Cal. 1995).

Here, Defendants would need to tie any cybercrime or other abuse to Plaintiffs' acquisition of their trademark rights—that is, did Plaintiffs perpetuate fraud and abuse on their platforms to acquire their trademarks? Even if Defendants could somehow make that showing, they would then also need to demonstrate how the activity on Plaintiffs' platforms seriously harmed Defendants directly. Defendants have not even attempted to make this connection because they cannot. The motion to compel this response should be denied.

- **Request Nos. 13-14:** These requests seek documents identifying all investigations, complaints, and other proceedings brought by the EU Data Protection Commissioner, or any other regulatory or government agency for violations of GDPR or any other privacy laws, as well as related correspondence. Defendants argue that their refusal to disclose customer data to Plaintiffs was justified because Plaintiffs purportedly do not comply with such privacy laws. Plaintiffs already explained how GDPR is not relevant to this action when opposing Defendants' motions to dismiss. ICANN has released a Temporary Specification that obligates Defendants to disclose customer information in response to infringement notices. ECF No. 30-2 at 26. Further, Defendants have provided no authority that alleged privacy law violations obviate Defendants' obligations under the RAA or its obligations not to engage in cybersquatting. Thus, these requests are simply harassment.

To the extent this purported defense is tied to unclean hands, it fails because (1) Defendants have not tied any privacy law violations to the acquisition of Plaintiffs' trademarks, and (2) Defendants have not shown how they have been seriously and directly harmed by any such alleged privacy law violations. If this purported defense is not tied to unclean hands, then Defendants have cited no authority supporting their position that they are not required to comply with Section 3.7.7.3 of the RAA solely because Plaintiffs have allegedly violated privacy laws. Defendants should not be permitted to go on a fishing

11

expedition for this information that bears no relevance here.

- **Request Nos. 15-16:** These requests seek all communications with ICANN concerning Plaintiffs' efforts to effect certain policy changes as well as all documents relating to Plaintiffs' broader policy objectives, including through litigation. Defendants assert these documents are relevant to this litigation because they explain the motivations behind this lawsuit. But Defendants have in no way tied Plaintiffs' purported motivations in bringing this action with any cognizable claim or defense. Thus, even if these communications would provide the information Defendants' claim, such information would not be relevant to this litigation. Given the burden associated with seeking "all communications" on a non-relevant topic, the motion should be denied for this request.

- **Request No. 17:** This request seeks Plaintiffs' policies and procedures for handling customer data Defendants have disclosed in response to infringement notices. Defendants' justification for seeking this information—that Defendants are essentially allowed to violate Section 3.7.7.3 of the RAA if they do not believe Plaintiffs handle data in the correct manner—does not turn on any cognizable legal theory, is not supported by the RAA, and thus is not relevant. Further, such information implicates privilege concerns involving Plaintiffs' enforcement efforts undertaken in response to customer data received.

- **Request Nos. 18-19:** Plaintiffs have produced the prosecution file from their outside counsel as well as internal documents from custodians involved in the prosecution of the FB Mark. Plaintiffs have also produced documents reflecting the use of the mark as well as various other documents associated with the mark. Plaintiffs continue to search for documents and will continue to produce responsive documents as necessary. Plaintiffs have also produced evidence of the date of Facebook's first use in commerce of the FB Mark.

- **Request No. 20-25:** These requests seek documents related to Plaintiffs' intent to use the FB mark. Plaintiffs have produced and are continuing to produce responsive information related to use of the FB Mark, and they have logged privileged documents.

    **2.    Only a fraction of the interrogatories and MIDP are at issue.**

Before Plaintiffs even served their responses, they proactively met and conferred

with Defendants concerning certain interrogatories and requests. The parties reached an agreement on the vast majority of these, which Defendants fail to acknowledge.

- **Interrogatory No. 1 and MIDP Request No. 4:** Defendants seek a list of all disputed domain names. While the parties agreed that Plaintiffs could respond in the manner in which they did (by referencing lists of domain names), Plaintiffs could have easily listed the 1,241 domain names at issue in this action in their interrogatory response *if Defendants had ever raised this issue*. Doing so involves a simple copy and paste job, rendering a motion to compel unnecessary.

- **Interrogatory No. 6**: Defendants are attempting to impermissibly rewrite this interrogatory. This interrogatory refers to communications identified in response to Interrogatory No. 4, yet that interrogatory does not request the identity of any communications. Defendants cannot now come and rewrite this interrogatory.

