SNELL & WILMER L.L.P.
David G. Barker (#024657)
dbarker@swlaw.com
Jacob C. Jones (#029971)
jcjones@swlaw.com
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070

TUCKER ELLIS LLP
David J. Steele (*pro hac vice*)
david.steele@tuckerellis.com
Howard A. Kroll (*pro hac vice*)
howard.kroll@tuckerellis.com
Steven E. Lauridsen (*pro hac vice*)
steven.lauridsen@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223
Telephone: (213) 430-3400
Facsimile: (213) 430-3409

Attorneys for Plaintiffs,
Meta Platforms, Inc. (fka Facebook, Inc.),
Instagram, LLC, and WhatsApp LLC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Meta Platforms, Inc., et al.,<br><br>                    Plaintiffs,<br><br>       v.<br><br>Namecheap, Inc., et al.,<br><br>                    Defendants.<br><br>AND RELATED COUNTERCLAIMS. | Case No. CV-20-470-PHX-GMS<br><br>**PLAINTIFFS' RESPONSIVE BRIEF RE: PLAINTIFFS' REQUESTS FOR ADDITIONAL DOMAIN NAME DATA AND PAYMENT INFORMATION** |

## I. INTRODUCTION

Once again, Defendants are stonewalling Plaintiffs in discovery concerning plainly relevant information directed toward the extent of the cybersquatting at issue in this action as well as Defendants' unlawful scheme to provide a safe haven for cybersquatters and other bad actors on the internet. By way of their motion to compel, Plaintiffs seek (1) for each customer account associated with the infringing domain names in this action, a list of domain names associated with that customer account together with complete information concerning those domain names; (2) payment information for each account together with all contact and account information provided by each customer, regardless of whether it is the most recently provided information; and (3) all notices of infringement and complaints (including UDRP complaints to seek transfer of a domain name to its proper owner).

As discussed below, this information is directly relevant to the claims in this action—as shown by both case law and by Defendants' own admissions concerning the best way to track down infringers to combat abuse. Further, while Defendants assert that searching for and collecting this information would be unduly burdensome, Defendants have provided nothing but speculation to support that argument. Indeed, Namecheap's own COO, Hillan Klein, has publicly stated that Namecheap has automated tools it currently uses to collect this very information, and has described the speed and ease with which Namecheap collects and uses this information when it chooses to do so.

Defendants have not shown good cause to refuse producing this information in discovery. Plaintiffs' motion to compel should therefore be granted.

## II. DEFENDANTS HAVE NOT CARRIED THEIR BURDEN TO RESIST PRODUCING THE REQUESTED INFORMATION.

District courts have broad discretion to determine relevancy for discovery purposes, and the burden is on the party resisting discovery to show "that the discovery should not be allowed." *Cisco Sys., Inc. v. Arista Networks, Inc.*, No. 3-14-CV-05344-BLF, 2015 WL 5728297, at *2 (N.D. Cal. Sept. 30, 2015) (citing *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002) and quoting *Louisiana Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*,

1

285 F.R.D. 481, 485 (N.D. Cal. 2012)). "This requires the party resisting discovery to show for each request . . . how each of its objections is appropriate, by providing the relevant standard for each objection and a meaningfully developed argument as to how the standard has been met." *Bartech Sys. Int'l, Inc. v. Mobile Simple Sols., Inc.*, No. 2:15-CV-02422, 2018 WL 834589, at *1 (D. Nev. Feb. 12, 2018). Defendants have not met their burden.

### A. The information sought is highly relevant to the claims.

#### 1. The nine ACPA bad faith factors are not "merely permissive."

"A cybersquatter is liable under the ACPA to the owner of a protected mark if the cybersquatter has: (i) a bad faith intent to profit from that mark; and [¶] (ii) registers, traffics in, or uses a domain name that—[¶] (I) in the case of [a] mark that is distinctive ..., is identical or confusingly similar to that mark that is distinctive. [¶] (II) in the case of a famous mark ..., is identical or confusingly similar to or dilutive of that mark." *Interstellar Starship Services, Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002) (quoting 15 U.S.C. § 1125(d)(1)(A)). "A finding of 'bad faith' is an essential prerequisite to finding an ACPA violation." *Id.* "Congress enumerated a list of nine factors to consider 'in determining whether a person has a bad faith intent.'" *Id.* (quoting 15 U.S.C. 1125(d)(1)(A)). The eighth enumerated factor ("Factor VIII") tilts toward a finding of bad faith when the accused cybersquatter has engaged in the "registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others . . . ." 15 U.S.C. § 1125(d)(1)(B)(VIII).

