**ROME & ASSOCIATES, A.P.C.**
Eugene Rome (admitted pro hac vice)
Sridavi Ganesan (admitted pro hac vice)
Brianna Dahlberg (admitted pro hac vice)
2029 Century Park East, Suite 450
Los Angeles, CA  90067
Telephone:   310-282-0690
Facsimile:    310-282-0691
erome@romeandassociates.com
sganesan@romeandassociates.com
bdahlberg@romeandassociates.com

**FENNEMORE CRAIG, P.C.**
Ray K. Harris (No. 007408)
Mario C. Vasta (No. 033254)
2394 E. Camelback Road, Suite 600
Phoenix, AZ 85016
Telephone: (602) 916-5000
rharris@fennemorelaw.com
mvasta@fennemorelaw.com

Attorneys for Defendants and Counterclaimants
Namecheap, Inc. and WhoisGuard, Inc.

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Meta Platforms, Inc., et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>WhoisGuard, Inc., et al.,<br><br>　　　　Defendants.<br> | CASE NO. 2:20-cv-00470-GMS<br><br>**DEFENDANTS' REPLY IN SUPPORT OF BRIEF RE: PLAINTIFFS' REQUESTS FOR ADDITIONAL DOMAIN NAME DATA AND PAYMENT INFORMATION** |
| WhoisGuard, Inc., et al.,<br><br>　　　　Counterclaimants,<br><br>　v.<br><br>Meta Platforms, Inc.,<br><br>　　　　Counterclaim Defendant. | |

# REPLY MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

In their Opposition brief, Plaintiff and Counterclaim Defendant Meta Platforms, Inc. ("Facebook") and Plaintiffs Instagram, LLC and WhatsApp LLC (collectively, "Plaintiffs") complain that Defendants and Counterclaimants Namecheap, Inc. ("Namecheap") and WhoisGuard, Inc. ("WhoisGuard") (collectively, "Defendants")are "stonewalling" their discovery efforts.  These accusations are without merit and are ironic coming from Plaintiffs, who have still produced *no internal documents* at all in the litigation. By contrast, Defendants have produced their responsive data and communications related to the 1,241 disputed domain names. Plaintiffs now seek to unduly burden Defendants with a massive ESI search for data related to tens of thousands of domain names that are not even at issue in the case, which Defendants have demonstrated would take at least 640 attorney hours to review (which would cost $336,000, at a rate of $525.00 per hour). Plaintiffs have failed to demonstrate that their requests are relevant or proportional to the needs of the case.

Contrary to Plaintiffs' arguments, the measures that Namecheaptakes to combat abuse on its platform do not demonstrate that Namecheap "routinely and automatically" performs such searches.Plaintiffs rely on a recent podcast interview in which Namecheap's COO, Hillan Klein, explained how Namecheap employs automated tools and other measures so that abusive domains arenow taken down within minutes, as opposed to hours. *See* Ex. 1 to Lauridsen Decl. (Doc. 176-2) at 18-19, 22:14-15. Mr. Klein's statements in the interview do not contradict his declaration testimony. Namecheap's use of an automated tool to identify malicious accounts linked to known bad actors is obviouslya very different task than collecting and reviewing the information requested by Plaintiffs for litigation purposes.

Plaintiffs argue that the requested data is relevant to Defendants' "own" cybersquatting. However,the other domain names registered *by the customers*bears no possible relevance to proving *Defendants'* bad faith.  Indeed, settled Ninth Circuit

precedent holds that there is no requirement for domain name registrars to "analyze [their] customer's subjective intent with respect to each domain name," as this would be an "impossible task."*Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 737 F.3d 546, 553 (9th Cir. 2013); *AMPAS v. GoDaddy.com, Inc.*, Case No. CV 10-03738 AB (CWx), 2015 WL 5311085, at *47 (C.D. Cal. Sept. 10, 2015) (quoting same language);*Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 966 (C.D. Cal. 1997), *aff'd on other grounds*, 194 F.3d 980 (9th Cir. 1999) ("a domain name registrar, has no affirmative duty to police the Internet in search of potentially infringing uses of domain names").