- **Interrogatory Nos. 2, 7, 14-15, & 19:** As Defendants observe, the parties reached an agreement on these interrogatory responses. While compiling a chart with this information may appear simple at first blush, responding to these interrogatories is time consuming and involves processing large amounts of data, facts which the parties discussed and agreed upon. For instance, to prepare a chart of all domain names where Plaintiffs sent notices, Plaintiffs must review all of their notices and cross-check them against the entirety of their correspondence for those domain names. Apart from the fact there are 1,241 domain names to review, much of the correspondence and data concerning these domain names is scattered across various of Plaintiffs' vendors that assist in trademark enforcement efforts as well as Plaintiffs' own internal systems. As discussed above, Plaintiffs have acquired and produced hundreds of these notices; however, Plaintiffs' vendors are still locating additional notices and sending them to Plaintiffs. Thus, Plaintiffs cannot finalize their chart at this time. Similarly, Plaintiffs must review all current and past records for the 1,241 domain names to determine which domain names were registered to Namecheap and which were used for parking pages. This involves aggregating data from both Plaintiffs' internal systems with data from the security vendors.

When the parties agreed on the production of a chart as a response to these interrogatories, Defendants understood the complexity of the task and that it would be time consuming and would require Plaintiffs to supplement these particular responses once this vast amount of data had been collected and analyzed. Plaintiffs have been preparing these charts as they collect and analyze data. At no juncture did Defendants request that Plaintiffs provide charts based on information currently available with the caveat that they would be updated later. Had Defendants done so, Plaintiffs could have complied. Defendants, however, never met and conferred further after the parties reached this agreement and Plaintiffs served their responses, making it both premature and disingenuous for Defendants to now move to compel further responses to these interrogatories.

- **Interrogatory Nos. 5, 12-13, and 17-18:** Again, Defendants only tell part of the story. During a conference of counsel, the parties agreed that Plaintiffs could invoke Rule 33(d) in their responses. The parties further understood that document collection efforts were ongoing and, once the pertinent responsive documents were produced, Plaintiffs would supplement these responses with Bates numbers. The expectation was never for Plaintiffs to repeatedly supplement these responses with each rolling production but was instead to do so once all responsive documents containing this data had been produced, for providing the information piecemeal would be resource intensive while adding little value. And while Plaintiffs have produced hundreds of documents responsive to these requests, they even just recently located more, which they produced on December 8. Per the ESI Order, Plaintiffs have been prioritizing the production of these documents. *See* ECF No. 92 at ¶ 7. Plaintiffs have made it clear to Defendants they have been waiting for all data to be compiled. This readily resolved "dispute" therefore should not be before this Court.

Further, for Interrogatory Nos. 17-18 in particular, Defendants complain that Plaintiffs stated they would only offer a representative sample of instances of infringement. With 1,241 domain names at issue in this litigation, many of which have hosted various infringing websites over the years, this is a reasonable proposal.

- **Interrogatory Nos. 10-11 and 20-22 and MIDP Request No. 5:** As with all

14

contention interrogatories, which require a full record for a party to respond, these interrogatories and request on damages are premature and cannot be answered until Defendants have produced complete financial data and until Plaintiffs' own experts can analyze that data. Plaintiffs are entitled to either their actual damages or the disgorgement of Defendants' profits, as well as the costs of this action, for Defendants' trademark and service mark infringement, false designation of origin, and willful dilution. For disgorgement of profits, Plaintiffs must prove Defendants' sales, and Defendants must prove costs, which may involve expert testimony. 15 U.S.C. § 1117(a); McCarthy § 30:65.

To date, Defendants have not produced complete financial data, making it impossible for Plaintiffs to provide a calculation of their actual damages or of Defendants' profits. Plaintiffs have, however, provided in their responses the method prescribed by statute by which they will calculate their damages, and they have stated that they will supplement their responses once Defendants produce full financial information. If Defendants contend they have produced such documents, Plaintiffs are not aware of that fact, though once again, this would have been determined during a proper meet and confer.

Finally, for Plaintiffs' cybersquatting claims, Plaintiffs are entitled to statutory damages of up to $100,000 per domain name. 15 U.S.C. § 1117(d). "A plaintiff may elect statutory damages regardless of the adequacy of the evidence offered as to his actual damages and the amount of the defendant's profit." *Verizon Cal. Inc. v. Onlinenic, Inc.*, No. C 08-2832, 2009 WL 2706393, at *3 (N.D. Cal. 2009). "[C]ourts generally consider a number of factors in making such determinations, including the egregiousness or willfulness of the defendant's cybersquatting, the defendant's use of false contact information to conceal its infringing activities, the defendant's status as a 'serial' cybersquatter . . . and other behavior by the defendant evidencing an attitude of contempt towards the court or the proceedings." *Id*. Plaintiffs cannot fully advance arguments as to the amount of statutory damages to which they are entitled until they have received complete discovery from Defendants concerning their conduct, leaving nothing to compel.