Defendants argue that, "[c]ontrary to Plaintiffs' assumption, the Ninth Circuit has noted that the nine factors are merely permissive criteria." ECF No. 170 at 6 (citing *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2009)). Defendants cite no authority for the proposition that a party cannot take discovery supporting "permissive criteria" that may support a claim. Regardless, the relevance of the discovery here is not Plaintiffs' "assumption"—it is the law. In fact, the very case relied upon by Defendants highlights the relevance of Factor VIII right after identifying this "permissive criteria": "Congress has said that in evaluating bad faith, courts may consider a person's prior cybersquatting

2

activities." *Lahoti*, 586 F.3d at 1202 (citing 15 U.S.C. § 1125(d)(1)(B)(VIII)). The Ninth Circuit affirmed the district court's finding of bad faith by relying on the fact the defendant had registered multiple domain names. *Id.* at 1203 ("Lahoti is a repeat cybersquatter who has registered hundreds of domain names resembling distinctive or famous trademarks").

The authority relied upon by Defendants simply does not support their position. As detailed further below, the customer and payment information sought is highly relevant.

### 2. Registration of multiple infringing domain names by Defendants' customers bears on Defendants' liability under RAA § 3.7.7.3.

The Court already rejected Defendants' relevancy arguments when it denied their motions to dismiss. In ruling that Plaintiffs had stated a claim, the Court explained "WhoisGuard plausibly made itself liable . . . for the infringements of the Domain Name Licensees [i.e., Defendants' customers,] when it failed to disclose the identity of the Infringing Domain Name licensees." ECF No. 52 at 6-7. As a result of the Court's rulings, Defendants may be liable for the cybersquatting and infringing acts of their customer/licensees. Accordingly, all of the ACPA bad faith factors—including all of the domain names registered by those customers/licensees—have a direct bearing on the customers'/licensees' liability, and thus Defendants' liability under RAA § 3.7.7.3.

Here, information about the domain names registered by the Domain Name Licensees, *i.e.*, Defendants' customers, is directly related to cybersquatting liability under 15 U.S.C. § 1125(d)(1)(B)(VIII). Thus, whether a Domain Name Licensee registered multiple domain names that infringed the rights of other trademark owners goes to the very heart of cybersquatting liability. Similarly, whether a Domain Name Licensee has had numerous UDRP decisions filed against it is highly probative of cybersquatting liability. This information is relevant, and the motion to compel should therefore be granted.

### 3. The domain names registered by Defendants' Customers are relevant to Plaintiffs' non-Section 3.7.7.3 cybersquatting and infringement claims.

Defendants rely on *AMPUS v. GoDaddy.com, Inc.*, No. CV 10-03738, 2015 WL

5311085, at *47 (C.D. Cal. Sept. 10, 2015) for the proposition that Factor VIII "is either inapplicable or weighs strongly in the registrar's favor." ECF No. 170 at 6. That case is inapposite to the claims at hand. To start, the court in *AMPUS* did not state that, as a general principle of law, Factor VIII is either inapplicable or weighs in the registrar's favor. Instead, the court stated, based on its analysis of the bad faith factors, "when applied to the ***facts of this case***, the nine factors are either inapplicable, neutral, or weigh in favor of GoDaddy," the registrar being sued. *Id.* at *40 (emphasis added). The district court still analyzed each factor, and with respect to Factor VIII, the court observed that GoDaddy had not itself registered any infringing domain names in its own name and that GoDaddy could not be charged with monitoring its customers' domain names. *Id.* at *47. Thus, this factor only weighed in favor of GoDaddy in that case. *Id.*

The facts here, however, are distinct from those in *AMPUS*. First, Plaintiffs alleged that Namecheap has registered a number of the domain names at issue in this case. Plaintiffs also alleged that "Namecheap and Whoisguard have acted to further an intentional and continuous scheme to attract cybersquatters to use their services to infringe trademarks through the fraudulent registration of domain names used for malicious activity, including phishing, malware, spam, fraud, and trademark infringement. This scheme to attract cybersquatters is intended to increase Namecheap's profits, which demonstrates Defendants' bad faith intent to profit from Plaintiffs' trademarks, as well as the marks of others." ECF No. 56 ¶¶ 34-35.