Plaintiffs ignore this holding from the Ninth Circuit's opinion in *Petroliam Nasional*. Instead, they improperly rely on two out-of-jurisdiction district court cases from the Southern District of Florida that are also factually distinguishable because they involved registrars who were *themselves*alleged to have selected and owned the infringing domain names at issue. *See**Dell v. BelgiumDomains*, No. 07-22674-CIV, 2007 WL 6862342, at *10, ¶ 18 (S.D. Fla. Nov. 21, 2007) &*Transamerica v. Moniker Online Services*, 672 F. Supp. 2d 1353, 1366 (S.D. Fla. 2009).By contrast, here there are no allegations that Defendants selected or owned any of the disputed domain names. Even if the information regarding other domain names offered some evidence that of the *customers'* bad faith intent to profit, Plaintiffs cannot impute any such bad faith to Defendants, who are service providers with millions of domain names under management.

Accordingly, the Court should deny Plaintiffs' motion to compel.

II.     **ARGUMENT**

A.     **Plaintiffs Do Not Dispute that Defendants Have Already Produced the Customer Contact Information Associated with Each Disputed Domain**

With respect to Plaintiffs' request for "all contact and account information provided by each customer," Defendants noted in their initial brief that they had already produced the customer contact information for each of the 1,241 disputed domains identified by Plaintiffs *before* Plaintiffs initiated this discovery dispute.Defs.' Br. (Doc. 170) at 9. Defendants identified the Bates numbers of the documents containing this information. In

their Opposition, Plaintiffs do not deny that this information was already produced. DahlbergDecl. (Doc. 170-1) at ¶ 8. The Court should therefore deny this portion of Plaintiffs' motion to compel.

### B. Plaintiffs Have Failed to Show That Information Regarding Other Domain Names Not at Issue in the Case Is Relevant

#### 1. Plaintiffs Have Failed to Demonstrate that the Requested InformationIs Relevant to Defendants' "Own" Alleged Cybersquatting

In their Opposition, Plaintiffs completely ignore the holdingin *Petroliam Nasional*cited by Defendants, in which the Ninth Circuit held that registrars are simply not responsible for policing domains registered by their customers for trademark infringement.The basis for this holding was that because domain registrars like Namecheap register millions of domains, requiring them to "analyze [their] customer's subjective intent with respect to each domain name" would be an "impossible task." *Petroliam Nasional*, 737 F. 3d at 553; *see also**AMPAS v. GoDaddy.com, Inc.*, 2015 WL 5311085, at *52 (noting that the fundamental problem with AMPAS' "theory of liability" is that it "would impose upon GoDaddy (and presumably any other company offering parking, hosting, or other basic internet services) the unprecedented duty to act as the internet's trademark police. The ACPA did not impose such sweeping obligations.").As such, because Namecheap has no duty to monitor their customers' domainsfor potential trademark infringement as a matter of law, the other domains not at issue in this litigation that are registered by those customers are simply not relevant to establishing *Defendants'*bad faith intent to profit.

Plaintiffs'attempt to distinguish *AMPAS* as somehow being different from the facts in this case, also fails. Like here, *AMPAS*involved a domain name registrar with millions of domains under management, as well as plaintiffs attempting to hold that registrar liable for its customers' cybersquatting.Plaintiffs claim that this case is unlike *AMPAS* because Namecheap is alleged to have registered a number of domains in the case. However,Plaintiffs merely allege that Defendants "registered" the domains in the course of WhoisGuard providing its proxy service. *See* FAC (Doc. 56) ¶ 13. Within the meaning of

the ACPA, "[t]he word 'registers,' when considered in context, obviously refers to a person who presents a domain name for registration, not to the registrar." *Lockheed Martin Corp. v. Network Solutions, Inc.*, 141 F. Supp. 2d 648, 655 (N.D. Tex. 2001) ("*Lockheed II*"). Here, there is no allegation that Defendants selected to register any of the allegedly infringing domain names. Further, like GoDaddy in *AMPAS*, Namecheap is not alleged to have owned any of the allegedly infringing domains. *AMPAS*, 2015 WL 5311085, at *47 As such, Namecheap cannot be deemed to have "registered" its customers' domains.

Plaintiffs further argue that *AMPAS* is distinguishable because here, Plaintiffs alleged that Defendants engaged in a deliberate scheme "to attract cybersquatters to use their services to infringe trademarks[.]" Plaintiffs cite *Transamerica* and *Dell* as support for the proposition that allegations of operating a deliberate scheme are "sufficient to survive a motion to dismiss," but their reliance is misplaced. This is a discovery dispute, not a motion to dismiss. Moreover, these cases are out-of-jurisdiction and were decided before *Petroliam Nasional*. They are also distinguishable on their facts, as, in those cases, the disputed domains were selected and owned by the registrars themselves rather than customers whereas, here, the customers selected and owned the infringing domains. *See Dell v. BelgiumDomains*, 2007 WL 6862342, at *10, ¶ 18 & *Transamerica v. Moniker Online Services*, 672 F. Supp. 2d at 1366. In short, nothing about *Transamerica* and *Dell* opinion suggests that the massive amount of requested documents and information related to other domain names that are not at issue here is relevant or proportional to the needs of the case.