- **Interrogatory No. 23:** This contention interrogatory seeks all facts supporting

15

Plaintiffs' allegation that this is an "exceptional" case entitling Plaintiffs to an award of attorneys' fees. The Lanham Act provides that a prevailing plaintiff is entitled to an award of its reasonable attorneys' fees in an "exceptional case." 15 U.S.C. § 1117(a). "While the term 'exceptional' is not defined in the statute, attorneys' fees are available in infringement cases where the acts of infringement can be characterized as malicious, fraudulent, deliberate, or willful." *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1023 (9th Cir. 2002). While Plaintiffs will not be in a position to fully respond to this interrogatory until discovery is complete and the full extent of Defendants' unlawful conduct is known, Plaintiffs have responded with nearly a full page of facts based on information known.

This case is exceptional in part because of Defendants' lack of candor with the Court and concealment of key documents. When Defendants finally produced one such key document, the Whoisguard Service Agreement that Plaintiffs requested ***around April 2020*** and which was highly relevant to Whoisguard's motion to dismiss and Plaintiffs' claims (ECF No. 142 at 3-5), which they over-designated it as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," forcing Plaintiffs to file a motion to de-designate this document. As part of this motion, Plaintiffs argued that key non-attorney decision makers were unable to view the document, requiring some vagueness in the interrogatory response. ECF No. 141 at 5. Defendants argued that Plaintiffs' outside counsel should sign the responses as Plaintiffs' agents without Plaintiffs having reviewed the responses themselves. The Court, however, tacitly rejected that argument, and granted the motion to de-designate portions of the document on November 12, 2021. ECF No. 157. Defendants then—without any further discussion—filed a motion to compel a further response to this interrogatory ***seven days later,*** citing the portion of Plaintiffs' motion to de-designate as an admission that the response was incomplete. That Defendants engaged in this tactic for an interrogatory about their lack of candor to the Court and abusive tactics highlights just that.

- **Interrogatory Nos. 24-25:** These interrogatories seek the identity of all persons to whom Plaintiffs have disclosed customer data provided by Defendants in response to demand letters invoking Section 3.7.7.3 of the RAA as well as all locations where such

data is stored. Defendants have cited no authority as to why this would be the proper subject of discovery, and in any instance, the Court already determined that data revealed in this manner is outside the scope of this litigation. *See* ECF No. 117. Accordingly, this information would not be relevant to the claims or defenses in this action. Moreover, this information implicates privilege concerns concerning Plaintiffs enforcement efforts.

### D. Sanctions are not appropriate given these facts.

As Defendants acknowledge in their motion, a moving party is not entitled to recover its fees unless the losing party was not substantially justified in opposing the motion or if other circumstances render such an award unjust. Fed. R. Civ. P. 37(a)(5); *see also* Fed. R. Civ. P. Rule 37(b) The Court already determined that Defendants filed their motion to compel without obtaining express authorization from the Court. ECF No. 164. Had Defendants done so, the issues in this motion would have been substantially narrowed. Further, Defendants have moved on requests for which the parties have already reached an agreement, have sought to compel documents that were already produced, and have interjected new issues about which they never met and conferred. Thus, even if the Court were to grant this motion, an award of sanctions would be unjust. Finally, Defendants claim that they have spent at least 18.0 hours conferring on and briefing the issues presented in their motion. As explained above, most of these conferences resolved outstanding issues, and many were dedicated to unrelated topics, such as Plaintiffs' own concerns with Defendants' discovery responses. In fact, the only conference of counsel taking place after Plaintiffs served their discovery responses was on November 8, 2021, when Plaintiffs provided a brief update on the status of their document production after a lengthy discussion of Defendants' own discovery deficiencies. Simply put, Plaintiffs should not be sanctioned for Defendants having filed an unnecessary and overly broad motion to compel.

## III. CONCLUSION

Defendants' premature motion was wholly unnecessary, has improperly consumed both the parties' and the Court's resources, and should therefore be denied.

DATED: December 10, 2021

SNELL & WILMER L.L.P.

By: /s/ *Jacob C. Jones*
David G. Barker
Jacob C. Jones
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

TUCKER ELLIS LLP
David J. Steele
Howard A. Kroll
Steven E. Lauridsen
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223

Attorneys for Plaintiffs,
Meta Platforms, Inc. (fka Facebook, Inc.),
Instagram, LLC, and WhatsApp LLC