Such allegations of operating such a deliberate scheme are sufficient to survive a motion to dismiss on the bad faith element. *See Transamerica Corp. v. Moniker Online Svcs. LLC*, 672 F. Supp. 2d 1353, 1367 (S.D. Fla. 2009); *see also Dell Inc. v. BelgiumDomains, LLC*, No. 07-22674-CIV, 2007 WL 6862342, at *10 (S.D. Fla. Nov. 21, 2007) ("Here, Defendant registrars are in a position of trust as ICANN-accredited registrars. By concealing their unlawful activities, however, they have grossly abused their position of trust to the detriment of Plaintiffs' customers and the general public, as well as Plaintiffs and countless other trademark owners. This abuse of trust further supports, and

4

indeed amplifies, Defendants' bad-faith intent.")).

In *Transamerica*, the court observed the "Amended Complaint discusses Defendants' history as it applies to trademarks of other entities." 672 F. Supp. 2d at 1366. "In numerous cases, registrants who registered their domain names with [the registrar] were the subject of UDRP complaints, with the result that the registrant was forced to stop using the domain name, as it was found that the domain name was infringing upon a protected trade or service mark." *Id.* "In spite of these complaints, however, [the registrar] continued to register domain names substantially similar to well-known trade names to the same John Doe Defendants." *Id.* "These factual allegations are sufficient at the pleading stage to satisfy the bad faith prong by creating an inference that Defendants intended to profit from the misuse of Transamerica marks as well as the marks of others." *Id.*[1]

It is not surprising in light of this authority that, when denying Defendants' motion to strike, the Court determined the information related to Defendants' scheme to support and shelter cybercriminals for profit were directly relevant to this case. In particular, the Court cited the following allegations from the First Amended Complaint:

> 1. Domain names used in a 2018 ransomware scam were primarily registered through Namecheap. (Doc. 56 ¶¶ 27–28.)
> 2. Defendants facilitated a "predatory wire fraud scheme exploiting the COVID-19 pandemic" through a domain name that Whoisguard registered and licensed. *Id.* ¶¶ 29–34.
> 3. Namecheap is the "registrar of choice for cybercriminals." *Id.* ¶ 25.
> 4. Defendants "facilitate" the shielding of cybercrime and intentionally attract cybersquatters to use its services. *Id.* ¶¶ 7, 35, 126, 133, 142, 179.

ECF No. 109 at 6. In discussing that Plaintiffs must show that Defendants intended to profit from another's trademark, the Court ruled, "Defendants' alleged awareness of how its services are used and willingness to facilitate cybersquatting is relevant to evaluating the nature of Defendants' intentions regarding Plaintiffs' trademarks, as well as others." *Id.* at 7. The customer information, the domains they registered, the complaints lodged against

---

[1] Notably, the court in *Transamerica* found the numerous infringement complaints lodged against the registrar's customers relevant to the registrar's liability for perpetuating its bad faith scheme. 672 F. Supp. 2d at 1366. Plaintiffs have requested, and Defendants have refused to provide, this information, which is also a subject of this motion.

them, and their payment information are relevant as they can be used to determine the level of cybercrime occurring on Defendants' platforms and Defendants' awareness thereof.[2]

Simply put, all of the customer, domain name, payment, and complaint information is directly relevant to Plaintiffs' claims and must be produced in discovery.

### B. Defendants' own public statements both belie their alleged burden and highlight the information's relevance.[3]

"On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost." Fed. R. Civ. P. 26(b)(2)(B). Defendants assert that the information sought by Plaintiffs—namely, customer and domain name information, payment information, and UDRP and similar complaints—is not proportional to the needs of this case. ECF No. 170 at 7-9. In particular, Defendants advance three arguments:

(1) Because the 1,241 disputed domains correspond to approximately 980 customer accounts," "[t]he effort and expense for Defendants to produce the requested information would be enormous" in part because "Namecheap would have to pull the information manually." *Id.* at 8 (citing Klein Decl. ¶¶ 3, 6, 9, ECF No. 170-2).[4]

(2) Namecheap only retains "the type of payment method (i.e., credit card, PayPal,

---

[2] The claims in the pleadings define the scope of relevant discovery. *Vantage Mobility Int'l, LLC v. Kersey Mobility, LLC*, No. CV-19-04684-PHX-JJT, 2020 WL 3103945, at *3 (D. Ariz. June 11, 2020) ("The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that <u>they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings</u>.") (quoting Fed. R. Civ. P. 26(b)(1) Advisory Committee's Note (2000 Amendment)) (emphasis added by the court).