Plaintiffs next argue that the Court's denial of Defendants' motion to strike certain allegations about cybercrime shows the relevance of the requested discovery. But the Court's denial of Namecheap's motion to strike is also irrelevant to this discovery dispute. Contrary to Plaintiffs' argument, compelling lists of other domains registered by customers that registered domains allegedly infringing Plaintiffs' marks would show nothing about Defendants' awareness of "the level of cybercrime occurring on Defendants' platforms," given that Namecheap has millions of domains under management and has no duty as a

matter of law to review domains that its customers select prior to registration.

> 2. *To the Extent Plaintiffs Rely on Section 3.7.7.3, the Customers' Other Domains Would, at Best, Only Be Relevant for a Tiny Percentage of the Domains at Issue, Not All 1,241 Domains*

For the first time, Plaintiffs also argue that identification and related information of the other domains registered by customers that also registered the 1,241 domains allegedly infringing Defendants' marks are relevant because they have "a direct bearing" Defendants' alleged liability under RAA § 3.7.7.3[1] for their customers' allegedly infringing acts. But even assuming that RAA § 3.7.73 applied, this liability would at best only bear upon atiny percentage of the 1,241 domains at issue: specifically, only to those domain names for which Plaintiffs provided "reasonable evidence of actionable harm" to WhoisGuard, **and** for which WhoisGuard did not provide the identity of the licensee within seven days thereafter. Here, there are only 46 domains which Plaintiffs have identified as ones which WhoisGuard allegedly did not provide licensee information within seven days. FAC at ¶ 122. This represents only 3.7%[2] of the domains at issue, which means Plaintiffs' argument does not even apply to the remaining 96.7% of the allegedly infringing domains.

Moreover, Plaintiffs' belief that the other domain names registered by these customers will show evidence that the customers were repeat infringers is mere conjecture. Finally, the "registration or acquisition of multiple domain names" that infringe the marks

---

[1] The "RAA" is the Registrar Accreditation Agreement between Namecheap and the Internet Corporation of Assigned Names and Numbers. Section 3.7.7.3 of the RAA provides, in relevant part, that "A Registered Name Holder licensing use of a Registered Name according to this provision shall accept liability for harm caused by wrongful use of the Registered Name, unless it discloses the current contact information provided by the licensee and the identity of the licencess within seven (7) days to a party providing the Registered Name Holder reasonable evidence of actionable harm."

[2] This percentage would be even smallerif one takes into account the fact that, to date, Plaintiffs have failed to provide any evidence that they provided WhoisGuard with "reasonable evidence of actionable harm" in association with the 46 identified domains.

of others is just one of nine permissive statutory *factors* that courts *may* consider in evaluating whether the customer registered the domain name at issue with a "bad faith intent to profit." *See* U.S.C. § 1125(d)(1)(B)(i).

As such, the information's potential relevance, if any, would be minimal. As demonstrated below, the marginal "importance of the discovery in resolving the issues" is outweighed by the burden or expense in obtaining the discovery. *See* Fed. R. Civ. P. 26(b)(1).

### C.     Plaintiffs Have Failed to Show That Information Regarding Domains Not at Issue in the Case Is Proportional Under Rule 26(b)(1)

Even if the Court were to determine that discovery of the other domains not at issue in this case is relevant, Plaintiffs have failed to effectively refute Defendants' argument that this discovery is not proportional to the needs of the case because its burden or expense outweighs any likely benefit. Defendants have produced evidence quantifying the difficultly and expense to Defendants in order to meet Plaintiffs' discovery demands. Plaintiffs' assertion that Defendants have provided "no facts" is simply not correct. Opp. at 9.

In support of their position, Plaintiffs largely rely on an interview given by Namecheap's COO Hillan Klein in which he describes how Namecheap has automated systems and tools in place to detect abuse and to find related accounts associated with a known bad actor by looking at a number of variables, including "payment source" and email address. Ex. 1 to Lauridsen Decl. (176-2) at 23-24. Despite Plaintiffs' assertions, Mr. Klein's interview does not contradict his declaration testimony submitted in support of Defendants' brief.