[3] As discussed in detail below, Defendants describe as important to their efforts to fight cybercrime their routine amalgamation of the exact information Plaintiffs requested, thus highlighting that information's relevance here.

[4] Defendants fail to acknowledge that Plaintiffs are subject to the same ESI burdens. imposed by searching for such a large number of domain names as well as correspondence with Defendants and their customers. Moreover, because Plaintiffs' claims encompass some 1,241 disputed domains, the "needs of the case" for purposes of assessing proportionality are inherently significant. The alleged burden Defendants assert cannot be assessed in a vacuum.

6

etc.), and an identifier such as the last four digits of a credit card number or a transaction number," so "unless Plaintiffs were to track down each of these transactions from the various banks and credit card companies, the limited information that Namecheap possesses would not be useful to them" while "be[ing] extraordinarily burdensome for Namecheap to manually collect, given the voluminous number of other domains/transactions at issue." *Id.* at 8 (citing Klein Decl. ¶ 4).[5]

(3) "[C]ollecting the complaints or notices of infringement . . . would also be onerous," and as an example, "Namecheap's ESI search for such communications associated with the 1,241 disputed domain names yielded 5,823 results, which counsel spent more than 30 hours reviewing," meaning "the domains of just the one account containing 16,000 domains would likely take about 390 attorney hours," with the total for all relevant accounts taking at least 640 attorney hours over forty fulltime days. *Id.* at 8-9 (citing Klein Decl. ¶¶ 7-8).

Each of these excuses is specious, and the COO of Namecheap, Hillan Klein, has directly contradicted his own declaration testimony through public statements he made during a November 1, 2021 interview about not only Namecheap's capacity to conduct just these kinds of searches but also how Namecheap performs them routinely and automatically. *See generally* Lauridsen Decl. ¶ 2 & Ex. 1. During this interview, Mr. Klein discusses the manners in which Namecheap addresses abuse on its platform. *Id.*

***First,*** Mr. Klein explains how Namecheap has partnered with companies—such as Netcraft and PhishLabs—that allow Namecheap to use in certain cases APIs integrated into Namecheap's systems such that searching for other domain names associated with a user account can be processed ***automatically*** instead of through support tickets that must be processed manually. *Id.* Ex. 1 at 18. Mr. Klein further explains that Namecheap has "***also built a tool that allows us to find related accounts*** so that we can act not only on the

---

[5] Apart from accurate for the reasons explained below, this argument is a red herring. Plaintiffs do not seek to track each transaction but instead to cross-reference common data points to track the same bad actors across multiple accounts.

reported services that we may receive from external parties, *but we can proactively look to see, 'Are there any other abuse domain names associated with that user.'" Id.* at 18-19 (emphasis added). Mr. Klein also explained that about 40% of such activity occurs on Namecheap's own initiative because of how the tools have *dramatically reduced the amount of time spent* for these tasks. *Id.* at 19.

Accordingly, not only does Namecheap have automated tools to track domain names across related accounts, but almost half of the abuse on Namecheap's platforms is investigated in this manner. Thus, Defendants have not shown any undue burden.

***Second,*** Mr. Klein's interview also contradicts Defendants' arguments concerning the difficulty of collecting and producing financial data to allow Plaintiffs to track customers that use a single payment method across multiple accounts to mask the extent of their malicious activities.[6] Although Defendants argue that they do not retain sufficient financial data to perform this task, Mr. Klein explained during his interview that, not only can Defendants conduct this search, but they also can do it automatically:

> **Interviewer:** Yeah, I want to go back to *something you said a few minutes ago about your automated systems to catch people who are doing something that might have other accounts,* for example, with Namecheap. Because one thing in the past I've found – I think, look, *a registrar will take down one domain, but that person -- and maybe they only have one domain in their account, but they use the same payment method or email address in other accounts.* [¶] So are you going in then and saying, OK? This person is clearly a bad actor, I'm going to squash other accounts as well, and what they're doing there?
> **Mr. Klein:** *Yes, so we will look at a number of different variables. It can be payment source,* it can be email address. It can be even perhaps the IP addresses, bad actors' accounts they're using. . . . *But where we do find abuse, we can follow a trail of abuse.* . . . [T]hat's resulting in about 40% of our action coming from those investigations internally . . . .