First, the fact that Namecheap has systems that automatically identify potential abuse does not contradict Mr. Klein's testimony that the specific information requested by Plaintiffs here would have to be pulled manually. Using tools to detect related malicious accounts is not the same thing as compiling the lists of information and correspondence that Plaintiffs request now for over 16,000 domain names. The former task simply involves

banning a user; while the latter task involves working closely with counsel and an e-discovery vendor to (i) electronically collect potentially relevant ESI from multiple sources, (ii) design and conduct searches to capture responsive information, (iii) have attorneys manually review the "hits," and (iv) prepare the responsive documents for production according to the format in the parties' stipulated ESI protocol. *See* Klein Decl. (Doc. 170-2) at ¶ 5; Stipulated Order Re: Discovery of ESI (Doc. 92).

Second, although the use of certain tools has made it more efficient to identify other abusive domains owned by a bad actor, the interview does not discuss how much time it would take to find all the information sought by Plaintiffs here for the nearly 1,000 customer accounts at issue, and therefore does not contradict Mr. Klein's testimony.

Third, Mr. Klein's interview statements that payment *source* or *method* can be used in conjunction with other information to identify related malicious accounts via an automated system does not contradict Defendants' arguments that Namecheap only retains limited payment information (*i.e.*, form of payment and transaction identifier—not billing contact information or full credit card numbers). Nor do Mr. Klein's statements contradict Defendants' arguments that such limited information would not help Plaintiffs identify the true identities of customers who registered domains under fake names.

Tellingly, Plaintiffs do not even respond to Defendants' argument that Plaintiffs' stated need for the payment information to identify customers is simply not credible, given that the only defendants named in the case are the service providers, *i.e.,* Namecheap and WhoisGuard. Not one of the customers has been added as a defendant, despite Defendants producing the customers' contact information to Plaintiffs months ago. *See* Dahlberg Decl. (170-1), ¶ 8 (identifying Bates numbers where contact information was produced). Therefore, Plaintiffs' stated need for customer payment information is questionable.

Finally, Plaintiffs fail to refute Defendants' evidence regarding the burden of conducting an ESI search to identify all notices and complaints related to the tens of thousands of other domains. Defendants have extrapolated the anticipated number of "hits" and the time for review based on the ESI review they have conducted to date in this case.

Plaintiffs contend that the large number of estimated hits only "highlights the information's importance" because it shows there must have been a large number of infringement complaints. However, Plaintiffs misunderstand that the 5,823 hits in the prior search represent *all correspondence* related to the domain names (not just infringement complaints). All of the correspondence mentioning the domains would need to be reviewed to determine whether they contain a responsive complaint or notice. In short, not all "hits" are responsive documents, let alone infringement notices.

Plaintiffs suggest in their Opposition that the receipt of a notice of infringement (or even multiple notices) does not mean that the infringement allegations in the notices are credible. Plaintiffs and other overzealous brand protection companies are known to use automated bots to spam Namecheap and other registrars with boilerplate notices of infringement, when there is no real infringement. *See* Ex. 1 to Lauridsen Decl. at 16-17; *see also* Ex. 1 to Ganesan Decl. filed herewith (10/21/2018 Ltr from domain registrar Tucows, Inc. to ICANN regarding 1,273 notices received from Facebook's brand protection partner AppDetex for domains like "linolnstainedglass.com" and "griffinstafford.com," which were presumably included because they contain a portion of Facebook's trademark "Instagram," and noting that Tucows is considering banning AppDetex as a vexatious reporter). Plaintiffs also incorrectly assume the existence of multiple infringement notices for other domains would mean that "no action was taken" against the customer accounts in the lawsuit (*see* Opp. at 10), when in fact many accounts were suspended by Namecheap on its own initiative prior to this lawsuit.

Plaintiffs also argue that Defendants cannot know whether the search would be burdensome because they "refuse to even attempt a search," but this argument misses the point. Collecting the data and conducting the search would be massively expensive, given the large number of other domains encompassed within the requests (*i.e.*, 16,000 in one account alone). Again, these are other domain names that *are not even at issue* in the case.

### III.   CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion to compel.

Dated: December 29, 2021     **ROME & ASSOCIATES, A.P.C.**


By: ___*s/ Brianna Dahlberg*___
      Eugene Rome
      Sridavi Ganesan
      Brianna Dahlberg

And

**FENNEMORE CRAIG, P.C.**

Ray K. Harris
Mario C. Vasta

Attorneys for Defendants and Counterclaimants Namecheap, Inc. and WhoisGuard, Inc.