*Id.* at 23-24 (emphasis added). The interviewer then asks whether Namecheap is "proactively taking action on domains and accounts," to which Mr. Klein replied, "*where there is already a bad actor, I'm looking at their behavior, looking at areas in which we*

---

[6] Defendants fail to mention in their papers whether they maintain billing addresses for their customers, which would provide another data point for cross-referencing accounts.

8

*can find related accounts and more abuse.*" *Id.* 24-25 (emphasis added). In fact, Mr. Klein further highlighted the goal of employing this enforcement process: "[I]t's about getting that time to take action down so that there's no value for a bad actor to use our platform." *Id.* at 35. Such rapid action does not comport with undue burden and lack of relevance.

Accordingly, not only does Namecheap have sufficient payment information to cross-reference users across accounts to discover all of those users' malicious domain names, Namecheap alleges that it already proactively does so through an automated process. Defendants cannot show that this information would be too burdensome to search.

**Third,** Defendants' refusal to search for UDRP complaints and other infringement notices is in plain violation of Defendants' Rule 34 and MIDP obligations. Defendants describe as too onerous the exact process by which nearly all ESI is collected, and Defendants have provided no facts that would allow them to show that this search and production would be onerous.

First, Defendants complain that they would need to electronically collect ESI from the relevant custodians who received emails sent to legal@namecheap.com, perform keyword searches, and then manually review potentially responsive documents. ECF No. 170-2 ¶ 5 This is standard ESI practice. *See, e.g.*, ESI Order, ECF No. 92, at ¶¶ 2, 4(b) (identification of custodians) & 5(a)-(b) (describing using keyword searches followed by a manual review of the resulting documents). And Defendants provide no explanation on the number of potential custodians such that they can claim there is an excess warranting excusing Defendants from the ESI Order's requirements.

Next, Defendants identify one account containing 16,000 domain names. Because searching for communications associated with the 1,241 disputed domain names resulted in 5,823 infringement complaints, Defendants extrapolate that just this one customer account containing 16,000 domain names would take about 390 attorney hours to review, assuming the same ratio of complaints have been lodged against that account. ECF No. 170 at 8-9. By making this argument, Defendants highlight this information's importance: it is notable that there are about five infringement notices or complaints for each of the disputed

9

domain names, a fact that points to Defendants perpetuating a scheme to hide cybercriminals. If there is one account with five complaints/notices for each of 16,000 domain names, that would mean that Defendants have ignored the fact that a single customer has received 80,000 infringement notices and yet, despite allegedly having automated systems to deal with such bad actors, Defendants have taken no action against this account, again highlighting their scheme and making these documents relevant.

Regardless, it is evident from Defendants' papers that they have not even conducted a preliminary search to determine the total population of potentially responsive documents. The account with 16,000 domain names could have a far lower percentage of complaints associated with it—or even none at all. This calculation of 390 hours for this one account is simply a red herring. Similar logic applies to Defendants' speculation concerning the nearly 1,000 customer accounts allegedly associated with the infringing domain names, particularly given that Defendants admit that "most of these accounts only have one or two active domains associated with them . . . ." ECF No. 170-2 ¶ 9.[7] Further, because Defendants refuse to even attempt a search, the parties have not been able to determine whether this purported massive number of hits could be further limited through additional keywords and Boolean search strings.

Simply put, Defendants have not carried their burden to show that the discovery sought is unreasonable, disproportionate to the needs of the case, or overly burdensome.

## III. CONCLUSION

Defendants seek to conceal relevant information concerning the extent of their customers' (and their own) cybersquatting by making vague and unsupported assertions. Moreover, both the relevancy and burden arguments are belied by Defendants' own public statements. Plaintiffs respectfully request that the Court grant their motion to compel.

---

[7] It would be improper for Defendants to attempt to provide additional detail concerning the number of domain names, accounts, or complaints in support of their burdensomeness argument for the first time in their reply. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("district court need not consider arguments raised for the first time in a reply brief").

DATED: December 22, 2021   SNELL & WILMER L.L.P.


By: /s/ *Jacob C. Jones*
David G. Barker
Jacob C. Jones
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

TUCKER ELLIS LLP
David J. Steele
Howard A. Kroll
Steven E. Lauridsen
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223

Attorneys for Plaintiffs,
Meta Platforms, Inc. (fka Facebook, Inc.),
Instagram, LLC, and WhatsApp LLC

11